UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                                    CASE NO. 3:13-cr-141-J-32JRK

SHELTON THOMAS BELL

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States, through its undersigned Assistant United States Attorney and its undersigned Trial Attorney from the Counterterrorism Section of the National Security Division, Department of Justice, files this Sentencing Memorandum.[1]  The Government requests that the Court sentence the defendant, Shelton Thomas Bell ("Bell"), to 30 years in prison followed by a lengthy term of supervised release to insure appropriate recognition of the seriousness of Bell's crimes, to provide adequate deterrence, and to insure the public's safety from a terrorist who, but for the intervention of Jordanian immigration authorities, likely would have joined a designated Foreign Terrorist Organization.[2]

I.    INTRODUCTION

On September 25, 2012, after months of physical training and mental preparation, after listening to hundreds of lectures by confirmed-terrorist Anwar

---

[1] This sentencing memorandum is filed in accordance with this Court's Order (Doc. No. 46).  In accordance with the Order, the Government also is filing a sealed supplement that supplements certain sections of this sentencing memorandum.

[2] When available, citations are included to the most recent copy of Bell's Presentence Report dated June 19, 2014.  To the extent not included in Bell's Presentence Report, the Government will be prepared to offer proof of all factual representations set forth in this Sentencing Memorandum at the Sentencing Hearing.

al-Awlaki, after recruiting a network of impressionable juveniles from a local mosque, and after stealing money and a computer, Shelton Bell was ready. His sole intent was to turn radical ideology into violent action.

That morning, he and a juvenile recruit boarded a plane at the Jacksonville International Airport and embarked on an intended, one-way journey to the country of Yemen. Once there, Bell would heed the call of his virtual teacher and mentor, al-Awlaki, and assume his spot with Ansar al-Sharia, an avowed enemy of the United States and a designated Foreign Terrorist Organization responsible for hundreds of murders. Bell would fulfill his self-proclaimed purpose of becoming an accomplished jihadist and participating in the widespread slaughter, maiming, and killing of other people in an effort to overthrow existing governments that he deemed blasphemous and illegitimate.

Fortunately, Bell's murderous attempt fell short when Jordanian authorities apprehended him for overstaying his visa. Instead of making it to the front lines of jihad, Bell, at the Government's expense, returned to his home in Jacksonville. Now, as a convicted terrorist, Bell faces the just sentence of this Court. The Court must determine an appropriate sentence—one that is sufficient, but not greater than necessary, to provide just punishment, to deter Bell and other would-be terrorists from doing the same thing, and, most importantly, to protect the public from the very real threat that Bell and those like him represent.

## II.    THE STATUTORY SENTENCES AVAILABLE

Bell stands convicted of conspiring to provide material support to terrorists and attempting to provide material support to terrorists—two separate violations of 18 U.S.C. § 2339A.   The deaths Bell intended never materialized, so the Court can impose a sentence of not more than 15 years imprisonment, a fine of not more than $250,000, or both the imprisonment and fine for each count of conviction.  18 U.S.C. §§ 2339A(a) and 3571(b)(3).[3]  The cumulative, available sentence for both counts is imprisonment for 30 years, fines of $500,000, or both. See 18 U.S.C. § 3584(a).

In addition, because these are terrorism offenses, normal supervised release terms do not apply. Instead, the Court can sentence Bell to supervised release for any term of years up to life.  18 U.S.C. § 3583(j).[4]

## III.    THE ADVISORY GUIDELINE RANGE

Because of the seriousness of Bell's conduct—taking all steps necessary to join a well-known terrorist organization—and the obvious danger Bell represents to society (both here and abroad), Bell's guidelines are "off the chart." With a total offense level of 43 and a criminal history category of VI, his advisory sentencing range is not a range, but a well-earned recommendation of life in

---

[3] Under 18 U.S.C. § 2339A(a), if Bell had succeeded in actually killing others, the penalty would be "any term of years or for life."  18 U.S.C. § 2339A.

[4] 18 U.S.C. § 3583(j) provides for lifetime supervised release for any offense listed in 18 U.S.C. § 2332b(g)(5)(B).  That list includes section "2339A (relating to providing material support to terrorists)." 18 U.S.C. § 2332b(g)(5)(B).

prison.  Pre-sentence Report, at 18 ¶ 97.[5]  However, the statutory maximum sentence caps Bell's exposure at 30 years, so the advisory guideline range becomes 30 years.[6]  USSG §5G1.2(b).  The Sentencing Commission rightly believes a 30-year sentence is the sentence someone like Bell deserves, and 30 years is the sentence that the United States, with the strongest plea on behalf of her citizens, requests the Court to impose.

In reaching the advisory recommendation, the Probation Officer correctly determined the base offense level was 33 pursuant to USSG §2A1.5(a).  The Probation Officer then applied three guideline adjustments to reach an adjusted offense level of 49.  These calculations are well-founded and well-supported by the evidence.  Bell, however, objects to the cross reference the Probation Officer used as well as the appropriateness of a leadership-role adjustment.[7]  These matters are discussed below.

A.    The Base Offense Level

The Probation Officer correctly determined that defendant's base offense level is found in USSG §2A1.5(a).  Defendant objects to using USSG §2A1.5(a)

---

[5] The Pre-sentence Report will subsequently be referenced as "PSR."  Because the final PSR was not prepared at the time of this memo, the page and paragraph references are to the PSR circulated to the parties on June 19, 2014.

[6] To some extent, the charges make the Court's decision easier.  Bell, of course, potentially could have been charged with discharging a firearm in furtherance of a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(iii) or the actual conspiracy he tried to support in violation of 18 U.S.C. § 956.  In either of those scenarios, Bell's advisory guideline range would have been life, not 30 years.

[7] Bell's guideline objections are somewhat academic.  If the Court agreed with both of Bell's objections, Bell's total offense level would be 37, and his criminal history category would be VI.  That would yield an advisory range of 360 to life, instead of life.  However, because the statutory maximum is 30 years, Bell's advisory range would be 30 years under either calculation.

and, instead, urges the Court to use USSG §2M5.3.  The Probation Officer's calculation is correct.

When determining the appropriate guideline section to use, the Court first must locate the offense of conviction in the cross references contained in the USSG Statutory Index (Appendix A).[8]  USSG §1B1.2(a).  For violations of 18 U.S.C. § 2339A, the Statutory Index provides cross references to two guidelines: USSG §2X2.1 (Aiding and Abetting) and USSG §2X3.1 (Accessory After the Fact).  USSG App. A.  Between these two, USSG §2X2.1 is appropriate here.

That guideline states, "The offense level is the same level as that for the underlying offense."  USSG §2X2.1.  The commentary makes clear that "in the case of a violation of 18 U.S.C. § 2339A …'underlying offense' means the offense the defendant is convicted of having materially supported … prior to or during its commission."  USSG §2X2.1, comment. (n.1).

The only other potential cross reference to 18 U.S.C. § 2339A from the Statutory Index is USSG §2X3.1, a guideline titled "Accessory After the Fact."  USSG §2X3.1.  The commentary shows that this latter section is inapplicable here.  Namely, "[i]n the case of a violation of 18 U.S.C. § 2339A, 'underlying offense' means the offense the defendant is convicted of having materially supported **after** its commission (i.e., in connection with the concealment of or an escape from that offense)."  USSG §2X3.1, comment. (n. 1) (emphasis supplied).

---

[8] Normally, USSG §2X1.1 covers conspiracies and attempts.  USSG §1B1.2.  However, by its express terms, USSG §2X1.1 does not apply to federal crimes of terrorism under 18 U.S.C. § 2339A.  USSG §2X1.1(d)(1)(A).

Clearly, between USSG §2X2.1 and USSG §2X2.3, Bell's applicable guideline is USSG §2X2.1.  The indictment charges Bell with, and Bell pled guilty to, actually conspiring and actually attempting to violate 18 U.S.C. §  2339A, not trying to cover up those violations.  See Doc. 1.

Once the Court correctly looks to USSG §2X2.1, that section directs the Court to apply the same offense level applicable to the underlying offense—the "offense the defendant is convicted of having materially supported."  USSG §2X2.1, comment. (n.1).  In this case, the underlying offense that Bell is guilty of conspiring and attempting to support is a conspiracy to kill, kidnap, maim, or injure persons or damage property in a foreign country, a violation of 18 U.S.C. § 956.  Doc. 1, at 3 and 12.  The guideline applicable to that offense is USSG §2A1.5, titled "Conspiracy or Solicitation to Commit Murder."  See USSG App. A. The base offense level provided by that guideline is 33.  USSG §2A1.5(a).  The Probation Officer, therefore, is correct.

Defendant, however, argues that the proper cross reference is the guideline provided by USSG §2M5.3.  While that guideline does involve a material support offense, that guideline applies to material support offenses under 18 U.S.C. § 2339B, not material support offenses under 18 U.S.C. § 2339A.  The Statutory Index discloses that the applicable guideline for a conviction under 18 U.S.C. § 2339B is USSG §2M5.3, while the applicable guideline for a conviction under 18 U.S.C. § 2339A is either USSG §2X2.1 or USSG §2X3.1.  See USSG App. A.  Accordingly, defendant's suggested use of

section 2M5.3 runs afoul of USSG §1B1.2's directive that the Court "[r]efer to the

Statutory Index (Appendix A) to determine the Chapter Two guideline, referenced

in the Statutory Index for the offense of conviction."  USSG §1B1.2(a).

The Government knows of only one Court that has considered defendant's

argument, and that Court rejected it. See United States v. Hassan, 5:09-CR-216-

FL-7, 2012 WL 147952 (E.D.N.C. Jan. 18, 2012).  There, the Court explained,

> Defendant Hassan objects to a base level
> offense of 33. He contends that under USSG §
> 2M5.3, the base offense level should be 26. …
>
> USSG § 2X3.1 [sic] provides that for aiding and
> abetting, the offense level is the same as that for the
> underlying offense. The application note specifically
> references § 2339A, and provides that "underlying
> offense" for violation of that statute means "the
> offense the defendant is convicted of having
> materially supported or provided or collected funds
> for, prior to or during its commission." As the officer
> noted, the sentencing authority then looks to the base
> offense level for § 956(a) which, according to § 2A1.5,
> is 33.
>
> Case law implicitly suggests that § 2X1.1 [sic]
> is the correct guideline to apply for § 2339A. Cf.
> United States v. Abu Ali, 528 F.3d 210, 264 (4th
> Cir.2008) (citing § 2X1.1 in discussing sentencing of
> defendant convicted of § 2339A); United States v.
> Stewart, 590 F.3d 93, 177–78 (2d. Cir.2009) (citing §
> 2X1.1 in the context of a conviction for § 2339A). The
> court discerns no authority suggesting that § 2M5.3
> should be applied instead of § 2X1.1 [sic]. Cf. United
> States v. Chandia, 514 F.3d 365, 370–71 (4th
> Cir.2008) (citation of § 2M5.3 in the context of a case
> where defendant was acquitted of § 2339A).

Id. at *2.  This Court should follow the same reasoning, apply the plain language

of the Sentencing Guidelines, and reject defendant's argument that the base

offense level should be 26.  The Probation Officer correctly determined a base offense level of 33.

**B.    Terrorism Adjustment**

The Probation Officer correctly applied a 12-level increase under USSG §3A1.4.  That guideline provides both a 12-level increase to the base offense level and a required criminal history category of VI when the "offense is a felony that involved, or was intended to promote, a federal crime of terrorism."  USSG §3A1.4.  The phrase "federal crime of terrorism" is defined by reference to the statutory definition of that phrase in 18 U.S.C. § 2332b(g)(5).  Id., comment. (n.1).  Thus, in deciding whether a particular crime is a federal crime of terrorism for purposes of the 3A1.4 adjustment, the Court must look to the statutory definition of the phrase "federal crime of terrorism" in 18 U.S.C. § 2332b(g)(5). That definition lists two elements that make an offense a federal crime of terrorism; namely, the offense "(A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and (B) is a violation of" another enumerated statute.  18 U.S.C. § 2332b(g)(5).  See United States v. Garey, 546 F.3d 1359, 1361 (11th Cir. 2008) (outlining two elements required to make an offense a federal crime of terrorism). The other enumerated statutory violations that satisfy the second element include violations of 18 U.S.C. § 2339A.  See 18 U.S.C. § 2332b(g)(5).

Using this two-prong test, the first element—whether Bell's crimes were "calculated to influence or affect the conduct of government by intimidation or

coercion, or to retaliate against government conduct"—is very much present here.  When considering this element, the Court must focus on "what the activity was calculated to accomplish, not what the defendants' claimed motivation behind it was."  See United States v. Jayyousi, 657 F.3d 1085, 1115 (11th Cir. 2011).  Bell minimally sought to provide aid in overthrowing the legitimate government of Yemen and to eventually see black flags of jihad flying over the capitals of the United States, Canada, and other ally nations.  In Jayyousi, the Eleventh Circuit upheld the terrorism adjustment when defendants' "support activities were intended to displace 'infidel' governments that opposed radical Islamist goals."  Id.  Much like Bell, the defendants in Jayyousi expressly spoke of "their desire to impose Sharia, toppling existing governments in the process." Id.  Bell's conduct articulated in the PSR as well as what he admitted in the factual basis for his plea agreement demonstrate far more intent to influence, affect and retaliate against governments than the intent of the defendants chronicled in Jayyousi.

Turning to the second element—an enumerated statutory violation, an actual conviction of one of the 2332b(g)(5)-enumerated violations is not required. See United States v. Mandhai, 375 F.3d 1243, 1247-48 (11th Cir. 2004).  Both of Bell's convictions are enumerated violations, though, so the second element is present by definition.  See Jayyousi, 657 F.3d at 1115 (enumerated felony element satisfied in case involving 2339A charges because those charges "are among the specified statutes that can give rise to a federal crime of terrorism").

The Probation Officer, therefore, correctly applied the terrorism adjustment to Bell in this case.  Bell does not oppose the adjustment.

### C.    Use-of-Minor Adjustment

The Probation Officer also correctly applied a two-level increase under USSG §3B1.4 for Bell's use of a minor to commit the crime.  That guideline provides a two-level increase "[i]f the defendant used or attempted to use a person less than eighteen years of age to commit the offense or assist in avoiding detection of, or apprehension for, the offense."  USSG §3B1.4.  The operative phrase "used or attempted to use" is defined by illustration in the guideline commentary and "includes directing, commanding, encouraging, intimidating, training, procuring, recruiting, or soliciting" a minor.  USSG §3B1.4, comment. (n.1).  When a defendant like Bell uses or attempts to use multiple minors, "an upward departure may be warranted."  Id. at (n.3).  See United States v. Camacho, 2000 WL 534231, No. 99-1660 (2nd Cir. May 2, 2000) (unpublished) (affirming four-level upward departure for use of multiple minors).

Thankfully, no reported decisions address the use-of-minor adjustment in a case in which a defendant encouraged minors to join international terrorist organizations and attempted to use them to publish propaganda to encourage more minors to do the same.  The general case law, though, is well-settled.

The adjustment applies whenever a minor is used, regardless of defendant's actual knowledge of the minor's true age.  United States v. McLain, 252 F. 3d 1279, 1286-87 (11th Cir. 2001).  The minor's status as a conspirator,

moreover, will not prevent the adjustment.  See id., 252 F.3d at 1286 (noting that applying adjustment regardless of defendant's actual knowledge of age does not penalize innocent conduct because "defendants have no right to solicit or conspire with others (no matter what their ages) to commit crimes").

When the minor is a conspirator, mere partnership with the minor, standing alone, does not trigger the adjustment.  Rather, the defendant must take "some affirmative act to involve the minor in the criminal activity."  United States v. Taber, 497 F.3d 1177, 1180-81 (11th Cir. 2007).  When affirmative acts exist, the adjustment applies regardless of how culpable the minor was in the criminal plan.  Id.  While many affirmative acts are possible, "the 'unambiguous legislative design of section 3B1.4 is to protect minors as a class from being solicited, procured, recruited, counseled, encouraged, trained, directed, commanded, intimidated, or otherwise used to commit crime.'" United States v. Futch, 518 F.3d 887, 896 (11th Cir. 2008) (quoting United States v. McLain, 252 F.3d 1279, 1286 (11th Cir. 2001)); see also USSG §3B1.4, comment. (n.1).

The Probation Officer correctly applied the adjustment to Bell in this case. Bell does not contest the adjustment.

### D.    Leadership Adjustment

The Probation Officer correctly applied a two-level increase under USSG §3B1.1(c) for Bell's leadership role.  Bell opposes this adjustment.[9]

---

[9] In large part, this objection is academic.  If the Court initially uses the correct cross reference, Bell's total offense level would be 43 (with a range of "life"), even without the leadership role adjustment.  And, if the Court initially uses the incorrect cross reference Bell suggests, Bell's total offense level would be 37 (with a range of "360-life"), even without the leadership role adjustment.

USSG §3B1.1(c) provides a two-level adjustment when "the defendant was an organizer, leader, manager, or supervisor in any criminal activity..."   The Government must establish the propriety of this adjustment by a preponderance of the evidence.  See, e.g., United States v. Pringle, ___ F.3d ___, 2014 WL 3034039, *2 (11th Cir. 2014); United States v. Yates, 990 F.2d 1179, 1182 (11th Cir. 1993).

When considering the adjustment, the "[f]actors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others."  USSG §3B1.1, comment. (n.4).  Also, "[t]he assertion of control or influence over only one individual is sufficient to support the role enhancement."  United States v Mandhai, 375 F.3d 1243, 1248 (11th Cir. 2004).

Here, the defendant's organization, leadership, management, and supervision of minors provide ample support for the adjustment.  As noted in the PSR, the defendant "was speaking with the children who attended the mosque and teaching them things about the Muslim faith that were not legitimate."  PSR, at 5 ¶9.  Bell initiated discussions with juveniles about, and introduced at least one juvenile to, the teachings of al-Awlaki.  PSR, at 5 ¶12.  Bell suggested "that they go to Yemen to conduct 'violent jihad,'" since al-Awlaki was the leader of

Ansar al-Shari'a there.  PSR, at 6 ¶14.  Bell inspired others with the teachings of al-Awlaki as well.  Doc. 38, Factual Basis, at 2.  Bell devised the original plan of going to Yemen on a student visa, but because the juvenile was too young, that plan never worked.  PSR, at 6 ¶15.  Bell further encouraged the juvenile and others by watching al-Awlaki videos and looking at images of dead Muslims.  PSR, at 6 ¶16.  Bell, moreover, facilitated the juvenile's travel by purchasing the juvenile's airfare.  Doc. 38, Factual Basis, at 5-6.

The group also used Bell's home as a base of operations, where they engaged in firearms training in an adjacent field selected by Bell.  PSR, at 6 ¶17.  Bell provided the weapon and the ammunition for this training.  Bell also provided instructions on proper firearm handling, aiming, and discharge.  Bell "instruct[ed] [the juvenile] and the other individual on how to emulate battlefield postures and he ordered them to lie down on the ground when they heard a plane flying overhead."  PSR, at 7 ¶18.  Indeed, during some of this battlefield training, and on a video clip the Government will play at the hearing, Bell is referenced as "the commander."   Bell supervised the target practice, including taping an American flag to the silhouette of the person on the wooden board the group was using as a target to signify his war against the United States Government.  Doc. 38, Factual Basis, at 4.

In addition, the entire clandestine cemetery mission in which Bell and another individual inflicted $17,000 of damage to statues of Jesus clearly was planned and led by Bell.  Bell provided the equipment, the weapon, the

transportation, and the plan for this "training mission."  Throughout the operation, Bell clearly provides instructions to the other participant.  This incident, on its own, provides ample support for the role adjustment here.  A number of Bell's instructions and commands during this incident will be played at sentencing, and the Court will hear real-time audio of Bell issuing commands to another.

Another example of Bell's leadership is the purpose for the recordings he made of the group's training.  Bell "intended for another individual to upload the recordings to the internet to show that a person like Bell had gone before to fight and participate in violent jihad and to recruit others in joining and emulating him." Doc. 38, Factual Basis, at 3.

In sum, ample proof supports the Probation Officer's role adjustment in this case.  Bell planned and organized the charged crime; Bell recruited others to join the crime; and Bell used and controlled a juvenile, as the juvenile would have been unable to purchase his own transportation to the Middle East without Bell. See Mandhai, 375 F.3d at 1248 (upholding leadership adjustment in terrorism case involving plans to blow up electrical transformers when "[defendant] recruited [a coconspirator] into the plot, prompted him to purchase weapons, and briefed him on the bombing plan. Nothing more was required.").

Bell objects to the adjustment, though, by claiming that he and the juvenile were close in age and that the juvenile took a more commanding role while overseas.  The Government disagrees for a number of reasons.

First, Bell's objection focuses solely on the juvenile who traveled, but ignores other participants. As noted above, a preponderance of the evidence shows that Bell led more people than just the traveling juvenile.

Second, Bell was nearly two years older than the juvenile in question, so the suggestion that the two were close in age is debatable. More importantly, age disparity is not a factor that determines who occupies a leadership role. See Mandhai, 375 F.3d at 1250 (approving leadership adjustment when defendant was "the only teenager involved" and the other participants were "seasoned adults"). Indeed, the participant that Bell led in the July-4-armed assault on Jesus statues was four-and-a-half years older than Bell.

Third, the Government disputes that the juvenile took a commanding role once Bell and the juvenile reached the Middle East. The juvenile clearly became more involved in operations at that point. Bell and the juvenile stayed with a member of the juvenile's family for a period of time, and the juvenile was the only one who knew how to speak and translate Arabic. Nonetheless, coordinating physical lodging and translating do not equate to leadership. Bell continued to direct the overall plan.

Finally, even if the Court agreed that the juvenile exerted some level of leadership when the two reached the Middle East, under Eleventh Circuit precedent, both individuals in a two-person conspiracy can receive role enhancements if they managed or organized different aspects of the conspiracy. United States v. Yeager, 331 F.3d 1216, 1226-27 (11th Cir. 2003) ("When a

conspiracy involves only two participants, each participant can be a 'organizer, leader, manager, or supervisor' in the criminal conduct when each participant takes primary responsibility for a distinct component of the plan and exercises control or influence over the other participant with respect to that distinct component of the plan."); see also United States v. Revel, 971 F.2d 656, 660 (11th Cir. 1992); USSG §3B1.1, comment. (n. 4) ("There can, of course, be more than one person who qualifies as a leader or organizer.").

In sum, the Probation Officer correctly applied a role adjustment of two levels.  Defendant's arguments to the contrary are unavailing.

## IV.    18 U.S.C. § 3553(a) FACTORS

The advisory guidelines call for a sentence of 30 years for Bell.  Proper calculation of the guidelines, however, does not end the matter.  In dealing with the sentence of another young defendant in a terrorism case, the Eleventh Circuit observed, "Ours is a rule of law.  We can and must keep our traditional democratic principles in place as we deal with terrorism and its threat."  United States v. Mandhai, 375 F.3d 1243, 1250 (11th Cir. 2004).[10]  In other words, the Court is not called upon to apply the guidelines blindly just because the defendant is a convicted terrorist.  The Court must also look to the sentencing factors enumerated in 18 U.S.C. § 3553(a).  Those factors, individually and

---

[10] Mandhai addressed a "teenager" involved in what he believed was an al Qa'ida-led plot to blow up electrical transformers.  The plot was a ruse.  The defendant's advisory guideline range was 188 to 235 months.  The District Judge varied downward three levels to a sentence of 140 months in prison.  On appeal, the Eleventh Circuit unanimously upheld the imposition of the terrorism adjustment and a leadership-role adjustment.  In a two-to-one decision, the Court also indicated that a downward variance was justified, but not on the ground that the crime was inchoate.  The Court remanded for re-sentencing on a proper downward variance ground.

collectively, support the advisory guideline range of 30 years in this case. Several of those factors merit particular discussion here.

### A.    The Nature and Circumstances of the Offense

Obviously, terrorism crimes are serious.  These crimes strike at the very heart of the nation's security and the obligation every branch of Government has to insure the safety of her citizens.  This seriousness is reflected principally in the substantial penalties Congress has prescribed as well as the overall advisory guideline scheme adopted by the Sentencing Commission.  Each of Bell's violations carry a maximum penalty of 15 years, and the advisory sentencing range would have been incarceration for life, but due to statutory caps, that range is now 30 years.  Congress, moreover, has given the Court the added tool of extensive supervised release following imprisonment to protect innocent civilians from convicted terrorists like Bell.  These statutory and guideline schemes make very clear that the will of the people, expressed through their elected leaders, is that terrorism crimes are serious, harsh sentences are appropriate, and public protection and national security are paramount.

Apart from the nature of these offenses, the circumstances of what Bell actually did in this case fully support a sentence of 30 years.  Bell used his religious ties to a local mosque as a way to actively recruit and indoctrinate unwitting minors with radicalized hate.  Bell radicalized himself and others by resorting to the teachings of radical cleric Anwar al-Awlaki—a person whose teachings clearly espouse violence against the United States and who, before his

death, tried to inflict massive casualties on United States soil. Bell demonstrated extreme religious intolerance to families of countless deceased loved ones when he disguised himself, armed himself with a pistol and sledge hammer, and violently caused $17,000 of damage to statues of Jesus.[11] Bell engaged in his own attempts at domestic bomb making, with each successive creation in his arsenal getting bigger and more destructive. Ultimately, Bell created devices he termed "frag grenades" that had the capacity to inflict serious harm to others. Bell lied to his parents and his religious leaders about his true purpose in traveling overseas, and he misrepresented his true plans to the Department of State in order to obtain a passport. Bell stole money to fund his mission and rented a computer he had no intention of returning to use during his mission. Bell purchased airfare for a juvenile who was too young to do so himself, and Bell then placed that juvenile in a potentially life-threatening situation, all while encouraging the juvenile to lie to the juvenile's family. Bell created numerous videos and downloaded numerous items, both here and abroad, to use as propaganda and props to identify, recruit, and indoctrinate other juveniles to join him in Yemen. Once in the Middle East, Bell actively sought to get to Yemen and then to Syria to join others in pursuing violent jihad. Even when ultimately

---

[11] This single act (the armed destruction of religious statutes) is no small matter. Bell caused $17,000 of damage. Under applicable Florida law, this event, standing alone, is a third degree felony for criminal mischief. See § 806.13(b)3., Fla. Stat. (2013). However, because Bell wore a mask, carried a firearm, and evidenced prejudice based on religion, the third-degree felony would be enhanced to a second-degree felony, punishable by up to 15 years in Florida state prison. See id. § 775.0845(2)(a) (third-degree felony enhanced to second-degree felony when defendant wears a hood, mask, or other device to conceal identity); § 775.085(1)(a)3 (third-degree felony enhanced to second-degree felony when defendant evidences prejudice based on religion during commission of the crime); § 775.087(1)(c) (third-degree felony enhanced to second-degree felony when defendant uses a weapon or firearm during the crime).

apprehended, Bell had no desire to return to the United States, but instead requested the Department of State to send him to the country of Turkey—a location where he could easily cross the border into Syria.  Finally, once Bell made it home to Jacksonville, his failed attempt to join Ansar Al Sharia provided no deterrence to his long-term goals.  Instead of remorse for his crime, he sought to continue influencing impressionable juveniles by further soliciting them to his radicalized ideology, encouraging them to hide their relationship with him from their parents, and solicited their help in constructing his own masjid in the North-Florida woods.  His newly-acquired goal was to set up a location where he could further indoctrinate and incite youth to violence.

In sum, the nature of Bell's offenses calls for a guideline sentence.  The circumstances of the offenses show that a guideline sentence is abundantly reasonable.

### B.    Bell's History and Characteristics

Bell is a young man—20 years of age.  PSR, at 3.  Bell is also highly intelligent.[12]  Despite his youth and above-average intelligence, Bell has amassed a criminal record and engaged in serious conduct that demonstrates strong propensities for violence, dishonesty, theft, and destruction of private property as well as an overriding disdain for the authority of courts and the rule of law.

---

[12] As noted in the PSR, Bell scored in the upper 14 percent on a standardized school test when he was being considered for the Duval County gifted program.  PSR, at 17-18 ¶91.

### 1.    Bell's criminal record

The offenses at issue here reflect the primary criminality in Bell's adult life. However, this criminality did not begin when Bell failed to link up with Ansar al-Sharia and did not end when Bell returned to the United States.  Within months of returning home to Jacksonville, on January 24, 2013, Bell was arrested for, and pled no contest to, the offense of trespassing on someone else's posted property.  PSR, at 12 ¶ 57.  Much like destroying expensive religious statues, stealing money, and taking a rental computer with no intention of returning it, this minor conviction further demonstrates Bell's complete disregard for the property rights of others.

Based on his existing record—admittedly small—Bell's criminal history category would have been II.  PSR, at 13 ¶ 60.  The terrorism adjustment applies, though, so Bell's criminal history category increases to VI.  PSR, at 13 ¶ 61.  Stated differently, Congress and the Sentencing Commission view terrorism crimes to be so serious that a person's criminal record really does not matter. United States v. Meskini, 319 F.3d 88, 92 (2d Cir. 2003) ("Congress and the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists under § 3A1.4(b), because even terrorists with no prior criminal behavior are unique among criminals in the likelihood of

recidivism, the difficulty of rehabilitation, and the need for incapacitation.")  Bell, of course, is not a terrorist who lacks a criminal record.[13]

### 2.    Bell's propensity for violence

This entire case centers upon Bell's propensity for violence.  No need exists to belabor the point that Bell travelled to a foreign country with his heart set on murdering, killing, and maiming other people.  See Doc. No. 1.  Even before he left, Bell's propensity for violence was evident.  He and those he recruited spent hours engaged in shooting a pistol at a home-made target—a piece of wood with the painted figure of a person and a painted heart representing the bulls-eye.  The group referred to this imaginary person as "the prostitute."  The group openly discussed things like the smell of blood on the battlefield, hiding from drones, and being most happy when a United States embassy was attacked on September 11.

During the early morning of July 4, 2012, Bell also led an armed assault on religious statues in a cemetery.  In doing so, Bell took along a 9mm pistol in case any "kuffar" got out of hand.  According to his cohort, Bell was prepared to shoot the police or innocent civilians if necessary.  The two then proceeded to dress in all black, tape their shoes, put on masks, and inflict $17,000 of damage to religious statues of Jesus—statues that likely provided some level of comfort to people who had loved ones buried there.  Evidence the Government will

---

[13] Even without the increased criminal history category provided by the terrorism adjustment, Bell's advisory guideline range would still be life (i.e., criminal history category II and total offense level 43 call for a presumptive sentence of life).

produce at sentencing shows the next planned target was going to be a statue of the Virgin Mary in front of a local child care center.

Bell also spent hours engaged in making devices that he termed "bombs." Videos display Bell giving these activities titles like "Bomb Making 101" and "Weapons of Mass Destruction." The videos show Bell progressing to more destructive devices until he graduated to creating a device he called "frag grenades." These homemade "frag grenades" were designed to inflict harm and had the capacity to cause serious bodily damage or death. Interestingly, Bell took some of the materials he used to create his "frag grenades" with him when he traveled to the Middle East.

When he returned to the United States, Bell told federal agents that fighting (i.e., armed combat) was an obligation. He told them that his mission was to establish Sharia law—not just to spread it, but to establish it. Bell's return to the United States, moreover, only furthered and intensified his resolve, as he told agents that he would continue talking to the youth about jihad because they must decide between paradise and hellfire.

In sum, Bell's propensity to do violence to people and their property is well established and fully supports the advisory guideline range in this case.

### 3.    Bell's propensity for dishonesty

Apart from his criminal record and propensity for violence, Bell's conduct during these offenses shows that Bell has a strong propensity for dishonesty and easily lies when lying is expedient. Any remorse Bell offers at the sentencing

hearing will be highly suspect and, based on Bell's prior record of dishonesty, will be calculated manipulation.

Examples of Bell's actual falsehoods are legion. For instance, Bell initially lied to his parents and family members when he told them his purpose in traveling to the Middle East was to make Hajj. See PSR, at 6 ¶14. Even worse, Bell convinced minors to do the same thing. Bell persisted in this lie when he misrepresented his true intentions to the leaders at the Islamic Center of North Florida in an effort to obtain the papers that would have actually enabled Bell to make Hajj. The entire story—making Hajj—was nothing more than a front to conceal Bell's true purpose of offering himself for violent jihad in the service of a known Foreign Terrorist Organization.

Bell's lies did not cease with his family and religious leaders. Bell engaged in significant misrepresentation with the Department of State when he applied for the passport that enabled his trip. A copy of Bell's redacted passport application is attached as exhibit A. Bell engaged in three significant lies in that under-oath document.

First, when answering question 17 of the document, Bell lied about his true residence address. Bell provided his mother's address as his residence instead of his father's address, where Bell actually lived, kept his firearm, his computer and computer files, and where he conducted his battlefield training for violent jihad.[14]

---

[14] The Government is providing additional proof of this falsehood as part of its sealed filing.

Second, when answering question 14 of the document, Bell stated under oath that his occupation was "unemployed."  Just nine days before submitting this falsehood, Bell opened a business checking account with Wells Fargo Bank with an application indicating that Bell established his business in 2009, that he was the "business owner," and that he earned $78,000 in gross sales the previous year.[15]  More importantly, on September 14—the very day after Bell lied to the Department of State—Bell submitted an application to Aaron's, Inc. to lease (or steal) a computer.  On that application, Bell stated that he was "self employed," that he worked full time from "9 a.m. to 9 p.m.," and that he earned "800-1200" per week.[16]

Third, when answering question 19 on the passport application, Bell stated that the duration of his trip would be "4 weeks est.," and that the country he planned to visit was "Israel."  This statement too is demonstrably false.  Bell flew to the Middle East with a one-way ticket.  When interviewed in Jordan by officials with the FBI and the Department of State, Bell advised that he left the United States because "America is unstable and hostile toward Muslims" and that he wanted to make his life in a Muslim country.  Bell wanted to be sent to Turkey, not the United States, when authorities deported him from Jordan.  Upon his return, Bell told others that he did not want to return.  And, of course, the facts of Bell's offense show that his true, intended destination was Yemen, not Israel.

---

[15] A redacted copy of this account application is attached as exhibit B.
[16] A redacted copy of this rental application is attached as exhibit  C.

Apart from dishonesty with parents, religious leaders, and the Department of State, Bell has a demonstrated record of lying to law enforcement officers in connection with these offenses as well.

For instance, when Bell returned to the United States, federal agents interviewed him.  After being told about the consequences of lying to a federal agent, Bell proceeded to do just that.  Bell initially told agents the lie that the purpose of his trip was to visit the juvenile's family in Palestine and to see the al-Aqsa Mosque in Jerusalem.  Bell denied having any goals for the trip at that point during the interview.  Bell then changed his story and used the fabricated cover story—making Hajj.  Bell also said he wanted to visit Palestine and look for a wife.  Bell further lied and stated that he planned to return to the United States, but was researching the option of living in Jordan for faith reasons.  Armed with what the juvenile told them earlier, agents asked if Bell intended to go to any other countries.  Bell finally told the truth and said that he bought plane tickets to Oman and planned to enter Yemen.

Bell also lied to federal agents about the firearm he used in this District for his battlefield-combat training.  Despite the fact that Bell and others spent hours in the woods, shot nearly 100 rounds of ammunition, and constructed a homemade target, Bell advised the agents that he did not own or carry a gun. Bell would further lie about his pistol to detectives from the Jacksonville Sheriff's Office ("JSO").  When JSO burglary detectives learned that the pistol Bell used for firearms training was stolen, they questioned him.  In a video-taped interview

of Bell by JSO burglary detectives, Bell denied owning the pistol, possessing the pistol, and holding the pistol. Bell advised the detectives that, to his knowledge, his fingerprints and DNA would not be on the pistol. At sentencing, the Court will see Bell coolly and calmly lying to sworn law enforcement officers. Bell would later tell his father in a recorded jail call that he purchased the pistol on the street.

In sum, Bell has demonstrated very strong propensities toward dishonesty and lies when dishonesty and lies serve his purpose and his life's desire to be a violent jihadist.

### 4.    Bell's propensities for theft and fraud

Bell's conduct also shows that he has strong propensities toward stealing and committing fraud.

Initially, Bell engaged in significant theft and fraud as a means to finance his trip to Yemen. For instance, Bell took computers from a number of customers at his flea-market business while having no intention of repairing them or returning them.[17]    For three of these persons, the State of Florida issued arrest warrants for Bell. Bell was arrested on these charges on February 20, 2013, but the state of Florida declined prosecution. PSR, at ¶¶ 64-67. Copies of the arrest warrants and affidavits pertaining to these charges are attached as composite exhibit D.[18]

---

[17] Bell took five computers with him on his trip overseas. One of these was the computer Bell tried to steal from Aaron's, Inc. The others presumably were from customers, although the Government is unable to place any individual customers with the computers Bell actually took with him, as those computers were seized by Israeli authorities when Bell was turned away in Tel Aviv.

[18] Three of these individuals entrusted their computers to Bell during the weeks prior to Bell's departure for the Middle East on September 25, 2012.

Bell also defrauded a specific individual of $4,500 in cash as a means to fund his travels. In that regard, Bell convinced Michael Papagiannakis ("MP") that if MP would give Bell $4,500, Bell would obtain a pallet of used computers, refurbish them, sell them, and Bell and MP could share the profits. MP delivered $4,500 to Bell on September 23, 2012, just two days before Bell left the country. On September 24, 2012, the day before Bell departed the country, Bell spoke with MP by phone and advised MP that Bell was on his way to pick up the computers. Of course, this was false, and MP never received computers or the return of his money from Bell.[19]

Another example of Bell's propensity towards theft is the computer he leased from Aaron's, Inc. On September 14, 2012, less than two weeks before leaving the country, Bell leased an HP laptop computer from Aaron's, Inc., executed a lease agreement, and paid his first monthly rental payment of $104.60. Bell would subsequently use that computer to house an entire library of violent jihadist propaganda, al Qa'ida support materials, and al-Awlaki lectures and then carry it with him to the Middle East. Bell had no intention of returning that computer, as he purchased one-way tickets to the Middle East and never planned on returning to the United States.

Examples of Bell's propensities towards theft and fraud are not limited to the facts surrounding his failed attempt at joining Ansar Al Sharia, either. Bell

---

[19] MP's account of what happened is very credible. On September 24, 2012, Bell's phone contacted MP's phone, and a call took place at 11:53 p.m. that lasted over two minutes. Bell never contacted MP further after that call, but MP attempted to contact Bell seven times between September 26 and September 29. When he was unsuccessful, MP, accompanied by a JSO officer, went to the home of Bell's mother where MP learned that Bell had left the country.

currently is charged with committing insurance fraud by the state of Florida for his participation in a staged vehicle accident.  PSR, at 14-15 ¶ 68.  At sentencing, the Government will play a video recording Bell made of the front and back of his grandmother's credit card, raising the strong inference that Bell was going to steal from her.  The Government also will introduce intercepted phone calls following Bell's return to the United States in which Bell discusses two other frauds.  In one, Bell discusses creating an "under the table" gold purchasing business.  In another, Bell and his mother discuss Bell fraudulently obtaining food stamps by listing an address where Bell did not live.

In sum, as with his propensities for violence and dishonesty, examples of Bell's propensities for theft and fraud are numerous.  Those propensities further support the advisory guideline sentence in this case.  Indeed, nothing about Bell's history and characteristics support a below-guideline sentence.

### C.    The Seriousness of the Offense

The seriousness of Bell's offenses also supports the advisory guidelines in this case.  One simply needs to peruse a recent newspaper to appreciate the seriousness and gravity of what Bell tried to do.  See M. Mazetti, E. Schmitt, and M. Schmidt, Suicide Bomber is Identified as a Florida Man, N.Y. Times (May 31, 2014)[20] (describing young man in his early 20s who lived in Vero Beach and Fort Pierce, Florida who traveled to Syria, jointed a jihadist camp where he trained for two months, and then killed himself and others as a suicide bomber).

---

[20] A copy of this article is attached as exhibit E.

Indeed, in a recent speech in Oslo, Norway, the Attorney General of the United States commented on the serious threat to our national security posed by individuals like Bell who travel overseas to wage violent jihad.[21]  The Attorney General noted, "Particularly when hatred and extremism take expression in acts of violence and terror, we must be resolute in our protection of equal rights, democracy, and the rule of law.  And we must be both innovative and aggressive in combating violent extremism in all its forms."

The Attorney General continued,

> Like Norway, the United States is all too familiar with domestic threats, having suffered deadly attacks on our soil – including against government buildings, places of worship, and sporting events. These attacks, like the attacks you suffered here in Norway, share a common theme:  they are attacks on tolerance, in the name of violent extremist ideologies.
>
> Under the Obama Administration, while we have acted to protect our country and our allies, we have also redoubled our commitment to civil rights and to tolerance.  This is what violent extremists most fear, for their goal is to undermine open societies.  At the same time, we also have joined with our international partners to ensure that there is no impunity for those who seek to commit terrorist attacks.   Now, Norway, the United States, and countries around the world face a new threat – the possibility that violent extremists fighting today in Syria, Iraq, or other locations may seek to commit acts of terror tomorrow in our countries as well.
>
> U.S. intelligence officials estimate that nearly 23,000 violent extremists are currently operating in Syria.  Among these are over 7,000 foreign fighters –

---

[21] A copy of the Attorney General's speech is attached as exhibit F.

among whom are dozens of Americans, a number
that is growing.

We have a mutual and compelling interest in
developing shared strategies for confronting the influx
of U.S.- and European-born violent extremists into
Syria.  And because our citizens can freely travel,
visa-free, from the U.S. to Norway and other
European states – and vice versa – the problem of
fighters in Syria returning to any of our countries is a
problem for all of our countries.

This is a global crisis in need of a global
solution.  The Syrian conflict has turned that region
into a cradle of violent extremism.  But the world
cannot simply sit back and let it become a training
ground from which our nationals can return and
launch attacks.  And we will not.

In the face of a threat so grave, we cannot
afford to be passive.  Rather, we need the benefit of
investigative and prosecutorial tools that allow us to
be preemptive in our approach to confronting this
problem.  If we wait for our nations' citizens to travel
to Syria or Iraq, to become radicalized, and to return
home, it may be too late to adequately protect our
national security.

Fortunately, with regard to Bell, it is not too late to address the serious

threat he poses.  Apart from the general seriousness of Bell's crimes, two

additional factors heighten the seriousness of this case:  Bell's recruitment of

minors and Bell's tutelage by virtual mentor and radical cleric, Anwar al-Awlaki.

### 1.    Defendant's Recruitment and Indoctrination of Minors

Defendant's influence over impressionable minors makes these offenses

extremely serious.  The Sentencing Guidelines properly take this factor into

account by increasing Bell's total offense level by two levels and by indicating

that use of multiple minors provides a potential basis to vary upwards.  The Court should give this conduct added weight under 3553(a) when fashioning a sentence that reflects the seriousness of the offense.

As noted in the PSR, on June 12, 2012, an official with the Islamic Center of Northeast Florida approached the FBI because Bell "was speaking with the children who attended the mosque and teaching them things about the Muslim faith that were not legitimate."  PSR, at 5 ¶9.  The investigation corroborated what the mosque official reported.  Bell sought to radicalize minors and other individuals. PSR, at 5 ¶12.  Bell succeeded in getting one juvenile to travel with him to participate in violent jihad.  PSR, at 8 ¶23.  And, upon his return to the United States, Bell began plans to construct a masjid in the woods near his home where he could further indoctrinate youth and encourage others with his radical ideology.  In doing so, Bell specifically advised at least one juvenile not to tell his parents that Bell was back in the country and communicating with the juvenile.  In other words, Bell did exactly what he told federal agents he planned to do— continue talking to the youth about the virtues of violent jihad.

### 2.    Defendant's Virtual Tutelage by Anwar al-Awlaki

Defendant's tutelage by virtual mentor and radical cleric, Anwar al-Awlaki, further illustrates the seriousness of Bell's crime.  Al-Awlaki "was well known as an al-Qaida leader who espoused violent and radical jihadist views."  United States v. Hassan, 742 F.3d 104, 117 (4th Cir. 2014).  Awlaki's name surfaces frequently in terrorism cases. See, e.g., United States v. Kaziu, 559 F. App'x 32,

34 (2nd Cir. 2014) ("co-conspirator … testified that the lectures of radical cleric Anwar Al–Awlaki to which [conspirators] listened eased their apprehensions about fighting jihad and encouraged their travel to the Middle East"); <u>Hassan</u>, 742 F.3d at 117 ("Hassan and Yaghi actively promoted the violent views and teachings of al-Awlaki by providing literature and videos to others, both within and outside the conspiracies."); <u>United States v. Abdulmutallab</u>, 739 F.3d 891, 895 (6th Cir. 2014) (underwear bomber who "received training at an Al Qaeda camp under the direction of the radical Imam Anwar Awlaki and agreed to carry out a suicide attack by bombing a United States air carrier over the United States"); <u>United States v. Duka</u>, 671 F.3d 329, 334 (3rd Cir. 2011) (noting that defendants "viewed and praised a lecture, *Constants on the Path to Jihad*, by Anwar al-Awlaki, the prominent cleric and proponent of attacks against the United States military").

The Fourth Circuit Court described al-Awlaki in these terms:

> [a]l–Awlaki grew to prominence in the United States during the late 1990s as a cleric and activist. Following the September 11, 2001 terrorist attacks, al-Awlaki came under suspicion for his associations with two of the 9/11 hijackers. Al–Awlaki was thereafter linked to other terrorist activities within the United States, often communicating with the perpetrators via email. In 2003, al-Awlaki departed this country for Yemen and never returned, eventually becoming an active high-ranking member of al-Qaida. Al–Awlaki published his extreme views—particularly that violent jihad against America was a binding obligation on Muslims—through speeches and writings, which were widely disseminated on the internet. As Kohlmann explained, al-Awlaki's teachings "have proven extraordinarily popular among

> extremists living in western countries," and have
> "regularly surfaced" in cases of "homegrown
> terrorists." J.A. 299. In 2011, al-Awlaki was killed by a
> drone strike in Yemen. He frequently is attributed as a
> primary source of radicalization.

United States v. Hassan, 742 F.3d 104, 117 n.9 (4th Cir. 2014).

Bell's support for al-Awlaki and his virtual tutelage by al-Awlaki is no less serious here. Bell used al-Awlaki's lectures as a means of radicalizing himself and others. PSR, at 5 ¶12. "Bell suggested travelling to Yemen to fight because of al-Awlaki's teachings that ***all young people should travel to Yemen to take up the fight.***" Doc. 38, Factual Basis at 2 (emphasis supplied). At sentencing, the Government will produce evidence showing that Bell downloaded 372 computer files containing lectures by al-Awlaki. After returning from the Middle East, and with full knowledge that Federal agents were now on to him, Bell advised Federal agents during an interview that al-Awlaki has had a big influence on Bell and that Bell has viewed about 85 percent of al-Awlaki's lectures. Bell further advised agents that he viewed al-Awlaki's teachings as accurate and in accordance with the Qu'ran.

At sentencing, the Government will highlight the profound influence al-Awlaki has had on Bell through the Government's expert witness, Mr. William Braniff. Mr. Braniff will highlight the similarities between Bell's ideology and al-Awlaki's ideology and provide concrete examples of Bell and al-Awlaki using similar phrases and communicating similar ideas.

### D.    Deterrence and Public Safety

Perhaps the weightiest factors warranting the guideline recommendation in this case are the need to "afford adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2)(B), and the need "to protect the public from further crimes of the defendant," 18 U.S.C. § 3553(a)(2)(C).

In Jayoussi, the Eleventh Circuit reversed a material support sentence that was too lenient.  In doing so, the Court properly noted the very real need to protect the public from future acts of terrorism by one showing the demonstrated intent to engage in that despicable behavior.  Specifically, "[T]errorists[,] [even those] with no prior criminal behavior[,] are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation.' [Defendant] poses a heightened risk of future dangerousness due to his al–Qaeda training. He is far more sophisticated than an individual convicted of an ordinary street crime." Jayoussi, 657 F.3d at 1117 (quoting United States v. Meskini, 319 F.3d 88, 92 (2d Cir.2003)).

Bell is no different.  Bell poses a likelihood of recidivism, no meaningful chance of rehabilitation, and, due to his virtual tutelage by al-Awlaki, a heightened risk of future dangerousness.  Treating Bell's crimes like ordinary street crimes committed by an ordinary 19 year old poses grave and potentially deadly consequences for the public at large.  Bell, in fact, has exhibited his growing danger in this country by destroying religious property in this district, arming himself with a view to shooting police officers who interfered, and by

experimenting with and creating explosive devices with more and more capacity to do harm.  Moreover, he has already indicated a willingness to use deadly force against those who interfere with his radicalized ideology.  Anything short of a lengthy prison sentence and a lengthy term of supervised release places the public in grave danger.  See United States v. Ressam, 59 F.3d 1095, 1128-29 (9th Cir. 2012) (public protection "particularly relevant in a terrorist case such as this, where [defendant], who has demonstrated strongly held beliefs about the need to attack American interests in the United States and abroad, will be only 53 years old upon his release").

A lengthy sentence will deter and incapacitate Bell.  A lengthy sentence also will deter other would-be jihadists, including any youth that Bell tried to indoctrinate and radicalize.  A lenient sentence, conversely, will send the wrong message, embolden those who would do violence to innocent civilians, and otherwise disserve the need to protect the public.

### E.    Unwarranted Sentencing Disparities

18 U.S.C. § 3553(a)(6) requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  When applying this factor, the Court must take care to insure that "apples are being compared to apples."  United States v. Decampo, 573 F.3d 1091, 1101 (11th Cir. 2009).  Any comparison with other cases and other defendants needs to involve "(1) a specific defendant, (2) with a similar record to the defendant being

sentenced, (3) who has been found guilty of similar criminal conduct." United

States v. Espinoza, 550 F. App'x 690, 694 (11th Cir. 2013).

In Jayoussi, the Eleventh Circuit reversed a terrorism sentence that was

too lenient and noted that

> the district court unreasonably failed to consider the
> significant distinctions between [defendant]'s
> circumstances and the sentences of other offenders
> the district court referenced at the sentencing hearing.
> [Doc. 1373, p. 15–16.] In comparing Padilla to
> criminals like David Hicks, Yahya Goba, and Imran
> Mandhai who had either been convicted of less
> serious offenses, lacked extensive criminal histories,
> or had pleaded guilty, the district court erred. See
> United States v. Docampo, 573 F.3d 1091, 1101 (11th
> Cir.2009). The district court also improperly relied on
> the Terry Nichols and Zacarias Moussaoui
> prosecutions as examples of the types of behavior
> that warrant a life sentence because the government
> sought the death penalty in those cases. ***On remand,
> we admonish the district court to avoid imposition
> of a sentence inconsistent with those of similarly
> situated defendants. It should not draw
> comparisons to cases involving defendants who
> were convicted of less serious offenses, pleaded
> guilty, or who lacked extensive criminal histories,
> nor should it draw comparisons to cases where
> the government sought the imposition of the
> death penalty***. See United States v. Abu Ali, 528
> F.3d 210, 265 (4th Cir.2008) ("[T]o require a similar
> infliction of harm before imposing a similar sentence
> would effectively raise the bar too high. We should not
> require that a defendant do what ... Nichols did in
> order to receive a life sentence.").

Jayoussi, 657 F.3d at 1117-18.

While each particular case is unique, for the Court's benefit, the following

sentences have been imposed in material support of terrorism cases from other

jurisdictions.  These cases involve defendants, like Bell, who actually travelled

overseas as part of their intent to support violent acts of terrorism or violent

terrorist organizations:

- United States v. Delaema, No. 05-337 (PLF) (D.D.C. Apr. 17, 2009) (Doc. 109) (defendant sentenced to 25 years in prison for 18 U.S.C. § 2332(b)(2) conspiracy, and no supervised release);

- United States v. Hassoun, No. 04-60001-CR-COOKE (S.D. Fla. Jan. 22, 2008) (Doc. 1335) (defendant sentenced to 188 months in prison for 18 U.S.C. § 956(a)(1) conspiracy, 60 months in prison for 18 U.S.C. § 371 conspiracy, 180 months in prison for 18 U.S.C. § 2339A(a) conspiracy, to run concurrently, and 20 years of supervised release);

- United States v. Padilla, No. 04-60001-CR-COOKE (S.D. Fla. Jan. 22, 2008) (Doc. 1333) (defendant sentenced to 208 months in prison for 18 U.S.C. § 956(a)(1) conspiracy, 60 months in prison for 18 U.S.C. § 371 conspiracy, 180 months in prison for 18 U.S.C. § 2339A(a) conspiracy, to run concurrently, and 20 years of supervised release);

- United States v. Jayyousi, No. 04-60001-CR-COOKE (S.D. Fla. Jan. 22, 2008) (Doc. 1337) (defendant sentenced to 152 months in prison for 18 U.S.C. § 956(a)(1) conspiracy, 60 months in prison for 18 U.S.C. § 371 conspiracy, 120 months in prison for 18 U.S.C. § 2339A(a) conspiracy, to run concurrently, and 20 years of supervised release);

- United States v. Alkadhi, 14-20030-CR-LENARD (S.D. Fla. July 23, 2014) (Doc. 27) (defendant sentenced to 5 years in prison and 3 years of supervised release for violating 18 U.S.C. § 1001 in case in which defendant lied to agents about travelling to Kenya in attempt to join al-Shabaab);

- United States v. Ahmed, No. 1:06-cr-147-01-WSD (N.D. Ga. May 2, 2011) (Doc. 651) (defendant sentenced to 13 years in prison and 30 years of supervised release for violating 18 U.S.C. §§ 2339A(a), 956 and 2332b);

- United States v. Sadequee, No. 1:06-cr-147-02-WSD (N.D. Ga. Dec 15, 2009) (Doc. 622) (defendant sentenced to 15 years in prison for 18 U.S.C. §§ 2339A(a) conspiracy, 956, 2332b and 2, 2 years consecutive to any sentence imposed for 18 U.S.C. §§ 2339B(a)(1) conspiracy, and 30 years of supervised release);

- United States v. Mehanna, No. 09-CR-10017-001-GAO (D. Mass. April 13, 2012) (Doc. 432) (defendant sentenced to 210 months, including two concurrent sentences of 180 months for conspiring and attempting to violate 18 U.S.C. § 2339A followed by seven years of supervised release);

- United States v. Isse, No. 09-cr-50(01)(MJD/FLN) (D. Minn. May 29, 2013) (Doc. 162) (defendant sentenced to three years in prison and 20 years of supervised release for violating 18 U.S.C. § 2339A);

- United States v. Ahmed, No. 09-cr-50(02)(MJD/FLN) (D. Minn. May 29, 2013) (Doc. 165) (defendant sentenced to three years in prison and 20 years of supervised release for violating 18 U.S.C. § 2339A);

- United States v. Warsame, No. 04-029 (JRT/FLN) (D. Minn. Jul 17, 2009) (Doc. 177) (defendant sentenced to 92 months in prison and 3 years of supervised release for 18 U.S.C. § 2339B conspiracy);

- United States v. Kaziu, No. 1:09-CR-660-01(S-1)(JG) (E.D.N.Y. March 8, 2012) (Doc. 263) (defendant sentenced to 27 years including a concurrent sentence of 15 years for conspiracy to violate 18 U.S.C. § 2339A followed by lifetime supervised release);

- United States v. Hasanoff, No. 1:S6-10-CR-162-02(KMW) (S.D.N.Y. Oct. 3, 2013) (Doc. 142) (defendant sentenced to 216 months for providing material support in violation of 18 U.S.C. § 2339B and conspiracy to do so in violation of 18 U.S.C. § 371);

- United States v. Ahmed, No. 1:S2-10-CR-131-01(PKC) (S.D.N.Y. March 28, 2013) (Doc. 101) (defendant sentenced to 111 months for two 18 U.S.C. § 371 conspiracies involving providing material support to a foreign terrorist organization and ordered to comply with immigration authorities);

- United States v. Boyd, No. 5:09-CR-216-1FL (E.D.N.C. Aug. 24, 2013) (Doc. 2115) (defendant sentenced to 180 months in prison for 18 U.S.C. § 2339A conspiracy,  216 months in prison for 18 U.S.C.§ 956(a) conspiracy, to run concurrently, and 5 years of supervised release);

- United States v. Yaghi, No. 5:09-CR-216-8-FL (E.D.N.C. Jan. 13, 2012) (Doc. 1666) (defendant sentenced to 180 months in prison for 18 U.S.C.§ 2339A conspiracy, 380 months in prison for 18 U.S.C. § 956(a) conspiracy, to run concurrently, and 5 years of supervised release for 18 U.S.C. § 2339A);

- United States v. Hassan, No. 5:09-CR-216-7-FL (E.D.N.C. Jan. 13, 2012) (Doc. 1668) (defendant sentenced to 180 months in prison and 3 years of supervised release for 18 U.S.C. § 2339A conspiracy);

- United States v. Subasic, No. 5:09-CR-216-3-FL (E.D.N.C. Aug. 24, 2013) (Doc. 2117) (defendant sentenced to 180 months in prison for 18 U.S.C. § 2339A conspiracy, 360 months in prison for 18 U.S.C. § 956(a) conspiracy, 120 months in prison for two counts of 18 U.S.C. § 1425(a), all to run concurrently and 5 years of supervised release);

- United States v. Sherifi, No. 5:09-CR-216-2-FL (E.D.N.C. Jan. 13, 2012) (Doc. 1663) (defendant sentenced to 180 months in prison for 18 U.S.C. § 2339A conspiracy, 180 months in prison for 18 U.S.C. §§ 956(a) and 1117 conspiracies, 60 months in prison for 18 U.S.C. § 924(c), consecutive to any other term of imprisonment, 300 months in prison for 18 U.S.C. § 924(c), consecutive to any other term of imprisonment, producing a total term of 540 months in prison and 5 years of supervised release);

- United States v. Boyd, No. 5:09-CR-216-J-4-FL (E.D.N.C. Oct. 16, 2012) (Doc. 2133) (defendant sentenced to 93 months in prison and 3 years of supervised release for 18 U.S.C. § 2339A conspiracy);

- United States v. Boyd, No. 5:09-CR-216-5-FL (E.D.N.C. Oct. 16, 2012) (Doc. 2132) (defendant sentenced to 84 months in prison and 3 years supervised release for 18 U.S.C. §§ 2339A and 2 conspiracy and aiding and abetting);

- United States v. Akl, No. 3:10cr251-01 (N.D. Oh. May 22, 2012) (Doc. 100) (defendant sentenced to 75 months in prison for each 18 U.S.C. § 2339B and 1956(h), 60 months in prison for each 18 U.S.C. §§ 175(1) and 2, 1621(1), 152(7), to run concurrently, and 10 years of supervised release);

- United States v. Akl, No. 3:10cr251-02 (N.D. Oh. June 23, 2011) (Doc. 83) (defendant sentenced to 40 months in prison and 3 years of supervised release for 18 U.S.C. § 2339B);

- United States v. Amawi, No. 3:06cr719-01 (N.D. Oh. Oct. 23, 2009) (Doc. 996) (defendant sentenced to 240 months in prison for U.S.C. 18 U.S.C. § 956(a)(1) conspiracy, 15 years in prison for 18 U.S.C. § 2339A

conspiracy and 20 years in prison each for two counts of 18 U.S.C. § 842(p)(2)(A), to run concurrently, and supervised release for life);

- <u>United States v. El-Hindi</u>, No. 3:06cr719-02 (N.D. Oh. Oct. 26, 2009) (Doc. 997) (defendant sentenced to 144 months for 18 U.S.C. § 956(a)(1) conspiracy, 144 months for each 18 U.S.C. §§ 2339A conspiracy, and 842(p)(2)(A), and supervised release for life);

- <u>United States v. Mazloum</u>, No. 3:06cr719-03 (N.D. Oh. Oct. 26, 20019) (Doc. 1000) (defendant sentenced to 100 months in prison for 18 U.S.C. § 956(a)(1) conspiracy, 100 months in prison for 18 U.S.C. § 2339(A)(a) conspiracy, to run concurrently, and supervised release for life);

- <u>United States v. Paul</u>, No. CR2-07-87 (S.D. Oh. Mar. 26, 2009) (Doc. 81) (defendant sentenced to 240 months in prison for 18 U.S.C. § 2332(a)(1) conspiracy, and 5 years of supervised release);

- <u>United States v. LaRose</u>, No. 2:10CR000123-001 (E.D. Pa. Jan. 7, 2014) (Doc. 102) (defendant sentenced to term of 10 years in prison and five years of supervised release for, among others, 18 U.S.C. § 2339A conspiracy);

- <u>United States v. Ramirez</u>, No. 2:10CR000123-001 (E.D. Pa. Jan. 8, 2014) (Doc. 105) (defendant sentenced to term of 96 months in prison and three years of supervised release for 18 U.S.C. § 2339A conspiracy); and

- <u>United States v. Maldonado</u>, No. 4:07CR00124-001 (S.D.T.X. Jul. 24, 2007) (Doc. 41) (defendant sentenced to 120 months in prison for 18 U.S.C. § 2339D(a), and 3 years of supervised release).

Some of these cases involved cooperating defendants, and none of the cases involve identical facts to the those of Bell's case. Nonetheless, all of these cases demonstrate the overwhelming national consensus that terrorism cases are serious; terrorism cases merit stiff jail sentences; and terrorism defendants should be subject to long-term supervised release. Bell's case provides no good or justifiable reason to deviate from the clear consensus of sister courts that have recognized the serious threat and danger a terrorist like Bell represents.

## V.    CONCLUSION

In conclusion, Bell is an extreme danger to the public.  The difference

between Bell and his virtual mentor al-Awlaki is not a matter of intent and desire,

but a matter of present means and present ability.  But for the statutory maximum

penalties Bell faces, his advisory guideline range would be life, and that

recommendation would be well deserved.  Due to the statutory caps, though, the

advisory guideline range is 30 years in prison.  For the reasons set forth above

and in the Government's sealed supplement to this memorandum, the

Government recommends that Bell be sentenced to 30 years in prison, followed

by a term of supervised release for life.

Respectfully submitted,

A. LEE BENTLEY, III
United States Attorney


By:    _s/ Mac D. Heavener, III_
          MAC D. HEAVENER, III
          Assistant United States Attorney
          Florida Bar No. 0896748
          300 N. Hogan Street, Suite 700
          Jacksonville, Florida 32202
          Telephone:   (904) 301-6300
          Facsimile:    (904) 301-6310
          E-mail:  mac.heavener@usdoj.gov


By:    _s/ Mara Kohn_
          MARA M. KOHN
          Trial Attorney
          Counter Terrorism Section
          National Security Division,
          Department of Justice

**U.S. v. Shelton Thomas Bell**               **Case No. 3:13-cr-141-J-32JRK**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 21, 2014, I electronically filed the

foregoing with the Clerk of the Court by using the CM/ECF system, which will

send a notice of electronic filing to the following:

Lisa A. Call, Esq.


 *s/ Mac D. Heavener, III*
MAC D. HEAVENER, III
Assistant United States Attorney


*s/ Mara Kohn*
MARA M. KOHN
Trial Attorney