UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

vs.                                                    Case No.: 3:07-Cr-97-J-25-JRK

SHELTON THOMAS BELL

_____

## DEFENDANT'S SENTENCING MEMORANDUM

The Defendant, **SHELTON THOMAS BELL,** by and through his undersigned

counsel, hereby files this memorandum of law for the Court's consideration at the sentencing

hearing in this case, and states the following:

## MEMORANDUM OF LAW

The Supreme Court in *United States v Booker*, 543  U.S. 220, 125 S. Ct. 738, 755

(2005)*,*  made the federal sentencing guidelines advisory and thus drastically changed the

way that a district court conducts a sentencing hearing.

After *Booker,* sentencing requires two steps.  First, the district court must consult the

Guidelines and correctly calculate the range provided by the Guidelines, including

adjustments and departures called for under the guidelines.  *Gall v. United States*, 552 U.S.

38, 49, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007).  Second, the district court must give each

side the opportunity to argue for whatever sentence they deem appropriate and then must

consider the statutory factors of 18 U.S.C. § 3553(a).  The sentencing court may not presume

that the Guidelines range is reasonable.  *Gall*, 552 U.S. at 49-50.

1

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall*, 552 U.S. at 52 (citing *Koon v. United States*, 518 U.S. 81, 113, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996)).

In determining the reasonable sentence which satisfies the purposes of sentencing, Mr. Bell asks the court to consider the following:

## 1.     BACKGROUND

How does a seemingly normal Jacksonville teenager find himself on the front page of the newspaper, charged as a would-be terrorist?  More importantly, how does the court craft an appropriate sentence without blurring the line between public safety and the First Amendment's protections of free speech and the free exercise of religion.

The world is a complex place. In sentencing Mr. Bell, the Court is not called upon nor could it settle these complexities, but rather to understand them and place Mr. Bell's actions in that context.  The bedrock principle of our sentencing system is that an individual is punished  for his actions - what actually happened and not the speculative worst thing that might have happened.

### A.     HISTORY AND CHARACTERISTICS OF DEFENDANT

Mr. Bell's childhood was marred by rejection, divorce, adultery, substance abuse and family violence.

When he was 7, his second-grade teachers at Atlantic Beach Elementary School

2

recommended him for the gifted program. But his time in the program was short-lived. The following year, he was pulled out because of impulsiveness and inability to focus. His third-grade teacher, Marian Fogg, wrote that he had extreme difficulty paying attention, staying on task and completing assignments.[1]

"He's very distractible, restless and constantly is on the move during the day (pencil sharpening, blowing nose, walking around for water, Kleenex, pencils, etc.)," she wrote. She described him as a bright young man who wanted to do well and to please but was frustrated at being unable to do so.

Ms. Fogg had three conferences that year with Mr. Bell's mother, each time recommending that he be medically tested for attention deficit hyperactivity disorder (ADHD), which Mrs. Bell told her ran in the family. At the end of the school year, Ms. Fogg wrote a handwritten note on a Child Study Team report that said she strongly felt he also should have been tested for a learning disability.

"Please keep an eye on him," she pleaded.

Stephanie Bell eventually took her son to the doctor, and in June 2003 he was diagnosed with ADHD and prescribed Strattera, which made him sick. His doctor wrote that, additionally, Mr. Bell spoke of not wanting to be alive, though he had not attempted to hurt

---

[1]Duval County Public Schools, Exceptional Student Education program, statement of student progress, April 8, 2003.

3

himself.[2] In 2009, his ADHD medication was switched to Vyvanse. Both medications have side effects that could account for some of the juvenile outbursts described below.[3]

The advent of young Mr. Bell's behavioral issues coincided with stress at home. His mother began an affair with her next-door neighbor and husband's best friend, Daniel Dexter. The Bells divorced in July 2003, by which time Stephanie Bell was five months' pregnant with Mr. Dexter's child.[4]

Mr. Bell, then 9, said he struggled with confusion over his mother's tempestuous new relationship. Mr. Dexter had a son Mr. Bell's age, whom Mr. Bell grew up playing with as a friend. Suddenly, their relationship had changed to stepbrothers. To confuse matters further, Mr. Bell's father happened to move next door to Mr. Dexter's ex-wife, though no romantic relationship developed between them.

Mr. Bell has a difficult relationship with Mr. Dexter, which he attributes to Mr. Dexter's physical and verbal abuse of both himself and his mother. Shortly after Mr. Bell turned 12, his mother and Mr. Dexter moved to Oregon with his twin younger brothers and

---

[2]Jacksonville Pediatric Associates, consultation report, April 16, 2003. Available records show Mr. Bell was treated for ADHD through 2009.

[3]According to the National Institutes of Health, possible side effects of Strattera include mood changes, aggressiveness and irritability, while Vyvanse can cause extreme energy, mood or mental changes, confusion, agitation and unusual behavior.

[4]Two daughters eventually were born to Mrs. Bell and Mr. Dexter in 2004 and 2006. In 2011, Mrs. Bell filed a paternity lawsuit against Mr. Dexter (Duval County Case No. 2011-DR-10479) when he threw her and the children out of the house after a fight. He initially challenged her paternity claim, but a month later, the case was dismissed after they filed a joint motion saying they had reconciled and settled their differences.

two half-sisters, leaving Mr. Bell behind. He lived with his father during the three years they were gone.

In 2009, Mrs. Bell and Mr. Dexter returned to Jacksonville and Mr. Bell moved back in with them. His father blames his own alcohol abuse for causing arguments with his son.[5] Things were even more tense at Mr. Dexter's home. At 15, Mr. Bell was arrested for domestic violence after a fight with Mr. Dexter that resulted from Mrs. Bell confronting her son about finding marijuana and alcohol in his bedroom.

Over the next two years, there were at least three other domestic violence incidents involving Mr. Bell and Mr. Dexter. In 2011, Mr. Dexter petitioned for a domestic violence injunction, which was dismissed after he failed to show up for the hearing. He then threw Mrs. Bell and all the children out of the house for about six weeks. They moved back in five days after Mr. Bell's 18th birthday, except for Mr. Bell, who slept in his truck for several days before moving back to his father's house.

It was during this time of upheaval that friends from Sandalwood High School, including a juvenile,[6] converted Mr.Bell to Islam.[7] He said he read the first three chapters of the Qur'an and converted. He admits without excuse that he was out of control as a teenager with substance abuse and premarital sex but said his conversion sobered and

---

[5]U.S. Probation Office, Pre-Sentence Investigation Report (PSI), paragraph 76.

[6]At the court's direction, this individual will be referred to as "the juvenile" throughout this memorandum.

[7]PSI, paragraph 11.

chastened him. And at first, his new faith gave him a sense of belonging that he was not experiencing in his family. He recounted volunteering to help out with repairs and special events around the Islamic Center of Northeast Florida (the Center).

By all accounts, Mr. Bell's involvement with Islam took a wrong turn. Mr. Bell uses words like foolish, arrogant, dumb, outrageous and mistake to describe what happened in the aftermath of his attempts to learn more about his new faith.[8]

Initially he sought guidance from Joe Bradford, then the imam at the Center. Like Mr. Bell, Imam Bradford attended Sandalwood High School and was an American. But Imam Bradford was responsible for the Center's entire congregation, leaving him little time to counsel the new convert. Mr. Bell said few of the elders had time for him either, so he turned to the Internet to educate himself, and that introduced him to the militant teachings of Anwar al-Awlaki. Mr. Bell became obsessed with the plight of Muslim women and children victimized by violence in the Middle East, and that obsession started him down a path that ultimately resulted in the instant case. At the time he was 18 years old, barely an adult and with a teenager's limited understanding of the world and of his own religion.[9]

B.    THE NATURE & CIRCUMSTANCES OF THE OFFENSE

Though Mr. Bell has pleaded guilty and accepted responsibility for his behavior –

---

[8] A letter from Mr. Bell will be provided to the court.

[9] For example, in one of the undersigned's earliest conversations with Mr. Bell, he said he wanted to fight the "Syrian dictator" for atrocities committed against innocent civilians, but he was unable to actually name Syrian president Bashar al-Assad.

facts that will be addressed in greater detail below – it is important to summarize what did *not* happen in this case.

No overt terrorist act resulted directly or indirectly from Mr. Bell's acts. No person was physically harmed. He never made contact with any terrorist organization because he had no contacts in any such organization and was certainly not a recruiter for some unnamed terrorist organization,  as the juvenile's counsel stated during his client's in camera dispositional hearing before this court.[10] The government has produced no evidence that he was.

Mr. Bell did not have any large sum of money to provide to any terrorist or terrorist organization.  During the trip, Mr. Bell's money was either lost or stolen and he had no other funds available to him.  Mr. Bell did not ship or bring any firearms or dangerous devises with him.

Mr. Bell never set foot in any jurisdictions controlled by al-Qaeda or any other terrorist organization. Though he and the juvenile had plane tickets from Amman, Jordan, to Oman, they never even made it to the airport. They turned back from the Syrian border after Mr. Bell received a phone call form his father in Jacksonville informing him that his grandmother had died. Mr. Bell said he realized at that moment how much he missed his family.

He spent a good deal of his time in Jordan sightseeing and working. He made no

---

[10]Transcript of the juvenile's in-camera sealed dispositional hearing, page 98, paragraphs 18-22.

attempts to disguise his identity and he agreed to return to the United States when his Jordanian visa expired.

In Jacksonville, Mr. Bell made homemade explosives out of fireworks being sold for Independence Day and fired guns with his friends at homemade targets in the woods surrounding his father's house. They declared that training for jihad. Again, there was no connection to any terrorist group. And while such actions are potentially dangerous, they certainly aren't unusual for teenaged boys.

One thing he never did was take up arms against his own countrymen, which, if he were truly interested in more than just the concept of armed jihad, would have been easier to do in Jacksonville than halfway around the world.

While overseas, Mr. Bell made no attempts to conceal his identity, agreed to return to the United States after his Jordanian visa expired and spoke at length with the FBI about his trip when he landed in Houston, Texas.

He pleaded guilty without litigation and has consistently expressed a desire to resolve this case and take his punishment. He long ago swore off ever doing anything like this again, calling it a "dumb" thing to do. He is remorseful about his actions and wants to do something tangible. For instance, he has expressed a desire, whenever he is released, to work community service hours at Chapel Hills Memory Gardens cemetery, where he participated in the destruction of several statues. This desire is genuine; he was reluctant for defense counsel to bring it to the court's attention for fear of his motivation being misinterpreted.

Mr. Bell has followed the rules during his nearly 20 months of incarceration. He has

8

had no disciplinary reports since his first week in federal custody in August 2013.

Since his indictment, one of Mr. Bell's primary concerns has been how this case and the resultant media attention has impacted his family, particularly his mother and his younger siblings. In addition to regretting his actions, he also regrets the pressure his actions have put on his family.

Upon his release, Mr. Bell would be able to reside with his father in Jacksonville.

## 2. SENTENCING GUIDELINES AND KINDS OF SENTENCES AVAILABLE

Although advisory to the Court, the Court is obligated to correctly calculate the sentencing guidelines. Mr. Bell would assert that the Sentencing Guidelines themselves produce, by their application, a sentence greater than necessary to effectuate the policies of sentencing.

Mr. Bell was charged with and entered his plea of guilty to the two count indictment: court one, charging him with conspiracy to provide material support to terrorists in violation of 18 U.S.C. §2339A, and count two, charging him with an attempt to provide material support to terrorists, also in violation of 18 U.S.C. §2339A.

In applying the Sentencing Guidelines, the Guidelines direct that the Court first determine the offense guideline section from Chapter Two (Offense Conduct) applicable to the offense of conviction. USSG §1B1.1. Most federal criminal statutes are listed in the Statutory Index  (Appendix A) which provides the Chapter Two guidelines section to be used. In connection with 2339A, Appendix A directs the Court to §2X2.1 (Aiding and Abetting) or §2X3.1 (Accessory after the Fact).

9

Given these options, USSG §2X2.1 seems more appropriate.  The application note to §2X2.1 then states that "in the case of a violation of 18 U.S.C. §2339A or §2339C9A)(1)(A), "underlying offense"means the offense the defendant was convicted of having materially supported or provided or collected funds for, prior to or during its commission."  Although this arguably leads to the cross reference described in the PSR, Mr. Bell argues that the truer analogous offense for the base offense level is USSG §2M5.3, entitled Providing Material Support or Resources to Designated Foreign Terrorist Organizations or Specially Designated Global Terrorists, or for a Terrorist Purpose.  This would provide a base offense level of 26.

Mr. Bell also argues against the increase to his offense level for any leadership or role enhancement.  Mr. Bell was not an organizer or leader as described by the Guidelines.  It appears that the government argues that there are others persons at the mosque or in Jacksonville over whom Mr. Bell was 'in charge.'  Since the guidelines talk of a participant as "one who is criminally responsible for the commission of the offense, but need not have been convicted," the government can not mean to imply that listening to discussions or even taking part in conversations with Mr. Bell made others criminally liable for the conspiracy or attempt charged in the Indictment.  There are no other participants other than the juvenile.

The factors for the Court to consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal

10

activity, and the degree of control and authority exercised over others.  As discussed throughout this memo and the sealed submission, there is clear evidence that Mr. Bell and the juvenile were co-actors and that the juvenile had special skills or resources making his role more significant than Mr. Bell's.  Thus a leadership enhancement is inappropriate.

**3.      SENTENCING POLICY ISSUES**

      A.      THE NEED FOR THE SENTENCE IMPOSED TO REFLECT THE SERIOUSNESS OF THE OFFENSE, TO PROMOTE RESPECT FOR THE LAW, AND TO PROVIDE JUST PUNISHMENT FOR THE OFFENSE

Terrorism is obviously a bad thing.  However, there has to be some distinction between someone who acts in a foolhardy and thoughtless way without achieving any success and someone who accomplishes the act.  If the government's argument prevails -that all terrorism offenses receive the statutory maximum- it fails to achieve the individualized purposes of sentencing and fails to distinguish between the foolish and the successful.

Any sentence imposed on Mr. Bell is significant.  However, the government asks the court to impose a sentence of the statutory maximum which would represent significantly more time than Mr. Bell has even been alive.

      B.      THE NEED FOR DETERRENCE

The difficulty with the deterrence argument is that it is hard to measure the effectiveness of using a single sentencing hearing, conducted in the Middle District of Florida, to send a message to others who might be contemplating committing a bad act.  For the foolish, who are not thinking through or planning ahead, no message would be received by hearing of a sentencing because such a person is unlikely to put his or her actions in the

context of a future criminal case.  To someone whose heart and mind are both set on a destructive path, the message might be warped into "Make sure you succeed (so you earn the maximum sentence)" or "Make sure you die in the effort (so you don't face the consequences)."

C.    THE NEED TO PROTECT THE PUBLIC

The odds of Mr. Bell committing any kind of new offense are so low as to be virtually negligible.

When he is released from custody, Mr. Bell will be on supervised release but will also have to try to create a life in the shadow of his conviction.  In today's Google age of internet review, Mr. Bell's name will always be tied to these charges based on acts committed as a teenager.  Creating a new life and a new future will not be easy, but he has a family and friends committed to supporting him, and he is determined to reach for his potential. It is time to let him start creating that life.  However, Mr. Bell is young enough to turn his life around.  Sentencing him to some extreme sentence will only mean that he becomes hardened and institutionalized and would likely leave him without resources to start again.

In this case, there has been a violation of the law.  Accordingly, the crime should be punished in some fashion.  The federal conviction admitted by Mr. Bell carries great weight. Mr. Bell has been labeled and will be known forever, in the age of internet searches, as a terrorist suspect.  No matter the changes he makes in his life or the steps he takes to put this behind him, he will forever be known for this brief time as a teenager.

The experience of the present prosecution has had a terrible emotional impact on Mr.

12

Bell and his family.

Regardless of the sentence, Mr. Bell will now always suffer the brand of a federal criminal conviction - no small punishment for any defendant.  As a result of this conviction, Mr. Bell suffers the resulting loss of civil liberties.  Mr. Bell has lost the right to own or possess a firearm.  Mr. Bell has lost the right to vote and to serve on juries.  Mr. Bell can be limited in obtaining certain occupational licenses.  Mr. Bell can be limited from participating in some federal entitlement programs.

Additionally, Mr. Bell will be on supervised release following any incarceration imposed by the court.  Such supervision will entail great responsibility from him to the court and represents a substantial restriction on his liberty.  There is a "substantial restriction of freedom" involved in a term of supervised release or probation.  *Gall*, 552 U.S. at 48.  The Court noted that:

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. See *United States v. Knights*, 534 U.S. 112, 119, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled' " (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987))).  Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. USSG § 5B1.3. Most probationers are also subject to individual "special conditions" imposed by the court.

*Id.*

The same limitations on liberty apply to the terms of federal supervised release since the conditions of supervision are substantially similar to those imposed in probationary sentences and the consequences of a violation (re-incarceration) are the same.

Additionally, it is anticipated that the federal government will keep a close eye on Mr. Bell, apart from any court ordered supervision.

D.     THE NEED TO PROVIDE THE DEFENDANT WITH NEEDED EDUCATIONAL OR VOCATIONAL TRAINING, MEDICAL CARE

This directive to the court is difficult to address since it conflicts with the instructions given to the Sentencing Commission in 28 U.S.C. § 994(k), which states that "the Commission shall insure that the guidelines reflect the general ***inappropriateness*** of imposing a sentence to a term of imprisonment for the purpose of rehabilitating the defendant or providing the defendant with needed educational or vocational training, medical care, or other correctional treatment." (Emphasis added).

By the time of his sentencing date, Mr. Bell will have spent 21 months in continuous county jail custody. This time has been at the Duval County Jail, the D Ray James facility and now at the Baker County Jail.  None of these facilities offer much in the way of educational programs or work  programs.  Mr. Bell has therefore had almost two years of time in which he has had to wait helplessly to find out what will happen to him next.

Any time he spends with the Bureau of Prisons isn't likely to be any easier given his terrorism designation.  According to the Department of Justice, "BOP defines terrorist inmates as those having been convicted of, charged with, associated with, or linked to

14

terrorist activities.''[11] Mr. Bell would fall within that designation, which would mean all his mail and phone conversations would be monitored.[12]

Additionally, with a terrorist designation, Mr. Bell faces a strong possibility of incarceration in one of the Bureau of Prisons' Supermax or Communication Management Units[13] far from his family in Jacksonville. He would face limited family contact, fewer opportunities for work or education and potential limitations on the practice of his religion.[14]

## 4.   NEED TO AVOID UNWARRANTED SENTENCE DISPARITY

Sentencing parity issue arises when one looks at sentences nationally for conspiracy and material support charges. According to a study released in July by Human Rights Watch, the median sentence received by defendants nationally who resolved material support and conspiracy charges via a plea was 84 months.[15]  The study does not distinguish between those who pled guilty to actually providing material support and those who, like Mr. Bell, pled guilty to attempting to provide such support.  Reason suggests the median sentence would be lower for those attempting to provide material support than for those who succeeded in

---

[11]U.S. Department of Justice fact sheet, Feb. 21, 2007.

[12]Id.

[13]Communication Management Units (CMUs) are similar to medium-security units but with constant surveillance and heavily restricted communication with the outside world. The Bureau of Prisons has two CMUs, in Marion, Illinois, and Terre Haute, Indiana, populated largely be Muslim inmates.

[14]Columbia Law School, supra at 138-139.

[15]Columbia Law School, Human Rights Institute, *Illusion of Justice: Human Rights Abuses in U.S. Terrorism Prosecutions*, July 2014, Appendix D: Qualitative Analysis of the Department of Justice Terrorism Conviction Dataset, p. 205.

doing so.

In the Eastern District of New York involving a set of defendants who provided substantial support to the Tamil Tigers, in the cases of *United States v. Thavaraja* et al., 1:06-cr-616 (RJD) (E.D.N.Y.) and *United States v. Sriskandarajah* et al., 1:06-cr-616 (RJD) (E.D.N.Y.). In these cases, the defendants provided support to the Tamil Tigers, or the LTTE, a proscribed terrorist organization.  The support was substantial – millions of dollars, oftentimes illegally laundered, was directly provided, and was provided with specific intent that they be used for violent terrorism. The cases involved bribery of public officials and the movement of large amounts of arms. In each, the defendants received sentences between 12 and 108 months.   In *United States v. Thavaraja*, 740 F.3d 253 (2nd Cir 2014), the below guidelines, 108 month sentence for Defendant Thavaraja was upheld.

In *United States v. Warsame*, 651 F.Supp.2d 978 (D. Minn. 2009), the defendant – who swore allegiance to al Qaeda, spent over a year in al Qaeda camps in Afghanistan, sought to bring his family to live with him in Afghanistan, and then traveled to the United States after September 11, 2001, where he remained in contact with senior al Qaeda  al Qaeda associates he had met in Afghanistan and Pakistan.  The district court sentenced him to 92 months.   The court's opinion, which acknowledged Warsame's membership in al Qaeda and access to its leadership, explained its sentence:

> [T]his Court's role at sentencing is not to construct the
> darkest possible interpretation of a defendant's conduct and
> potential and then sentence the defendant as if that
> interpretation is truth. While this Court has given its utmost
> consideration to all of the public and non-public information
> in his case - including all of the information that in any way

16

> implicates the national security of the United States - it simply finds nothing that adequately demonstrates that Warsame was a part of a specific plot against the United States, and very little that suggests he was especially useful to al Qaeda, either during his training in the Middle East or upon his return to North America.

Id at 981.  In this case, although the government argues that Mr. Bell and the juvenile traveled overseas for the express purpose of giving themselves over to a terrorist organization, no group or individual took them up on their offer.

The *Warsame* court further "carefully considered the sentences imposed in dozens of other terror-related cases" and found many to be "unhelpful measuring sticks" as they involved "unique, violent circumstances." The Court did find "some guidance" in the cases of Salim Hamdan, often described as the personal driver for Osama bin Laden, who received a sixty six month sentence from a military court and from the "Lackawanna Six" case in which six defendants were charged with six defendants were accused of traveling from the United States to Pakistan, and then to an al Qaeda training camp in Afghanistan.  Those defendants ultimately received sentences ranging from 84 to 120 months. *Id* at 982.

Lastly, it should be noted that due mainly to the terrorism enhancement, Mr. Bell's adjusted offense level is 11 points higher than the base offense level for second-degree murder (38).  The terrorism enhancement also has the draconian effect of both increasing the base offense level by at least twelve levels but increases the criminal history category to the highest category.  Since every six levels on the guidelines chart roughly doubles the sentencing exposure, this one increase to the base offense level quadruples the sentencing exposure, even before the application of the criminal history category shift.

## CONCLUSION

*"I HAVE ALWAYS FOUND THAT MERCY BEARS RICHER FRUITS THAN STRICT JUSTICE."*

*ABRAHAM LINCOLN, SPEECH IN WASHINGTON D.C., 1865*

Based on the foregoing, Mr. Bell urges the Court to consider the over-arching principle of sentencing - parsimony - to impose a sentence sufficient but not greater than necessary.

DATED: August 21, 2014.

DONNA ELM
FEDERAL DEFENDER

s/ *Lisa Call*

Lisa Call, Assistant Federal Defender
Florida Bar No. 0896144
200 West Forsyth Street, Suite 1240
Jacksonville, FL 32202
Telephone: (904) 232-3039
Facsimile: (904) 232-1937
Lisa_call@fd.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing has been furnished by electronic filing through the United States District Court to Mac Heavener, AUSA, 300 North Hogan Street, Suite 700, Jacksonville FL 32202 on August 21, 2014.

s/ *Lisa Call*

Lisa Call, Assistant Federal Defender

18