```
                  IN THE UNITED STATES DISTRICT COURT
                      MIDDLE DISTRICT OF FLORIDA
                        JACKSONVILLE DIVISION

UNITED STATES OF AMERICA,           Jacksonville, Florida

              Plaintiff,            Case No. 3:13-cr-141-J-32JRK

  vs.                               October 23, 2014

SHELTON THOMAS BELL,                9:35 a.m.

              Defendant.            Courtroom No. 10D
_____
```

**REDACTED TRANSCRIPT**
SENTENCING HEARING
(VOLUME I OF II)
BEFORE THE HONORABLE TIMOTHY J. CORRIGAN
UNITED STATES DISTRICT JUDGE

GOVERNMENT COUNSEL:

**MAC D. HEAVENER, III, ESQ.**
**KEVIN C. FREIN, ESQ.**
United States Attorney's Office
300 North Hogan Street, Suite 700
Jacksonville, Florida  32202

**MARA M. KOHN, ESQ.**
Department of Justice
Counterterrorism Division
950 Pennsylvania Avenue
Washington, D.C.  20530

DEFENSE COUNSEL:

**LISA CALL, ESQ.**
Federal Public Defender's Office
200 West Forsyth Street, Room 1240
Jacksonville Florida 32202

COURT REPORTER:

Shannon M. Bishop, RMR, CRR

(Proceedings recorded by mechanical stenography; transcript
produced by computer.)

T A B L E   O F   C O N T E N T S

Page No.

WITNESSES FOR THE GOVERNMENT:

**WILLIAM JAMES BERRY, JR.**
Direct Examination................................   9

**DAVID SCHIAVONE**
Direct Examination................................  91
Cross-Examination.................................  96
Direct Examination (Continued).................... 111
Cross-Examination................................. 160
Redirect Examination.............................. 181

**WILLIAM EDWARD BRANIFF**
Direct Examination................................ 184

E X H I B I T S   R E C E I V E D

Page No.

Government's Exhibits:


Nos. A-1 through A-35............................  16
Nos. B-1 through B-6............................  17
No. C-1.......................................... 127
No. C-2.......................................... 129
No. C-3.......................................... 131
No. C-4.......................................... 137
Nos. C-5 through C-12...........................  76
Nos. B-7 and B-8................................  18
Nos. C-13 through C-16..........................  81
Nos. C-17 through C-19..........................  83
No. C-20........................................  29
Nos. C-21 through C-32..........................  29
No. C-33........................................ 120
Nos. C-34 and C-35.............................. 122
Nos. C-36, C-37, and C-38 ......................  84
No. C-39........................................  38
No. C-40........................................ 157
No. C-43........................................ 125

1                   P R O C E E D I N G S

2   October 23, 2014                              9:35 a.m.

3                        -  -  -

4             COURT SECURITY OFFICER:  All rise.  The United States

5   District Court in and for the Middle District of Florida is now

6   in session.  The Honorable Timothy J. Corrigan presiding.

7             THE COURT:  We're on the record in *United States of*

8   *America versus Shelton Thomas Bell*.  The case is numbered

9   3:13-cr-141.

10            Mr. Heavener, Mr. Frein, and Ms. Kohn -- is Kohn

11   correct?

12            MS. KOHN:  It's Kohn, Your Honor.

13            THE COURT:  Kohn.  Sorry.  I get it wrong every

14   time -- are present for the government, along with Agent Berry

15   from the FBI.  And they all represent on the government's side,

16   of course.

17            And Ms. Call is here representing Mr. Bell, who is

18   present in the courtroom.  We're here today for a sentencing

19   hearing in this case.

20            I've met briefly with counsel in chambers to kind of

21   plan the day here.  And the two issues that we discussed

22   that -- as to how we're going to proceed are that -- there is

23   a -- as the public record indicates, there is a juvenile that

24   was involved in this case as well.

25            And there's no way to discuss the case without

 1   discussing the juvenile and his role; however, under federal

 2   law the identity of the juvenile is protected and any

 3   proceedings that involve the juvenile are protected.

 4         And so we're going to make an effort to honor that by

 5   referring to the person as the juvenile rather than by name,

 6   and by having the witnesses and the evidence that's presented

 7   do everything possible to not give any personal identifying

 8   information regarding the juvenile.

 9         However, the juvenile's role and any matters which are

10   important to Mr. Bell's situation will be discussed in open

11   court.  I don't have any intention at the moment of closing the

12   court proceedings or sealing them or anything like that.  I

13   think all of it will be able to be done in public.

14         Secondly, we discussed how we're going to proceed

15   today.  And there are different ways you can proceed in a

16   sentencing hearing.  This one is a little bit different than

17   most, because there's going to be a substantial evidentiary

18   presentation, both by the government and by Ms. Call.

19         And so rather than segregate the discussion and

20   compartmentalize it into a -- a particular guidelines

21   application or -- or a 3553(a) factor or -- or the things that

22   we're going to end up needing to talk about, or an application

23   of law, what I've decided to do, and the parties are in

24   agreement, is that the government is just going to make its

25   complete evidentiary presentation without trying to pigeonhole

1    what bit of testimony goes with what issue.

2           And then Ms. Call, on behalf of Mr. Bell, will make

3    her evidentiary presentation, subject to appropriate

4    cross-examination, of course, by both sides.

5           We'll complete the evidentiary presentation and then

6    we will, at that point, start talking about the law and the

7    guidelines and so forth.

8           I'm told that the presentations may take some time,

9    and could even take the day.  And so we'll just see how it goes

10   as we proceed.

11          I would expect that there will be a morning break, a

12   luncheon break, and then resume in the afternoon, and then a

13   midafternoon break.

14          And if the -- if it does take the day, for logistical

15   and other reasons, we would conclude at 5 o'clock.  But we'll

16   just see how it goes.

17          So, Mr. Heavener, is it -- it seems to me if we're

18   going to proceed in this way -- and I have read all the

19   briefing.  And I should say that for the record I've read -- go

20   ahead and have a seat.  It's going to take a minute.

21          I have read the presentence investigation report.

22   I've read sentencing memoranda by both the government and --

23   and Ms. Call.  I've read additional supplemental memoranda that

24   were filed pursuant to a scheduling order.

25          There are some matters under seal that I've read that

1  refer to the juvenile's specific situation and some other

2  juvenile matters.  And so I -- those are under seal.  And they

3  are part of the court record, but they're not publicly

4  available.

5        I've looked at -- so I've read literally hundreds of

6  pages of material that the parties have provided to me to give

7  me their perspective and information that I'll need in order to

8  arrive at an appropriate sentence.

9        And then the government and Ms. Call, pursuant to my

10  previous scheduling order, have provided a witness list, an

11  exhibit list, not only to me, but to each other, so that

12  everybody should know what -- what's coming and -- and we will

13  be putting the exhibits into evidence as we go along.

14        And then there also is going to be expert reporting.

15  And so I've read expert reports.  The government has an expert.

16  Ms. Call has an expert.  I've read their reports.  But I expect

17  them both to be here live, as well.

18        And then I have reviewed the juvenile's proceeding to

19  refresh myself on it, and a number of other matters, including

20  the plea agreement, the indictment, docket sheet.  And so I --

21  I feel like I have a good working base of -- of knowledge as to

22  matters that are coming before me.

23        And so, Mr. Heavener, what I was getting ready to say

24  was I don't think there needs to be any opening statement or --

25  or setting the scene.  But if you want to do something briefly,

1    I'll let you do it, or I'll let you begin your presentation.

2          I think what I'm essentially going to do is turn it

3    over to you at this point and let you proceed as you're

4    advised.  And then once you complete your presentation, then

5    I'll do the same for Ms. Call.

6          MR. HEAVENER:  In the interest of time, Your Honor, we

7    would be -- prefer to just begin the presentation.

8          THE COURT:  All right.  Then you may either call your

9    first witness or show me your first exhibit.

10          MR. HEAVENER:  Your Honor, the United States would

11    call Special Agent William Berry.

12          COURTROOM DEPUTY:  Do you solemnly swear that the

13    testimony you are about to give before this court will be the

14    truth, the whole truth, and nothing but the truth, so help you

15    God?

16          THE WITNESS:  I do.

17          COURTROOM DEPUTY:  Please state your full name and

18    spell your last name for the record.

19          THE WITNESS:  William James Berry, Jr., B-e-r-r-y.

20          COURTROOM DEPUTY:  Thank you.  Please be seated.

21          THE COURT:  And, Mr. Heavener, before you begin, I did

22    not address this with the parties.  And we don't typically have

23    as much evidentiary presentation as we're going to have in this

24    sentencing hearing.

25          Nobody has asked me to invoke the rule of

1  sequestration.  And so I am not invoking the rule unless I'm

2  asked to do so by a party.  So as of right now, the rule is not

3  invoked.

4          MR. HEAVENER:  We have no objection to that.

5          THE COURT:  All right.  You may proceed.

6          MR. HEAVENER:  And, Your Honor, one housekeeping

7  matter.  Prior to the sentencing hearing today, as the court

8  indicated, the government has provided both exhibits, exhibit

9  lists -- I would intend to introduce all those exhibits through

10  Agent Berry.  But I just wanted the record to be clear I

11  previously provided the exhibits to Ms. Call.

12          And so I -- in the interest of time, I'll probably not

13  do anything more than refer to what's been assembled in

14  notebooks that we provided.

15          THE COURT:  All right.  And I have a notebook that you

16  provided to me.  And is that going to be what you'll be working

17  from?

18          MR. HEAVENER:  Yes, sir.

19          THE COURT:  Okay.  All right.  You may proceed.

20          MR. HEAVENER:  Thank you, Your Honor.

21      **WILLIAM JAMES BERRY, JR., GOVERNMENT'S WITNESS, SWORN**

22                        **DIRECT EXAMINATION**

23  BY MR. HEAVENER:

24  Q.   Sir, would you please state your name.

25  A.   William James Berry, Jr.

1    Q.    And how are you employed?

2    A.    I'm a supervisor with U.S. Customs and Border Protection.

3    Q.    And do you currently have an assignment with that agency?

4    A.    I do.  I'm currently full-time assigned to the Northeast

5    Florida Joint Terrorism Task Force.

6    Q.    And tell us what the Joint Terrorism Task Force is.

7    A.    The task force, or JTTF, is an FBI-led investigative group

8    of federal, state, and local law enforcement agencies, tasked

9    with investigating both domestic and international terrorism

10   matters.

11   Q.    All right.  And how long have you worked for the Joint

12   Terrorism Task Force?

13   A.    Four-and-a-half years.

14   Q.    And were you in that position back in the summer of 2012?

15   A.    I was.

16   Q.    Okay.  And are you familiar with an investigation

17   involving an individual named Shelton Thomas Bell?

18   A.    Yes, sir, I am.

19   Q.    And how are you familiar with that investigation?

20   A.    I am one of the lead investigators.

21   Q.    All right.  And during that investigation -- and we're

22   going to get to this in detail.  But you've had an opportunity

23   to interview and interact with Mr. Bell?

24   A.    Yes, sir, I have.

25   Q.    And do you see Mr. Bell here in the courtroom today?

1  A.   I do.  He's seated to my right, next to Ms. Call.

2       MR. HEAVENER:  And may the record reflect the

3  identification, Your Honor?

4       THE COURT:  Yes, sir.

5       MR. HEAVENER:  All right.

6  BY MR. HEAVENER:

7  Q.   I want to give just a general overview of some of the

8  things that you did as the lead investigator in the

9  investigation.  You mentioned you interviewed Mr. Bell.  Do you

10 recall the date that that interview took place?

11 A.   That was on November 21st, 2012.

12 Q.   And where was that interview?

13 A.   That was at the Houston International Airport.

14 Q.   And can you give us just a brief summary of the

15 circumstances of that interview, how you found yourself to be

16 in the Houston International Airport?

17 A.   Sure.  That was after Mr. Bell had been detained in Oman,

18 Jordan by the Jordanian authorities and ultimately deported

19 back to the United States.

20 Q.   Okay.  And was that a voluntary interview on behalf of

21 Mr. Bell at the airport?

22 A.   Yes, it was.

23 Q.   And then you've heard mention of a juvenile in this case.

24 Have you actually interacted or interviewed with that juvenile

25 on a number of occasions?

1    A.    I have.  I've interviewed the juvenile on four occasions.

2    Q.    And what -- what were the dates of those interviews?

3    A.    The first date was November 16, 2012, April 13, 2013,

4    August 7th, 2013, and August 28, 2013.

5    Q.    And have you also interviewed other witnesses and persons

6    with knowledge about this investigation?

7    A.    I have.

8    Q.    And at some point in the investigation you've had the

9    opportunity to review a number of digital items or electronic

10   items, including a laptop computer and some flash drives that

11   Mr. Bell had; is that accurate?

12   A.    That is accurate, sir.

13   Q.    You've also listened to some intercepted phone calls of

14   Mr. Bell?

15   A.    Yes, sir.

16   Q.    And you've assisted in obtaining business records and that

17   type of thing?

18   A.    Yes, sir.

19   Q.    And have you spoken with other agents who -- you may not

20   have been present, but you've -- you've certainly reviewed

21   their reports and talked to them about the case?

22   A.    I have.

23   Q.    Okay.  And directing your attention, sir, to a number of

24   exhibits that have been provided to the court and to -- to

25   opposing counsel, specifically Government's Exhibits A-1

1  through A-35 -- those are all video recordings.  Have you had

2  the opportunity to review all of those recordings?

3  A.   Yes, sir, I have.

4  Q.   And with the exception of A-1 and A-35, each of the other

5  recordings were actually obtained from Mr. Bell's digital

6  media?

7  A.   That is correct.

8  Q.   And the copies that have been provided to the court and

9  Ms. Call, those are fair and accurate depictions of what you

10  reviewed from that media?

11  A.   Yes, sir, they are.

12  Q.   And with regard to Government's Exhibit A-1, what --

13  what's the source of that video file?

14  A.   That video file was taken from a juvenile's computer with

15  his consent.

16  Q.   Okay.  Was that the same juvenile that you interviewed on

17  November 16th, or a different juvenile?

18  A.   It's a different juvenile.

19  Q.   Okay.  So A-1 is from a different juvenile's computer, but

20  it's a fair and accurate depiction of the file that you

21  reviewed on that computer?

22  A.   That's correct, sir.

23  Q.   And A-35 is a -- it's really a compilation of videos that

24  you prepared, but there -- the source of those videos is all

25  videos from Mr. Bell's computer?

1  A.   Yes, sir.

2  Q.   And you prepared that compilation, really, just to -- in

3  the interest of time, so that we wouldn't have to watch hours

4  of videotape?

5  A.   There were quite a few hours of tape.  Yes, sir, that's

6  accurate.

7          MR. HEAVENER:  Your Honor, at this time the United

8  States would request submission of Government's A-1 through

9  A-35.

10         MS. CALL:  Your Honor, I do object to A-35, the

11  compilation.  And then I had a question -- may I approach

12  Mr. Heavener for just a moment?

13         THE COURT:  Sure.

14     (Counsel confer.)

15  BY MR. HEAVENER:

16  Q.   Agent Berry, let me ask one question.  Video -- the video

17  A-3, that did not come from Mr. Bell's computer either; is that

18  right?

19  A.   That's correct, sir.

20  Q.   That's a recording that was conducted by the Jacksonville

21  Sheriff's Office of an interview?

22  A.   Correct.  And then turned over to us.

23         MR. HEAVENER:  All right.  Your Honor, at this time

24  the United States would request submission of all those

25  exhibits.

```
 1              THE COURT:  All right.  So A-1 came from a juvenile.
 2    And it references some discussion at the mosque, apparently,
 3    from what I'm reading.
 4              A-2, skipping over A-3, all the way to A-34, are all
 5    videos that came from Mr. Bell's computer or other access that
 6    he had, and then -- I'm going to all this and then you can tell
 7    me if I'm right.
 8              And then A-3 came from a JSO interview with Mr. Bell;
 9    is that correct?
10              THE WITNESS:  Correct.
11              THE COURT:  Okay.  And A-35 is the one that Ms. Call's
12    objecting to.  Tell me what that is, again.
13              THE WITNESS:  That's a video that I put together.
14    It's clips from all of the other -- not all of them, but some
15    of the bomb-making videos.
16              THE COURT:  All right.  And where did -- what's the
17    original source of it?  Did it come from Mr. Bell?  Did it come
18    from somewhere else?  Where did it come from?
19              THE WITNESS:  They're all from Mr. Bell's computer.
20              THE COURT:  So is it correct to say that they would be
21    similar to the other clips that are from Mr. Bell's media, but
22    you've taken little snippets of them and put them all together
23    in one -- one clip?  Is that the way it works?
24              THE WITNESS:  Yes, sir.  That's pretty accurate.
25              THE COURT:  Okay.  And, Ms. Call, your objection to
```

1    A-35 is what?

2            MS. CALL:  Your Honor, this is not like under -- I

3    think it's Rule 1001, where it's a summary of voluminous

4    documents just meant to provide a factual summary.  This is

5    edited material, and may or may not be a fair and accurate

6    representation of the entirety of the video.

7            THE COURT:  Sure.

8            MS. CALL:  And as it represents more of the

9    government's work product or opinion, I don't think it's fair

10   to include that as an exhibit here.

11           THE COURT:  Okay.  Well, as you know, the rules of

12   evidence don't strictly apply in a sentencing proceeding.  I'm

13   going to overrule your objection.

14           Of course, I haven't actually seen it yet.  And if

15   it's played to me -- but if you feel that it's unfair in any

16   way or that additional viewing of other portions of -- of these

17   videos that would give it more context, I would be happy to

18   review those as well at your request.

19           So with that understanding, I'm going to admit

20   Government's A-1 through A-35.  They will be received.

21           Mr. Heavener, you may proceed.

22      (Government's Exhibit Nos. A-1 through A-35 were received

23   into evidence.)

24           MR. HEAVENER:  Thank you, Your Honor.  I would advise

25   the court A-15, A-22, A-23, A-24, A-29, and A-30 are the actual

```
 1   underlying videos from which A-35 was assimilated.

 2          So if Ms. Call wants to play any of those, she's free

 3   to do so.

 4          THE COURT:  All right.  You may proceed.

 5   BY MR. HEAVENER:

 6   Q.   And, Agent Berry, directing your attention to a number of

 7   recorded phone calls, specifically Government's Exhibits B-1

 8   through B-6, have you had a chance to listen to each of those

 9   intercepted phone calls?

10   A.   Yes, sir, I have.

11   Q.   And do you recognize Mr. Bell's voice on those intercepted

12   phone calls from your interactions with Mr. Bell?

13   A.   I do.

14   Q.   And those calls fairly and accurately have captured

15   telephone conversations that you've listened to involving

16   Mr. Bell?

17   A.   They do.

18          MR. HEAVENER:  All right.  Your Honor, at this time

19   the United States would request submission of Government's B-1

20   through B-6.

21          MS. CALL:  No objection.

22          THE COURT:  Be received, Government's B-1 through B-6.

23      (Government's Exhibit Nos. B-1 through B-6 were received

24   into evidence.)

25   BY MR. HEAVENER:
```

```
 1   Q.   And then, finally, Agent Berry while we're talking about

 2   recordings, Government's Exhibits B-7 and B-8, are those

 3   recordings made at the Baker County Jail or the D. Ray James

 4   detention facility involving discussions with Mr. Bell and

 5   others?

 6   A.   They are.

 7   Q.   And do those recordings fairly and accurately depict what

 8   you listened to?

 9   A.   They do.

10   Q.   And being familiar with Mr. Bell's voice, do you recognize

11   Mr. Bell as the -- one of the speakers in those recordings?

12   A.   I do.

13        MR. HEAVENER:  All right.  Your Honor, at this time

14   the United States would request introduction of Government's

15   B-7 and B-8 as well.

16        MS. CALL:  No objection.

17        THE COURT:  Be received, B-7, B-8.

18     (Government's Exhibit Nos. B-7 and B-8 were received into

19   evidence.)

20   BY MR. HEAVENER:

21   Q.   Agent Berry, I want to direct your attention to the

22   investigation.  And just in very brief terms, just so we have

23   some context, can you give us a -- just a general overview,

24   three or four sentences, of what it was that you investigated

25   and -- and what brings us here to court today?
```

1  A.    Sure.  In June of 2012 the FBI was notified by the Islamic

2  Center of Northeast Florida here in Jacksonville, through their

3  attorney -- the board there was concerned about an individual

4  who was attending there by the name of Shelton Issa, Shelton

5  Bell, who was exhibiting unorthodox behavior.

6         He was speaking to the youth there about jihad, about

7  matters in Yemen and in Syria.  The youth began to hang around

8  Mr. Bell, dress like Mr. Bell.  And they were concerned about

9  the influence that he was having.

10        Ultimately we opened an investigation and Mr. Bell

11  left the country.  Through the investigation we determined that

12  Mr. Bell and the juvenile departed the United States in an

13  attempt to join Ansar al-Shari'a, a designated terrorist

14  organization.

15  Q.    Okay.  And do you recall the specific date that Mr. Bell

16  and the juvenile left the country?

17  A.    September 25th, 2012.

18  Q.    All right.  So they leave the country to join Ansar

19  al-Shari'a.  And we're going to talk about that in a moment.

20  At some point did Mr. Bell and the juvenile return to the

21  country?

22  A.    They did.

23  Q.    And when I say "the country," the United States of

24  America?

25  A.    Yes, sir.

1   Q.    Okay.  What date did the juvenile return to the United

2   States?

3   A.    November 16th of 2012.

4   Q.    And then Mr. Bell returned on what date?

5   A.    The 21st of November, 2012.

6   Q.    All right.  During your investigation -- I'd like to ask

7   you about a particular individual named Anwar al-Awlaki.  Are

8   you familiar with that name?

9   A.    Yes, I am.

10  Q.    And what significance is that name to you as a JTTF

11  investigator?

12  A.    Well, Anwar al-Awlaki is -- or was an American-born cleric

13  and Islamic extremist.  He was the senior motivator and

14  recruiter for al-Qa'ida.  And for that reason he was ultimately

15  killed in a drone strike by the United States.

16  Q.    Okay.  And with regard to Mr. al-Awlaki, you mentioned the

17  name of a terrorist organization Ansar al-Shari'a.  Could you

18  give us a description of that organization, both what it is,

19  what it does, and what Mr. al-Awlaki's role was in that

20  investigation.

21  A.    Well, simply, Ansar al-Shari'a is al-Qa'ida in the Arabian

22  peninsula, or AQAP.  Ansar al-Shari'a was AQAP's attempt at --

23  attempt at rebranding itself, to make its name more pleasing so

24  that it could inspire and recruit more fighters.

25          In 2012 -- I think October -- September or October

1    2012, the State Department designated Ansar al-Shari'a as an

2    alias for al-Qa'ida.

3            And as we know, al-Qa'ida is a terrorist organization

4    that has carried out many terrorist attacks, including those on

5    9/11 here in the United States.  It is the one that Osama bin

6    Laden is associated with as well.

7    Q.   Okay.  Directing your attention to the interview of

8    Mr. Bell, when he returned to the United States on November

9    21st of 2012, did you have any discussion with Mr. Bell about

10   the name Anwar al-Awlaki?

11   A.   I did.

12   Q.   And what -- tell us how that discussion -- what's the

13   context in which that discussion came up?

14   A.   We were talking about any scholars that were a great

15   influence on Mr. Bell.  And he named Anwar al-Awlaki as someone

16   who had had a great influence on him.

17   Q.   Okay.  And when he told you that, did you make any effort

18   to determine how much of Mr. Awlaki's messages or lectures he

19   had consumed?

20   A.   I did.  I asked him that question.  And he responded that

21   he had consumed approximately 85 percent of al-Awlaki lectures.

22   Q.   All right.  And with regard to these lectures of Anwar

23   al-Awlaki, as a JTTF investigator, do you have any knowledge

24   about where these are available and how they're available to

25   people?

1  A.    They're available on-line.

2  Q.    Okay.  When Mr. Bell told you that he had consumed

3  approximately 85 percent of Mr. al-Awlaki's lectures, did you

4  question him regarding what he viewed about them, what he

5  thought about them?

6  A.    I did.  And he said that he believed them to be accurate

7  and true, and that he believed them and that they were

8  accurate, according to the Quran.

9  Q.    Okay.  And you mentioned analyzing Mr. Bell's digital and

10 electronic evidence.  When that analysis was done, did Mr. Bell

11 have any of Mr. al-Awlaki's lectures saved on his computer?

12 A.    Yes, sir, he did.  We found approximately 372 audio and

13 video files on his computer.

14 Q.    And has the FBI done any analysis to determine how much

15 time those 372 lectures consumed?

16 A.    Approximately 176 hours.

17 Q.    All right.  And we're certainly not going to play all of

18 those for the court.  But have you identified one particular

19 lecture by Mr. Awlaki that's illustrative of his ideology?

20 A.    I have, sir.

21 Q.    And would that be Government's Exhibit A-2?

22 A.    Yes, sir, it would.

23        MR. HEAVENER:  And, Your Honor, at this time the

24 United States would request permission to publish Government's

25 A-2.

1            THE COURT:  Yes, sir.

2      (Video played.)

3  BY MR. HEAVENER:

4  Q.   Agent Berry, I'd like to ask you a couple of questions

5  about the video that we just watched.  In that video Mr. Awlaki

6  is discussing an incident that took place on Christmas Day, and

7  talked about a technical issue, and mentioned the name Umar

8  Farouk several times.

9            Do you have any knowledge about what he's referring to

10 there?

11 A.   He's talking about an individual who was flying into the

12 United States.  He's commonly known as the Underwear Bomber.

13 He had a device in his underwear in which he attempted to

14 detonate as he flew into the United States.  There was a

15 failure with the device.  So it did not go off.

16 Q.   All right.  And at the very end of this video, Mr. Awlaki

17 concludes by basically saying to the youth that they have two

18 options, they either stay in America -- or in the West and

19 fight or they join him in these various other countries.  Is

20 that --

21 A.   That's correct.

22 Q.   With that in mind, during the investigations, specifically

23 during your interview of the minor -- and let's begin when the

24 minor, the juvenile, returns to the United States on November

25 16th of 2012.

1          Did you have any discussions with the juvenile about

2   how Mr. Bell was able to get him to travel over to the Middle

3   East?

4   A.   Yes, I did.  In particular -- in reference to al-Awlaki,

5   Mr. Bell played al-Awlaki videos for the juvenile, and in

6   particular a series called *The 25 Promises of Allah*.

7   Q.   And did the juvenile tell you what effect viewing these

8   materials had on his beliefs and what he wanted to do?

9   A.   Yeah.  It -- after that, he believed that -- al-Awlaki and

10  that they should go.

11  Q.   All right.  And we've talked about this group Ansar

12  al-Shari'a.  In your discussions with the juvenile on November

13  16th, did he tell you why Ansar al-Shari'a was the group that

14  they wanted -- their plan was to associate with that group?

15  A.    Yeah.  They chose Ansar al-Shari'a in Yemen because that

16  was the group that Anwar al-Awlaki is associated with.

17  Q.    Okay.  And during your discussion with the juvenile on

18  November 16th, did the juvenile have any discussion with you

19  about -- I'll use the phrase cold feet, or whether he had

20  developed doubts while they were overseas?

21  A.    There did come a time while they were overseas in Jordan

22  where the juvenile did get cold feet.  In response, Mr. Bell

23  played another series of videos, al-Awlaki's series, *The*

24  *Hereafter*.  It was a 14-part series.  The juvenile stated they

25  were about an hour-and-a-half long each.

1    Q.    So 14 one-hour-and-a-half-long lectures?

2    A.    Correct.  And after hearing that, he once again believed

3    that what they were doing was right and they should go to

4    Yemen.

5    Q.    All right.  And then, finally, Mr. Awlaki ends this

6    message about fighting in the West.  And he talks about jihad.

7    Did you have any understanding from his -- Mr. al-Awlaki's

8    materials as to what he means by jihad?

9    A.    Well, there's certainly two meanings to jihad.  There's

10   one that's more common.  It's the internal struggle.  But he's

11   talking about violent jihad, talking about fighting.

12   Q.    Okay.  And when you interviewed the juvenile on November

13   16th, did you talk about fighting and killing people?

14   A.    I did -- we did.

15   Q.    Did you specifically talk to the juvenile about fighting

16   and killing people in relation to what Mr. Awlaki said?

17   A.    I did.  He said he believed Anwar al-Awlaki's message of

18   killing for the sake of Islam, but he did not agree with just

19   killing civilians.

20   Q.    Okay.  And when you interviewed him on subsequent

21   occasions, April 13th, August 7th, and August 28th, did you

22   have similar discussions with the juvenile about al-Awlaki

23   videos?

24   A.    We did.

25   Q.    Okay.  And I think the only thing you really added was on

1    April 13th, that a good portion of their time while they were

2    in Jordan in a hotel was spent consuming al-Awlaki videos?

3    A.    That's correct, sir.

4    Q.    Okay.  During your -- let me jump forward to when you

5    spoke with the juvenile on August 28th.  That discussion took

6    place here in this courthouse building; is that right?

7    A.    That's correct.

8    Q.    And who was with the juvenile at that point?

9    A.    His attorney, his counsel.

10   Q.    Okay.  And during that discussion, did you try to

11   determine if there were other people like Mr. Awlaki that

12   Mr. Bell and the juvenile had turned to for inspiration and

13   guidance?

14   A.    Yes, sir.  He stated that they had also listened to Osama

15   bin Laden, Mohamad al-Makdessi, and Anjem Choudary.  In

16   particular, he said that they enjoyed listening to Osama bin

17   Laden recite the Quran and enjoyed listening to his lectures.

18   Q.    All right.  And apart from consuming these lectures,

19   watching videos, and listening to lectures, did you -- did you

20   review Mr. Bell's digital media, the computers, the drives that

21   he had, to determine if he had any -- any image files or

22   computer files that reflected not words, but images of this

23   kind of ideology of radically killing and fighting for this

24   belief?

25   A.    Yeah.  We found numerous images on his computer.

1    Q.   All right.  I want to direct you to a few of those.

2         Let me ask you to look at Government's C-20.  And it

3    should be on a screen.

4         THE COURT:  I'm not seeing that.  Is it C-20, you

5    said?

6         MR. HEAVENER:  C-20, Your Honor.

7         THE COURT:  Okay.

8    BY MR. HEAVENER:

9    Q.   Are you able to see it in front of you, Agent Berry?

10   A.   No.

11   Q.   Okay.

12      (Judge confers with courtroom deputy.)

13        THE COURT:  I take it you want to -- I mean, it's not

14   in evidence.  Do you want it in evidence or --

15        MR. HEAVENER:  Yes, sir.  And I'll move all of these

16   into evidence after he talks about them.

17        THE COURT:  That's fine.  That's fine.  I guess we

18   wanted to make sure Ms. Call didn't have objection to them.

19   But that's all right.  Go ahead.

20   BY MR. HEAVENER:

21   Q.   All right.  Showing you C-20, Agent Berry, explain what

22   we're looking at.  This is from Mr. Bell's digital media.  What

23   are we looking at on C-20?

24   A.   An image that states -- it says Sharia-Controlled Zone,

25   Islamic Rules Enforced.

1  Q.   And what does that mean?

2  A.   As you heard from the al-Awlaki video a minute ago, the

3  spread of Sharia law, the Islamic law, throughout the world is

4  something that Islamic extremists are promoting.  That goes

5  along with the removal of secular governments.

6  Q.   All right.  And directing your attention back to the

7  interview you had with Mr. Bell on November 21st of 2012, did

8  you discuss that topic with Mr. Bell during that interview?

9  A.   Yes, sir.  And Mr. Bell stated that it was his mission to

10 establish Sharia law, not just to spread it, but to -- but to

11 establish it.

12 Q.   Would that be forcibly establishing it?

13 A.   That's correct.

14 Q.   Okay.  And when he -- when he told you that, did you seek

15 to determine where he had that thought from or -- or what had

16 enforced that thought in his thinking?

17 A.   That he had learned that from Anwar al-Awlaki.

18 Q.   Okay.  And did you -- did you have any discussion with him

19 about his view of people that didn't have that view of

20 thinking?

21 A.   I did.  And what I asked him was:  Was that something that

22 is taught here at the Islamic Center of Northeast Florida?  And

23 Mr. Bell stated that it was not and he personally found it

24 disgusting.

25        MR. HEAVENER:  All right.  And, Your Honor, at this

1  time the government would move introduction of Government's

2  Exhibit 20 -- C-20.

3          MS. CALL:  No objection.

4          THE COURT:  Be received.

5     (Government's Exhibit No. C-20 was received into evidence.)

6  BY MR. HEAVENER:

7  Q.   And just to save time, Agent Berry, we're going to be

8  reviewing Government's Exhibit C-20 through C-32.  You've

9  previously reviewed all of those images that were obtained from

10 Mr. Bell's computer?

11 A.   Yes, sir.

12 Q.   They all have some relevance to your discussion about

13 Mr. Bell and your interviews with him?

14 A.   Yes, sir.

15 Q.   All right.

16         MR. HEAVENER:  Your Honor, at this time I would simply

17 go ahead and move Government's C-21 through C-32 into evidence,

18 so that we can just refer to them.

19         MS. CALL:  No objection.

20         THE COURT:  Be received, C-21 through C-32.

21    (Government's Exhibit Nos. C-21 through C-32 were received

22 into evidence.)

23 BY MR. HEAVENER:

24 Q.   All right.  Agent Berry, let me direct your attention now

25 to Government's C-21.  What are we looking at on C-21?

```
 1  A.   Well, you're looking at an image, obviously, of President

 2  Obama.  And you see the words there, Is the assassination of

 3  Obama legal?  Next to Obama, that's Anwar al-Awlaki.  And then

 4  next to him is Osama bin Laden.

 5        Those two have -- have been killed -- both killed

 6  under the administration of Obama -- President Obama.  And so

 7  this is just a -- a depiction of that.

 8  Q.   All right.  And this was on Mr. Bell's computer?

 9  A.   It was.

10  Q.   Okay.  And Government's C-22, what are we looking at in

11  that document, or picture?

12  A.   This is another image found on Mr. Bell's computer.  It's

13  al-Awlaki with a grenade launcher.

14  Q.   Government's C-23?

15  A.   This is a quote from a Russian general.  It states, How

16  can you defeat an enemy who looks into the barrel of your gun

17  and sees Paradise?  This is a quote that you will hear Mr. Bell

18  in a video, a little later, quote.

19  Q.   All right.  During the al-Awlaki lecture we just viewed,

20  was that same idea put forward?

21  A.   It was.

22  Q.   All right.  And then Government's C-24 -- what is C-24?

23  A.   This is a picture of that Nadil Hasan.

24  Q.   All right.  And was he actually referenced during the

25  al-Awlaki lecture that we just watched?
```

1   A.   He was.  And as we know, Mr. Hasan is -- was the U.S. Army

2   psychiatrist who shot 13 people and wounded 30 others in 2009

3   at Fort Hood.

4        So during the interview it came up, because Mr. Bell

5   stated that he did not agree with the -- with the assassination

6   of -- or killing of Anwar al-Awlaki, because -- he said it was

7   done because America believed that Anwar al-Awlaki recruited

8   men like Nidal Hasan.

9        And he then quoted the video that we just watched, in

10  which Anwar al-Awlaki stated that it was American crimes that

11  recruited Nidal Hasan.

12       I then asked him if he agreed with Anwar al-Awlaki.

13  And he stated that he did agree with that, that it was American

14  crimes that recruited Mr. Hasan.

15  Q.   And just so we have the timeline clear, this interview was

16  on November 21st, when he comes back into the United States; is

17  that right?

18  A.   That is correct.

19  Q.   At the time you're interviewing Mr. Bell, you have not

20  seen whatever is on his computer?  Would that be accurate?

21  A.   That is accurate, sir.

22  Q.   Okay.  And this is -- this interview takes place

23  subsequent to Mr. Bell being held in a Jordanian holding cell

24  for a period of time; is that right?

25  A.   That is correct.

1  Q.   Okay.  And it's during this interview that he tells you

2  about how Mr. Awlaki was influential, all this material he had

3  consumed, how he agreed with his teaching?  And it's during

4  this interview that he basically mimics the same thing that

5  al-Awlaki said on that lecture that we just watched; is that

6  right?

7  A.   That is correct, sir.

8  Q.   All right.  Did he seem to have any trouble mimicking that

9  idea?  I mean, what -- compare Mr. Bell's words with the words

10 we heard Anwar al-Awlaki saying on the lecture.

11 A.   He did not have any trouble comparing them.  And they

12 are -- he quoted exactly those words.  And throughout the

13 interview there were other quotes from al-Awlaki, you know,

14 Hellfire and Paradise.  And in the videos -- some of the videos

15 you'll see, he talks about the spreading of the worldwide

16 jihad.

17 Q.   All right.  Government's C-25, what are we looking at

18 there?

19 A.   Just some mujahideen fighters, with some weapons there.

20 All of them, obviously, very young.

21 Q.   Okay.  Government's C-26?

22 A.   This is a photo of black flags, appear to be over a

23 mosque.  It says the black banners with fly in al-Quds, which

24 is an Arabic word for Jerusalem.

25 Q.   Okay.  Let me direct your attention -- we see a black flag

1    that's kind of in the middle of the photograph.  Can you

2    elaborate and provide some discussion to the court about

3    what -- what these black flags signify?  Are they --

4    A.    The black flags, also known as the black banners, the

5    black flag of jihad -- Mr. Bell routinely refers to them as the

6    black flag of Tawheed.

7            They are flags that have been adopted by many

8    terrorist organizations, ISIS currently, al-Qa'ida, al-Shabaab.

9    The flag consists of -- in this one it's wording in the middle.

10   It's the jihada, or the Islamic testament of faith, which --

11   which literally states there is no God but Muhammad -- or,

12   excuse me, there is no God but Allah.  And Muhammad is his

13   messenger.

14   Q.    And during your investigation of Mr. Bell, did you

15   determine if the phrase black flags, like we're seeing depicted

16   in this photograph -- did that have any significance to

17   Mr. Bell?

18   A.    It did.  In our review of his computers, we found that

19   Mr. Bell had at least three e-mail accounts that were black

20   flags rising.  So you had a black flags rising Hotmail, Yahoo,

21   and I think Gmail.

22   Q.    All right.  And in some of the videos we'll review of

23   Mr. Bell later on, did he actually talk about black flags?

24   A.    Yes, he does.

25   Q.    Okay.  Directing your attention to Government's C-27, what

1    are we looking at on C-27?

2    A.    So obviously you see a mujahideen fighter here with the

3    two pistols.  It looks like possibly the jihada there on the

4    pistols.  The *Free Syrian Army* down on the right.  And *Call of*

5    *Jihad, Operation Assad*.

6            Operation Assad is referring to the president of

7    Syria, Bashar al-Assad.  Operation Assad referencing to the

8    removal or assassination of Mr. Assad.

9    Q.    All right.  And that particular name, Bashar al-Assad --

10   did Mr. Bell use that name during your interview on November

11   21st of 2012?

12   A.    He did on multiple occasions, that -- he referenced the

13   fact that one time when they were thinking about going to

14   Syria -- or were going to go to Syria that it was because of

15   Bashar al-Assad and the killing of thousands of Muslims.  And

16   at one point he actually said that he would like to kill Bashar

17   al-Assad.

18   Q.    All right.  And you don't need to give us a detailed

19   listing.  But in some of these videos we're going to watch,

20   does he actually use that full name, Bashar al-Assad?

21   A.    He does, quite often, in quite a few of them.

22   Q.    Okay.  And in a handwritten journal that you recovered,

23   where was that recovered?  Can you tell us that?

24   A.    Sure.  When Mr. Bell came back into the country into

25   Houston, he had to go through Customs and Border Protection.

1  And so he went through a secondary procedure in which they look

2  into his luggage and looked at his -- what we call the pocket

3  litter.  And they copied that journal.  He had it on him when

4  he came in the United States.

5  Q.   All right.  And in the context -- we'll look at it later.

6  But in the context of the journal, did it indicate where it was

7  written?

8  A.   It did.  It was written while he was detained in a

9  Jordanian prison.

10 Q.   Okay.  And was there any reference to Bashar al-Assad by

11 name in that journal?

12 A.   There was.  At least two that I can remember.

13 Q.   Okay.  Going to Government's C-28, what are we looking at

14 in Government's C-28?

15 A.   So, again, you know, One Day, One Flag.  And you see

16 the -- the map at the bottom, the world map, you see the jihada

17 in a couple of ways, one with the Muhammad crest or seal, the

18 round -- so, again, it's just showing this worldwide jihad,

19 world movement, jihad takeover.  And it's the removal of, you

20 know, the secular government and replacing it with, you know,

21 Sharia law.

22 Q.   All right.  Is the United States depicted in that

23 photograph?

24 A.   It is.

25 Q.   And is it depicted underneath the -- a black flag of that

1  nature?

2  A.   It is.

3  Q.   Turning your attention to Government's C-29, what is

4  Government's C-29?

5  A.   This -- excuse me.  This is a -- a poem, basically.  You

6  know it starts out, I'm a sniper.  I never miss my throw.  My

7  hit will break you into trash.  I'm a warrior with stone in

8  hand.  I love to die young.

9          So this is an appeal, you know, to the youth to join

10  the jihad movement.

11  Q.   All right.  And this phrase "I love to die young,"

12  it's -- the very next line after that also mentions dying

13  young, as well?

14  A.   It does.

15  Q.   Okay.  Government's C-30, what are we looking at at

16  Government's C-30?

17  A.   You see, obviously, domino effect.  The listed countries

18  there in the dominos are, you know, mostly Islamic lands, but

19  controlled by secular governments.

20          And you heard that theme in Anwar al-Awlaki's video

21  of, you know, This is where the movement starts, this is where

22  they need to start, is to get those secular governments out of

23  Muslim lands first.

24  Q.   All right.  And then taking you, sir, to Government's C-31

25  what are we looking at at C-31?

1  A.   Again, some mujahideen fighters, a little bit different

2  version of the black flag, black banner.  This one, again --

3  even though it looks different, just has the jihada with the

4  Muhammad crest or seal in it.  It's probably -- most people

5  have seen this lately because it's the one that ISIS has

6  adopted.

7  Q.   Okay.  And I'll direct your attention to Government's

8  C-32.

9  A.   So you see -- so you see a couple of passports.  On the

10  one side, a passport Islamic Emirate of Afghanistan.  That was

11  the previous territory that was controlled by the Taliban.  The

12  other side passport, Islamic State of Iraq.

13  Q.   Is that what's currently called ISIS in the national news

14  reports?

15  A.   Correct.  Correct.  And the Islamic State of Iraq in

16  Syria, ISIS.

17        I belong to Al-Qaeda and proud -- again, it's just --

18  so you see the different Islamic lands.  It says, Soon

19  inchaAllah, which is soon if God wills.  And it's just a

20  promotion of the global jihad.

21  Q.   And while we're talking about that phrase "inchaAllah" --

22  we'll hear that on a number of videos.  Is that your

23  understanding of the literal translation of that phrase?

24  A.   It is.

25  Q.   All right, sir.  Apart from just images, did you -- when

1  you were viewing Mr. Bell's electronic media, did you determine

2  if he had downloaded any books or articles, that type of thing?

3  A.   I did.  We located a particular book called *The Book of*

4  *Jihad*.

5  Q.   And is that what's -- you've reviewed before as

6  Government's Exhibit C-39?

7  A.   Yes, sir.

8  Q.   All right.

9       MR. HEAVENER:  And, Your Honor, at this time the

10 United States would request Government's C-39 be introduced

11 into evidence.

12       MS. CALL:  No objection.

13       THE COURT:  So this was -- where was this book --

14       MR. HEAVENER:  I believe he just testified from the

15 computer and digital media.

16       THE COURT:  So it was just -- it was just on his

17 computer?

18       THE WITNESS:  Yes, sir.

19       THE COURT:  Okay.  All right.  Be received, C-39.

20    (Government's Exhibit No. C-39 was received into evidence.)

21 BY MR. HEAVENER:

22 Q.   And just to clarify, Agent, this is something that had

23 been downloaded from the Internet or some other source onto the

24 computer?

25 A.   That's correct.

1  Q.    Okay.  And -- and I just want to direct your attention to

2  some of the chapters referenced in the book, specifically --

3          MR. HEAVENER:  If you'd turn to page four,

4  Mr. Di Vita.  And if you could enlarge that so the agent could

5  see it.

6  BY MR. HEAVENER:

7  Q.    Chapter 7 -- what is the title of Chapter 7?

8  A.    The virtues of killing a non-believer for the sake of

9  Allah.

10  Q.    And how about Chapter 8?  What is that chapter titled?

11  A.    The virtue of an individual or small group immersing

12  themselves within a large Army of non-believers in search of

13  martyrdom and causing damage to the enemy.

14  Q.    And then if you'll go down to Chapter 12, what is that

15  chapter titled?

16  A.    Martyrdom.

17  Q.    Okay.  All right.  Now, Agent Berry, you didn't ask

18  Mr. Bell about this book or his beliefs about this book; is

19  that right?

20  A.    That's true.  We weren't aware of the book at the time of

21  the interview.

22  Q.    All right.  So to be fair to be Mr. Bell, all we can say

23  is this was found amongst a number of other materials on his

24  computer; is that correct?

25  A.    That's correct.

1   Q.   All right.   Now, I want to direct your attention not so

2   much to what Mr. Bell was consuming and what he had on his

3   computer, but, really, what he was doing with other

4   individuals, and particularly other juveniles.

5        You told us about the initial complaint that you had

6   received from the mosque.  In reviewing Mr. Bell's computer,

7   did you discover any files that were suggestive of -- of that

8   going on at the mosque?

9   A.   Yes, I did, sir.

10       MR. HEAVENER:  And, Your Honor, at this time if we

11  could publish A-4.  It's a video recording.

12       THE COURT:  Yes, sir.

13     (Video played.)

14       MR. HEAVENER:  Stop it for a moment, Mr. Di Vita.

15  BY MR. HEAVENER:

16  Q.   Agent Berry, before we move on, the beginning of this

17  video -- it appears that they're talking about what subject?

18  A.   They're talking about Anwar al-Awlaki and, I believe,

19  Mr. Hasan.

20  Q.   And right at this point we see a face enter the video.

21  Have you identified who that face is?

22  A.   Yes, sir.  I know who that is.

23  Q.   Is that another juvenile?

24  A.   It is another juvenile.

25  Q.   That's a juvenile that's different than the juvenile that

1  traveled overseas?

2  A.   It is.

3  Q.   And how old is that particular individual?

4  A.   16 at the time.

5  Q.   At the time?  Okay.  Thank you.

6     (Video played.)

7  BY MR. HEAVENER:

8  Q.   All right.  Agent Berry, the person that's the main focus

9  of that video, that's Mr. Bell?

10 A.   It is.

11 Q.   All right.  And Mr. Bell's appearance in that video, was

12 that consistent with what the leaders of the mosque had

13 reported to you, or to the FBI when they made their report?

14 A.   It is.

15 Q.   Okay.

16 A.   I should also say that -- I don't think I said it at the

17 beginning, that when they reported Mr. Bell they said that they

18 did try to intervene and discuss this with him and he was

19 defiant, and then we found this video.

20 Q.   All right.  Going to your interview of the juvenile that

21 traveled with Mr. Bell on April the 13th, did you question him

22 at all about -- when they're over in Jordan, was Mr. Bell

23 kicked out of any other religious assemblies over there?

24 A.   He did.  He said that -- he was kicked out of a mosque for

25 openly discussing jihad and fighting.  So they kicked him out.

1  Q.   Okay.  During your investigation, what was -- I mean, I

2  understand your goal was to investigate Mr. Bell.  Did you also

3  have a goal to determine who it was Mr. Bell was trying to

4  influence?

5  A.   I did.

6  Q.   And did you talk to the juvenile about that?

7  A.   I did.

8  Q.   And directing your attention specifically to your

9  interview of the juvenile on August 7th of 2013, did he tell

10  you how large the group was initially?

11  A.   Initially there were seven individuals.  There were three

12  adults, four minors.

13  Q.   Okay.  And of these -- did you say three adults and four

14  minors?

15  A.   Correct.

16  Q.   Is that -- are you -- have you got those mixed up?

17  A.   Backwards.  Four adults, three minors.

18  Q.   It was three adults and four minors, correct?

19  A.   Three adults and four minors.  Sorry.

20  Q.   During these discussions within this group, did the

21  juvenile tell you what Mr. Bell talked about, in terms of

22  fighting overseas?

23  A.   That he was talking to the group about jihad and about the

24  need to go overseas and to fight.

25  Q.   Okay.  And did the group -- this initial group of seven,

1  did they have a de facto leader?  Did they have an election for

2  a leader?  What happened in that regard?

3  A.   They did.  They elected Bell as the leader of the group.

4  Q.   All right.  And did the juvenile tell you that the imam

5  here in the Islamic Center of North Florida -- did he have any

6  discussions with them or warnings to them about what they were

7  doing?

8  A.   The previous imam, Mr. Joe Bradford, did have a discussion

9  with them.  And they told them if they did not stop discussing

10 jihad that they could possibly be kicked out of the Islamic

11 Center.

12 Q.   All right.  And during the interview with the juvenile,

13 what did the group ultimately get whittled down to?  Did people

14 stay focused on Mr. Bell and then continue along with him?  Or

15 did the group get whittled down?

16 A.   It was whittled down.  It was whittled down to four, and

17 then ultimately three.

18 Q.   Okay.  And the four that it was whittled down to, what was

19 the makeup, in terms of adults and juveniles?

20 A.   It was two adults and two minors.

21 Q.   All right.  And Mr. Bell was one of those adults?

22 A.   Yes, sir.

23 Q.   All right.  And you said it ultimately got down to three.

24 What distinguished between the four going down to three?

25 What -- tell us a little bit of that.

```
 1  A.   The fourth -- the fourth one, which was a juvenile, could
 2  not go -- decided not to go, so -- he still had an active role.
 3  His role was to publish all these videos that they were
 4  recording to his YouTube channel for others to see.
 5  Q.   Okay.  That fourth juvenile, is that the same juvenile we
 6  just saw in the video that we watched, Government's Exhibit
 7  A-4, the face that appeared?
 8  A.   Yes, it is.
 9  Q.   Okay.  So that juvenile wasn't going to travel, but his
10  role was to upload videos on a YouTube account?
11  A.   That's correct.
12  Q.   And these videos -- we're going to review some of them in
13  a moment.  But these are videos that were shot where?
14  A.   They were shot here in Jacksonville, throughout
15  Jacksonville.  There were also other videos that were filmed
16  overseas in Oman, Jordan.
17  Q.   Okay.  And did the juvenile relay to you where these
18  discussions, the group and their plans, their talks -- where
19  these were typically taking place?  These discussions, whatever
20  they're doing, I mean, among themselves, where was that
21  typically happening?
22  A.   They met quite a bit in Mr. Bell's pickup truck.  They
23  would hold meetings there.  They would also watch videos in
24  Mr. Bell's truck.
25  Q.   And did the juvenile ultimately tell you who came up with
```

1    the idea to go to Yemen?

2    A.   Mr. Bell.  The juvenile had discussed going to Syria, but

3    Mr. Bell wanted to go to Yemen, because, again, that was where

4    Anwar al-Awlaki suggested they go.

5    Q.   All right.  And with regard to these discussions, you

6    indicated earlier that you -- you obtained consent to review

7    the video -- or the computer -- of the one juvenile that we saw

8    in the video just a moment ago?

9    A.   That's correct.

10   Q.   When you reviewed that juvenile's computer, did you

11   actually recover a file that depicted one of these meetings

12   at -- in or around Mr. Bell's truck?

13   A.   Yes, sir.  We did.

14   Q.   All right.  That's Government's A-1?

15   A.   Yes.

16   Q.   All right.

17         MR. HEAVENER:  Your Honor, at this time can I publish

18   Government's A-1?

19         THE COURT:  Yes, sir.

20      (Video played.)

21         MR. HEAVENER:  Pause that.

22   BY MR. HEAVENER:

23   Q.   The person that's speaking right now, do you recognize

24   that voice?

25   A.   Yes, sir.  That is Mr. Bell.

 1            MR. HEAVENER:  All right.  Thank you.

 2      (Video played.)

 3            MR. HEAVENER:  Stop it for a moment.

 4   BY MR. HEAVENER:

 5   Q.   Agent Berry, we hear this term repeated frequently in this

 6   discussion, kuffar.  Do you have any understanding of what that

 7   term means?

 8   A.   Yeah.  It's infidel, unbeliever.  Just like he did in the

 9   other video, he's referring to the American Army and Americans

10   as infidels.

11   Q.   All right.

12            MR. HEAVENER:  Go ahead, Mr. Di Vita.

13      (Video played.)

14            MR. HEAVENER:  Stop it for a second.

15   BY MR. HEAVENER:

16   Q.   That phrase that we just heard Mr. Bell say, is that the

17   same as the phrase that was on the picture that we reviewed

18   earlier?

19   A.   Yes, sir, it is.

20            MR. HEAVENER:  All right.  Go ahead.

21      (Video played.)

22            MR. HEAVENER:  Stop it for a minute.

23   BY MR. HEAVENER:

24   Q.   He's discussing before Thursday he's going to have nasheed

25   memorized.  Do you know what a nasheed is?

1  A.   Yeah.  It's a poem that's chanted or -- you sing it.

2  Q.   All right.  And this discussion about leaving on Thursday,

3  was that -- was it a Thursday that they left the United States?

4  A.   It is.

5       MR. HEAVENER:  All right.  Go ahead, Mr. Di Vita.

6    (Video played.)

7       MR. HEAVENER:  Stop it, Mr. Di Vita.

8  BY MR. HEAVENER:

9  Q.   All right.  That phrase "the flags of Tawheed," what's

10  being referenced there?

11  A.   Again, that's the black flag, the black banner.  It's a

12  common theme.  They'll fly -- fly everywhere.  It's that

13  jihadist movement, takeover.  You know, he said earlier it's

14  the true movement.

15  Q.   Okay.  And in context -- that specific phrase was

16  mentioned in context of talking about the United Kingdom?

17  A.   Correct.

18       MR. HEAVENER:  Go ahead, Mr. Di Vita.

19    (Video played.)

20       MR. HEAVENER:  All right.  Stop it, Mr. Di Vita.

21  BY MR. HEAVENER:

22  Q.   Agent Berry, at the end of this video Mr. Bell is talking

23  about what made him the happiest and something about an

24  Embassy.  Do you have any knowledge about what he's

25  referencing?

1  A.    Yes.  So on September 11th, 2012, we know a couple of

2  things, that the Embassy -- the Embassy compound in Gaza,

3  Lybia, was attacked by Islamic militants.  It resulted in the

4  death of four Americans, including the ambassador.

5         On the same day, throughout the next day, militants

6  scaled the walls at the compound -- the Embassy compound in

7  Cairo, Egypt.  They removed the American flag and flew the flag

8  of Tawheed, the black banner.

9         So when he's discussing removing the flag or the flag

10  of Taghut, that is the secular flag, the government flag that

11  they no longer want to see.  And they replaced it with the flag

12  of Tawheed.

13  Q.   All right.  Agent, directing your attention to the

14  interview on November 21st, when Mr. Bell returned from the

15  Jordanian holding cell -- during that interview, did you ask

16  Mr. Bell in terms of what his future intents were with regard

17  to this ideology, and what his future intents were with regard

18  to the youth that he had been talking to at the local mosque?

19  A.   Yeah.  He would continue with his -- what he called the

20  mission, that he would continue to talk to the youth about

21  jihad, because they needed to decide between Paradise and

22  Hellfire.

23  Q.   Okay.  And when you talked with the juvenile back in

24  August of 2012, did you have -- ask the juvenile if Mr. Bell

25  had any plans about what he was going to do with regard to the

1   group once he got back to the United States?

2   A.   When he -- yeah.  So when they came back the plan was to

3   continue -- that he wanted to build -- you'll hear the term

4   masjid, which is a mosque.  And that he was going to build that

5   in his backyard.

6   Q.   When you say "he," who is he?

7   A.   Mr. Bell.

8   Q.   Okay.  And did they say what the purpose of that mosque in

9   Mr. Bell's backyard was going to be?

10  A.   So that -- to support the -- those that were like-minded

11  in their group, so that they could have a safe place to come

12  to.

13  Q.   All right.  And the -- the leader in a mosque or a masjid,

14  what's that term?

15  A.   Imam.  And Bell was going to be the imam of that masjid.

16  Q.   All right.  Now, with regard to that line of thought,

17  that -- Mr. Bell returning to the United States, setting up his

18  own masjid, and becoming an imam to radicalize other people --

19  while the juvenile and Mr. Bell were overseas, did you uncover

20  a video where they actually had that discussion?

21  A.   We did.  This was a time when they were having some

22  struggles with each other in -- in imam.  And Mr. Bell makes

23  the statement that -- how virtuous would it be if he should be

24  in the place of a sheikh, in which he could --

25  Q.   All right.  So we'll watch the video.

```
 1  A.    Okay.

 2  Q.    It's Government's A-11.   Is that it?

 3  A.    That is correct.

 4         THE COURT:  What's the running time on that?  I'm

 5  trying to figure out if I want to go ahead and get a break in

 6  now.

 7         Is this a good place to take a break?

 8         MR. HEAVENER:  It's fine to take a break, Your Honor.

 9         THE COURT:  Okay.  All right.  It's more or less

10  11 o'clock.  We'll take a ten-minute recess and be back in

11  session.

12         COURT SECURITY OFFICER:  All rise.

13      (Recess, 11:00 a.m. to 11:10 a.m.; defendant not present.)

14         COURT SECURITY OFFICER:  All rise.  This Honorable

15  Court is now in session.  Please be seated.

16      (Judge confers with courtroom deputy.)

17      (Defendant enters the courtroom.)

18         THE COURT:  All right.  Everybody is present,

19  including the defendant.

20         Mr. Heavener, you may proceed.

21         MR. HEAVENER:  And, Your Honor, may we publish

22  Government's A-11 at this time?

23         THE COURT:  Yes, sir.

24      (Video played.)

25  BY MR. HEAVENER:
```

1    Q.    Okay.  Agent Berry, a few questions about that video.

2    Mr. Bell is talking about how virtuous it would be if he could

3    use his home to train others to go to jihad?

4    A.    That's correct.

5    Q.    All right.  And we're going to talk about this in a

6    moment.  But as a general proposition, do you know if he tried

7    to do that once he got back to the United States?

8    A.    Yes, he did.

9    Q.    Okay.  All right.  And then there's this discussion about

10   having $1200 and being sufficient to get across the border and

11   get armed.

12            Can you just provide a little bit of context for that

13   discussion that we heard on the video?

14   A.    Yeah.  For the interview with the juvenile, we understand

15   that they had interacted with an individual named Nidal.

16   That's all the background information we know about him.

17            That individual suggested that they go to Syria to

18   fight.  And that it would cost them approximately 1200 denar to

19   do that, and which he could get them there and arm them for

20   that amount of money.

21   Q.    All right.  Was this a different plan than what -- the

22   plan they had originally gone to the Middle East with?

23   A.    It was.

24   Q.    And the plan originally was what?

25   A.    To go straight to Yemen.

1    Q.    Okay.  Now, this recorded conversation, this video we just

2    watched, who are the speakers on that video?

3    A.    Mr. Bell and the juvenile.

4    Q.    The juvenile who traveled?

5    A.    Correct.

6    Q.    Okay.  This video was shot before Mr. Bell was detained by

7    Jordanian authorities; is that right?

8    A.    That is correct.

9    Q.    After Mr. Bell was detained by Jordanian authorities, you

10   interviewed him at the airport, correct?

11   A.    That's correct.

12   Q.    And he indicated that he was going to continue teaching

13   the youth?

14   A.    That's correct.

15   Q.    Okay.  And did you intercept a series of phone calls -- or

16   did you listen to a series of intercepted phone calls in which

17   Mr. Bell affirmed that after he got back to the United States?

18   A.    Yes, we did.

19   Q.    All right.  And B-1 is a phone call with the juvenile

20   whose job was to put the videos up on YouTube; is that right?

21   A.    That is correct.

22   Q.    And the juvenile that we saw on the previous video, whose

23   face came in at 52 seconds?

24   A.    Correct.  A different juvenile than the one that traveled.

25   Q.    All right.  So the phone call that's identified as B-1 is

1    the discussion between Mr. Bell and that particular juvenile?

2    A.   Yes, sir.

3          MR. HEAVENER:   And, Your Honor, may I publish various

4    portions of that phone call at this point?

5          THE COURT:   Yes, sir.

6    BY MR. HEAVENER:

7    Q.   All right.   Let me -- Agent Berry, I'm going to publish

8    from one minute and 18 seconds to six minutes 23 seconds.

9        (Audio played.)

10   BY MR. HEAVENER:

11   Q.   All right.   And, Agent Berry, just to give some context to

12   that snippet of conversation we've heard, he's clearly talking

13   about building a masjid in his backyard --

14   A.   That's correct.

15   Q.   -- or in his house, I think is the term that was used.

16   And, again, that's another term for a mosque?

17   A.   Yes, it is.

18   Q.   All right.   And this discussion about doing things at a

19   flea market, can you just give a little context of that portion

20   of the discussion we just heard?

21   A.   Yeah.   Prior to Mr. Bell going overseas, he operated a

22   booth at the Pecan Park Flea Market, in which he repaired

23   computers.

24   Q.   All right.   And we're not going to play it, but later on

25   in this discussion does Mr. Bell even talk about getting a card

1  with a different name and a different phone number to use so

2  that he could be kind of behind the scenes?

3  A.   That's correct.

4  Q.   All right.  Let me publish for you from 15 minutes and 11

5  seconds to 17 minutes and 40 seconds -- just with the eye of

6  keeping a low profile and not telling the truth to people.

7     (Audio played.)

8        MR. HEAVENER:  Stop it.

9  BY MR. HEAVENER:

10  Q.   Agent Berry, that snippet, Mr. Bell is instructing this

11  juvenile to not be honest with his parents; is that correct?

12  A.   That's correct.  He's telling him to lie to his mother.

13  Q.   All right.  And I think Mr. Bell used the phrase, We have

14  to resort to any means necessary at this particular time?

15  A.   That's correct.

16  Q.   Okay.  That whole idea of resorting to any means

17  necessary, including lies, did that manifest itself in your

18  interviews with the juvenile?

19  A.   Yes, sir, it did.  And when the --

20  Q.   And when I say "the juvenile," the juvenile that traveled

21  overseas with Mr. Bell.

22  A.   That's correct, sir.

23        So in one of the interviews with the juvenile he

24  relayed that Mr. Bell had told him that -- the money -- part of

25  the money that he had for the trip to go overseas was money

1   that he stole from an individual, $3,000 worth.

2         He said that was a person that was in the military,

3   that he had conned the person -- had told the person it was to

4   buy a lot of computers.

5         And in the end he told the ████ that al-Awlaki would

6   approve of the money being stolen because it was in furtherance

7   of the cause.

8   Q.   All right.

9         MR. HEAVENER:  And, Mr. Di Vita, if you would publish

10  from 23:49 to 25:40, just along the same line of instructions

11  to lie.  23:49.

12     (Audio played.)

13  BY MR. HEAVENER:

14  Q.   Agent Berry, I'm not going to publish these, but the calls

15  on -- that are introduced as Exhibits B-2 and B-3 would

16  involve -- B-2 would certainly involve a similar discussion

17  of -- of lying about Bell's presence in the United States?

18  A.   Yes, sir, it would.

19  Q.   And on B-3 there's also a discussion about this -- this

20  masjid being built in Mr. Bell's backyard?

21  A.   Yes, sir.  That's accurate.

22  Q.   All right.  I'd like to turn your attention to another

23  topic now.  And that is the initial plan.  You told us in --

24  and explained in that one video how the plan changed once they

25  got over there and they were actually considering Syria.

```
1              During your interview with Mr. Bell on November 21st
2    of 2012 -- this is after he's been detained in Jordan -- did
3    you ask him what the purpose of his trip was?
4    A.   We did.  And originally he stated that it was to go visit
5    overseas.  There was a particular mosque that he wanted to
6    visit that -- and that he wanted to make Hajj.
7    Q.   All right.  And we'll get into the making Hajj part.  But
8    at the time of that interview, you had already spoken with the
9    juvenile on November 16th; is that right?
10   A.   That's correct.
11   Q.   All right.  And did you confront him with some of those
12   facts?
13   A.   We did.
14   Q.   And did he ultimately tell you a different story?
15   A.   He did.  So we were talking about that.  And he ultimately
16   admitted that they were going to go to Yemen.  And he stated
17   that if you were asking me if I was going to Yemen for jihad, I
18   would say yes.
19   Q.   All right.  And while you're interviewing him -- now, this
20   is before you've had the benefit of all the digital evidence
21   that we're reviewing here.  Did you have the opportunity to ask
22   him who he was going to go to Yemen to fight for?
23   A.   Originally he said it would be for whatever group was
24   persecuting Muslims.  So I followed that up with, you know, was
25   it going to be -- I was going to say Ansar al-Shari'a.  But
```

1  when I said Ansar, he finished with al-Shari'a. And then said,

2  yes, Ansar al-Shari'a.

3  Q.  And during that -- did you have you a discussion about

4  Ansar al-Shari'a at that point?

5  A.  We did.

6  Q.  And during that discussion, what did he exhibit in terms

7  of his knowledge of who Ansar al-Shari'a was and what they did?

8  A.   In particular, he said that Ansar al-Shari'a was a group

9  that was associated with the Taliban and al-Qa'ida.

10  Q.  Okay.  Did he give you any -- did you ask him about any

11  purposes for going over there to fight; why are you doing this?

12  Or did that subject come up?  Maybe it wasn't that question.

13  But did that come up, the purpose for why he was going over

14  there?

15  A.   He did.  It was because of the persecution of Muslims and

16  for the jihad.

17  Q.  Okay.  And are you familiar with the term caliphate?

18  A.   Yeah.  He did state that -- that the purpose was that it

19  was an Islamic revolution and a re-establishment of the

20  caliphate, which -- which is an Islamic state or idea of an

21  Islamic empire; again, the idea of removing secular governments

22  and establishing this caliphate, which is in the news now

23  because of the ISIS agenda.

24  Q.  All right.  With regard to the -- what Mr. Bell was

25  prepared to do once he got over there, did you ask him about

 1  that?

 2  A.   He said he was prepared to kill for the cause.

 3  Q.   All right.  And, sir, directing your attention to this

 4  whole idea of getting to the Middle East and what they did when

 5  they got here, during your review of the computer and video

 6  evidence, did you review any videos that Mr. Bell made of

 7  himself alone getting around in Jordan?

 8  A.   I did.

 9  Q.   All right.  And directing your attention to Government's

10  A-7 --

11          MR. HEAVENER:  May I publish, Your Honor?

12          THE COURT:  Yes.

13     (Video played.)

14  BY MR. HEAVENER:

15  Q.   All right.  Agent Berry, the voice that we hear speaking

16  in most of the video, whose voice is that?

17  A.   Mr. Bell's.

18  Q.   All right.  And we hear some discussion where Mr. Bell

19  says something like, No jihad, no jihad.  Can you give us an

20  elaboration on what that was in reference to?

21  A.   The no jihad, no jihad was actually the other unknown male

22  in the video saying that.

23  Q.   I'm sorry.

24  A.   So Mr. Bell is telling this individual -- and it's just

25  those two -- the juvenile is not with them at this time.  And

1  evidently he is relaying a story in which he was correcting

2  someone when they were viewing a jihad facility, he called it.

3  And in response, this gentleman simply says, No jihad, no

4  jihad.

5  Q.   All right.  And this is a person -- a person that Mr. Bell

6  didn't know, to your knowledge, before he got over to Jordan?

7  A.   That's correct.

8        MR. HEAVENER:  Okay.  And then if we could publish

9  Exhibit A-8, Your Honor?

10        THE COURT:  Yes.

11    (Video played.)

12  BY MR. HEAVENER:

13  Q.   All right.  Agent, that discussion is about a black flag

14  over what city?

15  A.   Over Jordan in particular.  Evidently he saw a flag.  And

16  he's talking to this gentleman about, Instead of the flag of

17  Taghut -- the secular flag -- wouldn't it put a smile on your

18  face -- similar to the language to the video we heard before,

19  Wouldn't it put a smile on your house to see the flag of

20  Tawheed rising over the city?

21  Q.   And, Agent, he ends that conversation by saying the words,

22  One day?

23  A.   That's correct.  Very similar to the image that we saw

24  earlier this morning.

25  Q.   That's the image with the entire world with black flags

```
 1   all over the continents?

 2   A.    That's correct.

 3   Q.    All right.  Let me move from Mr. Bell's discussions with

 4   strangers in Jordan to discussions with the juvenile who

 5   traveled with him.

 6           During your review of the digital media, did you

 7   recover any evidence where Mr. Bell and the juvenile were

 8   discussing what their original plans had been?

 9   A.    I did.

10           MR. HEAVENER:  And may I publish Government's A-9,

11   Your Honor?

12           THE COURT:  Yes.

13      (Audio played.)

14   BY MR. HEAVENER:

15   Q.    All right.  Agent Berry, with regard to that discussion,

16   was that an example -- when you told us earlier the juvenile

17   talked about he became indecisive, was that -- when you

18   reviewed this video, was that consistent with what the juvenile

19   had told you?

20   A.    Yes, it was.

21   Q.    Okay.  And then with regard to Mr. Bell seeking to join

22   Ansar al-Shari'a in Yemen, did you review any materials that

23   would suggest that Mr. Bell was being impulsive or reckless in

24   how he was going to get in Yemen and announce what he was

25   trying to do?
```

1   A.    I did.

2   Q.    All right.  And Government's Exhibit A-10 --

3           MR. HEAVENER:  May I publish the first two minutes,

4   Your Honor?

5           THE COURT:  Yes.

6       (Audio played.)

7           MR. HEAVENER:  Okay.  Stop.  That's good, Mr. Di Vita.

8   BY MR. HEAVENER:

9   Q.    All right.  So with regard to that statement, did that

10  give you any insight with regard to Mr. Bell's intentions once

11  he got into Yemen, in terms of whether he was going to be overt

12  or covert?

13  A.    He was going to be overt.  He was going to go straight to

14  Yemen and wanted to get to Ansar al-Shari'a.

15  Q.    Okay.  Now, Agent Berry, I'd like to -- to move to a

16  discussion of not so much what Mr. Bell did in Jordan, in terms

17  of what they planned to do, but did he indicate to you during

18  your interview with Mr. Bell on November 21st why this original

19  plan of going to Yemen and joining up with Ansar al-Shari'a --

20  why that didn't take place?

21  A.    He did.  And he stated it was because of problems with the

22  juvenile.  And when I tried to elicit more response from him,

23  he stated that he wouldn't talk about another Muslim without

24  that person present.

25  Q.    All right.

1          THE COURT:  Can I ask a question?  On these audios

2     we've been listening to, what -- how was that being recorded?

3     By what medium?

4          THE WITNESS:  They have a -- or they had a tablet that

5     they were using to record those with.

6          THE COURT:  These were conversations that the two of

7     them were having while they were in Jordan, just conversations,

8     and they were just recording their everyday conversations?  Is

9     that what they were doing?

10          THE WITNESS:  Yes, sir.

11          THE COURT:  Were there a lot of those?

12          THE WITNESS:  There were quite -- not a lot of just

13     the two of them talking to each other.  Most of them were

14     other -- you know, training and things like that.  But this --

15     this series is actually one long conversation.  There's six

16     videos.  And it's just one conversation.

17          THE COURT:  And whose tablet was it?

18          THE WITNESS:  Mr. Bell's.

19          THE COURT:  Okay.  Thank you.

20          Go ahead, Mr. Heavener.

21     BY MR. HEAVENER:

22     Q.   And, Agent Berry, just for the court's benefit, when you

23     see the titles of the exhibits, these clips that we've been

24     watching, there's actually a date stamp in the title that -- it

25     will say video, hyphen, 2012, hyphen, 0704, and then some

1  additional language.  That's 2012 and following.  That's the

2  year, the month, and the date, to your knowledge?

3  A.    Yes, sir, it is.

4  Q.    And in some of the videos you reviewed, you -- based upon

5  your review of videos and your knowledge of times when things

6  happened, it appeared that the timestamps were accurate on

7  those videos?

8  A.    Yeah.  For all these we can pretty much tell that they

9  were all accurate dates.

10 Q.    And so for what we just listened to, A-9 and A-10, those

11 were both conversations that took place on October 25th of

12 2012, part of one long conversation?

13 A.    Correct.

14 Q.    All right.  Let me turn your attention, sir, to not so

15 much what was done in Jordan but what was done here in the

16 United States.

17        And let me direct your attention first to -- you said

18 that -- earlier when you started your testimony, you

19 interviewed people other than just Mr. Bell and the juvenile

20 who traveled.

21        You told us that the group eventually whittled down to

22 three, two adults and the juvenile who traveled.  Did you have

23 a chance to interview that third adult --

24 A.    I did.

25 Q.    -- or the second adult?  I'm sorry.

1    And that person -- why did that person not make it to

2  the Jordan trip?

3  A.   That -- that individual participated in some of the

4  training but ultimately decided that he did not want to travel,

5  because killing was not what he was about.

6  Q.   All right.  And did he describe some of this training that

7  he and Mr. Bell and the juvenile who traveled did?

8  A.   He did.  They -- he described mental training as watching

9  videos, physical training as martial arts fighting, and

10  firearms training.

11  Q.   All right.  And did he make any statements to you during

12  your interview with him about why -- were they video recording

13  this training and, if so, why they were doing that?

14  A.   He did.  He said it was to be uploaded to the Internet to

15  share with brothers and to recruit new recruits.

16  Q.   All right.  And then you also talked to the juvenile about

17  the training they did here in the United States?

18  A.   I did.

19  Q.   And tell us what the juvenile told you about that, the

20  juvenile who traveled.

21  A.   He also said that they conducted training.  It was both

22  mental and physical training, mental being the watching of the

23  videos.  Physical training he described as weightlifting, to

24  become stronger, and firearms training.

25  Q.   All right.  And when you said the mental training was

1   watching videos, did he identify any particular type of videos

2   when he told you that?

3   A.    Anwar al-Awlaki videos.

4   Q.    Okay.  And did you talk to the juvenile -- and

5   specifically on April the 13th, did you interview the juvenile

6   and talk to him about why they were making these videos?

7   A.    I did.  And he stated that they were to be uploaded to the

8   Internet.

9   Q.    Did the juvenile -- moving to your interview with the

10  juvenile who traveled on August 7th of 2013, what did he tell

11  you about where this training regime was coming from?

12  A.    He said that Mr. Bell had done research on the Internet

13  and found videos that would be useful that they would mimic or

14  follow as a guide for their training.

15  Q.    All right.  And did you ask the juvenile about -- we've

16  talked about Mr. Bell, the second adult, the juvenile who

17  traveled, and then the juvenile who was supposed to put all

18  these materials on the Internet.

19         Did you ask the juvenile who traveled about the

20  juvenile who was supposed to put the materials on the Internet?

21  A.    I did.

22  Q.    And what did he say about that?

23  A.    He said that he -- he was supposed to put the videos on

24  the Internet and that Mr. Bell was the one that was interacting

25  with him.

1  Q.    All right.  So he didn't direct or lead that part of it?

2  A.    No, sir.

3  Q.    Okay.  When Mr. Bell got back into the United States on

4  November 21st of 2012, did you talk to him about any training

5  that they may have done here in the United States?

6  A.    I did.  He, again, said that it was both mental and

7  physical training.  He described the mental training as being

8  the most important.  But he would not give any specifics as to

9  the type of training.

10 Q.    And mental training being the most important for what?

11 A.    For preparation for jihad.

12 Q.    And then you've, again, reviewed the computer evidence.

13 And you found evidence that they actually were videotaping

14 themselves doing training here in the United States?

15 A.    That's correct.

16 Q.    And with regard to this -- this idea of -- of using these

17 training videos to upload to the Internet and encourage others,

18 did you locate a particular video where it appeared that -- to

19 be a compilation of that training that they had done here in

20 the United States?

21 A.    We did.  We found what appeared to be the start of them

22 putting some videos together.  It's not fully edited.  And they

23 also -- the juvenile told us that the -- they were also going

24 to add live fighting scenes after they went overseas.  So you

25 don't see that part in the video either.

1    Q.   That's the video clip that's been introduced as

2    Government's A-5?

3    A.   Yes, sir.

4              MR. HEAVENER:  May I publish A-5, Your Honor?

5              MS. CALL:  Your Honor, before we get started with

6    that, may we approach at sidebar?

7              THE COURT:  Sure.

8         (Sidebar conference.)

9              MS. CALL:  Your Honor, if I'm thinking of this video

10   correctly, this is one that does involve a full picture of the

11   juvenile that's been at issue.

12             We've obviously talked about him.  And there's another

13   juvenile who was seen.  But this is the first time I think he's

14   going to be seen.  And I didn't know if the court wanted any

15   issue with that or just...

16             THE COURT:  I don't know.  Are you worried about it

17   or...

18             MR. HEAVENER:  I'm not worried about it.  I don't

19   think they identified him.

20             THE COURT:  Okay.

21             MS. CALL:  I think the agent did -- said his name.

22             THE COURT:  I didn't catch that.  Did he?

23             MS. CALL:  Uh-huh (affirmative).  He called him

24   Tarsha.

25             THE COURT:  Okay.

1          MR. HEAVENER:  Then I would will make a motion that --

2   we'll seal and redact it.

3          THE COURT:  Yeah.  Okay.  All right.  Thanks.

4      (The following proceedings occurred in open court:)

5          MR. HEAVENER:  May I publish, Your Honor?

6          THE COURT:  Yes.

7      (Video played.)

8   BY MR. HEAVENER:

9   Q.   All right.  Agent Berry, I want to ask you some questions

10  about some of the things we've just seen depicted in the video.

11  The area where they're doing all this target practice with the

12  pistol, do you know where that area is?

13  A.   I do.  It's an area -- some State land that's adjacent to

14  Bell's father's house.

15  Q.   And during the investigation, did the FBI actually locate

16  the field where they were doing that target practice?

17  A.   Yes, we did.

18  Q.   And what kind of things -- were you part of the search of

19  that field?

20  A.   I was not part of the search.

21  Q.   Okay.  You talked to other agents who were?

22  A.   Yes, I did.

23  Q.   And what was located on that field, just a general

24  description of what they found?

25  A.   They found the targets, the cans, the target with the

```
 1   silhouette spray-painted on it, shell casings, actual rounds,

 2   shrapnel from some of the explosives that Mr. Bell made, and

 3   actually a few unexploded bombs.

 4   Q.   All right.  And the -- you said the target that was

 5   painted with the silhouette.  Were there any body organs

 6   painted on that target?

 7   A.   There was a heart.

 8   Q.   Okay.  And in the video we just watched, there's one part

 9   of the video where it looks like there's something on the

10   specific target, it's, like, taped to the target?

11   A.   The American flag.

12   Q.   The American flag was taped to target as well?

13   A.   Yes, it was.

14   Q.   All right.  During your review of these videos -- we're

15   not going to review all of them.  But during your review of the

16   videos, was there one particular video where the group was

17   identifying what roles people in the group had?

18   A.   There was.

19   Q.   And what role did Mr. Bell -- was he identified as having?

20   A.   The commander.

21   Q.   And that's Government's A-21?

22   A.   Correct.

23   Q.   And during that video, did -- was there any discussion

24   about the purpose of making that video, whether it's personal

25   entertainment or for some other purpose?
```

```
 1  A.   It was for others to see, so that -- he went on to say so

 2  they could propagate the jihad here in America.

 3          MR. HEAVENER:  May I publish A-21, Your Honor?

 4     (Video played.)

 5          MR. HEAVENER:  Stop it, Mr. Di Vita.

 6  BY MR. HEAVENER:

 7  Q.   Agent Berry, Mr. Bell just uses the phrase, Any revert

 8  that's watching this.  Can you elaborate for the court what

 9  your understanding of that means?

10  A.   My understanding is that sort of a Muslim that has, you

11  know, fallen away and has come back.  During one of the

12  interviews, the juvenile that did not travel is actually

13  discussed as being a revert.

14  Q.   All right.  And let me -- let me ask you -- we've seen

15  these videos with Mr. Bell and others in the woods.  Are there

16  videos that you viewed that Mr. Bell made of just himself?

17  A.   Yes, I did.

18  Q.   And specifically directing your attention to A-31, is that

19  a video of Mr. Bell practicing various battlefield moves and

20  knife combat and that kind of thing?

21  A.   It is.

22          MR. HEAVENER:  May I publish, Your Honor?

23          THE COURT:  Yes.

24     (Video played.)

25  BY MR. HEAVENER:
```

1  Q.   Agent Berry, what do you understand that's being done

2  right there?

3  A.   He's practicing bomb throwing.

4  Q.   All right.  With a lighter?

5  A.   Correct.

6  Q.   All right.  And, Agent Berry, moving your attention from

7  just general training out in the woods and in Mr. Bell's home,

8  do you know if Mr. Bell participated in any specific -- what

9  I'll call training missions or things where he actually

10 destroyed other people's property?

11 A.   Yes, I am.

12 Q.   And tell us about that.

13 A.   We know that he planned and executed a mission here in

14 Jacksonville with an adult in which he destroyed some statues

15 in a cemetery here.

16 Q.   Okay.  And the -- this cemetery mission, did you ask

17 Mr. Bell any questions about that when you interviewed him on

18 November 21st of 2012?

19 A.   I did not.

20 Q.   And why is that?

21 A.   We did not know about it then.  We discovered it in the

22 media review.

23 Q.   All right.  The other adult who was with him, you

24 interviewed that person on March 28th of 2013?

25 A.   I did.

1   Q.   And what did he tell you about what they had done during

2   this cemetery mission?

3   A.   He said that they had -- that they had gone out, they'd

4   dressed in all black, that they traveled out to a cemetery,

5   they took turns knocking down statues of Jesus.

6           Bell did one and then the other gentleman did the

7   other.  And they filmed this mission and took turns filming

8   each other.

9   Q.   All right.  And these statues -- can you give us an idea

10  of size and value?  Are we talking about small cemetery statues

11  or --

12  A.   No.  These are very large -- in fact, they wanted to knock

13  the whole statue down, but it was too large.  So they ended up

14  knocking the heads off and the arms off.  And they are worth

15  about $20,000.

16  Q.   All right.  And the -- the other adult who was with

17  Mr. Bell, did he tell you, like, how they dressed when they

18  went on this mission?

19  A.   Yeah.  They dressed in all black, black masks, black

20  gloves.  They even taped their shoes with black tape.

21  Q.   And what was the -- how did they get from this -- where

22  they were beginning this mission to the cemetery where they did

23  this mission?

24  A.   In Mr. Bell's truck.

25  Q.   And did you talk to the juvenile who had traveled about

1  this thing that Mr. Bell and this other person had done when

2  you interviewed him on August the 7th?

3  A.   I did.  And he said that -- you know, after the mission,

4  that Bell had told him what they had done.

5  Q.   All right.  Now, you say you didn't have the benefit of

6  these videos that depicted this when you interviewed Mr. Bell.

7  When you reviewed the computer evidence, did you uncover these

8  videos?

9  A.   That's correct.

10 Q.   And this particular mission at the cemetery, what cemetery

11 was it?

12 A.   It's Chapel Hill Cemetery off of St. Johns Bluff.

13 Q.   And what area of Jacksonville is it located?

14 A.   Arlington area, near the Craig Airport.

15 Q.   All right.  And one of the videos that you reviewed

16 actually is depicting Mr. Bell and this individual as they

17 prepare to go out on this mission?

18 A.   That's correct.

19 Q.   And I'm using the phrase "mission."  Is that a phrase that

20 I'm just injecting into here?  Or is it something that they use

21 when they're describing what they're doing?

22 A.   That's exactly what they called it, is a mission.

23 Q.   All right.  So Government's A-16, is that the video that

24 depicts them getting ready for this mission?

25 A.   Yes, it is.

1           MR. HEAVENER:  May I publish, Your Honor?

2           THE COURT:  Yes.

3        (Video played.)

4           MR. HEAVENER:  Stop, Mr. Di Vita.

5    BY MR. HEAVENER:

6    Q.   Agent Berry, Mr. Bell is pulling things out of this bag in

7    the video.  Can you describe what it is we're seeing him pull

8    out?

9    A.   Sure.  You're seeing the duct tape there.  He's going to

10   pull out a black mask.  He's going to pull out the pistol that

11   you saw him shooting earlier, with multiple magazines.

12   Q.   Okay.

13          MR. HEAVENER:  Go ahead, Mr. Di Vita.

14       (Video played.)

15          MR. HEAVENER:  Stop, Mr. Di Vita.

16   BY MR. HEAVENER:

17   Q.   Agent Berry, Mr. Bell just said fully loaded in case any

18   kuffar wants to cause some trouble.  Do you know what he's

19   referring to in that statement?

20   A.   I am.  We spoke to the adult that participated.  And he

21   stated that Mr. Bell was ready to shoot anyone, including the

22   police, if they attempted to stop the mission.

23          MR. HEAVENER:  Okay.  Go ahead, Mr. Di Vita.

24       (Video played.)

25   BY MR. HEAVENER:

1   Q.   Agent Berry, he's talking on this video about dropping off

2   a sledgehammer at the drop-off point.  Can you give us a little

3   explanation and elaboration on that?

4   A.   Yeah.  This was a fairly elaborate plan that they had

5   developed.  And Mr. Bell developed this plan.  In other videos

6   you hear him directing the other adult throughout this plan.

7           So they were going to drive to a drop-off point, drop

8   off some sledgehammers, drop the vehicle off, go back, get the

9   sledgehammers, then go to the site to destroy the statues, go

10  back, drop the sledgehammers off, get the truck, and pick up

11  the sledgehammers.

12          THE COURT:  Remind me of the date of this, please.

13          THE WITNESS:  This was before they left to go

14  overseas.

15          THE COURT:  Okay.

16  BY MR. HEAVENER:

17  Q.   And the specific date that they did this at the cemetery

18  was what holiday?

19  A.   I'm not sure.

20          THE COURT:  If you want to suggest a date to him

21  and see --

22  BY MR. HEAVENER:

23  Q.   July 4th?  Does that sound right?

24  A.   Fourth of July.

25  Q.   All right.  I'm not going to -- in the interest of time,

1   I'm not going to play 18.  But you were just describing that

2   one of these videos, A-18, in fact, depicts -- you can hear

3   them destroying the statues.  You can't see anything.

4          Would that be accurate?

5   A.   That's correct.

6   Q.   And you indicated that that video depicts Mr. Bell

7   providing instructions to the other individual who's

8   participating?

9   A.   That's correct.

10  Q.   All right.  Let me ask you about the actual damage to the

11  statues.  You've reviewed Government's C-5 to C-12.  Are those

12  photographs that depict the damage that was inflicted on the

13  statues?

14  A.   Yes, sir, it is.

15         MR. HEAVENER:  May I introduce Government's C-5

16  through C-12, Your Honor?

17         MS. CALL:  No objection.

18         THE COURT:  Be received.

19     (Government's Exhibit Nos. C-5 through C-12 were received

20  into evidence.)

21  BY MR. HEAVENER:

22  Q.   All right.  Let me show you Government's C-5, Agent Berry.

23  What is this that we're looking at?

24  A.   This is the entrance to the cemetery.

25  Q.   All right.  And Government's C-7 -- what is depicted in

```
 1   C-7?
 2   A.    This is the statue -- one of the statues.
 3   Q.    All right.
 4          MR. HEAVENER:  Go back to C-7, Mr. Di Vita -- I'm
 5   sorry, C-6.
 6   BY MR. HEAVENER:
 7   Q.    All right.  So if we are looking at the entrance of the
 8   cemetery to the statue, that's the view that we've got depicted
 9   in C-6?
10   A.    Yes, sir.
11   Q.    And then C-7 was one of the statues that was actually
12   destroyed?
13   A.    That's correct.
14   Q.    All right.  The statue looks like it's intact at this
15   point.  Do you know why it looks to be intact?
16   A.    The management at the cemetery actually glued the parts
17   that were knocked off back on to the statue, as much as they
18   could.
19   Q.    All right.  And showing you -- Government's C-8 is a
20   close-up of the neck and head area of the statue.  We see a
21   line.  Is that where the head was severed from the statue?
22   A.    Yes, sir, it is.  And you can also see some of the -- the
23   thumbs and parts of the hand are still missing.
24   Q.    And Government's C-9, is that a frontal, close-up view?
25   A.    It is.
```

1 Q.   And, Mr. Di Vita, can you enlarge the -- all right.  So we

2 see the crack where the head had been severed?

3 A.   Correct.

4 Q.   And then directing your attention to C-10, is this the --

5 what are we looking at in C-10?

6 A.   This would be the other statue.

7        MR. HEAVENER:  And C-11, Mr. Di Vita.

8 BY MR. HEAVENER:

9 Q.   Is anything missing in the statue depicted in C-11?

10 A.   The right arm is missing.

11 Q.   All right.  And what's the story behind why the statue has

12 no right arm anymore?

13 A.   They were unable to -- when they were trying to glue it,

14 it just wouldn't stay.

15 Q.   Okay.  And a close-up of that statue is C-12.

16        MR. HEAVENER:  And if you could enlarge the neck area,

17 Mr. Di Vita.

18 BY MR. HEAVENER:

19 Q.   All right.  We see a line across the neck.  Is that where

20 the head on that statue had been severed, as well?

21 A.   That's correct.

22 Q.   All right.  Now, Agent Berry, going back to the actual

23 night that this happened itself, one of the videos that you

24 reviewed depicts Mr. Bell and this other individual talking

25 about this right after they had done it?  Would that be right?

```
 1   A.    That's correct.
 2   Q.    And do you remember what they called what they had just
 3   done?
 4   A.    Call of -- I think it was Call of Duty.
 5          MR. HEAVENER:  All right.  May I publish Government's
 6   A-19, Your Honor?
 7          THE COURT:  Yes.
 8       (Video played.)
 9   BY MR. HEAVENER:
10   Q.    All right.  Agent, that happens in the early morning hours
11   of July 4th; is that right?
12   A.    That's correct.
13   Q.    And in the daylight hours of July 4th, do they take the
14   juvenile who ended up traveling to show what they had done?
15   A.    They do.  They take him passed the cemetery and show him.
16   Q.    And does a very short video, A-20, depict that?
17   A.    Yes.
18          MR. HEAVENER:  May I publish A-20, Your Honor?
19          THE COURT:  Yes, sir.
20       (Video played.)
21          MR. HEAVENER:  Stop, Mr. Di Vita.
22   BY MR. HEAVENER:
23   Q.    All right.  The statement was just made they're going to
24   take down every idol in Jacksonville?
25   A.    That's correct.
```

1    Q.   All right.  We'll talk about this in a little more detail

2    in a moment.  But did you uncover evidence on the -- computer

3    evidence of Mr. Bell's that indicated they had, in fact, made

4    plans to conduct similar destruction like this?

5    A.   I did.

6    Q.   All right.

7             MR. HEAVENER:  Go ahead, Mr. Di Vita.

8        (Video played.)

9             MR. HEAVENER:  All right.  Go ahead and stop.

10   BY MR. HEAVENER:

11   Q.   All right.  So the tail end of this discussion, Mr. Bell

12   makes the comment, The masjid should welcome us with open arms,

13   and then he talks about, Instead they call us terrorists and

14   extremists; is that right?

15   A.   That's correct.

16   Q.   Okay.  Regarding the other instances where -- where it

17   looked like there were plans to do similar acts, did you

18   uncover some maps on Mr. Bell's computers that looked to be

19   that type of thing?

20   A.   I did.  Yes, sir, I did.

21   Q.   And directing your attention to Government's C-13, C-14,

22   C-15, and C-16, are those the maps you're referencing?

23            I'm sorry, Government's C-13 through Government's

24   C-15.

25   A.   Yes, sir.

1          MR. HEAVENER:  May I publish, Your Honor?

2          THE COURT:  Have we admitted them?

3          MR. HEAVENER:  I'm sorry.  The government would move

4   to admit Government's C-13 through C-15.

5          MS. CALL:  No objection.

6          THE COURT:  Be received.

7          MR. HEAVENER:  Actually, I'm sorry, C-13 through C-16,

8   Your Honor.

9          THE COURT:  All right.  They will be received.  And

10  you may publish.

11     (Government's Exhibit Nos. C-13 through C-16 were received

12  into evidence.)

13  BY MR. HEAVENER:

14  Q.   All right.  Let's begin with Government's C-13, Agent

15  Berry.  Can you explain to us what it is that we're looking at?

16  A.   So you're looking at what appears to be a Google map of an

17  area of Jacksonville, the Arlington area of Jacksonville, with

18  some overlay of some drawings.

19          You see the Tree Hill Park.  Across from it is the

20  Arlington Park Cemetery.  Some red Xs on the map, those

21  identify within the cemetery additional statues.  So these

22  would be targets.

23  Q.   All right.  So the red Xs on C-13 correspond to statues

24  that are located at the Arlington Park Cemetery located on the

25  map?

1  A.    That's correct.

2  Q.    All right.  And then C-14, what are we looking at?

3  A.    This is a close-up of the same cemetery.  You see two,

4  three, four, and one.  Those would be the targets within the

5  Arlington Cemetery.

6  Q.    All right.  And then C-15 -- explain to us what we're

7  looking at on C-15.

8  A.    All right.  So this is, again, a detailed map -- on the

9  top of this one you actually have a key, or a legend,

10  describing the different colors.  Yellow is the target,

11  drop-off point, car, us.

12          And this one is -- the highlighted area is actually a

13  child care center.  I believe it's Christ the King Child Care

14  Center, with a statue in the front of it.  And you have the

15  entire route that they would have -- that they planned to take,

16  from start to finish.

17  Q.    And have you actually gone out to -- well, let me just

18  show you C-16 one last time.  Is that the child care center?

19  A.    Yes, sir, it is.

20  Q.    And have you actually gone out to the child care center?

21  A.    Yes, sir.

22  Q.    And showing you -- or if you'd take a look at C-17 through

23  C-19, are those photographs of what's actually there where the

24  red circle is?  I'm sorry.  The photographs that are in the

25  Exhibit C-17 through 19, have you reviewed those?

1   A.   Yes, sir.

2   Q.   And do they depict what's shown from a bird's eye view up

3   close?

4   A.   Yes, sir.

5         MR. HEAVENER:  Your Honor, the government would

6   introduce Government's C-17 through C-19.

7         MS. CALL:  No objection.

8         THE COURT:  Be received.

9      (Government's Exhibit Nos. C-17 through C-19 were received

10  into evidence.)

11  BY MR. HEAVENER:

12  Q.   All right.  Showing you C-17, that's the child care center

13  that's circled with the X?

14  A.   Yes, sir.

15  Q.   And then the X is actually -- corresponds to C-18, which

16  is the statue?

17  A.   That's correct.

18  Q.   And then C-19 is the -- whoever doned [sic] the money --

19  or donated the money to construct that statue?

20  A.   That's correct.

21  Q.   All right.  This -- these maps that you looked at, and

22  these circles and that type of thing -- did you see that in any

23  other images on the computer when you were reviewing it?

24  A.   Yes, we did.

25  Q.   And what specifically did you see that on?

1  A.   We saw that in maps of Yemen.  So we actually found sort

2  of the raw map.  And then the maps that Mr. Bell had altered to

3  show, you know, potential routes and areas of -- you know,

4  maybe where the group was -- Ansar al-Shari'a groups were

5  within Yemen.

6  Q.   All right.  And those images are depicted -- or reproduced

7  at Government's C-36, C-37, and C-38?

8  A.   Yes, sir.

9       MR. HEAVENER:  May I introduce those at this time,

10 Your Honor?

11      MS. CALL:  No objection.

12      THE COURT:  Be received.

13    (Government's Exhibit Nos. C-36, C-37, and C-38 were

14 received into evidence.)

15 BY MR. HEAVENER:

16 Q.   All right.  Let me direct your attention to C-36.  This is

17 a -- a map.  And we see what country identified?

18 A.   Yemen.

19 Q.   All right.  And is there anything about Ansar al-Shari'a

20 on this particular map?

21 A.   No, sir.

22 Q.   And then if we turn to C-37, what's this?

23 A.   This is a -- again, a map of Yemen.  And, of course, you

24 can see in the bottom right it's showing locations of Ansar

25 al-Shari'a and AQAP.

1    Q.    You're referring to the bottom right?  There's a box with

2    text in it that says Ansar al-Shari'a and AQAP?

3    A.    That's correct.

4    Q.    And what's written right underneath that box?

5    A.    Locations of control.

6    Q.    All right.  And then if we look at C-38, we see the same

7    kind of markings that we saw on the graveyard video --

8    A.    That's correct.

9    Q.    -- or the graveyard maps.  And do the -- the circled areas

10   and the blue lines, do you have any understanding of what those

11   represent?

12   A.    Those would have been routes that Mr. Bell potentially

13   would have used and areas he potentially would have gone to.

14   Q.    And the country right next to Yemen, where those lines --

15   the border that those lines traverse, what country is that to

16   the immediate right of the country of Yemen.

17   A.    Oman.

18   Q.    Oman?  Okay.  All right.  So you told us about these maps

19   that you found that was indicative -- that other cemetery

20   statue destructions and other statues might be destroyed here

21   in Jacksonville.

22          When you spoke with the juvenile, did he give you any

23   information about other things the group planned to do in

24   Jacksonville?  When you spoke with the juvenile who traveled on

25   August 7th, did he tell you about any of that?

```
 1  A.   He did.  He said one of the places that they would like to

 2  destroy would be liquor stores.  And, in particular, he stated

 3  that Mr. Bell had said that he would like to go into liquor

 4  stores and chop -- or slice the bottles with a sword.

 5  Q.   All right.  And then any other kinds of places that they

 6  wanted to destroy here in Jacksonville?

 7  A.   Yes.  They wanted to burn down what they called porn

 8  places.

 9  Q.   All right.

10          MR. HEAVENER:  Your Honor, I don't know if you want to

11  break for lunch or --

12          THE COURT:  I was going to look for a -- is this a

13  good time?

14          MR. HEAVENER:  Good breaking point, Your Honor.

15          THE COURT:  All right.  Agent, you can step down, sir.

16          Mr. Heavener, can you give me a sense of where we are

17  and where we're going?

18          MR. HEAVENER:  Your Honor, I think I -- I anticipate I

19  have about another hour with Agent Berry --

20          THE COURT:  Okay.

21          MR. HEAVENER:  -- maybe a little bit more.  Then the

22  government will be prepared to move on with its --

23          THE COURT:  All right.  Ms. Call, do you have an

24  estimate of your -- the length of your cross-examination of the

25  agent?
```

1          MS. CALL:  I would assume about an hour.

2          THE COURT:  Okay.  All right.  So -- and then,

3   Mr. Heavener, who is after the agent?

4          MR. HEAVENER:  Your Honor, we have Mr. Schiavone from

5   the Bureau of Prisons.  He will be very brief.  And, quite

6   frankly, I think there's some suggestion in the sentencing

7   memo -- we are really going to tender him to explain to the

8   court, but also to be available for questioning by the court as

9   to that.

10         THE COURT:  Okay.

11         MR. HEAVENER:  And then we have the government's

12  expert.

13         THE COURT:  Expert?  Okay.

14         And, Ms. Call, you've got Dr. Cohen coming, as well.

15  Is she en route?  Or what's her situation?

16         MS. CALL:  Yes, Your Honor.  After we had the brief

17  discussion in chambers about what the likely calendar was, I

18  had my office call and tell her not any earlier than 2:30.  But

19  she would be en route from Orlando.

20         THE COURT:  All right.  And what's the situation with

21  your expert, Mr. Heavener?  He's -- did he travel to be here,

22  as well?

23         MR. HEAVENER:  He did.  He's from the D.C. area.

24         THE COURT:  Okay.  I'm wondering -- and y'all think

25  about this.  I'm wondering if we ought to interrupt the agent

1   and do the experts to make sure we get to them.

2          Because right now we're not -- I mean, if we don't

3   come back until 1:30 or so, to quarter to two, whatever we're

4   going to do, you've got another hour, Ms. Call has got an hour

5   or so, and now it's going to be close to 4 o'clock, right?

6          MR. HEAVENER:  Correct, Your Honor.

7          THE COURT:  So I don't know if that makes any sense or

8   not, but -- and I don't want to interrupt your presentation,

9   but I don't -- so why don't y'all -- I'm going to -- I'll let

10  y'all talk about it and see what you want to do or how you want

11  to do it.

12         If the -- if it turns out that not even the

13  evidentiary portion of the -- of the sentencing is finished

14  today, we're going to have to figure out where we're going to

15  land here.  So that's another thing we're going to have to talk

16  about.

17         I -- if I had to -- even though we've moved these

18  things before -- if I had to, I could make tomorrow -- or part

19  of tomorrow available, if that's something that's -- we have to

20  do or that would be of interest.

21         If not, then we're just going to have to figure it

22  out, because after that it gets tougher.  So -- so, anyway,

23  those are things that maybe y'all can think about.  Maybe you

24  two can talk to each other over the lunch break, see what makes

25  sense.

1          I was going to do -- I was going to do an hour and 15,

2     but I can cut it down if you'd rather me do that, to make sure

3     we get as much time in as you want, or as we can.

4          Y'all want to just do an hour?  Or what do you want to

5     do?

6          MR. HEAVENER:  That's fine with us.

7          THE COURT:  Ms. Call?

8          MS. CALL:  That's fine, Your Honor.

9          THE COURT:  All right.  So it is now 12:30.  We will

10    reconvene at 1:30.  We're in recess.

11          COURT SECURITY OFFICER:  All rise.

12       (Recess, 12:30 p.m. to 1:32 p.m.)

13          COURT SECURITY OFFICER:  All rise.  This Honorable

14    Court is now in session.  Please be seated.

15          THE COURT:  Mr. Heavener, how did y'all decide to

16    proceed?

17          MR. HEAVENER:  Your Honor, if -- if the court would

18    permit, we have one witness, Mr. Dave Schiavone, who is here

19    from Washington, D.C., with the Bureau of Prisons.  I

20    anticipate his testimony would be very short.

21          If we could take him out of order now, then we would

22    resume with Agent Berry's testimony.  We have no objection to

23    breaking as soon as Ms. Call's expert is here.

24          And then if we're not finished, our expert is able to

25    be here tomorrow morning, if the court is permitting that.  And

1    then we can -- that would be good.

2         THE COURT:  Okay.  All right.  What I'm going do -- I

3    think we're -- Ms. Call, did you have something you want to

4    say?

5         MS. CALL:  No.  I was just saying I could talk to

6    Mr. Heavener about that.  And as I indicated to the court, I

7    haven't seen my expert here.  I told her no earlier than 2:30.

8    So she probably slowed down or had a lunch or something.

9         But if she gets here whenever we finish with the agent

10   then would perhaps be a good breaking point, because that would

11   probably put us about three-ish or so.

12        THE COURT:  For her testimony?

13        MS. CALL:  Yes, Your Honor.

14        THE COURT:  Okay.  All right.  Well, we'll proceed

15   that way.  I'm going to need to -- if we're going to be here

16   tomorrow morning, I'm going to need to do a couple of things

17   here.  Hold on one second.

18        You can go ahead and get your witness in here,

19   Mr. Heavener, and then -- and let me just take a minute here.

20      (Judge confers with law clerk.)

21        THE COURT:  All right.  I'm able to be in session

22   tomorrow morning.  So if that's what we need to do, that's what

23   we will do.  Okay.

24        MR. HEAVENER:  Thank you, Your Honor.

25        THE COURT:  All right.  Ms. Diaz, will you swear the

1    witness, please.

2            COURTROOM DEPUTY:  Do you solemnly swear that the

3    testimony you are about to give before this court will be the

4    truth, the whole truth, and nothing but the truth, so help you

5    God?

6            THE WITNESS:  I do.

7            COURTROOM DEPUTY:  Please state your full name and

8    spell your last name for the record, sir.

9            THE WITNESS:  My name is David Schiavone,

10   S-c-h-i-a-v-o-n-e.

11           COURTROOM DEPUTY:  Thank you, sir.

12           THE WITNESS:  Thank you.

13           THE COURT:  You may proceed, ma'am.

14           MS. KOHN:  Thank you, Your Honor.

15           **DAVID SCHIAVONE, GOVERNMENT'S WITNESS, SWORN**

16                      **DIRECT EXAMINATION**

17   BY MS. KOHN:

18   Q.   Mr. Schiavone, would you please state your name.

19   A.   My name is David Schiavone.

20   Q.   How are you employed, sir?

21   A.   I'm a senior intelligence analyst with the

22   counterterrorism unit of the Federal Bureau of Prisons.

23   Q.   And as a senior intelligence analyst, can you tell us what

24   your duties are, please.

25   A.   I coordinate the collection of intelligence with our

1    intelligence analyst, the production and dissemination of

2    intelligence reports.  And I work on designations of inmates

3    and offenders in the Bureau of Prisons, including those with a

4    nexus to terrorism.

5    Q.    And how long have you been doing that?

6    A.    I've been at the counterterrorism unit for eight years.

7    Q.    Are you considered the designation expert, so to speak,

8    for the Bureau of Prisons for this area?

9    A.    For this area, yes.

10   Q.    So, Mr. Schiavone, could you explain briefly then, sir,

11   the procedure that you use to designate an inmate, once they

12   are determined to be going into your facility -- one of your

13   facilities?

14   A.    Well, the Bureau of Prisons reviews every inmate

15   individually based on their offense conduct, their

16   incarceration conduct, their history and behavior.  It is based

17   on any information we can obtain from the courts, other law

18   enforcement agencies, and relevant organizations that can

19   provide background on that offender.

20   Q.    Is there such a thing as a predesignation prior to

21   receiving all that information?

22   A.    No, there is not.

23   Q.    Is there such a thing as a predesignation based on their

24   offense prior to the -- to receiving all the information?

25   A.    No, there is not.

1   Q.    What is -- what do the initials ADX mean to you, if

2   anything?

3   A.    ADX is an acronym.  It's a term used for the Bureau of

4   Prisons, Administrative Maximum, penitentiary, the so-called

5   Supermax facility the Bureau of Prisons runs in Florence,

6   Colorado.

7   Q.    Are all terrorists defendants assigned to ADX?

8   A.    No, they are not.

9   Q.    In fact, how many -- are you familiar with the data of the

10  number of convicted -- or individuals that are convicted of

11  terrorist activity that are in your prison facilities?

12  A.    Yes.

13  Q.    And how many are there?

14  A.    Roughly, as of mid-October, the Bureau of Prisons have

15  identified approximately 330 offenders with a nexus to

16  terrorism in our custody.

17  Q.    And how many of those have been assigned to ADX, or

18  Florence?

19  A.    At the ADX there was approximately 30 offenders.

20  Q.    Can you give the court some idea of the reasons behind

21  those designations, some of the reasons?

22  A.    Well, the ADX is a high security administrative facility

23  for offenders who cannot otherwise program in typical

24  institutions, such as those that pose a serious security risk

25  to staff, inmates, or the community, based on history of

1   violence, escape risk, or other security concerns.

2   Q.    Are there also inmates there that are subject to the SAMs

3   measures?

4   A.    Yes.  A number of inmates have the special administration

5   measures and are housed at the ADX.

6   Q.    And for the court's benefit, could you explain what

7   SAMs -- or those special security administrative measurements

8   are, please?

9   A.    SAMs are a set of restrictions imposed on individuals,

10  communications in contact with the community, at the discretion

11  of the Attorney General.

12  Q.    Are you also familiar with a program called the CTU?

13  A.    I work for the CTU.

14  Q.    You work for the CTU?

15  A.    The CMU?

16  Q.    CMU.  Sorry, sir.

17  A.    Yes, I am familiar.  CMUs are the communication management

18  units.

19  Q.    And what are those, please?

20  A.    They're units -- they're general population units the

21  Bureau of Prisons operates for inmates believed to need

22  enhanced monitoring of their communication.

23          It is a level of monitoring below a SAMs that the

24  Bureau of Prisons imposes on inmates to ensure that their

25  communications don't cause any security concerns for the

1  institution, the staff inmates, or the community.

2  Q.    And, again, the same question I posed to you earlier.  Are

3  inmates predesignated for CMUs prior to you receiving all

4  those -- all the information that you've earlier described?

5  A.    No, they are not.

6  Q.    Can inmates be moved to a CMU?

7  A.    Yes, they can.

8  Q.    Do you have terrorists designated -- or terrorist

9  defendants that are housed at a CMU?

10  A.    Yes, there are terrorist offenders in the CMUs.

11  Q.    What other offenders are housed there?

12  A.    Any inmate that requires a heightened control of their

13  communications, such as sex offenders, sovereign citizens,

14  inmates that have contacted victims in the community, who have

15  engaged in either prohibited Bureau of Prisons activity or

16  criminal activity through the use of communications with the

17  community.

18  Q.    How about designated violent offenders?

19  A.    Ordinarily violent offenders would not be placed in the

20  CMU.  They would go to what are called special management

21  units, or the ADX, which are designed for the security controls

22  needed for violent and dangerous offenders.

23  Q.    So is it safe to say that each case -- each inmate is

24  looked at on a case-by-case basis before a designation?

25  A.    Every offender is viewed individually based on their own

1  history and behavior.

2  Q.   Does the Bureau of Prisons have a de-radicalization

3  program?

4  A.   No, we do not.

5  Q.   Why is that, sir?

6  A.   The government hasn't sanctioned any such programs for use

7  in the United States, that I'm aware of.

8            MS. KOHN:  We have nothing further, Your Honor.

9            THE COURT:  Do you wish to cross-examine, Ms. Call?

10           MS. CALL:  Yes, Your Honor.

11                       **CROSS-EXAMINATION**

12  BY MS. CALL:

13  Q.   Sir, you had indicated that you take part -- you

14  coordinate intelligence and take part in the designation

15  process for persons having a nexus to terrorism?

16  A.   Correct.

17  Q.   Okay.  Normally -- what I understand of the designation

18  process is that the paperwork goes from essentially the

19  sentencing court to the Grand Prairie, Texas, office.  Are

20  cases that -- is that the typical procedure?

21  A.   Yes.  Grand Prairie houses our national designation

22  center.

23  Q.   Yes.  And what that would typically include is that the

24  designation center receives the presentence report and the

25  court's judgment in a criminal case, correct?

1  A.   Correct, along with the statement of reasons and any other

2  relevant case information that was provided for the

3  designation.

4  Q.   If a case is determined to have some nexus to terrorism,

5  is it excluded from that process to Grand Prairie and then

6  routed to your office?

7  A.   No.  Grand Prairie routes it to our office for our

8  recommendations based on our subject matter expertise in

9  terrorism matters.

10  Q.   Okay.  So, essentially, the packet of information that you

11  talked about, the presentence report, the judgment, and

12  statement of reasons, will still go to Grand Prairie?  After

13  preliminary screening, if they determine that it has a nexus to

14  terrorism, they send it to you --

15  A.   Correct.

16  Q.   -- or your office?

17  A.   Correct.

18  Q.   And then in this individual process, it's done through

19  your office, rather than the normal designation process through

20  the national designation center?

21  A.   No.  We make recommendations.  But the final designations

22  are still decided and loaded by the designation center.

23  Q.   And the designation procedure that we're talking about

24  determines where an inmate will be housed, correct, and what

25  security level he or she is placed at?

1   A.    Correct.  That's part of the entire process.  Yes.

2   Q.    And the designation process can include what kind of

3   programming a person may or may not be eligible for, correct?

4   A.    Yes, to an extent, because depending on the level of the

5   facility the inmate is scored at and placed in, programs are

6   available at different security levels, so, yes.

7   Q.    And when we talk about the security levels, is part of

8   that based on the Bureau of Prisons' assessment of something

9   called public safety factors?

10  A.    One of the items looked at is a public safety factor, yes.

11  Q.    And, essentially, there's a worksheet that goes over

12  different factors in each individual case, correct?

13  A.    Well, there's a classification model we use which comes up

14  with a scoring off of that scoring level.  We determine a base

15  security level.

16  Q.    Okay.  And so that score sheet looks at things like what

17  was the nature of the charge, correct?

18  A.    Correct.

19  Q.    And more serious charges are assigned higher points,

20  correct?

21  A.    Correct.

22  Q.    It looks at the age of the person being sentenced,

23  correct?

24  A.    Correct.

25  Q.    And then this is an inverse, a younger person is assigned

1   more points than an older detainee?

2   A.   No.  Not necessarily.  Younger offenders may receive fewer

3   points.  And much older offenders may also receive fewer points

4   based on their age.

5   Q.   One of the other factors that it looks at is any prior

6   court cases, correct?

7   A.   Prior --

8   Q.   Convictions.

9   A.   Mostly prior convictions, correct.

10  Q.   And if there's -- once all of these things are given their

11  point level, then that assigns to whether someone may qualify

12  for low, medium, or a high security placement, correct?

13  A.   Correct.

14  Q.   Okay.  Given a charge under this statute -- we're talking

15  about 18, U.S.C., 2339A -- where does that place, in terms of

16  the number of points the offensive conviction would be

17  assigned?

18  A.   It's -- it varies based on all the other factors and

19  the -- the nature of the individual.  I don't do the actual

20  scoring.  The designation center does that particular scoring

21  level.

22        We make recommendations at the CTU based on the

23  offense conduct, the behavior conduct, and the institutions in

24  the Bureau of Prisons.

25  Q.   So there's no one point that says, If someone is convicted

1    under 2339A that they're given a certain number of points for

2    the conviction?

3    A.   Well, there's a scoring level for offense conduct, but it

4    relates also to level of violence and other offense conduct in

5    the individual's history.  So they all relate in the scoring

6    process.

7    Q.   And to determine the level of violence that might have

8    been involved in any particular offense, is the Bureau of

9    Prisons reviewing the presentence report?

10   A.   Yes.  Among other court documents, yes.

11   Q.   And part of the judgment in a criminal case can include

12   recommendations by the court.  How are those factored into the

13   designation process?

14   A.   How are the recommendations factored in?

15   Q.   Yes.

16   A.   The recommendations are always considered by the Bureau of

17   Prisons as part of the designation process.

18   Q.   If a case is determined to a nexus to terrorism and

19   referred to your office, do you have any indication -- or any

20   feeling as to -- when Ms. Kohn was talking to you about the

21   data set that you've reviewed, how many times someone is

22   recommended for placement at a facility and receives that

23   placement?

24   A.   No.  I don't have that data.

25   Q.   And you said out of the 330 cases that you know of that

1    have a nexus to terrorism, about 30 of them are actually at

2    ADX, Florence?

3    A.    Correct.  Presently.

4    Q.    The next level down from ADX would be penitentiaries,

5    correct?

6    A.    Well, we have a special management unit which houses

7    violent offenders, too.  And then below that would be

8    penitentiaries.

9    Q.    Okay.  How many of the remaining 300 terrorism nexus cases

10   are designated as violent and dangerous individuals?

11   A.    I don't have that figure.

12   Q.    Okay.  Do you know how many people out of the remaining

13   300 cases are, in fact, placed at penitentiaries?

14   A.    I don't have that figure.

15   Q.    And you mentioned the SAMs and CMU.  And I understand that

16   to be Communication Management Units, correct?

17   A.    Well, SAMs are Special Administrative Measures, which are

18   imposed by the Attorney General.  The Communications Management

19   Units are units operated by the Bureau of Prisons.

20   Q.    And are people who are subject to SAMs or to placement in

21   the CMU -- are they at a facility, a regular Bureau of

22   Prisons -- let me use the example.

23          If they're at USP1 at Coleman, is there a special --

24   someone can be at that facility and be under SAMs, the Special

25   Administrative Measures, correct?

1  A.    Correct.  The placement of individuals on SAMs is done

2  also on a case-by-case basis, depending on the nature of the

3  SAMs and what language is included identifying the particular

4  restrictions for that individual.

5  Q.    And the CMU, similarly, the Communication Management

6  Units, are those sections of a regular prison facility?

7  A.    Yes.  There are two units currently in the Bureau of

8  Prisons.

9  Q.    And where are those two units?

10  A.    One is in Terre Haute, Indiana, and one is in Marion,

11  Illinois.

12  Q.    And both Terre Haute and Marion are penitentiary

13  facilities?

14  A.    The units are actually located in the medium security

15  facilities.  Marion is called a United States Penitentiary

16  because that's how it was named by Congress when it was built.

17  But it was downgraded to a medium facility, basically a federal

18  correctional institution.

19        Terre Haute is a complex of institutions that has a

20  penitentiary.  But the CMU is located at the medium security

21  federal correctional institution.

22  Q.    So if someone is placed in the CMU, they're at a medium

23  security facility.  And the security designations essentially

24  measure how locked down someone is and the guard-to-inmate

25  ratio, correct?

```
 1   A.    The security level has an effect on staffing, perimeter

 2   security, inmate activities, correct.  But just to clarify, the

 3   CMUs are administrative units, even though they're located in

 4   medium security institutions.  So they house inmates of all

 5   security levels.

 6   Q.    Okay.  So even if someone who has been determined to have

 7   a nexus to terrorism is not placed at a penitentiary, they can

 8   be placed in these administrative units that limits their

 9   communications abilities, so their contact essentially with

10   family and friends on the outside?

11   A.    Any inmate can be placed in these units.  So, yes, that

12   would include inmates with a nexus to terrorism.

13   Q.    And the Special Administrative Measures, that also limits

14   communications.  But does it have any other effect on someone's

15   detention status?

16   A.    Well, it's part of the consideration the Bureau of Prisons

17   would give to housing an offender.  So it depends on the

18   language in the SAM and what kind of restrictions are required.

19   The Bureau of Prisons would have to make an assessment as to

20   how to enforce those restrictions.

21   Q.    And you said that the SAMs placement is determined by the

22   Attorney General.  What part of the Department of Justice

23   oversees that?

24   A.    Well, the enforcement of the SAMs is levelled with either

25   the Bureau of Prisons or the U.S. Marshals or whatever facility
```

1  is housing the offender under the SAMs.

2  Q.   But how does someone get recommended to SAMs, or placed in

3  SAMs?

4  A.   Ordinarily -- ordinarily the first step is the law

5  enforcement agency makes a recommendation to the United States

6  Attorney's Office, and then makes a recommendation to the

7  Office of Enforcement Operations.  Initial placement is then

8  referred to the Attorney General for approval or denial.

9  Q.   And that is an internal proceeding within the Department

10  of Justice office.  Is there any input from the defense or the

11  court?

12  A.   I'm not that familiar with the process outside of the

13  Bureau of Prisons' enforcement and just limited responses to

14  the preparation for the Bureau to monitor and manage the SAMs.

15  Q.   Going back a step, when we talked about the score sheet

16  that the Bureau of Prisons designation process goes through, is

17  length of sentence one of the factors that's scored on that

18  score sheet?

19  A.   Yes.

20  Q.   So longer sentences are assigned higher points towards a

21  higher placement?

22  A.   Correct.

23  Q.   And typically an inmate who's housed at the Bureau of

24  Prisons, if they meet all of the internal guidelines, qualifies

25  for a sentence reduction, gain time.  Do -- are there any

1  different calculations if a case is named one that has a nexus

2  to terrorism?

3  A.    I'm not sure I understand your question.  You -- an inmate

4  who has a sentence reduction -- it wouldn't affect his scoring

5  until the sentence reduction was put into effect.

6  Q.    And maybe "reduction" is the wrong phrase.  I should have

7  used -- is there any different analysis for a terrorism nexus

8  case, in terms of earning good time or gain time towards

9  lessening your sentence?

10  A.    No.

11          MS. CALL:  I have no other questions, Your Honor.

12          MS. KOHN:  None, Your Honor.

13          THE COURT:  Sir, you -- when Grand -- is it Grand

14  Prairie?

15          THE WITNESS:  Yes, sir.

16          THE COURT:  When they send you a case to look at and

17  then you make a recommendation, do you actually recommend a

18  specific placement and conditions of placement?  What is --

19  what recommendation are you making back to them?

20          THE WITNESS:  We would make a recommendation on

21  available facilities.  We try to look at balancing the

22  population, putting the offender in an appropriate institution

23  for their security level, and then managing the populations of

24  each individual facility.

25          THE COURT:  Then the government's memorandum -- one of

1    the memoranda that they gave to me, they cite this same 332

2    number, thereabouts, that -- of current BOP inmates who have

3    some nexus to international terrorism.

4         And then they also tell me that there's 96 inmates

5    with a nexus to domestic terrorism.  I'm assuming they're

6    getting that information from you or from your folks.

7         Is that right?

8         THE WITNESS:  Yes, sir.

9         THE COURT:  They also go on to tell me that -- give me

10   information about other terrorism cases to essentially say to

11   me that -- that depending upon the situation an inmate with a

12   terrorism nexus could end up in any level of institution or any

13   place.

14        Is that true?  Or is it -- is it more likely they'd

15   end up in one place or another, or what?

16        THE WITNESS:  The only location an offender with a

17   nexus to terrorism would not be designated is our minimum

18   security camps.  And that is because -- for communication

19   requiring -- monitoring requirements, the Bureau has determined

20   that a group of offenders that we call required monitoring

21   should not be in camps because the low security terrorist

22   offenders are among those.

23        But terrorist offenders are housed throughout our

24   agency in low, medium, high, and administrative facilities.

25        THE COURT:  And you've probably already done this --

1    and I don't mean to take too much of your time.  But if you

2    could tell me what -- if you could just list off a couple of

3    the key factors that would determine what a placement would be

4    if you had a terrorism nexus case.

5          What kinds of things are you looking at to decide

6    whether to recommend a Supermax or a low to medium?  Or what

7    are you -- what kind of things are you considering?

8          THE WITNESS:  Well, the Supermax -- our ADX placement

9    has specific guidelines, which terrorism is among the

10   considerations.

11         But the facility is designed for individuals who

12   require extensive security because of their background, their

13   history, their likelihood of violence, potential for escape.

14   So it's -- it's a very specialized designation.

15         The scoring model that we use recommends a point value

16   for inmates based on their history, their offense conduct.  We

17   look at each individual offender as a separate case.

18         We don't make any decisions outside of that case.  We

19   make recommendations within -- the information we have

20   available, whether from the courts, other law enforcement,

21   incarceration conduct -- and a lot of it is a correctional

22   judgment, based on our experience and knowledge of managing

23   offenders.

24         THE COURT:  I have been told in the context -- a

25   different context of sex offenders that that there are

1    facilities that, for lack of a better word, specialize in those

2    type of cases, or have specific treatment facilities, and so

3    that more offenders -- more sex offenders end up going to those

4    facilities than perhaps some others.

5           My question is related to terrorism.  Is there any

6    similar type of analysis made?  For example, are there

7    facilities that are more likely to house terrorism-related

8    defendants?

9           Or is it just spread all over the -- the BOP, and

10   that -- and so that terrorism defendants would be mixed in, for

11   lack of a better term, with other populations?

12          THE WITNESS:  Well, the Bureau does run the sex

13   offender management program.

14          THE COURT:  Right.

15          THE WITNESS:  There are available programs at many

16   institutions.  And there are, like you said, specific

17   institutions that manage that type of population directly.

18          THE COURT:  Right.

19          THE WITNESS:  The Bureau does not have any type of

20   terrorism management program.  Offenders with a nexus to

21   terrorism can be designated anywhere throughout the agency.

22   And we have offenders in just about every one of our low to

23   administrative facilities.

24          THE COURT:  Okay.  And can you tell me what the age of

25   the offender -- you know, and I'm not -- I am not asking you to

1   prejudge this case, because I -- we're a long way from -- from

2   that in this case.

3           But, you know, hypothetically speaking, you've got a

4   20 or 21-year-old offender with a terrorism nexus.  Are they

5   going to -- is that going to be thought of differently than a

6   30 or 35-year-old?  Or does it just depend?  Or what can you

7   tell me about age?

8           THE WITNESS:  Well, age will play a factor in the

9   scoring, because it's built into the model system.  Like I

10  said, lower ages tend to lower the score somewhat, because of

11  the age.  Much older ages will also do the same.

12          Your median ages will give you a more median score

13  because of the belief that younger offenders have a different

14  need compared with much older offenders.

15          There's no way, really, to just say that the age is a

16  more important factor than anything else.  History of violence,

17  previous offenses, the current offense conduct are very

18  critical in making that assessment.

19          Even offenders with a conviction for material support,

20  such as you're looking at in this case, can still score out as

21  a low security initial designation.

22          THE COURT:  And how often does the -- do the folks in

23  Texas follow your recommendations?

24          THE WITNESS:  Well, they follow them pretty regularly.

25  What we do is we don't ordinarily give them one option.  We

1   usually make several recommendations, because there are a lot

2   of factors to consider.

3        Institutions may have local issues on bed space.

4   There's medical care levels.  There's a lot of different

5   factors at play.

6        So we try to make a broad-based recommendation on a

7   certain security level that we think the institution will be

8   able to manage a particular offender.

9        THE COURT:  And I think in response to Ms. Kohn's

10  question -- I think you've already answered this.  But there's

11  no -- for example, as you know, we have sex offender treatment,

12  we have drug treatment, we have -- you know, we have various

13  programs in the Bureau of Prisons.

14       What I understand you to be saying, though, there has

15  not yet been developed any specific program that addresses a

16  terrorism defendant, per se.

17       THE WITNESS:  Correct.

18       THE COURT:  Okay.  I take it that an offender who

19  otherwise might qualify -- or who -- who needed it could be

20  recommended for mental health treatment, just like many of our

21  other defendants?  Is that -- there's no disqualification just

22  because you're labeled a terrorism nexus defendant, right?

23       THE WITNESS:  Absolutely not.  Those programs are

24  available to every inmate in our system.

25       THE COURT:  Okay.  All right.  Any questions of

1   counsel based on my questions?

2           MR. HEAVENER:  No, Your Honor.

3           MS. CALL:  No, Your Honor.

4           THE COURT:  Thank you for your time, sir.

5           THE WITNESS:  Thank you.

6       (Witness excused.)

7           THE COURT:  Mr. Heavener, did you want Agent Berry to

8   rejoin the stand?

9           MR. HEAVENER:  Yes, Your Honor.

10          THE COURT:  Come on up, sir.

11          MR. HEAVENER:  May I proceed, Your Honor?

12          THE COURT:  You may.

13                  **DIRECT EXAMINATION (CONTINUED)**

14  BY MR. HEAVENER:

15  Q.   Agent Berry, before we broke we had been talking about

16  these -- the cemetery destruction mission and these other areas

17  of property destruction here in Jacksonville.

18          I'd like to turn your focus now to explosive devices

19  and making bombs.  And I'd first like to direct your attention

20  to your interview with Mr. Bell on November 21st of 2012 at the

21  airport.

22          Did you -- did you bring that topic up with Mr. Bell?

23  A.   I did, sir.

24  Q.   And why were you bringing the topic of explosives up with

25  Mr. Bell?

1  A.   Well, I explained to Mr. Bell that the FBI had been made

2  aware of a report to the Jacksonville Sheriff's Office that

3  Mr. Bell may have explosives in his vehicle, and potentially in

4  his place of work, the flea market.

5  Q.   And when you talked to Mr. Bell about explosives and

6  explosive devices, what did he tell you?

7  A.   He downplayed it.  He stated that he had found some

8  mortar-type fireworks after the Fourth of July.  And he took

9  those and he used a paper roll and some duct tape and made a

10 small device that he ultimately detonated.  He stated he filmed

11 that and showed it to several people, that -- he downplayed the

12 significance of it.

13 Q.   And when you say he downplayed it -- when you reviewed the

14 computer evidence, did you determine that there was more to the

15 story than what he told you at the airport?

16 A.   Yes, sir.

17 Q.   Okay.  And you've reviewed the computer evidence.  And

18 could you give us a general description about what kind of

19 things are on the computer files with regard to making bombs or

20 explosive devices?

21 A.   Yes, sir.  There are numerous videos of Mr. Bell making

22 what I would categorize as how-to videos.  He is -- he starts

23 these videos -- in particular, one of them he says, you know,

24 This is Bomb Making 101.  These are the step-by-step

25 instructions, in some of the others.

1          And then he proceeds to give the ingredients, the

2   materials, that you need to make this explosive device.  And

3   then he constructs it.  And then in most cases you will find

4   another video where he has detonated the device.

5          Obviously these are meant for, like I said, how-to

6   videos, to show someone else how to make these devices.

7   Q.   And with regard to these videos themselves, do they -- are

8   they short in nature?  Or describe the typical length of him

9   making one of these devices.

10  A.   I would say some of them are quite long, you know, 20, 30

11  minutes, or even more, where -- in some of them he is taking

12  fireworks and breaking them open and taking the powder -- you

13  know, the gunpowder out of them and using that to make the

14  device.

15  Q.   And the devices that he's making on these video files, did

16  he use particular terms to describe the things that he was

17  making?

18  A.   He did.  I mean, he used terms like weapons of mass

19  destruction, bombs, bomb making, grenades, frag grenades.

20  Q.   And you've reviewed all these videos?

21  A.   I have.

22  Q.   And did you pull out segments to -- to illustrate

23  essentially a compilation of some of these bomb-making videos?

24  A.   I did.  And so -- really, what you see is -- from the

25  beginning there's a progression.  And some of the devices did

1    not work.  For instance, in that one video, the -- the video

2    that they spliced together, you know, it didn't look like some

3    of those fireworks or explosive devices worked.

4    Q.   You're referring to Government's A-5 that we watched

5    earlier?

6    A.   Correct.  But as he progresses then the devices progressed

7    greatly.

8    Q.   And that video that you compiled is Government's A-35?

9    A.   Yes, sir.

10         MR. HEAVENER:  Your Honor, at this time I would

11   request permission to publish Government's A-35.

12         THE COURT:  And I know Ms. Call had an objection to

13   this exhibit, which I have overruled.

14         And, of course, Ms. Call, I'll be happy to play

15   whatever other portions of the tapes you think are necessary

16   for context, but I just -- I'm going to let you publish it.

17         But let me just ask you -- tell me what I'm going to

18   be seeing.  And what progression are you talking about?

19         THE WITNESS:  What you see are just small segments of

20   several of the devices that he made throughout.  And so you'll

21   see different types of devices.

22         Some of them made out of sort of paper roll, some of

23   them made out of $CO_2$ canisters.  And then in the end you'll see

24   him actually detonate some of these devices.

25         THE COURT:  Okay.  You may publish.

1          MR. HEAVENER:  Thank you, Your Honor.

2      (Video played.)

3          MR. HEAVENER:  Stop for a moment, Mr. Di Vita.

4    BY MR. HEAVENER:

5    Q.   The device we just saw, that was a cardboard tube?

6    A.   It is.

7    Q.   And the ends were taped with what?

8    A.   So you have duct tape on the ends and some fireworks and

9    powder inside.

10   Q.   All right.

11         MR. HEAVENER:  Go ahead, Mr. Di Vita.

12     (Video played.)

13         MR. HEAVENER:  Hold on a second, Mr. Di Vita.

14   BY MR. HEAVENER:

15   Q.   What he just described as a frag grenade, what was that

16   that he's holding?  What were those things?

17   A.   Those were $CO_2$ cartridges.

18   Q.   All right.  And earlier he said -- he was describing how

19   you make these.  He had a hammer and a nail.  Can you just

20   describe the process he was using to make those frag grenades?

21   A.   Yes, sir.  He took the nail and he punctured the end of

22   the $CO_2$ cartridge and let out the $CO_2$.  He then took the

23   gunpowder and poured it into the $CO_2$ cartridges, put the fuse

24   in it and then sealed it with that Quick Steel.

25   Q.   All right.  The screen shot that's in front of you, we're

1    about to see him detonating some of these devices?

2    A.    Yes, sir.

3    Q.    And can you describe what we're looking at?  We see

4    Mr. Bell's leg.  How is he dressed in this video that we're

5    watching?

6    A.    He's dressed in sort of a -- like, a long black robe.  He

7    has a black tactical vest on, black kneepads, black arm pads,

8    and he's wearing a turban.

9         MR. HEAVENER:  All right.  Go ahead, Mr. Di Vita.

10        (Video played.)

11        MR. HEAVENER:  Stop for a second, Mr. Di Vita.

12   BY MR. HEAVENER:

13   Q.    The devices we're looking at right now looks like a

14   wadded-up piece of duct tape with a fuse.  Do you have any

15   knowledge of what those devices are?

16   A.    Yeah.  He called those duct tape bombs.  They're really

17   like -- really turned out to be more like a smoke grenade.

18   Q.    Okay.

19        (Video played.)

20   BY MR. HEAVENER:

21   Q.    Agent Berry, the -- earlier today you told us about

22   locating --

23        THE COURT:  Excuse me, Mr. Heavener.  Could we put a

24   time frame on that activity?  What's the time frame of the clip

25   I just watched?

1        THE WITNESS:  This is all before he leaves to go

2   overseas.  So he starts making them around the Fourth of July.

3   He makes them up to about the time he leaves.  So you're

4   talking about a two-month time frame.

5        THE COURT:  Thank you, sir.

6        Go ahead.

7   BY MR. HEAVENER:

8   Q.   Agent Berry, earlier today you told us that the agents

9   from the FBI located the field where this target practice had

10  been going on.  Was that in or about the same location where

11  these devices were being exploded?

12  A.   Yes, sir, it was.

13  Q.   Okay.  And in the processing of that field, did the FBI

14  locate pieces of what I'll call shrapnel or...

15  A.   Yes, they did.

16  Q.   Okay.  And in the videos -- any shrapnel -- and did they

17  locate any unexploded devices out there?

18  A.   Yes, sir, they did.  They found one of the duct-tape

19  bombs.

20  Q.   All right.  And all that was packaged up and sent to the

21  FBI laboratory in Quantico?

22  A.   Yes, sir.

23  Q.   And did that lab do an analysis and issue a report?

24  A.   They did, sir.

25  Q.   And you've reviewed their report?  It's Government's C-33?

1  A.   Yes, sir, I have.

2         MR. HEAVENER:  Your Honor, at this time the United

3  States would offer Government's C-33 into evidence.

4         MS. CALL:  Your Honor, I do object to this.  The agent

5  is testifying that he received the report, but not to preparing

6  it.  And although I know the rules of evidence don't apply,

7  that would be hearsay in -- for him to summarize what the

8  report means.

9         THE COURT:  Let me take a look at it.

10        Mr. Heavener, while I'm reviewing it, will you get a

11  little more foundation out of the witness about who prepared

12  the report and under what circumstances, please?

13        MR. HEAVENER:  Yes, Your Honor.

14 BY MR. HEAVENER:

15 Q.   Agent Berry, do you have the report in front of you?

16 A.   I do not.

17 Q.   Do you need -- do you need a copy?

18 A.   Yes, sir.

19        MR. HEAVENER:  May I approach, Your Honor?

20        THE COURT:  Yes.

21 BY MR. HEAVENER:

22 Q.   Agent, I'm showing you Government's C-33.  Is that the

23 report that you received from the FBI laboratory?

24 A.   Yes, sir, it is.

25 Q.   And does it reflect who authored that report?

```
 1   A.    It does.
 2   Q.    And who is that?
 3   A.    That is the laboratory in Quantico, Virginia.  I'm looking
 4   for a signature.  The explosives unit.
 5   Q.    All right.  And the report itself, does it outline the
 6   analysis that took place, the items that were submitted to the
 7   FBI laboratory in Quantico?
 8   A.    Yes, sir, it does.
 9   Q.    And does it -- does it -- it essentially articulates the
10   procedures, the steps that the laboratory in Quantico followed
11   in reaching their conclusions?
12   A.    Yes, sir, it does.
13   Q.    And does the report reflect conclusions of the laboratory
14   in Quantico?
15   A.    Yes, it does.
16   Q.    All right.  And are those conclusions things that you
17   relied upon in -- in conducting this investigation and
18   investigating the case against Mr. Bell?
19   A.    Yes, it is.
20         MR. HEAVENER:  All right.  Your Honor, at this time
21   the government requests submission of Government's 33.
22         THE COURT:  All right.  What I'm going to do,
23   Ms. Call, is I'm going to admit it conditionally by way of a --
24   we'll do it by way of a proffer for now.  I'll let Mr. Heavener
25   ask his questions.
```

1          If you want to cross-examine on it when it's your

2     turn, I'll let you do that.  And then I'll take a look at it.

3     I don't think that the hearsay objection is -- is valid in a

4     sentencing hearing, but I want to be sure about that.

5          So I'm going to go ahead and listen to it

6     conditionally as a proffer.  And then I'll make a final

7     determination as to whether I'll consider it as part of the

8     sentencing package.

9        (Government's Exhibit No. C-33 was received into evidence.)

10         THE COURT:  But, Mr. Heavener, you may proceed.

11         MR. HEAVENER:  Thank you, Your Honor.

12    BY MR. HEAVENER:

13    Q.   Agent Berry, the report itself -- and I want to direct

14    your attention specifically to the device that you referred to

15    as a frag grenade -- or that Mr. Bell referred to as a frag

16    grenade.

17    A.   Yes, sir.

18    Q.   Did the laboratory in Quantico give any opinion about what

19    that device was and what it was capable of doing?

20    A.    Yeah.  They classified it as an improvised explosive

21    device capable of causing personal injury -- or bodily injury,

22    property damage, or even death.

23    Q.   And this is a result of the explosion -- the shrapnel

24    being dispersed as a result of the explosion?

25    A.   That's correct.

1   Q.    All right.  Now, specifically with regard to that issue of

2   the fragmentation grenade, when -- when Mr. Bell returned to

3   the United States, was an inventory of his luggage made at the

4   airport, or a review of his luggage made upon entering the

5   country?

6   A.    Yeah.  Yes, sir.  When he came into the country, he --

7             THE COURT:  Excuse me, Mr. Heavener.

8             I apologize, Agent.

9             I want to just -- while I'm thinking about it, I want

10  to state that based upon the court's review of C-33, which

11  Ms. Call has objected to, the court does not have any concern

12  about the regularity of the report, doesn't have any concern

13  about the content of the report, or the way it's set up, nor

14  does it have any real doubt that this is a legitimate report

15  from FBI Quantico.

16            And so in terms of authenticity, that type of thing, I

17  have no concern about that.  There are a couple of redactions

18  in it, but they don't seem to be material.

19            And so, really, it's just a question of whether the

20  hearsay objection is a valid objection in this proceeding, as

21  far as I'm concerned.  And I'll take a look at that objection

22  made by Ms. Call.

23            But I wanted to go ahead while I was looking at the

24  report and say that I have now reviewed it and it does appear

25  to -- to have all required indicia of regularity.  The only

1  thing we don't have is the actual person who prepared the

2  report here today.

3          But I don't think that's all that unusual.  But I want

4  to reserve on it and make sure that Ms. Call is not right about

5  it, so...

6          All right.  Mr. Heavener, you may proceed.

7          MR. HEAVENER:  Thank you, Your Honor.

8  BY MR. HEAVENER:

9  Q.   Agent Berry, Government's Exhibits C-34 and C-35 -- are

10 those photographs of the contents of Mr. Bell's luggage when he

11 returned to the United States?

12 A.   Yes, they are.

13 Q.   And they fairly and accurately depict the way his luggage

14 looked when he returned to the United States?

15 A.   Yes, sir.

16         MR. HEAVENER:  Your Honor, at this time the United

17 States would request introduction of Government's C-34 and

18 C-35.

19         MS. CALL:  No objection.

20         THE COURT:  Be received.

21    (Government's Exhibit Nos. C-34 and C-35 were received into

22 evidence.)

23 BY MR. HEAVENER:

24 Q.   And, sir, directing your attention to Government's C-34,

25 we see the contents of Mr. Bell's luggage.  And I'd like to

```
 1   direct your attention to the bottom right corner of that

 2   photograph.  There appears to be a chrome-colored tube.

 3          Do you know what that is?

 4   A.   That's the Quick Steel.  It's either the same or similar

 5   to what we just saw in the video.

 6   Q.   That's what Mr. Bell was using to create those

 7   fragmentation grenades?

 8   A.   Yes, sir.

 9   Q.   And then C-35 is simply a close-up of that?

10   A.   That's correct.

11   Q.   All right.  All right, sir.  I'd like to change or focus,

12   again -- and not so much of -- of what Mr. Bell did.  But I'd

13   like to direct your attention to -- earlier we heard Mr. Bell

14   talking about, We need to resort to all means necessary, and

15   instructing a juvenile about what to say to his parents.

16          I'd like to talk to you with regard to Mr. Bell's

17   history and characteristics about propensities for dishonesty

18   in relation to this particular crime.

19          And the first thing I'd like to talk to you about is a

20   thing called Hajj.  Are you familiar with Hajj?

21   A.   I am.

22   Q.   And what is Hajj, for the court's benefit?

23   A.   It's a yearly pilgrimage to Mecca.  It's one of the

24   requirements of a Muslim to at least do once in their -- in

25   their lifetime.
```

1  Q.   And with regard to Hajj, how does that relate to the --

2  Mr. Bell's attempt to join Ansar al-Shari'a in the country of

3  Yemen?

4  A.   It was the cover story that they used.  And they told

5  everyone here before they left.

6  Q.   All right.  And when you say "everyone," is that -- is

7  that what they told the leaders at the mosque here in

8  Jacksonville?

9  A.   It was.

10  Q.   And do you have any knowledge, after speaking with leaders

11  at the mosque here in Jacksonville, about whether a convert

12  like Mr. Bell obtains anything, in terms of trying to make Hajj

13  when they leave from a mosque here in the United States?

14  A.   I did talk to the leaders.  And they explained to me that

15  as a convert he would need a certificate showing that he had

16  taken the Shahadah and certifying that he was a convert to

17  Islam.

18  Q.   And showing you Government's -- or you've reviewed

19  Government's C-43.  Is that a copy of that certificate that was

20  recovered from Mr. Bell?

21  A.   Yes, it is.

22        MR. HEAVENER:  All right.  Your Honor, at this time

23  the United States would request introduction of Government's

24  C-43.

25        MS. CALL:  No objection.

1          THE COURT:  C-43?

2          MR. HEAVENER:  Yes, sir.

3          THE COURT:  Let me take a look.  Be received without

4   objection.

5      (Government's Exhibit No. C-43 was received into evidence.)

6          MR. HEAVENER:  May I publish, Your Honor?

7          THE COURT:  You may.

8          MR. HEAVENER:  Mr. Di Vita, if you can -- may I

9   approach with my copy, Your Honor?

10          THE COURT:  Sure.

11  BY MR. HEAVENER:

12  Q.   Agent Berry, I've handed you my copy.  I really just want

13  to direct your attention to the upper right-hand corner.  There

14  appears to be a date block.

15  A.   Yes, sir.  September 24th, 2012.

16  Q.   And how is September 24th, 2012 -- where does that fit

17  into the timeline of Mr. Bell and the juvenile leaving the

18  country?

19  A.   It's one day before he left on 9/25.

20  Q.   All right.  And I'm not going to publish this, but at

21  B-2 -- the call that says B-2, did you overhear a discussion

22  during that call with Mr. Bell and another individual talking

23  about this particular certificate that you're holding and the

24  local mosque?

25  A.   I did.  And the other individual was relaying to Bell how

1    the leaders at the mosque were concerned that this certificate

2    had been issued, and an individual stating that Mr. Bell was an

3    extremist and he shouldn't have been issued the certificate.

4    Q.   All right.  Moving from the -- this cover story Hajj --

5    when you interviewed the juvenile, did he share anything with

6    you about Hajj as a cover story?

7    A.   Just that -- that that was the cover story, and that was

8    the cover story that they were telling everyone.

9    Q.   All right.  Let me move to actually obtaining a passport

10   to get to the Middle East.  Do you know if -- when this plan

11   began in the summer of 2012, do you know if Mr. Bell had an

12   issued passport at that point?

13   A.   He did not.

14   Q.   And what do you understand he did to obtain a passport?

15   A.   He completed a passport application.  And then on

16   September 13th, 2012, he took that passport -- or that

17   application to the passport office.

18          And once there -- so when you complete the passport --

19   you complete it.  And then you don't sign it until you're

20   before the passport officer.  And then you sign it there

21   declaring that the information that you've put on that

22   application is true and accurate.

23   Q.   All right.  And Government's Exhibit C-1, is that

24   Mr. Bell's passport application?

25   A.   It is.

1              MR. HEAVENER:  Your Honor, at this time the United

2    States requests introduction of Government's C-1.

3              MS. CALL:  No objection.

4              THE COURT:  Be received.

5         (Government's Exhibit No. C-1 was received into evidence.)

6    BY MR. HEAVENER:

7    Q.   Agent, have you reviewed the passport application?

8    A.   I have.

9    Q.   And with regard to this passport application, are you

10   familiar with whether this passport application was rendered in

11   the -- or was submitted in the normal course?  Or was it done

12   on an expedited basis?

13   A.   It was done -- it was done on an expedited basis.  So in

14   interviewing the passport officer, he went to the passport

15   office, completed this, signed it.  And then it's sealed in a

16   package and sent to the company that he was using to expedite

17   the passport.

18             MR. HEAVENER:  All right.  And if we can look at the

19   bottom, Mr. Di Vita.  Is it possible to...

20             May I use the document projector, Your Honor?  I think

21   I might...

22             THE COURT:  Sure.

23             Agent, do you need a paper copy?

24             THE WITNESS:  Thank you, sir.

25   BY MR. HEAVENER:

1    Q.   All right.  It's not showing up on the screen as much.

2    But in the middle, right under Mr. Bell's photograph, is there

3    a warning contained there?

4    A.   Yes, sir.  It says, I declare under penalty of perjury

5    that all of the following is accurate.

6    Q.   All right.  And then all of the following includes the

7    actual application itself?

8    A.   Yes, sir.

9    Q.   All right.  Let me direct your attention to page two of

10   the application, and specifically directing your attention to

11   question 17.  The application asked for Mr. Bell's permanent

12   address.  And the address of 10259 Astronaut Court is listed.

13   A.   Yes, sir.

14   Q.   Do you know that as of December 13th of 2012 -- was

15   Mr. Bell residing at that address?

16   A.   He was not.  He was living with his father off of Cedar

17   Point Road.

18   Q.   Okay.  And do you know who lived at 10259 Astronaut Court?

19   A.   His mother.

20   Q.   All right.  And then if I could direct your attention to

21   question number 14 on that same page.  The application asked

22   Mr. Bell if -- his occupation?

23   A.   Yes, sir.

24   Q.   And what did Mr. Bell list?

25   A.   Unemployed.

1    Q.    And on September 13th of 2012, do you have any knowledge

2    about Mr. Bell's employment status?

3    A.    I do.  He was employed.

4    Q.    And what kind of work was Mr. Bell doing on September 13th

5    of 2012?

6    A.    He had a business at the Pecan Park Flea Market.

7    Q.    All right.  And, sir, directing your attention to five

8    days before this passport application was filed, indicating

9    that Mr. Bell was unemployed, do you know if five days earlier

10   Mr. Bell had opened a business checking account with Wells

11   Fargo Bank?

12   A.    He had.

13   Q.    And directing your attention to Government's Exhibit C-2,

14   is that a copy of that banking application?

15   A.    Yes, sir, it is.

16         MR. HEAVENER:  And, Your Honor, at this time the

17   United States would request submission of Government's C-2.

18         MS. CALL:  No objection.

19         THE COURT:  Be received.

20         MR. HEAVENER:  All right.  If we could put the -- I

21   don't know if it's going to show up.

22      (Government's Exhibit No. C-2 was received into evidence.)

23   BY MR. HEAVENER:

24   Q.    All right, sir.  Showing you Government's C-2.

25         MR. HEAVENER:  And specifically if we could run down

1    to the middle of that, Mr. Di Vita.

2    BY MR. HEAVENER:

3    Q.    This is an application opening a Gold Business Services

4    Package?  Is that -- have I read that correctly?

5    A.    Yes, sir.

6    Q.    And what was the initial opening deposit?

7    A.    $100.

8    Q.    All right.  And then if you'll go to the next page of that

9    document.  Under customer information, who is the customer

10   listed?

11   A.    Shelton Thomas.

12   Q.    And right above that there's a -- the name of the

13   business -- or the name of the information listed on the

14   statement is what?

15   A.    Shelton Bell.

16   Q.    And underneath?

17   A.    DBA Shelthon Thomas.

18   Q.    Okay.  And then if you go down -- all right.  There's a

19   description of the business type.  What did he list?

20   A.    Sole proprietor.

21   Q.    And then when the business was originally opened, what did

22   he list?

23   A.    The relation -- the income.

24   Q.    Right below the sole proprietor, two lines below, it says

25   date.

1    A.    Sorry, 1/1 of 2009.

2    Q.    And then what did he list as his annual gross sales?

3    A.    $78,000.

4    Q.    Through what date?

5    A.    12/31/2011.

6    Q.    All right.  So that was five days before he filled out the

7    passport application indicating he was unemployed?

8    A.    Yes, sir.

9    Q.    All right.  And if you would go back to -- well, let me

10   ask you.  The day after he filled out the passport

11   indication -- application indicating he was unemployed, do you

12   know -- are you aware of him submitting any documents

13   indicating an employment status different than that?

14   A.    Yes, sir.  He rented a laptop.

15   Q.    And if you'd look at Government's C-3, is that the laptop

16   application?

17   A.    It is.

18         MR. HEAVENER:  Your Honor, at this time the United

19   States would request introduction of Government's C-3.

20         MS. CALL:  No objection.

21         THE COURT:  Be received.

22      (Government's Exhibit No. C-3 was received into evidence.)

23   BY MR. HEAVENER:

24   Q.    And, sir, directing your attention to the front page of

25   that application, the middle says source of income.  What did

1  Mr. Bell tell the laptop rental company about his income?

2  A.    That he was self-employed.

3  Q.    And did he indicate how he was self-employed?

4  A.    Pecan Park Flea Market.

5  Q.    Do you have any knowledge what that means?

6  A.    The flea market business, computer store business.

7  Q.    And did he have any indication of what kind of income he

8  was earning there?

9  A.    800 to $1200 a week.

10  Q.    Okay.  And if you look over on the right-hand side of that

11  same block, it indicates a hire date.  What does he say there?

12  A.    12/1 of 2010.

13  Q.    All right.  And this was the day after he submitted the

14  passport application indicating he was unemployed?

15  A.    Yes, sir.

16  Q.    Now, sir, if I could direct your attention back to the

17  passport application --

18         MR. HEAVENER:  And it will be on the document camera,

19  Mr. Di Vita.

20  BY MR. HEAVENER:

21  Q.    The application asked the person to identify their travel

22  plans; is that right?

23  A.    Yes, sir.

24  Q.    And it's actually question 19?

25  A.    Yes, sir.

1   Q.   And what does Mr. Bell identify as his travel plans?

2   A.   That he will visit Israel for four weeks.

3   Q.   And does -- there's a word EST after the four weeks?

4   A.   Estimated.

5   Q.   Okay.  Now, with regard to that statement, did you develop

6   any evidence about whether or not Mr. Bell intended to visit

7   Israel for four weeks, estimate?

8   A.   Well, we know that he purchased one-way air tickets

9   overseas and did not have any return flights.

10  Q.   And with regard to purchasing one-way airline tickets

11  overseas for one week -- I'm sorry.

12        With regard to purchasing overseas airline tickets

13  with no return flight -- explain what the significance of that

14  is.

15  A.   Well, certainly, he -- it just indicates he didn't plan to

16  return to the United States.

17  Q.   All right.  And, in fact, when he did return, have you

18  overheard telephone conversations in which he tells people he

19  had no plans to return to the United States?

20  A.   I have.

21  Q.   All right.  And specifically directing you to Government's

22  Exhibit B-3, which has previously been received into

23  evidence --

24        MR. HEAVENER:  Your Honor, at this time the United

25  States would request permission to publish a portion of that

1  phone call.

2         THE COURT:  Yes, sir.

3         MR. HEAVENER:  And, Mr. Di Vita, if you could publish

4  from 19 minutes and 45 seconds to 20 minutes and 5 seconds.

5     (Audio played.)

6  BY MR. HEAVENER:

7  Q.   Agent Berry, that particular call, which is Government's

8  B-3 -- that call took place on November 26 of 2012?

9  A.   Yes, it did.

10 Q.   So that call was after Mr. Bell had been detained in the

11 Jordanian holding cell?

12 A.   That's correct.

13 Q.   And in that call he stated he had told his parents he was

14 never coming back?

15 A.   That's correct.

16 Q.   And he also told the other individual on the call that he

17 had no intention of coming back?

18 A.   That he did not want to come back.

19 Q.   Okay.  And do you have any knowledge about -- if anyone

20 from the Department of State spoke to Mr. Bell when he went

21 to -- when he was detained by the Jordanians?

22 A.   Yes, sir.

23 Q.   Who spoke to him?

24 A.   A gentleman by the name of Ian Hopper spoke to him.  And

25 so -- as part of the deportation process, they had to arrange

1   his flights back to the United States.

2          Mr. Bell did not have the required funds.  So the

3   Department of State was going to have to fund his trip back.

4   So Mr. Hopper had the conversation with him.

5          Mr. Bell initially stated that he -- that he wanted to

6   return to Turkey and not to the United States.  And Mr. Hopper

7   explained to Mr. Bell that the United States would not fund his

8   trip to Turkey.

9   Q.   All right.  So the only thing the United States would fund

10  was the trip back to the United States?

11  A.   That's correct.

12  Q.   All right, sir.  Turning to the firearm that we saw

13  Mr. Bell discharging on the videos we've reviewed, during your

14  interview of Mr. Bell, when he returned to the airport on

15  November 21st of 2012, did you ask him whether or not he had a

16  firearm or carried a weapon like that?

17  A.   I did.  He said that he did not own or carry a firearm.

18  Q.   Okay.  Now, when you're interviewing him on the 21st, you

19  had previously spoken with the juvenile on November 16th, five

20  days earlier?

21  A.   That's correct.

22  Q.   And what had the juvenile told you about Mr. Bell on the

23  firearm?

24  A.   That Mr. Bell had a firearm.

25  Q.   And did you interview anyone else besides the juvenile who

1    said, yes, Mr. Bell had a firearm?

2    A.    Yes, sir.

3    Q.    Who did you interview?

4    A.    Well, we interviewed some of the other -- the other adults

5    that were involved in the training.

6    Q.    Okay.  And did you interview a person named Kenneth

7    Carrillo?

8    A.    I did.

9    Q.    That was on June 23rd of 2012?

10   A.    That's correct.

11   Q.    And what did he tell you?

12   A.    Mr. Carrillo stated that he actually sold the weapon, the

13   Smith and Wesson, to Mr. Bell for $100.

14   Q.    Okay.  And the particular firearm in question that we see

15   Mr. Bell using on the videos, do you know if that firearm was

16   ever recovered?

17   A.    Yes, it was.

18   Q.    And could you explain the circumstances behind the

19   recovery of that firearm?

20   A.    Yes, sir.  Agents interviewed Mr. Bell's father, Thomas

21   Bell.  His father stated that after Shelton Bell was

22   incarcerated on state and local charges, he --

23   Q.    Give us a time frame of when Mr. Bell was incarcerated on

24   state and local charges.

25   A.    It was January 26th or 29th.

1    Q.    Of 2013?

2    A.    2013.  In that general time frame.

3    Q.    All right.

4    A.    His father searched the truck and located this firearm.

5    But he originally told agents that he had given it to a friend

6    for safekeeping.

7           Later Mr. Bell subsequently offered to turn over the

8    gun to special agents.  And they went out and recovered it.

9    Mr. Bell had actually -- the father had buried the weapon near

10   his home.

11   Q.   All right.  And Government's Exhibit C-4, is that a

12   photograph of the weapon and the state it was recovered?

13   A.    I'm sorry.  Yes, sir.

14          MR. HEAVENER:  And, Your Honor, the United States

15   would request introduction of Government's C-4 at this time.

16          MS. CALL:  No objection.

17          THE COURT:  Be received.

18      (Government's Exhibit No. C-4 was received into evidence.)

19   BY MR. HEAVENER:

20   Q.    All right.  Agent Berry, so the weapon is recovered.  Is

21   the agency able to determine the status of this weapon by gun

22   traces or other means?

23   A.    Yeah.  We conducted the FBI checks, NCIC checks, and found

24   out that the weapon was actually stolen from a home invasion

25   here in the Jacksonville area.

1   Q.   And you have no knowledge that Mr. Bell had anything to do

2   with that theft of the weapon, correct?

3   A.   No, sir.  Not at all.

4   Q.   And at least according to Mr. Carrillo, Mr. Bell bought it

5   off the street?

6   A.   That's correct.

7   Q.   All right.  Do you know if the -- if detectives from the

8   Jacksonville Sheriff's Office interviewed Mr. Bell about that

9   specific weapon?

10  A.   Yes, they did.

11  Q.   And did they conduct that interview in a videotaped

12  fashion?

13  A.   They did.

14  Q.   And Government's A-3, that's a copy of the video interview

15  that the JSO detectives did of Mr. Bell while he was detained?

16  A.   Yes, sir.

17        MR. HEAVENER:  Your Honor, at this time the government

18  requests permission to publish A-3.

19        THE COURT:  Yes, sir.

20    (Video played.)

21        MR. HEAVENER:  Stop for a moment, Mr. Di Vita.

22        Your Honor, may I publish Government's C-4?  It was

23  previously admitted.

24        THE COURT:  Yes, sir.

25  BY MR. HEAVENER:

1    Q.   Agent Berry, C-4 is the photograph of the gun that you've

2    previously testified about?

3    A.   Yes, sir.

4    Q.   Is that the photograph that the detectives in the video

5    we're watching were using to show Mr. Bell?

6    A.   Yes, sir.

7    Q.   Okay.

8        (Video played.)

9            MR. HEAVENER:  You can stop.

10   BY MR. HEAVENER:

11   Q.   All right.  Agent, have you ever heard Mr. Bell making

12   statements, recorded statements, that he, in fact, did have the

13   gun?

14   A.   Yes, sir.

15   Q.   And that was during an interview that was recorded between

16   Mr. Bell and his father while Mr. Bell has been detained on

17   these charges?

18   A.   That's correct.

19   Q.   And what's been previously introduced at B-7 --

20           MR. HEAVENER:  If I could publish just ten seconds,

21   Your Honor?

22           THE COURT:  Sure.

23           MR. HEAVENER:  Mr. Di Vita, if you could publish B-7

24   from 30 minutes to 30 minutes and 50 seconds.

25   BY MR. HEAVENER:

1  Q.    Let me have you summarize what happens on B-7 that we were

2  trying to play.

3  A.    No problem.  Mr. Bell and his father are discussing the

4  weapon.  And, basically, his father asked where the weapon came

5  from.  And Shelton explains that he -- that he bought it off

6  the street.

7  Q.    All right.  Now, during the videotaped interview with the

8  JSO officers we saw just a second ago, Mr. Bell is discussing

9  having shot a gun with a guy named Mike P., who Mr. Bell says

10  on the video, Mike P. claims I owe him money.

11  A.    Correct.

12  Q.    Are you familiar with what Mr. Bell is talking about?

13  A.    I am.

14  Q.    All right.  Let me -- let me kind of move to a different

15  topic, and that is with regard to Mr. Bell's history and

16  characteristics, any propensities for theft or stealing things.

17  All right?

18  A.    Okay.

19  Q.    That person, Mike P., that he mentions on the video,

20  what's the story with that?

21          MS. CALL:  Your Honor, I object.  This is now wildly

22  hearsay.  And these are the subject of the pending state

23  charges, or at least they were subject to state charges that

24  have been dismissed.

25          I don't know how that -- the court can make a finding

1  that someone's witness statement shows Mr. Bell's propensity

2  based on this out-of-court interview.

3          THE COURT:  This has to do with the alleged theft of

4  the computers?

5          MR. HEAVENER:  Your Honor, this has to do with the --

6  this is directly relevant to this particular crime.  I

7  anticipate Agent Berry will be testifying about Mr. Bell's

8  theft of approximately $4500 in cash shortly before leaving the

9  country.

10          And the juvenile has corroborated that.  And I believe

11  Agent Berry has already testified that the juvenile said that

12  Mr. Bell said this was okay with al-Awlaki because it was all

13  in furtherance of the cause.

14          THE COURT:  All right.  Hold on one second.

15          MR. HEAVENER:  I believe it's also in the presentence

16  report.

17          THE COURT:  I'm going to allow it.  And I'll give it

18  the weight it deserves.  I think it's -- you know, we very

19  commonly consider matters in sentencing that we wouldn't be

20  able to consider in a trial setting where the rules of evidence

21  apply.

22          But if I have any doubt about the bona fides of it, or

23  if Ms. Call is able to cast doubt on it, I won't consider it.

24  But I'm going to go ahead and let the government proceed.

25          You may proceed, sir.

```
 1            MR. HEAVENER:  All right, sir.
 2  BY MR. HEAVENER:
 3  Q.   Did you interview this person that's mentioned as Mike P.
 4  in the videotaped interview?
 5  A.   I did.
 6  Q.   And what is his name, sir?
 7  A.   Michael Papagiannakis.
 8  Q.   And could you spell that for us?
 9  A.   Sure.  It's P-a-p-a-g-i-a-n-n-a-k-i-s.
10  Q.   All right.  And did Mr. Papagiannakis explain to you how
11  he knew Shelton Bell?
12  A.   Yes, sir.  Mr. Papagiannakis also -- his wife runs a -- a
13  booth at the flea market on Pecan Park Road -- or, yeah, Pecan
14  Park.  And so he knows Mr. Bell.
15            He helps his wife at that booth on the weekends.  And
16  so they have some interaction with each other at the flea
17  market.
18            And, in fact, they had interacted on some, I'll say,
19  deals in the past, where Mr. Papagiannakis purchased some
20  computers and gave them to Mr. Bell to repair.  And then
21  Mr. Bell would sell them and they would split the profits.
22  Q.   Okay.  And did Mr. Papagiannakis tell you anything about a
23  transaction with Mr. Bell involving cash several weeks before
24  Mr. Bell left the country?
25  A.   Yes, sir.  He said that Mr. Bell came to him with a -- I
```

1    guess proposition that Mr. Bell had the opportunity to buy bulk

2    computers -- I think it was 30 to 40 -- for the price of $4500.

3           Mr. Papagiannakis was going to front the money.

4    Mr. Bell would then sell those computers and they would -- they

5    would split the profit.

6    Q.   And when you say "sell the computers," would Mr. Bell do

7    anything to the computers?  Is that what he was --

8    A.   Yeah.  He was going to refurbish them or fix them, and

9    then sell them.

10   Q.   And we saw the -- we talked about the flea market business

11   on the laptop rental application and the business bank account.

12   Was that the business Mr. Bell was saying he was going to use

13   to sell these computers?

14   A.   Yes, sir.

15   Q.   Okay.  And did Mr. Papagiannakis advise you that he

16   provided cash to Mr. Bell?

17   A.   Yes.  He provided Mr. Bell with $4500 in cash.

18   Q.   Okay.  And did he indicate to you approximately when that

19   money was provided to Mr. Bell?

20   A.   Approximately on September 16th is when he provided

21   that -- that money.  And then they had subsequent conversations

22   later.  I think it was on the 24th they had a phone call in

23   which Mr. Bell told Mr. Papagiannakis that he was on his way to

24   pick the computers up.

25   Q.   Okay.  And the time frame to September 24th is where in

1    relation to when Mr. Bell left the country?

2    A.    One day before he left.

3    Q.    All right.  And did you actually obtain Mr. Bell's

4    telephone records?

5    A.    I did.

6    Q.    And did those records reflect contact between Mr. Bell and

7    Mr. Papagiannakis?

8    A.    Yes, sir.  So we see the contact on the 16th, the contact

9    on the 24th.  And then we see subsequent contact -- or

10   attempted contact after Mr. Bell left the country.  I think on

11   the 26th, 27th, and 29th there were four calls.

12   Q.    And these calls -- these are calls that

13   Mr. Papagiannakis's phone was making to Mr. Bell's phone?

14   A.    That's correct.

15   Q.    And did any of these calls ever get answered or returned?

16   A.    They did not.

17   Q.    Did Mr. Papagiannakis indicate what, if anything, he did

18   when he couldn't get in touch with Mr. Bell by phone?

19   A.    Yeah.  He notified the Jacksonville Sheriff's Office.

20   And, in fact, Mr. Papagiannakis and a JSO officer went to

21   Mr. Bell's grandmother's home to find out, you know, where

22   Mr. Bell was.  And it was at that time, I believe, that he

23   found out that Mr. Bell had left the country.

24   Q.    Okay.  When you interviewed Mr. Papagiannakis, did you try

25   to determine if he had any -- any documentary records that

1    would establish this transfer to Mr. Bell, any bank records,

2    receipts, anything of that nature?

3    A.    We did.  And he did not.

4    Q.    Okay.  When you interviewed the juvenile who traveled with

5    Mr. Bell on August 7th of 2013, did you discuss this topic with

6    him?

7    A.    We did.

8    Q.    And that's when he told you that Mr. Bell had admitted he

9    had done that?

10   A.    That's correct.

11   Q.    And that's when he told you that it was because Awlaki

12   would approve of that type of behavior?

13   A.    That's correct.

14   Q.    All right.  The laptop application we looked at, what's

15   the name of the company from which Mr. Bell rented that laptop?

16   A.    Aaron's.

17   Q.    And with regard to that laptop rental, was Mr. Bell

18   ultimately supposed to return the laptop?

19   A.    Yes, he was.

20   Q.    Do you have any knowledge about whether he made any

21   attempts to do that while he was overseas in the Middle East?

22   A.    He did not.

23   Q.    And it wasn't until he was returned to the United States

24   that he did so?

25   A.    That's correct.

1    Q.   Okay.  Mr. -- you indicated that you did an interview with

2    Kenneth Carrillo on June 26th?

3    A.   That's correct.

4    Q.   And why were you wanting to interview Mr. Carrillo?  This

5    is the person that told you about the gun.  But why were you

6    wanting to interview him?

7    A.   Well, we were wanting to know more about Mr. Bell, and

8    also the gun.  But in addition to that, Mr. Carrillo, during

9    the interview, provided some information about staged auto

10   accidents.

11   Q.   All right.  And I don't want to get into Mr. Bell's

12   pending charges in state court, the facts and circumstances of

13   those.  But when you talked to Mr. Carrillo, did he provide any

14   information to you about Mr. Bell wanting to do new staged

15   accidents?

16   A.   Yes, sir.  So what we were -- the context was -- we were

17   trying to determine if he knew how Mr. Bell had raised the

18   funds to go overseas.

19            And what Mr. Carrillo said was that Bell had requested

20   that Mr. Carrillo set up another staged accident.  And in

21   preparation for that, according to Mr. Carrillo, Mr. Bell had

22   changed the paint color of his truck and had reinforced the

23   front bumper of his vehicle.

24   Q.   All right.  And, sir, with regard to taking money that

25   he's not entitled to take, or stealing, when you reviewed

1    the -- the computer evidence in this case, did you see any

2    files that were questionable in that regard?

3    A.   Yes, we did.

4    Q.   And specifically directing your attention to Government's

5    Exhibit A-6, can you just give us a verbal description of

6    what's depicted on that video?

7    A.   Yes, sir.  That's a -- a relatively short video.  And what

8    you see when it comes on is a female's wallet.  And you see a

9    bunch of credit cards in the wallet.

10          And the person filming it reaches over, pulls out a

11   credit card, and begins focusing and, obviously, scanning and

12   recording the credit card number.

13          The name on the credit card is Charlotte Willingham,

14   which is his grandmother.  He then turns the card over and

15   focuses in on the security code of that credit card, puts that

16   credit card back, begins to pull out another credit card, but

17   then quickly -- I don't know if somebody was returning, quickly

18   puts it back and closes the wallet.

19   Q.   All right, sir.  And then after Mr. Bell returned to the

20   United States, one of the intercepted phone calls you listened

21   to -- did it involve Mr. Bell talking about a -- conducting a

22   gold buying business unlawfully?

23   A.   Yes, sir.

24   Q.   And is that Government's B-4, that call?

25   A.   Yes, sir.

1          MR. HEAVENER:  Your Honor, at this time I would

2   request permission to publish just a small snippet from

3   Government's B-4.

4          THE COURT:  Yes.

5          MR. HEAVENER:  Mr. Di Vita, if you would play from

6   seven minutes, seven seconds, to eight minutes and 38 seconds.

7      (Audio played.)

8   BY MR. HEAVENER:

9   Q.   And, Agent Berry, finally, with regard to this whole topic

10  of -- of theft propensity, when Mr. Bell returned to the United

11  States, did you listen to a phone call in which Mr. Bell is

12  talking about submitting some kind of food stamp application

13  with falsehoods in it?

14  A.   Yes, sir, I did.

15  Q.   And who is that call with?

16  A.   His mother.

17  Q.   All right.  And that call took place on December 4th of

18  2012?

19  A.   Yes, sir.

20  Q.   It's Government's B-5?  Is that Government's B-5?

21  A.   Oh, I'm sorry.  Yes, sir.

22          MR. HEAVENER:  Your Honor, may I publish at this time?

23          THE COURT:  Yes.

24      (Audio played.)

25  BY MR. HEAVENER:

1  Q.   Agent Berry, does this conversation continue on the same

2  topic, discussing him saying he lived somewhere where he didn't

3  live?

4  A.   Correct.

5  Q.   Okay.  And when he says his dad is feeding him but he'd

6  like an extra $200, do you have any knowledge about what he

7  wanted that for?

8  A.   Probably not food.

9  Q.   All right.  Agent, I'd like to direct your attention back

10  to the main topic of this case.  And that is Mr. Bell's

11  material support of terrorism.

12         In the investigation we -- we began your testimony

13  with talking about Anwar al-Awlaki.

14  A.   Yes, sir.

15  Q.   During the investigation and your review of Mr. Bell's

16  computers, did you -- did you locate video clips of Mr. Bell

17  essentially giving speeches that were similar or in the same

18  vein as the speech that we heard from Mr. Awlaki?

19  A.   Yes, I did.

20  Q.   All right.  And the first one of those is the speech that

21  he gave on his way to destroy the statues in the cemetery; is

22  that right?

23  A.   That's correct.

24  Q.   And he's talking to another individual who went with him?

25  A.   That's correct.

```
 1   Q.   And that's Government's A-17, correct?

 2   A.   Yes, sir.  That's correct.

 3           MR. HEAVENER:  May I publish, Your Honor?

 4           THE COURT:  Yes, sir.

 5      (Video played.)

 6           MR. HEAVENER:  Stop for a second.

 7   BY MR. HEAVENER:

 8   Q.   Agent Berry, during this video we're watching, and

 9   Mr. Bell talking about the drop-off location, who is providing

10   the directions and the instructions during this video?

11   A.   Mr. Bell.

12   Q.   Okay.

13           MR. HEAVENER:  Go ahead, Mr. Di Vita.

14      (Video played.)

15           MR. HEAVENER:  Stop it, Mr. Di Vita.

16   BY MR. HEAVENER:

17   Q.   When the other individual is talking about, They can hear

18   us, when Mr. Bell talks about the scholars in America, do you

19   have any understanding of what's being referenced there?

20   A.   Just make sure that the recording is also taping the

21   audio, so that they can publish it later.

22   Q.   All right.

23      (Video played.)

24           MR. HEAVENER:  May I have just a moment with Ms. Call,

25   Your Honor?
```

1          (Counsel confer.)

2          MR. HEAVENER:  Your Honor, the next video is a little

3     bit longer.  And I don't know if Ms. Call's expert is present.

4     It might be a good place to stop.  But if she's not, we can go

5     ahead and start playing the video.

6          THE COURT:  Well, we're probably due for a break

7     anyway.

8          Where do we stand, Ms. Call?

9          MS. CALL:  Your Honor, Mr. Pinkham is going to

10    double-check.  He believes that she's here.  She may also be

11    available tomorrow.  And so I was going to ask her about the

12    payment arrangements, if the court wanted to keep the flow as

13    we're going.

14         THE COURT:  Yeah.  It's --

15         MS. CALL:  But perhaps if we did take our afternoon

16    break --

17         THE COURT:  Yeah.  Let's go ahead -- why don't we --

18    let's go ahead and take 15.  We'll be back at 3:25.  And

19    whatever y'all work out is okay with me.  All right?

20         MR. HEAVENER:  Thank you.

21         COURT SECURITY OFFICER:  All rise.

22         (Recess, 3:12 p.m. to 3:27 p.m.)

23         COURT SECURITY OFFICER:  All rise.  This Honorable

24    Court is now in session.  Please be seated.

25         THE COURT:  What did y'all decide to do?

1          MS. CALL:  Your Honor, my witness, Dr. Cohen, said

2    that she is available tomorrow and she won't recharge me for

3    anything or to write it as a pro bono obligation.  And so to

4    keep the flow, I would rather save her until my side of the

5    presentation.

6          THE COURT:  Okay.

7          MS. CALL:  Mr. Heavener and I were trying to

8    guesstimate.  He says he has kind of a longish tape to play, a

9    few more questions, and then it will be my cross-exam.  Their

10   expert is here if we had a few more minutes to kill in the

11   afternoon.

12         THE COURT:  We're not going to have any time, right?

13   By the time that tape plays and you cross-examine, we're --

14   we're done, right?

15         MS. CALL:  And so if we reconvene in the morning, then

16   that leaves one other small fact witness for the government and

17   their experts --

18         THE COURT:  Your expert.

19         MS. CALL:  -- and my expert.  So now my question is:

20   Do we finish everything that we need tomorrow?

21         THE COURT:  Well, the only thing I've got left is

22   tomorrow afternoon.  And I would have to move another

23   proceeding, which --

24         LAW CLERK:  There's also the *Teel*.

25         THE COURT:  Yeah.  That's at 4 o'clock.  We'll have

```
 1    to -- I've got an injunction hearing at 4 o'clock.  We'll have

 2    to keep that.  But -- so I can move the 2 o'clock matter and we

 3    can take until 4 o'clock, if that's what we have to do.

 4              MS. CALL:  Okay.

 5              THE COURT:  I'm not encouraging it, but...

 6              MS. CALL:  Well, in terms of --

 7              THE COURT:  But I would rather -- I mean, I'd rather

 8    get the evidence in -- at least the evidence in.  If we don't

 9    get anything else done, I'd like to get the evidence in.  And

10    it may be that it will go quicker than you think.  You never

11    know, so...

12              MS. CALL:  Well, in terms of safety, should I tell

13    Dr. Cohen to be back late morning or right at 12:30, or right

14    at 1:00, that she would be the first afternoon witness?

15              THE COURT:  Well, you know, if she's here just for

16    this, I don't feel too badly about having her wait, if she has

17    to.

18              So if we start -- I'll go ahead and start at 9 o'clock

19    instead of 9:30.  And, you know, we're going to be lucky to be

20    finished with the agent at 5 o'clock today.

21              So -- so your expert will take how long, Mr. Heavener?

22              MR. HEAVENER:  Your Honor, we anticipate a couple of

23    hours.

24              THE COURT:  On direct?

25              MR. HEAVENER:  He's very informative, Judge.  I
```

1   think it's -- and I think the court will find his testimony

2   very helpful.

3           THE COURT:  Okay.  And then you might want to

4   cross-examine him.  And so now it's lunchtime.  So I -- I don't

5   know what to tell you.

6           I guess I would say it sounds like -- I would rather

7   have her be available at least by late morning.  But she

8   certainly doesn't need to be here at 9 o'clock.

9           MS. CALL:  I'm going to suggest that she arrive here

10  by 11:30.

11          THE COURT:  Yeah.  That would be good.  I don't think

12  we'll get to her before then.

13          MS. CALL:  Thank you, Your Honor.

14          THE COURT:  Okay.  Thank you.

15          MS. CALL:  Your Honor, Mr. Pinkham will then go out

16  and let her know --

17          THE COURT:  That's fine.  And brief her --

18          MS. CALL:  -- and then come back to the table.

19          THE COURT:  Yeah.  That's fine.  Okay.

20          Mr. Heavener, you may proceed.

21          MR. HEAVENER:  Thank you, Your Honor.

22  BY MR. HEAVENER:

23  Q.   Agent Berry, one more video that I'd like to ask you

24  about.  And along the same lines of Mr. Bell emulating

25  Mr. al-Awlaki, Government's A-33, can you give us a setup for

1    what it is we're going to see on this video?

2    A.   Yes, sir.  This is a speech by Mr. Bell.  He's alone.

3    He's in the woods again near his home, again dressed in sort of

4    the long robe.

5    Q.   All right.  Let me ask you about the dress.  The al-Awlaki

6    video we reviewed when you began your testimony, Mr. al-Awlaki

7    is dressed -- not in clerical garb, but in what kind of garb?

8    A.   Just like regular garb.  He had the knife in front of him.

9    Q.   And is he wearing anything tactical?  Do you recall?

10   A.   I don't recall.  Sorry.

11   Q.   Mr. Bell, what is he looking like in his video?

12   A.   Very tactical.  He has the vest -- tactical vest, the

13   pads, the -- the knee pads, you know, very tactical.

14   Q.   All right.  And it's your understanding that this video is

15   shot in the same wooded area where the shooting was going on

16   and the -- and devices were being exploded?

17   A.   That's correct.

18   Q.   All right.

19        MR. HEAVENER:  May may I publish Government's A-33,

20   Your Honor?

21        THE COURT:  Yes, sir.

22     (Video played.)

23        THE COURT:  Mr. Heavener, can we stop a second?  As

24   you said, this is going to be a running time of a few minutes;

25   is that right?

1          MR. HEAVENER:  Yes, sir.

2          THE COURT:  I need to spend about three minutes

3     getting tomorrow set up.  So I'm going to just take a

4     three-minute recess, so that way I'll be able to focus on it

5     when I get back.  So I'm going to be in brief recess.

6          COURT SECURITY OFFICER:  All rise.

7       (Recess, 3:32 p.m. to 3:34 p.m.)

8          COURT SECURITY OFFICER:  All rise.  This Honorable

9     Court is now in session.  Please be seated.

10          THE COURT:  All right.  I have just put in

11     instructions to rearrange the day and I can go until 4 o'clock

12     if I have to.  But that's the absolute latest I can go, because

13     I have a -- I have out-of-town counsel in at 4 o'clock for a

14     hearing.  That's supposed to be at two, but I'm pushing them

15     back to four.  So we'll get started at nine and be productive.

16     But now I'll be able to give this my attention.

17          Mr. Heavener, you may proceed.

18          MR. HEAVENER:  Thank you, Your Honor.

19       (Video played.)

20          THE COURT:  Mr. Heavener, can we stop this thing?  I

21     think I get the drift.  Is there more -- is there anything

22     different than this?  Or is it all kind of in the same vein?

23          MR. HEAVENER:  I think towards the end there's a --

24     more of a call to action.  We can advance to the end if you

25     want.

1          THE COURT:  All right.  If we could -- yeah.  I feel

2     like -- however you think.

3        (Video played.)

4          MR. HEAVENER:  Stop, Mr. Di Vita.

5     BY MR. HEAVENER:

6     Q.   All right.  Agent Berry, we'll end there.  The last

7     statements about, This message is going out to the youth, or

8     words to that effect, can you provide explanation as to what

9     your understanding of that is, on your knowledge of the

10    investigation?

11    A.   Sure.  That's just a call to the youth here in America,

12    similar to Anwar al-Awlaki's message to head to the West.

13    Q.   All right.  And the final area of questions, Agent, while

14    Mr. Bell was detained in Jordan, in the Jordanian holding cell,

15    do you -- you've talked about a -- some pocket litter that

16    consists of a journal that he had prepared?

17    A.   Yes, sir.

18    Q.   Is that under Government's C-40?

19    A.   That's correct.

20          MR. HEAVENER:  And, Your Honor, at this time I would

21    request Government's C-40 be admitted.

22          MS. CALL:  No objection.

23          THE COURT:  Be received.

24       (Government's Exhibit No. C-40 was received into evidence.)

25    BY MR. HEAVENER:

1    Q.    All right.  I'm not going to publish it or ask you to

2    dissect it.  It's 50-some pages.  But what I want to ask you

3    is:  In that journal that Mr. Bell prepared while he's in the

4    Jordanian holding cell, did you note anywhere in that journal

5    where it appeared that his views had changed from the views of

6    al-Awlaki?

7    A.    No.

8    Q.    Okay.  And in that handwritten journal he prepared in the

9    Jordanian holding cell, was there ever any mention of

10   Mr. Bell's grandmother passing away?

11   A.    No.

12   Q.    And in that journal that he prepared in the Jordanian

13   holding cell, did he make any mention whatsoever about missing

14   his family and wanting to return to the United States?

15   A.    No.

16   Q.    Okay.  And, finally, Agent Berry, when you spoke with the

17   juvenile that had traveled with him, the very last interview

18   that you conducted of that juvenile, did you ask the juvenile

19   if he and Mr. Bell had a plan if things didn't go as they had

20   originally intended, if they didn't join up with the terrorist

21   organization and if they didn't get to participate in violent

22   jihad?

23   A.    I did.  And the juvenile stated that if they weren't able

24   to complete the mission, if they had to come back, that they

25   had a plan that they would come back and work as hard as they

1    could to return back to Yemen for jihad.

2        And Mr. Bell would restart his computer business and

3    make the required funds.  And, in fact, he stated that they

4    would lay low for a while until law enforcement calmed down.

5    Q.    Okay.  And did you ask him, in terms of returning to the

6    Middle East, if they would return the same way they had gone

7    this previous time?  Would they go to Jordan and then try to

8    make contact with people in Jordan?  Or what would they do?

9    A.    They would -- at this time they said they would not play

10   around, that they would go straight to Yemen.

11   Q.    All right.  And did -- in your interviews with the

12   juvenile who traveled, did he ever explain to you why they

13   didn't go straight to Yemen this first trip?

14   A.    Yes, sir.  They -- they could not go because -- you know,

15   Mr. Bell originally wanted to go straight to Yemen.  And when

16   the youth joined in, the original plan was that they were going

17   to go to Yemen on a student visa, but the juvenile was too

18   young to obtain that student visa.  So then they had to come up

19   with another plan.

20   Q.    And the juvenile describing their desire even after

21   Mr. Bell's return to the United States of going back to Yemen,

22   did he explain to you why Yemen was such an important part of

23   that plan?

24   A.    He said that Mr. Bell wanted to be part of the 1300 in

25   Yemen that would make it to Paradise.

1    Q.   All right.  And that has to do with some type of what's

2    called a hadid?

3    A.   Correct.

4    Q.   All right.

5              MR. HEAVENER:  Just a moment, Your Honor.

6              THE COURT:  Sure.

7        (Counsel confer.)

8              MR. HEAVENER:  No further questions, Your Honor.

9              THE COURT:  Cross-exam?

10                        **CROSS-EXAMINATION**

11   BY MS. CALL:

12   Q.   It's hard to find a starting place on this.  So I wanted

13   to talk to you about Mike Papagiannakis -- can you say that

14   again for me?

15   A.   Papagiannakis.

16   Q.   Okay.  When you took your statement from him, did you have

17   a chance to ask him for his identifiers, like name and date of

18   birth, and to be able to know who you were dealing with?

19   A.   Yes, ma'am.

20   Q.   And did you run his criminal background check?

21   A.   I did.

22   Q.   And you knew that he had a felony conviction?

23   A.   Yes.

24   Q.   And that was a felony conviction for a crime of selling

25   counterfeit goods, correct?

1  A.   Correct.

2  Q.   And in that crime he was selling items that he estimated

3  to have a value of $25,000, correct?

4  A.   I don't recall the specifics of -- you know, the details.

5  Q.   The affidavit that was done in support of his arrest

6  warrant says that he made a statement that the counterfeit

7  items included purses, MP3 players, watches, sunglasses, belts,

8  and wallets, bearing counterfeit trademark items -- were valued

9  in excess of $25,000.

10        Is that consistent with the records you reviewed?

11  A.   I just looked at his -- the criminal history printout and

12  not the JSO report, or whoever -- whoever's report it was.

13  Q.   And were you aware that his cash and vehicle were seized

14  as part of the forfeiture action in that case?

15  A.   No, I was not.

16  Q.   You were aware, though, that he had pled guilty and been

17  found guilty of that felony, which was a felony involving fraud

18  or dishonesty?

19  A.   Correct.

20  Q.   And you said that you also knew of him and knew of

21  Mr. Bell because there had been a report about Mr. Bell having

22  a bomb in his truck, correct?

23  A.   Correct.

24  Q.   And that report was made by this person?

25  A.   Correct.

1   Q.   And JSO went out and looked at Mr. Bell's truck, correct?

2   A.   Right.

3   Q.   And there was no bomb in his truck?

4   A.   Correct.

5   Q.   And you said that you reviewed the phone records of

6   Mr. Bell's phone and that there was contact between the number

7   associated with Mr. Bell and this gentleman, correct?

8   A.   Yes, ma'am.

9   Q.   And that all that tells you from the phone records is that

10  there was contact; it can't tell you anything about the content

11  of the conversations?

12  A.   That is correct.

13  Q.   And you indicated that he had no records or contracts or

14  receipts to show any proof that he had paid money to Mr. Bell,

15  correct?

16  A.   That's correct.

17  Q.   Sort of turning to the beginning of this case, then, in

18  this case, according to the indictment and the papers that have

19  been filed in court, Ansar al-Shari'a was named as a designated

20  terrorist group on October 4, 2012, correct?

21  A.   Yes, ma'am.

22  Q.   And that was during the time that Mr. Bell and the

23  juvenile were already overseas?

24  A.   That's correct.

25  Q.   And you mentioned this cleric named Anwar al-Awlaki.  You

1    knew of him as being someone that was killed in 2010, correct?

2    A.    Correct.

3    Q.    So any of his lectures or any information -- speeches that

4    he did had to have been produced before that point?

5    A.    That's correct.

6    Q.    And this one that was played here in court, *Message to*

7    *America*, is one of the lectures that's available on-line,

8    correct?

9    A.    That is correct.

10   Q.    You mentioned that there are a few hundred of them,

11   probably, in total, correct?

12   A.    Correct.

13   Q.    And some of them are longer and some of them are shorter

14   videos, correct?

15   A.    Correct.

16   Q.    Okay.  All of these, though, are available on-line?

17   A.    Correct.

18   Q.    You do a Google search with the right phrase and this

19   comes up, correct?

20   A.    Correct.

21   Q.    They're available for free?

22   A.    Correct.

23   Q.    So there's no payment required, no registration to get

24   these videos, correct?

25   A.    Correct.

1  Q.   And, in fact, most Muslims completely disavow his message,

2  correct?

3  A.   Correct.

4  Q.   And the timeline in this is that Mr. Bell and the juvenile

5  traveled overseas, leaving the United States on September 25th

6  of 2012?

7  A.   Right.

8  Q.   So just past two years ago?

9  A.   Yes, ma'am.

10 Q.   And Mr. Bell and the juvenile were, in fact, surveilled at

11 the airport, correct?

12 A.   That's correct.

13 Q.   Okay.  Because you had photographs of him and Mr. Bell at

14 the airside waiting for their flight?

15 A.   That's correct.

16 Q.   And during the trip, about October 23rd, the juvenile

17 turned 17, correct?

18 A.   I believe so.  Yes.

19 Q.   Okay.  And then turning to the return part of the trip,

20 you knew that Mr. Bell had been picked up in Jordan?

21 A.   Yes, ma'am.

22 Q.   You knew his travel flights of when he would be returning

23 to the United States?

24 A.   Yes, ma'am.

25 Q.   And you, in fact, went out to Houston and met him there

1   when he arrived back in the United States?

2   A.   That is correct.

3   Q.   And you did the interview you discussed with him right

4   there at the airport?

5   A.   That's correct.

6   Q.   Okay.  After the interview -- and I think it was a couple

7   of hours that you and he spent together -- Mr. Bell was

8   released to make his connecting flight, correct?

9   A.   That's correct.

10   Q.   Okay.  And you went over the first part of your interview

11   with Mr. Bell -- was about his background?

12   A.   That's correct.

13   Q.   And he was 18, correct?

14   A.   Right.

15   Q.   He told you he dropped out of Sandalwood High School?

16   A.   Correct.

17   Q.   And he had never traveled outside the United States?

18   A.   That's correct.

19   Q.   Okay.  And you knew that because you had his passport.

20   His passport number is part of the identifiers at the beginning

21   of the report, correct?

22   A.   Correct.

23   Q.   And when you mentioned earlier for Mr. Heavener that you

24   asked him about important scholars, the very first person he

25   mentioned was Joe Bradford, right?

1   A.   That's correct.

2   Q.   Okay.  Mr. Bradford is a local imam here in Jacksonville?

3   A.   He was at the time.

4   Q.   At the time, we're talking about back in 2012?

5   A.   Yes, ma'am.

6   Q.   And Mr. Bell told you that Mr. Bradford was an important

7   person to him because he was American-born?

8   A.   Correct.

9   Q.   That he'd, in fact, attended Sandalwood High School, the

10   very same school Mr. Bell attended?

11   A.   That's correct.

12   Q.   That he had converted to Islam?

13   A.   Correct.

14   Q.   He attended the University of Medina, right?

15   A.   That's correct.

16   Q.   And he had risen to a leadership role in the mosque?

17   A.   That is correct.

18   Q.   And that was the first person he said was an important

19   scholar to him?

20   A.   That is correct.

21   Q.   I kind of want to go over in clumps some of the physical

22   exhibits.  When you referenced the exhibits that are listed as

23   C-20 through 26, there are some still pictures of things like

24   Nadil Hasan, a picture of Osama bin Laden next to President

25   Obama.  These are all things that you're familiar with through

1  JTTF, correct?

2  A.   Yes, ma'am.

3  Q.   And these are things that you find on the Internet,

4  correct?

5  A.   Correct.

6  Q.   And they're downloadable?

7  A.   Correct.

8  Q.   For free?

9  A.   Correct.

10  Q.   So this is nothing that Mr. Bell produced or made himself?

11  A.   That is correct.

12  Q.   And C-27 was one that looks like a poster, or almost like

13  a video box, called *Call of Jihad*.  And that looks similar to

14  the video game box of a similar name, right?

15  A.   Yes, ma'am.

16  Q.   And, again, that was something that you can download from

17  the Internet, correct?

18  A.   Correct.

19  Q.   For free?

20  A.   Correct.

21  Q.   And that wasn't anything that was produced by Mr. Bell?

22  A.   It was not.

23  Q.   And then there was a series, C-28, 29, and 30, that you

24  called *One Day, One Flag,* poem, and *The Domino Effect*.  And the

25  same thing, those are still pictures that you download from the

1    Internet?

2    A.    Correct.

3    Q.    For free?

4    A.    Correct.

5    Q.    And nothing that Mr. Bell produced?

6    A.    Yes, ma'am.

7    Q.    And then you had two items that you called -- it was C-31

8    and 32.  And it says ISIS.  Obviously that's a big word in

9    today's news coverage.  You have no information that Mr. Bell

10   had any association with ISIS, correct?

11   A.    I did not.

12   Q.    And C-39 -- I think we saw the cover and the title page --

13   or index page to it.  It's called *The Book of Jihad*, correct?

14   A.    Yes, ma'am.

15   Q.    And I think you answered even for the judge that you were

16   familiar with this, correct?

17   A.    Through this investigation.

18   Q.    Okay.  Was that something that you had seen before through

19   JTTF?

20   A.    I had not seen this particular book.

21   Q.    Were you able to research and to find that it's also

22   available on-line?

23   A.    I did not query to attempt to find this book.

24   Q.    But you said that there's no -- you knew that it was

25   downloaded to the computer that Mr. Bell and the juvenile had

1   access to, correct?

2   A.   That is correct.

3   Q.   But no information as to who or whether either one of them

4   ever read it?

5   A.   That's correct.

6   Q.   And there were some files that were admitted as C-13

7   through 19.  And these were the photos and maps relating to a

8   second cemetery at a day care center.

9   A.   Yes, ma'am.

10  Q.   And you recall being prompted into -- that the events at

11  the Chapel Hill Cemetery happened on July 4th, correct?

12  A.   That's correct.

13  Q.   And Mr. Bell and the juvenile departed in September --

14  late September, the 25th, of that same year?

15  A.   That is right.

16  Q.   So even though they had these photos, there's absolutely

17  no vandalism by Mr. Bell or the juvenile in July?

18  A.   Correct.

19  Q.   August?

20  A.   Correct.

21  Q.   Or September?

22  A.   Correct.

23  Q.   And kind of turning to the juvenile, you've had a chance

24  now, you said, to interview him on at least four occasions,

25  correct?

1    A.    Yes, ma'am.

2    Q.    And so you're familiar with him?

3    A.    That's correct.

4    Q.    You've gone over his background information with him?

5    A.    That's correct.

6    Q.    And you knew that he was originally from the Middle East?

7    A.    That's correct.

8    Q.    That he was born Muslim?

9    A.    Yes.

10   Q.    That he speaks Arabic?

11   A.    Yes.

12   Q.    And that he had previously traveled outside the United

13   States before 2012?

14   A.    That is correct.

15   Q.    Okay.  And what you learned from your investigation and

16   from talking to the juvenile is that Mr. Bell had never

17   traveled overseas?

18   A.    That's correct.

19   Q.    That he had to apply for the passport for this trip?

20   A.    That's correct.

21   Q.    And that he doesn't speak Arabic?

22   A.    Correct.

23   Q.    And when they first started the trip, Mr. Bell and the

24   juvenile, they actually stayed with the juvenile's family

25   member in Jordan, correct?

```
 1  A.    They did.

 2  Q.    And that was something that the juvenile had arranged for

 3  them?

 4  A.    That is correct.

 5  Q.    All right.  And you mentioned that there was an

 6  audiotape -- well, let me go back a step to make sure.

 7           On all of the audiotapes, you were telling

 8  Mr. Heavener that it says 2012, and then another series of

 9  numbers, and that that's the date that the video was produced,

10  correct?

11  A.    Correct.

12  Q.    And from your review and forensic review of the computer

13  files, that those dates appear to be true and correct, in terms

14  of the timeline?

15  A.    Yes, ma'am.

16  Q.    So there was a conversation on 10/25, which would be

17  October 25th.  And you said that it's A-10 and 11, that that

18  was actually a conversation that was broken into six segments

19  on the computer media, correct?

20  A.    Correct.

21  Q.    Okay.  And in the first part of the 10/25 conversation,

22  the juvenile -- doesn't the juvenile tell Mr. Bell that he has

23  more experience in Jordan because he's been here before?

24  A.    He does.

25  Q.    And then in a later part he says that he will pay for the
```

1  travel tickets from there on out, because Mr. Bell has lost his

2  money?

3  A.   He does.

4  Q.   And that's consistent with what the juvenile tells you

5  later in interviews, that Mr. Bell had $3,000 stolen while he

6  was overseas?

7  A.   That's correct.

8  Q.   So Mr. -- the juvenile had money; Mr. Bell had lost his

9  money, correct?

10  A.   That's correct.

11         THE COURT:  Agent, I'm going to ask you to scoot up a

12  little bit or keep your voice up or pull the microphone in.

13  Thank you, sir.

14         THE WITNESS:  I'm sorry.

15         THE COURT:  Go ahead, Ms. Call.

16         That's all right.

17  BY MS. CALL:

18  Q.   And looking at another one of the videos, A-5 -- I believe

19  it's titled compilation video when it's described on the

20  exhibit list.

21         The first part of that is a video with some music.  It

22  seems to show a guy jumping around with some kickboxing moves

23  or something.  That's also a video that's available on-line,

24  correct?

25  A.   That is correct.

1  Q.    And so it was downloaded by Mr. Bell or someone to that

2  computer, correct?

3  A.    Correct.

4  Q.    But the music and footage was nothing that he created?

5  A.    That's correct.

6  Q.    And then it kind of cuts away to a person in a light blue

7  shirt who's firing the gun at these targets.  Is that the

8  juvenile?

9  A.    Yes.

10 Q.    And he's then seen there shooting the gun there in the

11 woods on the Northside also, correct?

12 A.    Correct.

13 Q.    And those films, the scenes of the shooting and the flag

14 scenes, were filmed here in Jacksonville, correct?

15 A.    They were.

16 Q.    But there was no attempt by Mr. Bell to take a firearm

17 overseas, correct?

18 A.    There was not.

19 Q.    And no attempt to take any explosives overseas?

20 A.    There was not.

21 Q.    And when you started interviewing the juvenile, he had

22 returned a few days before Mr. Bell back to the United States,

23 correct?

24 A.    That is correct.

25 Q.    And because you knew his travel plans, you met him up at

1  Chicago O'Hare?

2  A.   That is correct.

3  Q.   And you said but then -- so he and Mr. Bell are back in

4  the United States in November of 2012, correct?

5  A.   Correct.

6  Q.   And you knew in late January of 2013 that Mr. Bell was

7  arrested on some state charges --

8  A.   That's correct.

9  Q.   -- correct?  And from that point he's been in custody on

10  those state charges, correct?

11  A.   That is correct.

12  Q.   And so then you have a later interview, April 15th, with

13  the juvenile, correct?

14  A.   I believe it was 13, but...

15  Q.   I might be -- yeah.  I think I looked at the prepared

16  date.  Okay.  The interview is done on, then, April 13.

17          THE COURT:  Which calendar year, Ms. Call?

18          MS. CALL:  Of 2013.

19          THE COURT:  All right.

20  BY MS. CALL:

21  Q.   So -- and I'll set it up again.

22          Mr. Bell is detained in late January of 2013.  And

23  this interview is April 13, about two-and-a-half months later?

24  A.   Yes, ma'am.

25  Q.   And you had been in touch with the juvenile and asked him

1   to meet you at a public park, correct?

2   A.   That is correct.

3   Q.   And when he came, he was actually with someone, correct?

4   A.   Correct.

5   Q.   And that was the person -- the adult who's shown in some

6   of the videotapes?

7   A.   That is correct.

8   Q.   So two-and-a-half or three months after Mr. Bell is

9   detained, this adult and the juvenile are still associating

10  with each other?

11  A.   That is correct.

12  Q.   And at that point -- since the November interview, is this

13  your first substantive contact with the juvenile?

14  A.   It is.

15  Q.   So there's the November interview at Chicago O'Hare and

16  then this April interview, correct?

17  A.   That is correct.

18  Q.   So you asked him to give you some background information

19  on himself, correct?

20  A.   Correct.

21  Q.   And he was explaining that he is Muslim, correct?

22  A.   Correct.

23  Q.   And that a couple of years ago he had been in touch with

24  the janitor at the mosque and the janitor's son and he had

25  become more observant to his faith, correct?

1   A.    That is correct.

2   Q.    And then he said in Ramadan of the year before he met

3   Mr. Bell, correct?

4   A.    Correct.

5   Q.    And that he and this other person from the mosque, the

6   janitor's son, had helped convert Mr. Bell to Islam?

7   A.    Correct.

8   Q.    And that -- he describes for you some of the buildup and

9   some of the things that were done as they get ready to go on

10  the trip and what they're doing when they're overseas, correct?

11  A.    Correct.

12  Q.    And you were talking to Mr. Heavener about the fact the

13  juvenile said he got cold feet, correct?

14  A.    That's correct.

15  Q.    But he doesn't stick with his cold feet, does he?

16  A.    I don't -- I don't understand the question.  As far as I

17  know, he did.

18  Q.    Okay.  Did he tell you that there came a time when

19  Mr. Bell had wanted to find a wife and stay in Jordan to save

20  money?

21  A.    Yes.

22  Q.    And that they might -- that they could then eventually

23  leave to go fight?

24  A.    Correct.

25  Q.    Okay.  And that the juvenile felt that that would be a

1   lengthy process, possibly five to six months, correct?

2   A.   Correct.

3   Q.   And that it's the juvenile who then says they should go to

4   the closest country to Yemen, Oman, and walk across?

5   A.   Correct.

6   Q.   And, in fact, there's some discussion that the juvenile

7   tells you about the fact that he and Mr. Bell had obtained

8   tickets that would take them to Oman, correct?

9   A.   Correct.

10  Q.   That they then cashed those tickets in, or got a refund?

11  A.   That's correct.

12  Q.   That they repurchased tickets to go back to Oman, correct?

13  A.   Correct.

14  Q.   And didn't use those either?

15  A.   That's correct.

16  Q.   And then, in fact, there comes a time when they were --

17  walked to the Syrian border, correct?

18  A.   That is correct.

19  Q.   And they did not cross into Syria?

20  A.   They did not.

21  Q.   And when you were talking about these videos and it being

22  the inspiration in something that would be shown to others

23  later, all of the videos that have been introduced fall from

24  about June 2012 through October of 2012, correct?

25  A.   That is correct.

1    Q.    And you have no information that Mr. Bell uploaded any of

2    these videos to any website in the world, correct?

3    A.    We do not.

4    Q.    Nor that the juvenile, to whom at least one of them was

5    entrusted -- that he had ever done anything to upload them to

6    YouTube or anywhere else?

7    A.    Not to our knowledge.

8    Q.    And when Mr. Bell came back to the country, he's already

9    been interviewed at the airport, correct?

10   A.    Correct.

11   Q.    Okay.  And there does come a time when there's a wiretap

12   or intercepts listening to his phone conversations, correct?

13   A.    Correct.

14   Q.    And at some point, in fact -- I think there is some

15   surveillance and planes flying overhead, correct?

16   A.    Correct.

17   Q.    Okay.  And Mr. Bell, in fact, on some of the tapes, on B-1

18   through 6 -- these are the tapes that were wiretap or intercept

19   conversations from November of 2012, correct?

20   A.    That is correct.

21   Q.    And Mr. Bell, in fact, says, I think the FBI is watching

22   me and listening in, correct?

23   A.    He does.

24   Q.    And he continues to talk?

25   A.    He does.

1  Q.   And make statements that don't sound all that good, do

2  they?

3  A.   That's correct.

4  Q.   But he does all of that knowing that there's a good chance

5  that you are, in fact, listening in on him?

6  A.   That's correct.

7  Q.   And when you talked about this journal -- and I think

8  Mr. Heavener called it the Jordanian holding cell -- you had

9  talked to Mr. Bell about being in Jordan, correct?

10 A.   That is correct.

11 Q.   And he said he was treated well by the Jordanian

12 authorities?

13 A.   That is correct.

14 Q.   He had access to the American Consulate, correct?

15 A.   Correct.

16 Q.   So there's no impression that this was some dungeon that

17 they threw poor Mr. Bell and the juvenile in, correct?

18 A.   Correct.

19 Q.   Okay.  So he was in administrative custody for being a

20 visa overstay there, correct?

21 A.   That is correct.

22 Q.   That was the reason that the Jordanian officials had

23 picked him up, correct?

24 A.   There were some other -- there was some other information,

25 some other concerns about Mr. Bell, that led to them

1   investigating him and ultimately detaining him.  But he was

2   deported because of the visa.

3   Q.   Okay.  And you said that this journal -- it looks to me

4   that it's probably one of these small wire-rim notebooks -- or

5   wire-rim notebooks about two inches by three inches?

6   A.   Yes, ma'am.

7   Q.   And you said that that was in Mr. Bell's bag when he

8   arrived back at the Houston Airport?

9   A.   It was -- I couldn't say it was in his bag.  It was either

10  in his bag or on his person.  It was actually Customs and

11  Border Protection that copied that.  So I couldn't tell you if

12  it was on him or in his bag.

13  Q.   Okay.  And the first few pages there's some writing,

14  where -- it may be that he's practicing Arabic writing,

15  correct?

16  A.   From what I remember, that's correct.

17  Q.   And that he writes some of what he sees and hears while

18  he's in custody in the Jordan prison?

19  A.   Right.

20  Q.   And he drew a couple of pictures, including the state of

21  Florida with a house drawn beside it, correct?

22  A.   Correct.

23  Q.   And some of it seems to be that he's practicing verses

24  from the Quran, that he quotes things that say what appear to

25  be religious phrases and a number, like it might be a verse or

1  a chapter?

2  A.    Correct.

3  Q.    And all of this was copied and given to you while you were

4  there at the Houston Airport?

5  A.    Yes, ma'am.

6            MS. CALL:  Your Honor, may I have just a moment?

7            THE COURT:  Sure.

8       (Counsel confers with defendant.)

9            MS. CALL:  Your Honor, I have no other questions.

10           THE COURT:  Any redirect?

11           MR. HEAVENER:  Just briefly, Your Honor.

12                        **REDIRECT EXAMINATION**

13  BY MR. HEAVENER:

14  Q.    Agent Berry, you were asked some questions about Ansar

15  al-Shari'a being designated a foreign terrorist organization in

16  October of 2012 while Mr. Bell and the juvenile were overseas?

17  A.    That's correct.

18  Q.    That designation, was it a new terrorist organization?  Or

19  can you kind of explain the designation of the Department of

20  State?

21  A.    The Department of State -- it was really just a

22  designation of Ansar al-Shari'a as an alias for AQAP, or

23  al-Qa'ida in the Arabian Peninsula, which is already a

24  designated terrorist organization.

25  Q.    All right.  So al-Qa'ida is the real terrorist

1  organization, correct?

2  A.    That is correct.

3  Q.    And Ansar al-Shari'a was just an a/k/a, or an alias, that

4  al-Qa'ida was using?

5  A.    That's correct.

6  Q.    And that's what the Department of State's designation was

7  on October the 4th of 2012?

8  A.    That is correct.

9  Q.    All right.  And you were also asked about whether Mr. Bell

10 brought a firearm on the flight over to Jordan --

11 A.    Yes, sir.

12 Q.    -- or the flight to -- ultimately the flight to Israel.

13 You're with Customs and Border Protection?

14 A.    Yes, sir.

15 Q.    And you're familiar with security in the United States

16 airports right now?

17 A.    Yes, sir.  If Mr. Bell had attempted to fly with a

18 firearm, he would have actually never left the country, because

19 he would have been detained here.

20 Q.    How about if he attempted to fly with explosives?

21 A.    He would be in the jail.

22        MR. HEAVENER:  All right.  No further questions, Your

23 Honor.

24        THE COURT:  Anything else, Ms. Call?

25        MS. CALL:  No, Your Honor.

1          THE COURT:  All right, sir.  You may step down.

2          Thank you.

3      (Witness excused.)

4          THE COURT:  Mr. Heavener, is there anything we can do

5   profitably for half an hour, or not?

6          MR. HEAVENER:  Yes, Your Honor.  I think we can start

7   with the government's expert witness.

8          THE COURT:  All right.  That will be fine.

9          All right.  We are going to stop at five, but we might

10  as well get it going.  So -- all right.

11         MR. HEAVENER:  All right.

12         THE COURT:  Who are you -- thank you.

13         Who are you calling?

14         MS. KOHN:  William Braniff, Your Honor.

15         THE COURT:  All right.  Come on forward, sir.

16         COURTROOM DEPUTY:  Do you solemnly swear that the

17  testimony you are about to give before this court will be the

18  truth, the whole truth, and nothing but the truth, so help you

19  God?

20         THE WITNESS:  I do.

21         COURTROOM DEPUTY:  Please state your full name and

22  spell your last name for the record.

23         THE WITNESS:  My name is William Edward Braniff,

24  B-r-a-n-i-f-f, as in Frank.

25         COURTROOM DEPUTY:  Thank you.

1          THE COURT:  Ms. Kohn, don't mind me.  I'm going to

2   stand for minute.  But you may proceed.

3          MS. KOHN:  Thank you, Your Honor.

4          **WILLIAM EDWARD BRANIFF, GOVERNMENT'S WITNESS, SWORN**

5                        **DIRECT EXAMINATION**

6   BY MS. KOHN:

7   Q.   Would you tell us your name, please, sir.

8   A.   William Braniff.

9   Q.   And would you tell us about your educational background,

10  please, as a starting point.

11  A.   Sure.  I'm a 1999 graduate of the United States Military

12  Academy at West Point.  I graduated with a bachelor of science.

13  My major, however, was arts, philosophy and literature.  West

14  Point is an engineering school, so you take a lot of hard

15  science, hard math classes.

16          So the behavioral -- the bachelor of science in arts,

17  philosophy and literature, although it sounds weird, is fairly

18  normal.

19          I went into the active duty service as an armor

20  officer in the United States Army, and then went to grad school

21  after that at the Johns Hopkins, School of Advanced

22  International Studies.

23  Q.   Okay.  Let me stop you there and back up just a little

24  bit.

25          As part of your commitment through West Point, do you

1    have to do a period of service in the Army?

2    A.    That is correct.  So at the time I matriculated at West

3    Point, in 1995 the commitment was six years of active duty

4    service.  But in the first two years that I was at West Point,

5    that commitment was lowered to five years.

6    Q.    And did you do that?

7    A.    That is correct.  I served through my company command and

8    then got out of the Army in 2004.

9    Q.    Where did you serve, sir?

10   A.    I served in Armor Battalion in Germany.  From that base I

11   deployed to Kosovo as a peacekeeper for six months, in 2000, as

12   well as Poland, and -- for a month, and another location in

13   Germany for two short-term deployments.

14          Upon returning to the United States, I was stationed

15   at Fort Knox, Kentucky, after the Captain's Career (Advanced)

16   Course.  And I had my company command out of Fort Knox,

17   Kentucky, running a -- a company of about 50-plus soldiers.

18          Our job was to maintain and operate 15 marksmanship

19   ranges, rifle and pistol ranges, where we taught basic trainees

20   and new officers marksmanship.

21   Q.    Let me take you back just a second.

22          Did something occur while you were serving overseas

23   that helped you develop your career and your interest in

24   international terrorism?

25   A.    Certainly.  I mentioned I was a -- basically an English

1  major at West Point.  When I got to my unit in Germany, within

2  a few months as a tank platoon leader our unit was deployed to

3  Kosovo to serve as peacekeepers.

4          And so I found myself in a very real-world situation.

5  And I started picking up non-fiction books to try to understand

6  what had gone on in the Balkans, why we were there as

7  peacekeepers.

8          And I really -- that, I think, set my direction in

9  terms of my professional career path.  I never really stopped

10  reading those kinds of non-fiction books, and ultimately led me

11  to the international relations degree at Johns Hopkins SAIS.

12  It was a very formative experience for me personally.

13  Q.  While you were serving in Kosovo as a peacekeeper, did an

14  incident occur where a particular individual who served was

15  shot and killed with an AK47?

16  A.   An incident did occur.  He actually was not killed.  But

17  one afternoon an individual walked out the side door of his

18  home and was shot in the shoulder with an AK47 round.

19          And it became the job of my tank company -- or the

20  tank company which I was a part as a platoon leader, to try to

21  understand why this individual had been shot.

22          And having no real training in law enforcement, we did

23  the best we could.  We started to try to canvass our area of

24  responsibility and ask as many people we could if they knew

25  this individual, if they knew of any reason why he might have

1    been targeted.

2         And we really were unsuccessful for quite a while in

3    understanding this act of violence.  It turns out this

4    individual had a sterling reputation.

5         He was very well respected by both the Albanian -- the

6    Albanian Kosovars and the Serb Kosovars.  And that epic tension

7    was at the heart of the conflict in Kosovo.

8         But both sides of that conflict had great respect for

9    this individual.  He had -- he was not involved in any violence

10   prior to or during the war, or after the war.

11        In fact, after the war he had been entrusted by the

12   United Nations to be responsible for dolling out kerosene in

13   the winter and flour for cooking, and these kinds of necessary

14   items for subsistence in a very poor area.

15        We thought, well, maybe he was cooking the books,

16   maybe he was giving all that material to one community and not

17   the other.

18        It turned out that his books checked out.  People

19   verified that he actually did give out kerosene to both sides

20   of the conflict, et cetera.  There was really no -- no one

21   could point to any reason why he as an individual had been

22   targeted.

23        It was probably two months after the incident when I

24   was asking a very different question that the intelligence

25   officers in our brigade had asked us to start asking, about the

general climate in our area of responsibility, did people feel
safe, what did -- did -- was there any rumors of people who had
been ethnically cleansed from the area coming back to
rehabitate their homes that they had been chased out of.

And so I asked this question to an elderly woman.  I
asked if -- how she felt about her own safety, and if she knew
of any stories of people who were planning on coming back to
occupy the homes that they had been cleansed out of.  And she
said, Well, no, I still feel unsafe.

And that was surprising to me, because there really
had been very little violence in our area of responsibility.
And I asked about people coming back home or repatriating.

And she said, Well, no, of course, they're not
repatriating.  And I said, What do you mean "of course"?  Why
wouldn't they come back home?  And she said, Well, do you
remember when this individual was shot?  He was shot so that
people knew it wasn't safe for them to come home.  He was a
symbolic target.

And this is really the definition of terrorism.
Terrorism is violence or the threat of future violence that is
meant to carry a psychological impact on a target community
beyond the physical target of that attack.

So this individual wasn't shot for anything he had
done.  He was shot to scare other people away from returning to
that area.

1          This is terrorism -- it was -- it's a different way of

2   looking at violence and a different way of looking at the

3   world.  It was very sort of intriguing for me intellectually,

4   and started me down this road of trying to understand this

5   phenomenon.

6   Q.   Did that also then gain your interest when you returned to

7   Johns Hopkins University and -- to further your education?

8   A.   Yes, ma'am, it did.  One of my two areas of concentration

9   for my master's degree was strategic studies or security

10  studies.  And within that I took courses on terrorism,

11  insurgency, these kinds of irregular forms of warfare.

12          After that I took a job in nuclear counterterrorism at

13  the National Nuclear Security Agency, which is a semiautonomous

14  body within the Department of Energy that focuses on nuclear

15  couterterrorism and nuclear non-proliferation.

16  Q.   And what did you do for them?

17  A.   I was a foreign affairs specialist.  My office went back

18  and forth to Russia.  We worked with the Russian Atomic Energy

19  Agency and tried to convince them to secure their nuclear

20  weapons and nuclear material, so that they would not be

21  accessible to terrorist organizations that might want to seize

22  that material.

23          But in part of my job, I did a lot of the -- sort of

24  the strategic planning and thinking about the -- the threat

25  picture and how to create a sustainable infrastructure that

 1   would be resilient against the threat of nuclear theft.

 2   Q.    During this period of time, were you, as well, studying

 3   terrorism and counterterrorism?

 4   A.    I was.  I was also serving as a consultant to a research

 5   center based at West Point at the time, called the Combating

 6   Terrorism Center at West Point.  This is a research center

 7   that's housed in the department of social sciences there.

 8         And in the evenings or on the weekends, I was

 9   conducting research for a series of reports that they put out

10   on al-Qa'ida and its associated movement.

11   Q.    Did you eventually go to work for them?

12   A.    I did.  About 18 to 20 months into my time at the

13   Department of Energy, I was asked to go take a job at the

14   Combating Terrorism Center at West Point.

15         Specifically, I was asked to run, at the time, an

16   educational program for the Federal Bureau of Investigation.

17   So West Point was conducting a lot of the counterterrorism

18   training at Quantico for new agents, as well as at the field

19   offices for Joint Terrorism Task Forces on al-Qa'ida and its

20   associated movement, and other forms of international

21   terrorism.

22         So I ran that program, which -- although when I got

23   there, we were really just focused on the FBI.  I left

24   four-and-a-half years later, at which point in time we were

25   providing instruction for the intelligence community, for

1  Homeland Security investigators, a part of -- the Department of

2  Homeland Security for state and locals, through the

3  Antiterrorism Advisory Council, or ATAC, program.

4          So it was likely the largest educational program for

5  professional counterterrorism officers and agents in the

6  country.

7  Q.   Can you describe for the court the basic curriculum that

8  you helped put together?

9  A.   Yes, I can.  The -- the curriculum was quite widespread.

10  It included a lot of sort of introductory classes on topics

11  like Islam and political Islam, in order to differentiate them

12  from violent political Islam, which we often refer to as

13  jihadism.

14          The idea that violent jihad is a necessary tool in

15  order to create a political instate in the Muslim world that is

16  defined by Islamic law and a very particular interpretation of

17  Islamic law.

18          So there was lots of cultural awareness classes that

19  then also sort of teased out the differences between a faith

20  like Islam, a political ideology like Islamism, and then

21  violent political activism like jihadism, and how they relate

22  and how they differ.

23          And in addition to that, there were classes on

24  radicalization, classes on jihadist use of the Internet,

25  classes on specific regions of the world, such as the Arabian

1  Peninsula, South Asia, Southeast Asia, the Horn of Africa,

2  Islam in the United States, Islamism in the United States.

3          So the curriculum was quite extensive.  But by the

4  time I left, our -- the classes that we would give to the Joint

5  Terrorism Task Force were 32 hours of instructions, which is

6  almost a semester's worth of contact time with that one field

7  office.

8  Q.   Did you obtain any levels of expertise during your time

9  that you spent at the CTC?

10  A.   I did.  I taught undergraduate -- I taught at the

11  undergraduate level, the Introduction to Terrorism Studies

12  class, which forces you to do a lot of preparation on terrorism

13  in general, understanding basic ideas about terrorist violence.

14          But for the practitioner education program, our focus

15  was really on, as I mentioned, al-Qa'ida and its associated

16  movement and this idea of global jihadism.

17          In order to teach this really extensive curriculum, I

18  would go out and recruit subject matter experts that were

19  really able to do deep dives into each of these very specific

20  classes.

21          And so I had a stable of instructors, perhaps 25 to 30

22  at any given point, so that we were three and four instructors

23  deep on every one class that we had to teach, which meant that

24  as the person organizing these events I got to listen to

25  multiple subject matter experts on every topic over and over

1    and over again.

2           I got to hear them interact with students and question

3    and answer.  I got to hear their different approaches.  And

4    eventually I started to teach in the program, as well.  And by

5    the time I left, I was able to teach all of the 32 hours of

6    instruction with comfort.

7    Q.   About how many of those kinds of classes were going on in

8    any given year?

9    A.   The class -- the program grew over time, as I mentioned.

10   At our high-water mark in 2010 -- I remember doing the math on

11   this -- we conducted 182 days of training out of 242 workdays,

12   which is four out of five workdays we were somewhere teaching

13   someone at the federal, state, or local level about this topic.

14          That's, you know, an exceptionally high operational

15   tempo.  As the primary instructor and the leader of this team,

16   I probably was a part -- personally a part of or the lead

17   instructor for several hundred training exercises over the

18   four-and-a-half years.  And I remain engaged in training since

19   then.

20   Q.   When you say it was a practitioner education program, can

21   you be a little more explanatory about that, please?

22   A.   So the idea was to take all of the research that was being

23   done at the Combating Terrorism Center at West Point, which is

24   a very unique research center, because we all had clearances,

25   we had access to classified information.

1          But my job was to take all the research that was being

2    done -- all of our research would eventually be released in an

3    unclassified manner.

4          So we would get access to al-Qa'ida's primary source

5    documents, have them declassified, and then release

6    unclassified academic research papers based on that content.

7          My job was to take all that, distill it down so that

8    it was useful for practitioners in the real world, and then

9    engage them in dialogue through this curriculum, which meant

10   that we had really interesting discussions and give-and-take

11   with seasoned professionals in the counterterrorism field on a

12   daily basis.

13   Q.   So as an example of that -- could you give the court an

14   example, say, in the realm of radicalization?

15   A.   So we would look at case studies of sort of how different

16   individuals are radicalized.  We'd also look at the kinds of

17   propaganda and recruitment tactics used by terrorist

18   organizations.

19          And I'd be happy to talk about, just in general, some

20   ingredients of radicalization, so to speak.

21   Q.   Sure.

22   A.   Radicalization is a tricky phenomenon to understand,

23   because it's a highly unique or individualized thing.  All of

24   us engage with the world around us in our own personal way.

25          But a lot of scholars have identified certain key

1  ingredients that you find in just about any radicalization

2  model or explanation.

3         I like to focus on four.  There's the idea of a

4  grievance, something that makes -- you know, makes you

5  uncomfortable that the world isn't as it should be.

6         There's the idea of a cognitive opening, which means

7  that, for whatever reason, you're open to suggestions to

8  explain that grievance, or explain why the world is the way

9  that it is.  Cognitively -- being cognitively open just means

10 you're able to be persuaded or influenced to see the world a

11 certain way.

12        It could be a personal crisis that makes somebody

13 cognitively open.  And this is just a psychological term.  It

14 could be just a great deal of empathy for a community that you

15 feel is being persecuted.

16        And that feeling of empathy, that sympathy, makes you

17 want to understand why the world is the way it is, why they're

18 being persecuted, et cetera.  So there's lots of different

19 reasons.  You might be -- you might have just gotten divorced.

20 You might have just lost your job.  Reasons can range.

21        There's the idea of ideology.  And ideology then fills

22 that cognitive opening.  It explains why the world is the way

23 it is.  It explains who's responsible for the grievances that

24 you perceive.  It explains, most importantly, what you as an

25 individual need to do to address those grievances.

1    Ideologies are not just a set of ideas.  They're a

2 roadmap to action.  They -- embedded or encoded in an ideology,

3 if it's to be powerful and compelling, is an explanation of how

4 you can influence the world around you.

5    So it's tied to activism.  It's tied to behaviors.

6 It's tied to doing something, not just a -- sort of a passive

7 explanation for the world.

8    And that results in the fourth ingredient, which is

9 mobilization, the idea that you take part in a series of

10 actions.  You mobilize in order to influence the world around

11 you.

12 Q.   And you actually took all of this and then put it in to a

13 practical model -- model, rather, for the FBI agents and other

14 agents in your teaching platform; is that correct?

15 A.   That's correct.  So then we -- we talk about these things

16 in abstract terms and then apply it to their casework, to the

17 experiences that they've had as professionals.

18    We talk about historical examples.  We look at primary

19 source propaganda from terrorist organizations and identify how

20 it teased out all of these different ingredients.

21    How does someone like Anwar al-Awlaki assign blame for

22 a grievance that he highlights?  And then what he does he tell

23 you you need to do to solve this problem?

24 Q.   And we'll come back to that.

25 A.   Sure.

1  Q.   Also, as part of your -- your duties at the CTC, were you

2  part of a federal working group?

3  A.   I was.  At the time -- you may remember there was some

4  controversy over inflammatory training that was being conducted

5  at various agencies.

6         The problem is that you have 18,000 law enforcement

7  organizations in the United States, all of whom are clamoring

8  for education, professional training to help them understand

9  violent jihadism, the events of 9/11, the Umar Farouk

10 Abdulmutallab case that was mentioned earlier.

11        All of these events are going on.  Professionals need

12 the access training in order to better address that problem.

13 But a lot of individuals were filling that void and producing,

14 really, inflammatory training that was actually quite

15 counterproductive, training that blamed Islam as a religion for

16 the behavior of violent jihadists, and really sowed a lot of

17 distrust between law enforcement and the Muslim community in

18 the United States.

19        This, in a few examples, was so problematic that

20 training material being created by law enforcement agencies was

21 being passed out as recruitment material in radical circles:

22 This is what the U.S. Government thinks of you as a Muslim.

23        And so I was part of a federal working group that was

24 trying to address this problem of really irresponsible and

25 inflammatory training, to try to figure out how to -- how to

1  instead provide practitioners with training that allowed them

2  to engage in a positive manner with the Muslim community, to

3  build trust, as well as still understand what they needed to do

4  to protect Muslim communities and other American communities

5  from real threat.

6  Q.   All right.

7  A.   It was called -- sorry.  It was call the CVE, or

8  Countering Violent Extremism, CVE, training working group.

9  Q.   At some point, then, did you leave the CTC and join the

10  University of Maryland?

11  A.   I did.  I mentioned that operational tempo.  We were on

12  the road all the time.  And so after four-and-a-half years of

13  traveling around the country, I went to serve as the executive

14  director of another terrorism research center, this one based

15  at the University of Maryland.  It's called the National

16  Consortium for the Study of Terrorism and Responses to

17  Terrorism.  It's one of the Department of Homeland Security's

18  Centers of Excellences.

19        If you think about the Department of Homeland Security

20  very briefly as a bureaucracy that was created in the aftermath

21  of 9/11, it has this impossible mandate -- everything from

22  hurricanes and tornadoes, all the way through terrorism.

23        In order to outsource some of their research and

24  development needs, their R and D, instead of creating that

25  capability in-house, they outsourced some of it to universities

1  and created these ideas of these research consortiums that

2  would allow the academic community to do objective academic

3  research, and then, you know, sort of transfer that knowledge

4  into the Homeland Security enterprise.

5          And so START's at the University of Maryland is really

6  a network of researchers around the country, and as well as

7  some researchers around the world, that do objective, open

8  source, unclassified research on terrorism, counterterrorism,

9  and community or social -- societal responses to terrorism.

10         And we look at this problem through the behavioral and

11 social sciences.  And what I mean by that is -- in a

12 multidisciplinary fashion, we have criminologists, political

13 scientists, sociologists, psychologists, geographers, all of

14 whom have these -- great reach-back into their respective

15 methodology and theory and discipline from their academic

16 discipline.  And we apply it to terrorism studies.

17         One of the big problems with terrorism studies is that

18 everybody has an opinion, very few people have data.  Terrorism

19 is a highly emotional phenomenon.  And it's meant to be.

20         So oftentimes terrorism studies lack objective data.

21 And our organization has very aggressively tried to create

22 large, objective, transparent data sets on terrorism incidents,

23 terrorist organizations, individual radicalization, so that you

24 could study this in a -- in a sort of dispassionate way.

25         So a good example of this is the global terrorism

1    database, or the GTD.  The GTD is the largest unclassified

2    database on terrorism incidents in the world.

3            It goes back to 1970, and currently contains

4    approximately 120,000 terrorism incidents since 1970 that have

5    occurred anywhere in the world.

6            This is the largest unclassified database on terrorism

7    incidents.  And that data set is the source of the U.S.

8    Government's terrorism data, as captured in the Department of

9    State's statistical annex, in their annual country reports on

10   terrorism, which is a Congressional-mandated document.

11           So, basically, we provide that objective source of

12   data for the government.

13   Q.   For the Department of State?

14   A.   For the Department of State.

15   Q.   Okay.  So all in all, how many years of your life have you

16   dedicated to the study of international terrorism?

17   A.   If you include my five years on active duty as an armor

18   officer, 15.

19   Q.   Okay.  As part of your -- your 15 years of involvement in

20   the international terrorism field, have you, on occasion, had

21   to give prior testimony or lectures in different scenarios?

22   A.   Yes, ma'am, I have.  I've testified before Congress on two

23   occasions, in June 2013, in front of a subcommittee of the

24   House Homeland Security committee, the subcommittee on

25   oversight and management.

1          And I testified on U.S. attitudes towards terrorism

2    and counterterrorism, which was based on survey data --

3    national survey that we conducted out of the START consortium.

4          In February of 2014 I testified before the House Armed

5    Services Committee.  This is a full committee hearing on the

6    state of al-Qa'ida and its associated movement.

7          I've given lectures within the practitioner education

8    program at West Point for a -- really across the interagency,

9    but, in addition to that, I've given several lectures at the

10   National Counterterrorism Center, which is a -- an interagency

11   community.

12         People from across the -- the IC, the intelligence

13   community, sort of come together in a clearinghouse way, so

14   that information can be shared across organizations.

15         The NCC is also responsible for strategic planning

16   with respect to counterterrorism.  So it's a really critical

17   hub within the U.S. intelligence community with respect to

18   terrorism.

19   Q.   Have you given any lectures internationally and on behalf

20   of foreign countries?

21   A.   Sure.  So I was invited to -- by the Canadian government

22   on multiple occasions to consult and provide lectures for the

23   Canadian Intelligent Service, CSIS, as well as the Royal

24   Canadian Mounted Police, the Mounties.

25         And on two different occasions, once invited by the

1   Canadian government, once by the United States Government,

2   provided lectures for a program called *The Leadership in*

3   *Counterterrorism Program,* which is a collaborative effort among

4   the Five Eyes countries.  These are the five countries that the

5   United States Government shares intelligence with completely.

6          So the Five Eyes refers to For Your Eyes Only.  It's

7   an informal name, but those countries include the U.S., Canada,

8   the United Kingdom, New Zealand, and Australia.

9          And this leadership and CT program invites all the

10  rising leaders in their professional counterterrorism community

11  together.

12         And I just lectured for -- for that program last month

13  on this data -- or the Islamic states of Iraq and Syria, ISIS,

14  and how that relates to al-Qa'ida.

15         THE COURT:  Ms. Kohn, I'm satisfied with the expert's

16  credentials.  And I guess the only thing I would want to know

17  is whether -- his prior court testimony.

18         If you could ask that question, I think that will

19  probably take care of us on credentials.

20  BY MS. KOHN:

21  Q.   Other than today -- is today your first time testifying in

22  federal court?

23  A.   Yes, ma'am.

24         THE COURT:  Okay.  All right.

25         MS. KOHN:  Would this be a good place to stop, then?

 1          THE COURT:  This would be a good place to stop.  I

 2    assume now that we've established the witness' credentials --

 3    and, of course, Ms. Call will be privileged to cross-examine --

 4    I'll let her do that after you're done.

 5          But I assume when we resume tomorrow, then we'll be

 6    able to actually start focusing on this case?

 7          MS. KOHN:  Absolutely, Your Honor.

 8          THE COURT:  Good.  Okay.

 9          All right.  We are going to call it a day.  And we

10    will reconvene at 9 a.m. tomorrow.

11          And, Mr. Heavener, we will have your expert here and

12    cross-examination.  And then what else does the government

13    have?

14          MR. HEAVENER:  We have one small fact witness, a JSO

15    officer.

16          THE COURT:  Okay.

17          MR. HEAVENER:  And then we'll be done.

18          THE COURT:  Okay.  And then, Ms. Call, you've got

19    Dr. Cohen.  And what -- did you say you had something else, or

20    not?

21          MS. CALL:  No, Your Honor.  That would be the only

22    testimony I would intend to admit.  And I'm actually going to

23    ask Mr. Pinkham to call and maybe move her to 11, since we got

24    a little bit of a start this afternoon.

25          THE COURT:  Since we're making a start here.  Okay.

 1          MS. CALL:  Your Honor, if I may ask for leave,

 2   though -- Dr. Cohen asked if she could bring her laptop back to

 3   the computers -- back to the courthouse so she could get work

 4   done.  I've asked the CSO to give me the little interview room

 5   out front.

 6          THE COURT:  That's fine.

 7          MS. CALL:  I'll bring a letter back to the court

 8   security officers in the morning with her.

 9          THE COURT:  That's fine.

10          MS. CALL:  Thank you.

11          THE COURT:  Sure.

12          MS. CALL:  No other matters from the defense.

13          THE COURT:  Okay.  All right.  Then -- and you

14   can -- thank you.  You can step down, sir.  We'll see you

15   tomorrow morning.

16          All right.  We will be in recess until 9 a.m.

17          COURT SECURITY OFFICER:  All rise.

18      (The proceedings adjourned at 5:01 p.m.)

19                              - - -

20

21

22

23

24

25

## **CERTIFICATE**

UNITED STATES DISTRICT COURT      )
                                  )
MIDDLE DISTRICT OF FLORIDA        )


      I hereby certify that the foregoing transcript is a true and correct computer-aided transcription of my stenotype notes taken at the time and place indicated herein.


      DATED this 3rd day of November, 2014.



      s/Shannon M. Bishop
      Shannon M. Bishop, RMR, CRR