IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA,          Jacksonville, Florida

         Plaintiff,          Case No. 3:13-cr-141-J-32JRK

 vs.          October 24, 2014

SHELTON THOMAS BELL,          9:02 a.m.

         Defendant.          Courtroom No. 10D

_____

**REDACTED TRANSCRIPT**
SENTENCING HEARING
(VOLUME II OF II)
BEFORE THE HONORABLE TIMOTHY J. CORRIGAN
UNITED STATES DISTRICT JUDGE

GOVERNMENT COUNSEL:

        **MAC D. HEAVENER, III, ESQ.**
        **KEVIN C. FREIN, ESQ.**
        United States Attorney's Office
        300 North Hogan Street, Suite 700
        Jacksonville, Florida  32202

        **MARA M. KOHN, ESQ.**
        Department of Justice
        Counterterrorism Division
        950 Pennsylvania Avenue
        Washington, D.C.  20530

DEFENSE COUNSEL:

        **LISA CALL, ESQ.**
        Federal Public Defender's Office
        200 West Forsyth Street, Room 1240
        Jacksonville Florida 32202

COURT REPORTER:

        Shannon M. Bishop, RMR, CRR

(Proceedings recorded by mechanical stenography; transcript
produced by computer.)

<u>T A B L E   O F   C O N T E N T S</u>

<u>Page No.</u>

WITNESSES FOR THE GOVERNMENT:

**WILLIAM EDWARD BRANIFF**
Direct Examination (continued)......................  5
Cross-Examination.................................. 63

**NASSIM MANA**
Direct Examination................................. 92
Cross-Examination.................................. 99

WITNESSES FOR THE DEFENDANT:

**ROBYN COHEN, Ph.D.**
Direct Examination................................ 102
Cross-Examination................................ 119
Redirect Examination............................. 152

E X H I B I T S   R E C E I V E D

Page No.

Government's Exhibits:

No. C-33......................................... 156
No. C-41......................................... 158
No. C-42.........................................  32

1                    P R O C E E D I N G S

2   October 24, 2014                              9:02 a.m.

3                          -  -  -

4           COURT SECURITY OFFICER:  All rise.  This Honorable

5   Court is now in session.  Please be seated.

6           THE COURT:  Good morning.  I was requested to sign an

7   order -- and I just signed it this morning -- that allowed

8   Dr. Cohen to bring her laptop in.  I was in a meeting earlier

9   or I would have signed it earlier.

10          But I also got a request from a member of the media to

11  be allowed to bring his laptop in.  And I -- I did go ahead and

12  approve that.

13          And if there's other members of the media that would

14  benefit from that, then I did sign that order.  The CSOs will

15  let you bring it in.

16          The only caveat to that is there can be no live

17  transmissions from the courtroom.  Any reporting that is done

18  has to be done on a break or after the proceeding -- after

19  you're outside the courtroom.

20          And so I just wanted to let anybody in here that might

21  be interested in that -- because I wanted to make sure I was

22  not just doing it for one and not the others.

23          All right.  Remind me where we are.

24          MS. KOHN:  Good morning, Your Honor.  We are

25  mid-testimony of the expert, Bill Braniff -- William Braniff.

1          THE COURT:  That's right.  Come on up, sir.

2          Good morning, sir.

3          And, Ms. Call, did your expert get the word that she

4   can bring her material in?  I thought I had authorized that

5   last night, but I guess they require an order.  And I guess we

6   didn't actually do the order last night, so...

7          MS. CALL:  Yes, Your Honor.  After court, when I was

8   discussing it with the court security officers, they said it

9   would help to have an order.

10         THE COURT:  Okay.

11         MS. CALL:  But, yes, she did receive notice.

12         THE COURT:  Okay.

13         MS. CALL:  And I believe we asked her to be here by

14  elevenish, in case we do pick up any scheduling time.

15         THE COURT:  Okay.  Thank you.

16         All right.  Ms. Kohn, you may proceed.

17         MS. KOHN:  Thank you, Your Honor.

18     **WILLIAM EDWARD BRANIFF, GOVERNMENT'S WITNESS, SWORN**

19              **DIRECT EXAMINATION (CONTINUED)**

20  BY MS. KOHN:

21  Q.   Mr. Braniff, can you give us a brief description or the

22  brief history behind the global jihadist movement, please?

23  A.   Yes, ma'am.  So in Muslim doctrine or Islamic doctrine

24  there's a -- there are several different concepts referred to

25  as jihad.

1          The greater jihad -- or the kind of jihad that is

2   deemed most important is -- means struggling or striving to be

3   a better Muslim, to resist temptation, to resist sin, to be

4   more pious.

5          The lesser jihad -- or the jihad less emphasized is

6   military jihad, jihad for the sake of -- at the time the Muslim

7   empire.  So when the Muslim empire would expand or confront

8   another neighboring empire, this would be referred to as a

9   jihad.

10          In the context of martial or military jihad, there is

11   the concept of classical or defensive jihad, which means that

12   if your land is attacked by an outsider, every individual has

13   the obligation to defend that territory, that Muslim territory.

14          This is very consistent with just war theory from the

15   Christian tradition or other traditions, the idea that if

16   you're attacked by an aggressor you can, in turn, defend

17   yourself.

18          However, in 1979 the Soviet Union invaded Afghanistan.

19   And a Palestinian cleric at the time named Abdullah Azzam --

20   this individual happened to be the mentor of Osama bin Laden,

21   who would later become the amir of the al-Qa'ida organization.

22          Abdullah Azzam issued a religious legal opinion,

23   called a fatwa, calling for defensive jihad in Afghanistan.

24   But there was an innovation in his fatwa, in his opinion.

25          It wasn't just the individual responsibility of every

1  Afghan Muslim to defend Afghanistan, it was the individual duty

2  of every Muslim everywhere in the world to go to Afghanistan

3  and defend Afghanistan from this occupation, this outside

4  force.

5       So what happens over the next ten years is that you

6  have individuals from all over the world -- Muslim individuals

7  from all over the world who go and -- they train together.

8  They sometimes fight together with Afghans, sometimes in their

9  own units, against the Soviet Union.

10      And there's this internationalization of jihadism that

11 is really fostered by Abdullah Azzam and Osama bin Laden.  They

12 had an organization at the time called the Maktab al-Khidamat,

13 or the services bureau.

14      It was a logistics organization that brought in

15 foreign fighters to participate in training, indoctrination,

16 and -- and attacks.

17      That creates a global awareness between Muslim

18 communities that the grievances of this community and Algeria

19 are very serious to that community in Egypt, to that community

20 in Pakistan, et cetera.  So there's this awakening.

21      And in 1991 another world event will transpire, which

22 will take this global defensive jihad and really turn it into a

23 global offensive jihad, although it wouldn't be called that.

24      The regime of -- Saddam Hussein starts to invade other

25 countries.  They're on the border of Saudi Arabia.  And

1   Osama bin Laden, who just fought this fight against the Soviet

2   Union, goes to the Saudi Royal Family, with whom he had close

3   relationships through his father, and said that my Muslim Army

4   can defend Mecca and Medina, the two holiest sites in Islam,

5   and the Saudi Royal Family declines that request and says

6   instead that they're going to use -- they're going to ask the

7   help of the United States Government and the Department of

8   Defense.  And this is a huge insult to Osama bin Laden.  And it

9   crystalizes --

10          MS. CALL:  Your Honor, I would object to this

11  extensive background.  All of this is before Mr. Bell's birth.

12  And I don't see any relevance to the accusations that we're

13  dealing with here.

14          THE COURT:  Ms. Kohn?

15          MS. KOHN:  Well, Your Honor, what this is is it's

16  forming the base of why -- the importance of Ansar al-Shari'a

17  and al-Qa'ida and al-Qa'ida in the Arabian Peninsula and the

18  importance of al-Awlaki, as we get there.

19          THE COURT:  All right.

20          MS. KOHN:  If we could just be allowed a few more --

21          THE COURT:  Overruled.  Go ahead.

22          THE WITNESS:  bin Laden realizes that it's not enough

23  to conduct these violent attacks against occupying regimes or

24  the local apostate ruler that's not governing to the right kind

25  of Islam, but it's really the United States -- it's the far

1   enemy that is the problem.

2          And so they start to craft this rhetoric that suggests

3   that it's not just a -- a Muslim country is under attack.  It's

4   that Islam the world over is under attack.  All Muslims

5   everywhere are under attack.  And, therefore, it is an

6   individual obligation to attack -- to defend Islam everywhere

7   in the world all the time.  And so it really becomes an

8   offensive strategy under the guise of -- of a defense of Islam.

9   BY MS. KOHN:

10  Q.   So this offensive Islamic -- or this defense of Islamic

11  beliefs, was that shared by Anwar al-Awlaki?

12  A.   Yes, ma'am.  So in a few of his important speeches -- one

13  of them we heard -- the first at Government Exhibit -- the

14  video that we saw early yesterday morning, the March 2010

15  speech to the American people, he -- he uses this rhetoric to

16  describe the fact that for a Muslim in the United States,

17  because Islam is under attack everywhere, you have two choices.

18  It's either to make the hijrah, which is an immigration to a

19  place where there's a front, a jihadist front, so a military

20  campaign ongoing, or to stay and fight.  Those are the only two

21  options.

22          And he stresses that it's an individual obligation,

23  because Islam is under attack, to defend Islam either here in

24  the United States, by conducting attacks against the United

25  States, or to go to a jihadist front, like the one in Yemen or

1   like the one in Syria.

2   Q.    Now, Yemen apparently has some important significance to

3   both Osama bin Laden and Anwar al-Awlaki; is that correct?

4   A.    That's correct.

5   Q.    Can you explain that, please?

6   A.    So Osama bin Laden was a Saudi citizen, but he's of Yemeni

7   extraction.  So he's ethically Yemeni.  Anwar al-Awlaki is

8   also -- was also a dual citizen of the United States and Yemen.

9   His father was Yemeni, who was studying, getting his Ph.D. in

10  the United States when Anwar al-Awlaki was born.  So he's a

11  dual citizen.

12          But he grew up in Yemen and in the United States, came

13  back to the United States for college, where he received a

14  degree in civil engineering and was a self-taught scholar, as

15  well, on the side.

16          In terms of militant organizations, the al-Qa'ida

17  affiliate in Yemen, al-Qa'ida in the Arabian Peninsula, is the

18  closest branch of al-Qa'ida core of -- among the affiliates.

19          So different affiliated organizations have different

20  relationships to al-Qa'ida core, the al-Qa'ida of Osama bin

21  Laden.

22          Al-Qa'ida in the Arabian Peninsula is a direct branch

23  off of al-Qa'ida core.  So the leadership cadre of al-Qa'ida in

24  the Arabian Peninsula were members of and close associates with

25  Osama bin Laden, unlike other affiliated organizations that

```
 1   sometimes have more abstract relationships.
 2          They idealogically say they sign up to the agenda, but
 3   they don't have the same connectivity.  So al-Qa'ida in the
 4   Arabian Peninsula is the most closely related of the al-Qa'ida
 5   affiliates.
 6          THE COURT:  Excuse me one second, Ms. Kohn.
 7      (Judge confers with law clerk.)
 8          THE COURT:  Go ahead, ma'am.
 9          MS. KOHN:  Thank you, Your Honor.
10   BY MS. KOHN:
11   Q.   So in terms of the groups that spear off of AQAP, is there
12   one in Yemen that is closely -- or was closely associated with
13   Anwar al-Awlaki?
14   A.   Correct.  So Anwar al-Awlaki will become a member of
15   al-Qa'ida in the Arabian Peninsula in the mid to late 2000s.
16   He would become their most important ideologue, recruiter,
17   spokesperson.
18          He was responsible for a lot of their propaganda,
19   including being one of the co-leads on an English language
20   jihadist magazine called *Inspire*.
21          And a lot of the speeches that -- he would give
22   al-Qa'ida in the Arabian Peninsula a great voice because of his
23   ability to speak directly to the American experience, having
24   been born and spent a long period of his life in the United
25   States.
```

```
1            So he was able to take a lot of the propaganda that

2    had previously been written by Arabs from the Middle East in

3    Arabic in the context of the Arab Middle East and he was able

4    to repackage that so that it would speak much more effectively

5    to English language speakers.

6    Q.   So when we hear the term violent extreme -- Islamic

7    extremism, is that some of the things that are being taught by

8    Anwar al-Awlaki?

9    A.   It is.  And when I think about that, I don't just think

10   about a set of ideas.  Ideas are one thing that are important.

11   The idealogy is important.  But it's the behaviors.

12           Again, I mentioned yesterday that idealogies are

13   roadmaps to behavior.  They not only tell you what to think and

14   why to think it, but then what to do about it.

15           And Anwar al-Awlaki was very masterful at crafting a

16   set of ideas, explaining what the grievances were, who was

17   responsible for those grievances, and then what you need to --

18   what behaviors you need to take in order to do something about

19   that set of issues.  And that combination of criminal behaviors

20   plus violent ideologies is how I would define violent

21   extremism.

22   Q.   So, in fact, the tape that we watched yesterday at the

23   beginning of our presentation, showing Anwar al-Awlaki, can you

24   point out for the court some examples of how Mr. al-Awlaki is

25   using his message as a recruitment tool, in your opinion?
```

1    A.    Certainly.  He -- he talks about the crimes of the United

2    States Government, how the -- it was the crimes of the United

3    States Government that radicalized Nidal Hasan, for example.

4          The idea here is that Nidal Hasan was just responding

5    to this attack against Islam from the United States, the United

6    States Government, occupation of Muslim countries and these

7    sorts of things.

8          He then talks about the fact that even if -- even if

9    you don't feel persecuted yet as a Muslim in the United States,

10   there are dark clouds -- or ominous clouds gathering in your

11   horizon, that eventually the United States Government is going

12   to turn on you.

13         Yesterday the United States was a place of the KKK and

14   lynching and tomorrow it will be a place of concentration camps

15   or detention camps for Muslims.

16         So he's -- it's a very insidious message that even if

17   you don't feel oppressed, you will soon, so you had better act

18   now, that if you don't act now it will be too late.

19   Q.    Okay.  Was he successful in getting his message out to

20   the -- to the world?

21   A.    Yes.  He's believed to be the most important English

22   language ideologue.  And his speeches, his sermons, are widely

23   available, widely circulated, and have been on the persons of

24   many who have gone on to conduct attacks or been arrested while

25   trying to conduct attacks.  He's prolific in that way.

1   Q.   Does he seem to focus on any certain age group?

2   A.   He speaks about the youth quite extensively.  If you

3   remember in the government exhibit yesterday, he said -- you

4   know, said, I specifically have a message for the youth in the

5   United States.

6        He -- in an English language piece called *44 Ways to*

7   *Serve and Participate in Jihad,* he -- this is, again, another

8   example of him taking a -- a previous text written in Arabic,

9   rewriting it, embellishing upon it -- the original text had 39

10  ways to serve and participate, his had 44 ways.

11       And he changes them and he tailors them to the

12  American experience, and highlights the youth specifically.

13  No. 40 from that list of 44 ways to serve and participate in

14  jihad talks about creating English language nasheeds.

15       If you remember yesterday we talked about nasheeds

16  being these sort of acapella songs or poems that are very --

17  they're military cadences -- or similar to military cadences.

18       They're really emotional appeals.  And he says that

19  there -- there are many in Arabic.  There are, however, not

20  very many in English.  And this is a big problem.

21       So to the youth in the United States, we need talented

22  singers and poets to create English language nasheeds, because

23  that is very effective at mobilizing of the youth.  And the

24  youth are the base of any jihad.  And those are paraphrased

25  quotes from that text.  So he really focuses on that.

```
 1   Q.    In what media was he able to get his message out?
 2   A.    So videos, audio sermons, written texts, disseminated
 3   through his own social media platforms, also distributed by
 4   Al Malahem Media, which is the propaganda organ of al-Qa'ida in
 5   the Arabian Peninsula -- so they disseminated that content
 6   through on-line jihadist web forms.  So there are many
 7   different ways, mediums, through which you can access that
 8   material.
 9   Q.    And which group in Yemen was he associated with?
10   A.    Al-Qa'ida in the Arabian Peninsula and its -- any group
11   that has -- any alias of that group, so including Ansar
12   al-Shari'a.
13   Q.    And did the State Department designate Ansar al-Shari'a as
14   a designated terrorist organization?
15   A.    It designated Ansar al-Shari'a as an alias for al-Qa'ida
16   in the Arabian Peninsula in 2012.  Ansar al-Shari'a was
17   established as a name, as a facade, in 2011.
18   Q.    What, if any, significance does it have when the State
19   Department actually makes that designation?
20   A.    It means that attempting to join that organization is
21   material support for a designated terrorist organization and a
22   federal crime.
23   Q.    I want to back up just a second and talk about some of the
24   common terms that we're going to hear throughout the rest of
25   your testimony.
```

1           Can you explain to the court what the black flag of

2   Tawheed is?

3   A.   So if you remember from a lot of the imagery that we saw

4   yesterday there are these black banners or black flags that

5   have Arabic script written on them.

6           These are -- this has been co-opted by the jihadist

7   movement as one of their primary icons or symbols.  The term

8   Tawheed is exceptionally important for understanding jihadist

9   extremism.

10          Tawheed itself is one of the five pillars of Islam.

11  It means monotheism.  It is -- and that there is one God.

12  Islam is the third of the Abrahamic faiths.  So Judaism,

13  Christianity, and Islam are part of the Abrahamic tradition.

14  They all believe in one God.

15          For extremists, however, the word Tawheed, they have a

16  maximalist interpretation of that word.  So because there's

17  only one God, there's only one correct way to worship that God.

18  There can only be one kind of Islamic law.  And everything else

19  is innovation or sinful.  Everything else is a problem.

20          And if you don't worship God in a very specific way,

21  one specific way -- because of the oneness of God, there can

22  only be one way to worship that God.  If you don't believe in

23  that kind of Tawheed or monotheism, you're un-Islamic, you're

24  outside of the faith.

25          And it's a very -- it's sort of the base for a lot of

1  their follow-on behaviors.  And what I mean by that is, if you

2  don't subscribe to that interpretation of Islam or Islamic law,

3  Sharia, then you're not a true Muslim and you should be killed

4  for that.

5       And that concept is called takfir, to declare somebody

6  to be an infidel.  We heard the word kafr, or kuffar, yesterday

7  quite frequently.  Takfir is to declare someone to be an

8  infidel, a kafr.

9       And that gives you the right to kill that individual,

10  because they've turned their back on the right interpretation

11  of God.  So it's a very, very anomalous but strict

12  interpretation of Islam.

13  Q.   So if one is a true follower of this brand of Islam, where

14  you are promoting the black flag of Tawheed flying over

15  countries, what does that mean?

16  A.   So the interpretation -- or the implication of this is

17  that Islamic law is a requirement.  God is sovereign and,

18  therefore, God should be sovereign over man.

19       That means Islamic law is the only appropriate form of

20  law.  And any government that does not subscribe -- does not

21  enforce this puritanical understanding of Islamic law is

22  sinful.  They're elevating manmade law over God's law.

23       And so we heard references to flags flying over the

24  White House or other capitol buildings.  The idea is that we

25  need to have God's law be sovereign in these -- in these

1    countries and to replace the secular governments that are

2    currently in existence there.  In other words, this is a

3    revolutionary idea about overthrowing secular governments.

4    Q.   So, in other words, if you are a true believer, you don't

5    believe in the -- the country's government; you only believe in

6    true Islam?

7    A.   Correct.  Nationalism is an invention of the West.  After

8    the end of the first World War, the Ottoman Empire or the

9    Ottoman Caliphate was disbanded and instead nation states were

10   created.

11        And so the jihadist community believes that those

12   nation states are illegitimate and that the only nation that

13   matters is the Ummah, the Muslim nation.

14        And so the transnational identity -- the borders that

15   are on the map now, they don't have any meaning, the

16   government's don't have any legitimacy, and they should be

17   overthrown and replaced with a -- an Islamic government, or a

18   caliphate, that governs solely according to Islamic law.

19   Q.   A term that we heard yesterday "mujahideen" -- what does

20   that mean, please?

21   A.   Mujahideen is a plural for holy warriors.  So a mujahid is

22   a holy warrior.  Mujahideen are holy warriors.  And it's the

23   same root as jihad.

24   Q.   And Tablighi?  And could you spell that for the court

25   reporter, please.

A.   Certainly.  Tablighi is T-a-b-l-i-g-h-i.  And it's a
reference to a member of a group called Tablighi Jamaat,
J-a-m-a-a-t.

       Tablighi Jamaat is the largest missionary organization
in the world.  It's a Muslim missionary organization.  And
their purpose for being is to entrench conservative Muslim
values in the Muslim community.

       So while they're a missionary organization, they don't
try to convert Jews or Christians or any other members of any
other faith to Islam.  They try to entrench very conservative
Muslim values in Muslim communities.

       They do this through missionary work, proselytization.
So it's a passivist movement.  It's not a political activist
movement.  Part of the Tablighi doctrine is that you don't get
involved in political activism or fighting, that you preach the
word of God.  It's called dawa, the call to Islam.

       And that's it.  Because you're not going to be allowed
as a missionary to go travel the world if you're raising
trouble everywhere you go.

       And so we heard during the -- some of the content
yesterday Mr. Bell disparage the Tablighis for having the wrong
creed or the wrong set of behaviors, the wrong practices of
Islam.

       The ideas are fine.  The conservative values are fine.
But proselytization is the wrong way to go about manifesting

1    that -- those ideas, that the only right way to do so is

2    through violence and through jihad.

3            And so when the Tablighi talks about no jihad, you

4    know, we don't want to talk about jihad, this is a problem for

5    jihadist groups that see the Tablighi movement as effete,

6    effectless.

7    Q.   And that was shown on the video -- one of the videos

8    yesterday, correct?

9    A.   That's correct.

10   Q.   I want to take you back one second to the importance of

11   Yemen.  And from the data you've collected in the global

12   terrorism database, what, if any, significance was there about

13   the lethality of Yemen at the time that Mr. Bell was trying to

14   go there?

15   A.   So in 2012 al-Qa'ida in the Arabian Peninsula was the

16   third most lethal group in the world, according to the global

17   terrorism database that we cultivated at the University of

18   Maryland at the START Consortium.

19           Again, this is the database that provides the

20   Department of State its annual data for its Congressionally

21   mandated country reports on terrorism.

22           There were 960 fatalities -- over 960 fatalities at

23   the hands of al-Qa'ida in the Arabian Peninsula in 2012.  At

24   the same time, as a side note in Syria, Syria was the -- the

25   location of the sixth greatest number of fatalities in the

1    world.  So there were over 800 fatalities due to terrorism in

2    Syria in 2012.

3    Q.   As part of the global jihadist movement --

4          THE COURT:  Are you saying these 960 fatalities -- did

5    they occur in Yemen?  Or where did they occur?

6          THE WITNESS:  Yes, sir.

7          THE COURT:  Okay.  Just in Yemen?

8          THE WITNESS:  I would have to check, Your Honor, to

9    make sure that there were no attacks outside of Yemen.  But

10   the -- when a group claims responsibility for an attack, or

11   there is enough open source media -- not government reports

12   blaming a group, but open source, legitimate media assigning

13   responsibility to a group, we would code that in the data set.

14   And 960 fatalities were attributed to al-Qa'ida in the Arabian

15   Peninsula.

16         THE COURT:  And give me -- give me just a couple of

17   examples of the type of terrorist activity that resulted in

18   these fatalities.

19         THE WITNESS:  So al-Qa'ida in the Arabian Peninsula

20   specifically is famous for a certain bomb maker,

21   Yusuf al-Ayiri, who is the individual who created the bombs --

22   the PETN bombs that are able to go through metal detectors and

23   these sorts of security devices at international airports.

24         This is the organization -- while it was not a fatal

25   attack that put the PETN bombs in printer cartridges and cargo

1    aircraft destined for the United States, it is the organization

2    that conducted an assassination of a Saudi minister using one

3    of these bombs.

4           In fact, the bomb maker's brother was the suicide

5    terrorist who conducted this assassination against the Saudi

6    minister using this kind of explosive.  It's the same kind of

7    explosive that Umar Farouk Abdulmutallab had on his person when

8    he tried to detonate the flight inbound to Detroit on Christmas

9    Day in 2009.

10          On the ground in Yemen they conducted attacks against

11   a movement of Shia.  So Shia is the minority sect within Islam.

12   About 15 percent of the Muslim community around the world are

13   Shia.

14          And there is a group of Shia in Yemen called the

15   Hoothies.  And the Hoothies are one of the primary targets of

16   al-Qa'ida in the Arabian Peninsula, which sees them as

17   un-Islamic.

18          In addition to the -- the government of Yemen at the

19   time -- the leader of Yemen was Saleh.  And he was not

20   governing according to an unadulterated form of Islamic law

21   and, therefore, he was an apostate, he was un-Islamic.  And his

22   administration, his regime, his security forces, his police,

23   were frequent targets.

24          In fact, if I had to guess, the military and police

25   would probably be among the -- the second and third most

```
 1   frequently targeted actors in Yemen at the time.

 2           THE COURT:  Thank you.

 3   BY MS. KOHN:

 4   Q.   So, Mr. Braniff, going back for a second to the global

 5   jihadist movement, was one of their teachings -- did it have to

 6   do with promoting or producing propaganda, if you were going to

 7   be a true believer?

 8   A.   So one of the innovations of al-Qa'ida and the global

 9   jihadist movement is that they've really taken advantage of

10   advances in social media and computing.

11           So not only do they produce tremendous volumes of

12   propaganda -- and a lot of the propaganda is actually very well

13   produced.  It has a high production value.  It's very slick.

14           But they also teach you how to be -- how to not just

15   be a consumer of propaganda, but how to produce jihadist

16   propaganda yourself.

17           And that propaganda can, therefore, be tailored to

18   your local environment, your local circumstance.  So jihadist

19   magazines and jihadist web forms will teach you how to -- one,

20   it will give you access to pirated software that you don't have

21   to pay for so that you can create your own propaganda.  It will

22   give you encryption skills so that you can communicate securely

23   with one another.

24           There's a lot of emphasis on powering down both

25   violence and the production of propaganda to individual
```

1  adherence.

2       al-Qa'ida in the Arabian Peninsula really specialize

3  in that through the magazine *Inspire,* which encourage, in no

4  uncertain terms, do-it-yourself jihad.

5       It taught you how to maintain your firearms, how to

6  build explosives using household goods, how to use your car to

7  run over victims.

8       It encouraged that -- it encouraged the behavior.  It

9  identified the people you should be targeting.  It then helped

10 give you the skills to be able to do that yourself, and

11 encouraged the production of propaganda alongside of that.

12 Q.   Have you seen any illustrations of that with Mr. Bell

13 yesterday?

14 A.   Yes, ma'am.  I -- clearly he consumed a tremendous amount

15 of this content, especially content from Anwar al-Awlaki, as

16 we've heard.  But he was also actively producing his own

17 content.

18      The videos that we saw, his goal to have them be

19 watched by other youth, he -- in the very long video we watched

20 at the end of the day yesterday, in which Mr. Bell was dressed

21 up in sort of tactical garb and garb that he felt was

22 representative of the kind of Islam that he practices -- he

23 talked specifically about the youth watching this video.

24      And so he was basically self-styling himself like a

25 Sheikh or a leader, a spiritual leader, who could guide other

1    youth to participate in jihad.

2         He was very excited about that idea, of being someone

3    who could inspire and prepare mentally and physically youth to

4    go on and practice jihad.

5         When we saw the film of him in Jordan, talking about

6    taking the place of the Sheikh, this is the person who's

7    creating these inspirational messages, this content, and

8    sending other people off to fight.

9    Q.   Okay.  Now, in addition to all of the videos that were

10   shown yesterday and the phone calls that we listened to

11   yesterday here in court, were there other discovery materials

12   that were sent to you that you reviewed in preparation for your

13   testimony here today?

14   A.   Yes, ma'am.  I listened to the recorded phone calls, saw

15   images from Mr. Bell's computer, the videos.  And then there

16   were transcripts of some of that material, as well.  And then

17   finally a letter that Mr. Bell authored for the judge this past

18   week.

19   Q.   Can you talk a little bit, then, based on -- on the

20   discovery materials that you reviewed, the importance of

21   Mr. al-Awlaki to Mr. Bell?

22   A.   I don't know that you can overstate the influence of Anwar

23   al-Awlaki's speeches and sermons on the behaviors and the

24   speeches and sermons for Mr. Bell.

25        It's one thing to merely parrot somebody, to cut and

1   paste, or to just recite certain things that you've heard,

2   but -- and especially in the long video from yesterday

3   afternoon.

4          What you see is, in my opinion, Mr. Bell has really

5   internalized the content.  He can, without notes, riff on it

6   for 40 minutes quite easily.

7          And he's weaving in concepts from a whole host of

8   speeches and sermons.  He's tying it to the context of the

9   United States and to youth in the United States in a way very

10  similar to Anwar al-Awlaki's practice of tailoring content to

11  the conditions of the United States.

12  Q.   Yesterday you talked about four factors of radicalization.

13  Do you remember that?

14  A.   Yes, ma'am.

15  Q.   Did you see evidence of the radicalization of Mr. Bell?

16  A.   Yes, ma'am.  Mr. Bell frequently talks about grievances.

17  If you remember the content of that video yesterday, repeatedly

18  mentioning the murder, rape, and torture of Muslim innocents

19  around the world, and the likelihood of things like detention

20  camps or -- in the United States for Muslims.  So there's the

21  grievance -- one of the primary grievances.

22          In terms of being cognitively open, he -- he clearly

23  was, like many people, looking for, sort of, you know, meaning

24  in life.  And he mentions this in his letter, that he was --

25  when he converted to Islam, he felt it gave him purpose.  And

1   he was looking for answers and found those in Anwar al-Awlaki's

2   content.

3          In terms of ideology, he fully understands the concept

4   of Tawheed.  If you remember from that same sermon, the last

5   video of the day yesterday, he talks about the oneness of God,

6   the oneness of our cause, the oneness of the Ummah, the oneness

7   of our actions.

8          There is -- Tawheed is the centerpiece of his

9   ideology.  And it's the kind of Tawheed that I referred to

10  earlier, that is exclusive and creates the conditions for

11  mobilization, which is the last ingredient, so to speak.  And

12  what we've seen is not just a set of beliefs, but behaviors

13  that are intimately wedded to those beliefs.

14         So we've seen Mr. Bell strive to propagate the jihad

15  in the United States, to conduct fraudulent activities to raise

16  funds in order to travel to make the hijrah out to a jihadist

17  front.

18         We've seen him encourage others around him to lie

19  about their behavior so as not to violate their operational

20  security, to lie to their parents, et cetera.  He's practiced

21  gaining the capability to conduct a violent attack.

22         So when you evaluate a threat, you often look at three

23  important pieces:  capability, opportunity, and motivation.

24  Motivation is something that we see quite a bit of in terms of

25  the behaviors.

1          Opportunity in a free and open society exists.  And

2    what we see in some of these videos is Mr. Bell gaining

3    capability, so firearms practice, teaching himself how to

4    create more sophisticated explosives over time that actually

5    work, and all of this in a very deliberate fashion over a

6    period of time, not a one-off event, but a deliberate gaining

7    of capability, gaining of funds, maintaining operational

8    security, or attempts to do so, and then traveling to try to

9    get into a jihadist front.

10         And when opportunity one isn't available, they

11   consider opportunity two, going into Syria.  When that doesn't

12   work, they -- he talks about coming home to propagate the jihad

13   as a Sheikh, and to mobilize others to get into the fight.  So

14   he is fully mobilized in his behaviors.  And those behaviors

15   reflect directly the ideology that he's internalized.

16   Q.   It's been suggested that this was nothing more than a

17   whimsy on the part of Mr. Bell.  Do you agree with that?

18   A.   The amount of content that he both consumed, generated,

19   and the amount of behaviors that he participated in, or led,

20   suggests that this wasn't whimsy to me.

21   Q.   You've indicated previously that one can have ideological

22   principles, but there becomes a time when it's elevated to the

23   next level and it becomes problematic.

24         Can you explain that a little bit, please?

25   A.   Things like anti-American sentiment are not criminal.

1  They're not -- in fact, they're commonplace.  Disapproving of

2  U.S. foreign policy is not unusual.  These things are not

3  criminal activities.  It's not what I would consider extremism.

4       But when you marry some of these much more explicit

5  calls for violence against individuals, and then you prepare

6  yourself to engage in those acts of violence, I think you cross

7  a threshold.

8       So for me it's about behaviors primarily.  And we've

9  seen a -- in this case a trend of behaviors over a period of

10  time.

11  Q.   Does Mr. Bell -- based on your definition of true Islam,

12  in your opinion, does Mr. Bell believe himself to be a true

13  follower of true Islam?

14  A.   And let me just be clear about this.  True Islam is a term

15  that many extremists will use to separate themselves from the

16  traditional or mainstream Muslim community.

17       So it's not that I think he's a representative of true

18  Islam.  It's that this is how many extremists will refer to

19  themselves, that they are on the right path and all the other

20  Muslims are on the wrong path.

21       So the Muslims at the mosque in -- that Mr. Bell had

22  attended were not on the right path.  And he was a

23  representative, instead, of true Islam.

24       And what that means is that -- the only way to be a

25  true Muslim is to engage in jihad.  Jihad is an obligation at

1   the individual level, because Islam is under attack.  And dawa

2   preaching and praying, while those things are good and right,

3   are insufficient to be a true Muslim.

4   Q.   And certainly did Mr. Bell subscribe to all of that?

5   A.   Yes, ma'am.

6   Q.   In preparation for your testimony today, did you prepare a

7   chart comparing some of Mr. Bell's comments that we've seen and

8   heard on the videos and his phone calls to some al-Awlaki

9   references?

10  A.   Yes, ma'am.  I did that prior to receiving the letter that

11  Mr. Bell wrote, which explained that al-Awlaki was his role

12  model.

13         So just watching the content generated by Mr. Bell, it

14  struck me during the discovery process that it was very

15  reminiscent or derivative of Anwar al-Awlaki's work.  And so I

16  created this chart to see how closely aligned the -- sort of

17  the speeches, the sermons, were.

18  Q.   The information, then -- and I'm referring to Exhibit

19  C-42.  Is the information that's contained on that chart --

20  that was prepared by you, correct?

21  A.   Yes, ma'am.

22  Q.   And the videos and the references to the media that occurs

23  on the far left-hand side of the -- the exhibit, where were

24  those obtained from?

25  A.   The discovery process.

1    Q.    Okay.  And those were all from Mr. Bell, that he

2    generated?

3    A.    Yes, ma'am.

4    Q.    And then the middle commentary, or the middle column,

5    is -- is what, sir, if you could explain that?

6    A.    So in some cases -- in discovery I was provided

7    transcripts of the content generated by Mr. Bell.  And so then

8    I would have just cut and paste those transcripts into that

9    column.

10          In other cases I transcribed them myself, either

11   direct quotes or a paraphrase of the content generated by

12   Mr. Bell.

13   Q.    And then, finally, the third column?

14   A.    This was me looking at content from -- generated by Anwar

15   al-Awlaki and transcribing that into that column.

16          MS. KOHN:  Your Honor, we'd move to introduce Exhibit

17   C-42.

18          And do you not have a copy of this exhibit?

19          THE COURT:  I don't.  Yeah.  So I'm at a disadvantage.

20          MS. KOHN:  I've got it.  I apologize, Your Honor.

21          THE COURT:  That's all right.  There's a little note

22   and it says, To be provided at sentencing.  So I guess that's

23   what has happened.

24          MS. KOHN:  Oh, there you go.  I apologize.  We should

25   have had that to you yesterday.

1            THE COURT:  Ms. Call, have you seen this?

2            MS. CALL:  Yes, Your Honor.

3            THE COURT:  All right.  What's your position?

4            MS. CALL:  No objection, Your Honor.

5            THE COURT:  All right.  C-42 will be received.

6        (Government's Exhibit No. C-42 was received into evidence.)

7            MS. KOHN:  So if we could -- could publish it, Your

8   Honor?

9            THE COURT:  Yes.

10            MS. KOHN:  Thank you, sir.

11   BY MS. KOHN:

12   Q.   Mr. Braniff, I'd like to direct your attention -- we're

13   not going to go through each of these.  But I want to direct

14   your attention to the second block on the first page.  If you

15   could, now that we have the exhibit up, explain -- explain what

16   you've done there, please.

17   A.   Okay.  In the center column of block two are the

18   transcription of Mr. Bell's words.  He's talking about the

19   purpose of -- of his actions in the United States is to

20   propagate jihad here in America and to demonstrate that you can

21   be a true Muslim -- he uses the word truth here -- in the

22   United States even though the United States is not properly an

23   Islamic country.

24            And then he talks about any reverts -- I can explain

25   that term in a minute.  But anyone watching this video can

1   understand that you can be a true Muslim in the United States

2   and you can propagate the jihad and live sort of the proper

3   life, Islam, to the fullest.

4          Revert is a term that can have different meanings.

5   It's a reference to converts, or people who return to Islam as

6   the faith.  And so in the United States it often is a reference

7   to African-Americans.

8          The idea here is that their ancestors in Africa were

9   Muslim.  They were put on slave ships, brought to the United

10  States, forced into Christianity, and now Muslim

11  African-Americans realize that their true faith is Islam and

12  they revert back to Islam.

13         But it can be used just to talk about converts or --

14  the idea is that we're all Muslim and that we have to revert to

15  the truth.  We just -- not everyone realizes it yet.

16  Q.   And the third column is what, sir?

17  A.   So this is excerpts from an important short text written

18  by Anwar al-Awlaki.  It's, again, one of these instances of a

19  text written in Arabic originally -- not being translated word

20  for word, but being rewritten in English by al-Awlaki for an

21  American audience.

22         And the key takeaway is that jihad should be

23  propagated irrespective of time and place, that jihad has to

24  continue until Judgment Day, that the idea that there's only

25  certain times or places where jihad is appropriate is an

1   innovation and a falsehood that Muslims have sort of -- that

2   corrupt Muslims have introduced into the faith, but that true

3   jihad happens constantly until Judgment Day.

4   Q.   So when we heard Mr. al-Awlaki's message yesterday, we

5   will fight to the last man standing; our men love death like

6   you love life, is that consistent with what you're seeing here

7   and what you laid out with Mr. Bell's comments?

8   A.   Yes, ma'am.  Again, the idea that the only way to be a

9   Muslim is to practice jihad, that -- that otherwise you're not

10  a true Muslim.

11  Q.   And when you say the word "jihad," which of the two

12  definitions -- or the -- there's many definitions of jihad.

13  But which definition of jihad is being utilized here by

14  Mr. Bell?

15  A.   Specifically, militant jihad or violent jihad.

16  Q.   If I could then turn to page two, the top block.  Again,

17  sir, this particular video comes from the -- the cemetery; is

18  that correct?

19  A.   Yes, ma'am.  I believe, on their way to the cemetery, or

20  prior to the -- the destruction of the statues at the cemetery,

21  Mr. Bell's saying that if -- you know, if we're to be arrested,

22  they're going to, say, put us in a detention camp, these sorts

23  of ideas, and very similar to the ideas in the March 2010

24  speech to the American people -- or message to the American

25  people by al-Awlaki, that talks about religious discrimination

1   in concentration camps.

2   Q.    Let's talk for a minute about the significance of the

3   cemetery mission, if we could.  We certainly saw and heard the

4   descriptions yesterday.  But there's an underlying significance

5   to that; is there not?

6   A.    Yes, ma'am.  So part of jihadist culture and practice

7   conducted by groups like the Taliban, al-Shabaab in Somalia,

8   Ansar al-Shari'a in Yemen, the group now known as the Islamic

9   State in Iraq and Syria -- part of this -- their behavior is

10  called morality policing, or Hesbah.  And --

11  Q.    Can you spell that, please?

12  A.    H-e-s-b-a-h.  And morality policing is the idea that it's

13  not enough to believe in the right form of Islam, it's not

14  enough to practice the right form of Islam, that you have to

15  enforce your interpretation of Islam on the rest of the

16  community, and aggressively through actions.

17        This isn't about having a debate over an issue.  This

18  is about forcing other people to fall in line with your

19  interpretation of Sharia, or Islamic law.

20        And so what we see, sort of famously, the Taliban

21  destroying the Banyan Buddhists.  These are these massive

22  ancient relics that were destroyed with high explosives -- high

23  explosives in Afghanistan.

24        In Somalia you see the destruction of tombs of

25  ancestors or Sufi shrines.  Sufism is another kind of Islam --

1    interpretation of Islam.

2           And it's un-Islamic, according to a group like

3    al-Shabaab.  So they destroy the idols and the tombs of

4    those -- that represent those faiths.

5           And here what we see in the United States, in the

6    context of this event, this mission, was the destruction of

7    what Mr. Bell referred to as idols, that we had to purify the

8    cemetery of this idol worship, that to have a statute of Jesus

9    is to worship that statue and it takes away your worship from

10   God.

11          So you have to destroy these idols the way the prophet

12   Muhammad destroyed the idols in Mecca when he conquered Mecca

13   in his lifetime, the way Abraham destroyed idols in his

14   lifetime.

15          So it's a very symbolic kind of morality policing, not

16   inconsistent with the kind of morality policing conducted by

17   jihadist groups, but also -- we also heard discussion of things

18   like burning down -- what Mr. Bell referred to, a porno store

19   and destroying --

20   Q.   A liquor store?

21   A.   -- a liquor store.  You know, putting a sword through

22   bottles of alcohol, and these kind of things.  It's active

23   morality policing.

24   Q.   And that comes more from al-Awlaki teachings and more --

25   A.   It comes from many different ideologues in the jihadist

1    community.  And many different organizations practice that

2    behavior regularly.

3    Q.   If you would turn, please, sir, to page five of the

4    exhibit, and going to the second -- or the large block, if you

5    would explain what you've -- the comparison that you've done

6    here, please, and the significance of it.

7    A.   So in the center block there you have a very repetitive

8    sentence from Mr. Bell's sermon, the last exhibit of the day

9    yesterday.  And he talks about, What have you done for the sake

10   of Allah?

11        It's a very repetitive sentence.  He says it over and

12   over and over again.  And this is, again -- this idea of

13   Tawheed, that everything you do should be for the sake of God.

14        If you -- you know, you should love your spouse for

15   the sake of God.  You should raise your children for the sake

16   of God.  You should participate in jihad for the sake of God.

17        And, specifically, in Anwar al-Awlaki's *Constants on*

18   *the Path of Jihad*, he sort of answers the question that

19   Mr. Bell is posing.

20        So Mr. Bell is saying to the youth in this video, What

21   have you done for the sake of God?  And the answer is

22   Jihad fe Sabeelillah law.  It's jihad for the sake of Allah.

23   That's the answer that he's trying to sort of get you to think

24   of as he's saying this.

25        And it's a reference to al-Awlaki's *Constants on the*

1   *Path of Jihad,* where he says, The solution for the Ummah is

2   jihad for the sake of Allah.

3   Q.   And that actually appears in your -- on your chart at the

4   top of page six; does it not?

5   A.   Yes, ma'am.  It's on the top of the next page.

6   Q.   And, finally, the last one that I want to make a

7   comparison about is the -- the second-to-the-last block on page

8   six.  And can you tell us the significance of -- of this

9   comparison?

10  A.   So if you'll remember from the first government exhibit

11  video yesterday, al-Awlaki talks about how American sons and

12  daughters are going to go fight against mujahid or mujahideen,

13  who are actively seeking death, that they can't wait for the

14  United States Army to come to Yemen so that they can fight,

15  because our dead will go to Paradise and your dead will go to

16  Hellfire.

17       So it's this idea of really being eager for the fight,

18  because of the rewards for the righteous and the -- the penalty

19  for those who are not righteous.

20       And Mr. Bell references that directly in one phone

21  call and, again, in the sermon, the last exhibit from yesterday

22  afternoon.

23  Q.   There was some reference to Mr. Bell traveling over there,

24  over to the Middle East, and staying to raise his family.  Did

25  you see some inconsistencies with that premise?

1   A.   Yes, ma'am.  The purpose that Mr. Bell states, in several

2   different formats in the material that was provided in

3   discovery of going over there, was to fight.  That's the real

4   reason that they were going over.

5        He indicates they had other cover stories, but that

6   the purpose was to -- to fight.  And he refers to finding the

7   mujahideen, finding Ansar al-Shari'a.

8        There is mention of maybe staying in Jordan and

9   raising a family as he figures out how to get to a fight.  But

10  the purpose is to get into one of these active fronts in --

11  first Yemen and then Syria.

12  Q.   So when Mr. al-Awlaki -- and particularly in this

13  particular comparison, is Mr. al-Awlaki calling you to the

14  fight of all fights?  And does Mr. Bell seem to be responding?

15  A.   Yes, ma'am.

16  Q.   Can you expand on that just a little bit, about the fight

17  of all fights and why that's so important and so significant to

18  someone who is of this belief?

19  A.   So if you remember it from the last government exhibit

20  video yesterday afternoon, there's reference to how this

21  culminating fight is imminent, that it's going to happen within

22  our lifetime; we're going to eliminate al-Quds -- which is

23  Jerusalem -- in our lifetime.

24       There is a belief in jihadist circles, espoused by

25  groups like al-Qa'ida in the Arabian Peninsula, that the end of

1   days -- the final apocalyptic battle between the Muslims and

2   the non-Muslim world will occur and that an Army of 12,000 will

3   march out of Aden and Abyan, A-d-e-n, A-b-y-a-n, I think, that

4   they will participate in this final battle.

5          It's -- this is referenced to in the Hadith, which are

6   the traditions or stories of the deeds and sayings of the

7   prophet Muhammad and his companions.

8          So there's this belief -- this end-of-days apocalyptic

9   belief within the Muslim tradition that Southern Yemen plays a

10  key role in this end-of-days story.

11         Anwar al-Awlaki seizes upon that and talks about

12  how -- in a sermon called *Allah is Preparing Us for Victory*.

13  God is preparing us for victory that this end-of-days battle is

14  imminent, that it's happening, and that if you don't get on

15  board now and participate in this jihad, you will lose out on

16  the one opportunity to do so, because within our lifetimes it's

17  going to happen.  And if you're not there, you won't be among

18  the best generation of Muslims who receive the highest level of

19  Paradise and the greatest rewards.

20         And so there's an imminence.  There's this idea

21  that -- and currently in Syria the Islamic State is seizing

22  upon the same idea and really leveraging it in their

23  propaganda, that you have to -- you have to participate now.

24         And this is important for any sort of recruitment or

25  mobilization.  You tell your story.  Anwar al-Awlaki tells his

1  story, how he's an American citizen and how he came to realize

2  the truth, and then he tells you how you can be a part of that

3  story, and then, to finish the sales pitch, The time is now,

4  right.

5        And this is very common for recruiting of any kind.

6  And you see it play out with this weaving in of ideology, end

7  of days, sort of apocalyptic beliefs, and the geographic

8  location of Southern Yemen.

9  Q.   You've made several references to the *44 Ways to Support*

10 *Jihad*.  With specific reference to the 40th way, did you see

11 any illustrations in the discovery that you've reviewed where

12 Mr. Bell actually did take up and adhere to the 40th way to

13 promote or to support jihad?

14 A.   There's a poem in the journal that Mr. Bell kept while in

15 Jordan that is sort of that -- that rhythmic poetic form.  So,

16 again, to me, this is -- it is emblematic of the kind of thing

17 al-Awlaki was calling English speakers to do.

18        But not only that, it shows internalization of this

19 content, a creative process, the creation of new content.  And

20 that's very different, again, from just parroting what somebody

21 else has said.  This isn't followership alone.  This is

22 engaging intellectually in a more meaningful way with the

23 content.

24 Q.   Almost to the point of immersion?

25 A.   I think he was fully immersed in this -- not only

1   mentally, but in his behaviors, that they were intimately tied.

2   Q.   So, specifically, this poem that you indicated he wrote,

3   this was while he was detained in Jordan after being arrested

4   for his visa problems?

5   A.   Yes, ma'am.

6   Q.   I want to speak and direct your attention to Bell's

7   attempts at recruiting locally here in Jacksonville.  Can you

8   point the court to some of those -- or give him some

9   illustrations of where you saw that happening?

10  A.   Well, upon -- so he engages various individuals in the

11  preparation for jihad.  So by getting them physically engaged,

12  he then has them isolated and is able to talk to them about

13  what they're doing and why they're doing it.

14        We see him sort of lecture about the crimes of both

15  the U.S. Government as well as foreign governments.  And he's

16  very -- he has no issue, sort of, talking about those two as

17  the same thing.

18        So the crimes of the United States Government are akin

19  to the crimes of the Jordanian government, or the government in

20  Yemen.  And he moves back and forth between those two very

21  easily.

22        I think in his mind they're the same adversary.  And

23  so he -- by bringing these individuals into sort of isolated

24  circumstances, like in his pickup truck or at his home, in the

25  woods, he's able to spend time with them and indoctrinate them,

1    as well as get them mentally engaged.  He involves them in

2    criminality and fraudulent behavior.

3           This is important.  He asks them to lie about his

4    return to the United States, Don't tell your parents about

5    this.

6           So he's engaging them in that dishonest behavior,

7    asking them to be a part of his business, to raise funds upon

8    his return from Jordan.  So he's engaging them in various

9    different capacities.

10   Q.   Do you see him actually applying those four factors of

11   radicalization that you've pointed out -- were applied to him?

12   A.   Yes, ma'am.  He talks about grievances.  He talks about

13   ideology.  He talks about -- well, he doesn't talk about

14   cognitive opening.  That's not something you can -- that's

15   something you take advantage of.

16          And then he mobilizes them.  I mean, they're actively

17   fundraising, traveling, preparing for, gaining lethal capacity,

18   these sorts of things.  So he's doing all the things that go

19   into the radicalization process with others.

20   Q.   You've touched on this a little bit.  But Bell's view of

21   the United States Government and foreign governments, in all

22   the discovery that you've reviewed, what, if anything, stuck

23   out -- or struck you of any significance?

24   A.   So he uses the word Taghut, T-a-g-h-u-t, to refer both to

25   the leaders of foreign governments as well as to -- in one

1   example -- excuse me, from one 302, a law enforcement officer

2   in the United States who's Muslim, who he says is not -- who's

3   not enforcing the correct law, he's enforcing this manmade law,

4   which makes him a disbeliever and an idolator, instead of God's

5   law.

6           And so the same term applied to the tyrants that run

7   Muslim countries in the Muslim world are applied to law

8   enforcement in the United States, who aren't conforming to

9   Islamic law, or enforcing Islamic law above all else.

10          The United States Government, he -- he alleges, is

11  responsible for the -- the death of innocents, the rape and

12  torture of innocents, and that it's just as bad as the Assad

13  regime in Syria.  And he makes that comparison.

14          So there are many different cases where the same kind

15  of internal weakness, excuse me, that plagues the Muslim world,

16  right -- government is not governing according to Islamic law,

17  are being sort of taken advantage of or manipulated by the

18  United States Government, which is using those as their

19  puppets, and is engaging in criminality against the Muslim

20  world in conjunction with those apostate leaders.

21          So the near enemy and the far enemy -- the United

22  States Government and these foreign governments are not

23  synonymous, but in it together, so to speak, and are both an

24  enemy.

25  Q.   Does he espouse anti-American views throughout?

1   A.   He does.  He refers to not being an American citizen.

2   Q.   Let me stop you right there.

3        MS. KOHN:  Your Honor, yesterday Exhibit A-14 was

4   introduced.  I would like to publish it now, please.  It's

5   very, very short.

6        THE COURT:  Yes, ma'am.

7      (Video played.)

8   BY MS. KOHN:

9   Q.   Is that the reference that you're referring to, that phone

10  call?

11  A.   Yes, ma'am.  At another point in time in one of the videos

12  that we saw yesterday, he and his colleagues burn an American

13  flag.  And he does not seem to -- to worry about laws in the

14  United States.

15       He talks about upon his return from Jordan engaging in

16  fraud with respect to buying and selling gold and only

17  reporting some of it, but not reporting all of it.  Theft, that

18  we discussed yesterday, of -- of sort of computer parts, these

19  sorts of things.

20       So the laws don't apply.  He's not an American

21  citizen.  The American government itself is moving towards

22  martial law.  There are references to detention camps that

23  Mr. Bell makes.

24       There's references to what I believe -- he's referring

25  to the National Defense Authorization Act, where he talks about

1    how the U.S. Government is taking away individual liberties.

2           Yesterday we heard Mr. Bell discuss how the U.S.

3    Government uses fear in order to take your weapons away from

4    you, and that once you -- you can control people through fear.

5           All of these are very conspiratorial

6    anti-government -- in fact, they're akin to a lot of the

7    rhetoric that you see from the -- the anti-government

8    right-wing movements in the United States, but a -- you know, a

9    rejection of legitimacy of government and a conspiratorial idea

10   that it's actually out to get you as an individual citizen.

11   Q.   So yesterday we heard Mr. Bell state that, My mission is

12   to establish Sharia law.  Do you remember that being played

13   yesterday?

14   A.   Yes, ma'am.

15   Q.   What, if any, significance does that hold for you?

16   A.   Again, establishing Sharia law, according to jihadist

17   ideology, means at the expense of existing rule of law.  So you

18   replace -- it's not -- in the sermon yesterday he talked about

19   how ridiculous it was that the constitution could be compatible

20   with the Islamic law, that Muslims in the United States will

21   say that the constitution, you know, lives up to or is --

22   adheres to Sharia, and that's ridiculous, that that cannot be

23   the case, in Mr. Bell's judgment.

24          So establishing Islamic law in the United States is,

25   therefore, overthrowing secular law in the United States and

1   the U.S. Constitution.

2   Q.   Yesterday we also heard reference by Mr. Bell saying that

3   the -- seeing the flags of Tawheed flying over the U.S. Embassy

4   in Egypt made him so happy.

5        Did that have any concern for you?

6   A.   Yes, ma'am.  It's the same idea of overthrowing the

7   government in Egypt and replacing it with Islamic law.

8   Q.   Bell also made a reference that he wanted to be one of the

9   1300.  Can you explain that reference to the court, please?

10  A.   Yes, ma'am.  There is another Hadith, which is a -- a

11  story of the words or deeds that Prophet Muhammad and his

12  companions -- that talks about Judgment Day and how there will

13  be a group of Muslims that will fight, and a third will be

14  martyred and receive the highest levels of Paradise, a third

15  will be victorious, and a third will sort of flee, will not

16  fight.

17       And he's referring to being a part of those that are

18  victorious, that fight in this sort of culminating battle of

19  Judgment Day.

20  Q.   With your review of your database and the other training

21  and education that you've had over the 15 years that you've

22  been studying international terrorism, can you relate to us any

23  examples of individuals who have traveled overseas and returned

24  to the United States and become violent here, traveled overseas

25  to join a terrorist organization?

```
 1  A.   Yes, ma'am.  There are examples.  There are cases, sort of
 2  very recently -- an individual from Florida named
 3  Moner Abu-Salha, A-b-u, S-a-l-h-a, went to Syria, returned to
 4  the United States, and then instead of conducting an act here
 5  in the United States, went back to Syria and, at 22 years old,
 6  was a suicide bomber on behalf of al-Qa'ida's affiliate in
 7  Syria.
 8          Prior to that you have examples -- individuals like
 9  Carlos Bledsoe, who went to Yemen, was unable to join a
10  terrorist organization there, came back to the United States,
11  and conducted a firearms attack in Little Rock, Arkansas, that
12  killed one U.S. Army recruiter and injured a second.
13          You have individuals such as Daniel Patrick Boyd, who
14  left the United States in 1988 or 1989 to fight in Afghanistan.
15  He remained there for approximately three years and then came
16  home.
17          And it looked as if nothing was going to come of that
18  until the United States occupied Afghanistan approximately ten
19  years later and he mobilized again, this time forming a cell
20  that involved some of his family members and some of their
21  friends.
22          Their first indictment was about plans to go abroad
23  and conduct terrorist attacks abroad, but a follow-on
24  indictment discussed Daniel Patrick Boyd's stockpiling of
25  ammunition in order to conduct a firearms attack against the
```

1  Quantico Marine base.

2          So even someone who was latent for a good number of

3  years and whose neighbors said things like, If he was a

4  terrorist, he's the nicest terrorist I've ever met.  He was a

5  drywaller.  He had a career and a family.  But he was mobilized

6  by a new trigger for him years later.

7  Q.   So do you see any correlation, then, between individuals

8  who may not necessarily -- or be successful at actually joining

9  a terrorist organization that stop being terrorists?

10  A.   There is no sort of empirical evidence that failing to

11  join a terrorist organization means that you'll stop trying to

12  engage in terrorist behavior.

13          It's a hard thing to track and to know scientifically.

14  But we have examples of individuals who have not joined

15  organizations, but have maintained their desire and have

16  actually, you know, followed through and conducted attacks.

17  Q.   Are there any government -- that you're familiar with, are

18  there any government de-radicalization programs in the United

19  States?

20  A.   No, ma'am.  There are community-oriented policing programs

21  that seek to prevent people from going down this path.  There

22  are some community programs that are very nascent.

23          There's no scientific evaluation of their success or

24  success rates or failure rates.  But there are no U.S.

25  Government programs for de-radicalization in the United States.

1   Q.   Do you know why that is?

2   A.   Again, there's no empirical evidence that they work.

3   There's some de-radicalization programs abroad that claim to be

4   de-radicalization programs, but actually don't engage in

5   de-radicalization.

6        And what I mean by that is that they're not actively

7   trying to change the mindset, the beliefs of the individual.

8   Instead, they're trying to get them to change behaviors.  So

9   they're disengagement programs, to get them to disengage from

10  the violent community that they were a part of.

11       In other countries, you know, governments can resort

12  to different tactics than we would use in the United States,

13  such as applying pressure to the individual with respect to

14  that family.

15       If you go off the straight and narrow, there will be

16  consequences for your family, so, you know, the kind of

17  leverage that we don't use in the United States.

18       So we don't have many good examples to follow from

19  other countries that would apply in this country.

20       THE COURT:  Is there -- are there cases in which

21  people, for lack of a better term, just change their mind and

22  decide that's not what they think anymore?  Are you aware of

23  any -- any of that?

24       THE WITNESS:  Yes, sir.  There are --

25       THE COURT:  And I know it's -- I know -- as you say,

1    it's got to probably be anecdotal.  I'm sure there's no

2    scientific studies about it.

3              But tell me what you can tell me about that.

4              THE WITNESS:  Yes, sir.  There was -- there are cases

5    of individuals who have a change of heart for some reason.  And

6    there is -- there's really not much I can say empirically.

7              There's an example of an individual who just wrote a

8    book -- his name is Morten Storm -- who had a crisis of faith

9    with respect to Muslim after converting and realized that his

10   own doubts about his religion, Islam, would make him a target

11   of the groups that he was aspiring to join.

12             And so he said, you know, This is a problem.  If I

13   can't have a crisis of faith without being killed as a result,

14   then this is not a group I want to be a part of.  So that's one

15   example.

16             There are examples from sort of white supremacist

17   movements, where people have oftentimes engaged with other,

18   what are called, formers; so former white supremacists who

19   don't judge the individual, but -- they don't judge them sort

20   of negatively from the outside, but can relate to their

21   experiences.

22             And so there are some formers that have basically

23   made -- made -- and I don't mean this in a derogatory way, but

24   made a career of being formers and then participating in

25   programs to try to get other people out of these movements.

```
 1              THE COURT:  And I -- and the only other thing I can
 2   think of -- and this is just, again, anecdotal, I understand.
 3   But you sometimes read articles about people who went over to
 4   join one of these groups, or even -- even did join one of these
 5   groups and then become disenchanted and come back, or -- or
 6   whatever.
 7              What do you know about that?
 8              THE WITNESS:  Sir, that happens as well.  I can't
 9   speak to how frequently or what percentage of cases that
10   happens.
11              But you have these very righteous ideologies.  And
12   they paint what is for the consumer somewhat of an idealistic
13   picture.  And then you get over into these environments and
14   behaviors don't always live up to ideology.  And so some people
15   get disenchanted.
16              This happens in some cases because jihadist
17   organizations -- there's sometimes infighting for petty
18   reasons.  These are human organizations.
19              And so when someone thinks that they're going to fight
20   for the Muslim community, goes over and finds out that they're
21   actually killing Muslims, including other violent jihadists,
22   that can be disenfranchising.
23              Terrorist organizations have recognized this and now
24   try to inoculate people against it, so -- there's al-Qa'ida
25   literature that says you should anticipate that some people,
```

1    even jihadists, will fall off the straight and narrow, but

2    don't let that sway your faith.  You're doing what's right.  So

3    you have to stay the course.  And don't be swayed by those

4    even, you know, in those environments that are not being as

5    righteous as they ought to be.

6            So they're trying to inoculate recruits against that

7    kind of disenfranchisement, but it -- it can happen.

8            THE COURT:  What is the -- have you noticed any

9    particular type of person or personality or background that

10   seems to be more susceptible to embracing the type of ideology

11   that you're talking about here?

12           THE WITNESS:  Sir, there actually has been some social

13   scientific work on that.  And overwhelmingly the response from

14   researchers is that there's no profile for individuals who

15   subscribe to these ideologies.  In fact, it's -- they tend to

16   be quite normal, in a psychological sense.

17           There are often -- you could often point to individual

18   triggers that may have made somebody, as I mentioned, sort of

19   cognitively open and looking for answers -- answer seeking.

20   But that happens to everyone at some point in their life.  We

21   all go through that.

22           So that's not really a common -- that's not unique --

23   just to the community of people who buy into these kind of sets

24   of ideas.

25           There's a researcher named Scott Atran, who has done a

lot of first-person interviews with suicide bombers whose
either equipment malfunctioned or who were interdicted on the
way to their target, or who had cold feet and turned themselves
in, or somehow didn't go through with the act.

And his argument is that a lot of these individuals,
when pressed in conversation, exhibit a high degree of -- of
sort of empathy.  And he calls it philanthropy.  And what he
means by that is that they feel like this is the best thing
they can do for their community.

And his research focuses more on -- on individuals
like Palestinian suicide bombers.  So there's a very specific
context there.

You have second- or third-generation young people
whose grandfather was born in that refugee camp in Jordan,
whose father was born and died in that refugee camp, and now
I'm born in this refugee camp in Jordan, and I am not going to
die here.  My life is not going to mean nothing.  It's going to
mean something, even if I have to kill myself in the process.
And so the best thing I can do, the most empowering thing I can
do for my community, is to kill myself and others in a suicide
bombing attack.

So his research is, you know, I think affected by that
sample set, but -- you know, and it doesn't really translate
across -- there's no psychological profile that translates
across the spectrum.

 1          Age ranges vary.  You have lots of individuals who are

 2    very young and you have lots of individuals who are in their

 3    30s and lots of individuals who are even older than that.  So

 4    there's -- it's very -- there's certainly no operationally

 5    useful profile for practitioners.

 6          THE COURT:  And I want to take this away from

 7    Mr. Bell's case for the moment and just make it a more

 8    hypothetical paradigm situation.

 9          If a person is ascribing to the type of ideologies and

10    radicalism that you're talking about here today, and they are

11    an American citizen, they live in the United States -- I've

12    heard you talk about how they view the government and how they

13    view other governments and so forth.

14          How do they view other Americans, just as somebody

15    walking down the street, who is not a government official, you

16    know, is a -- is an electrician, and just is an American, goes

17    about their business -- what do they -- what's the view of

18    those people?  And how do they -- what's their view of those --

19    of just everyday Americans?

20          THE WITNESS:  Sir, it differs.  But Anwar al-Awlaki

21    has made an argument that many find compelling, that democracy

22    is a religion, because you're subordinating -- you're basically

23    giving sovereignty over men to other men in Parliament, in

24    Congress, right?

25          So people -- man compromises.  They make their own

1  legislation and they enforce that upon other individuals.  And

2  that is a religious practice, because it's establishing a

3  sovereignty that belongs to God on earth.  And so he has a

4  sermon called *Democracy is a Religion*.  And it used to justify

5  attacks against civilians.

6       In addition to that, he talks about U.S. civilians

7  being taxpayers who fund military campaigns against Muslim

8  countries, that elect leaders who conduct extra legal attacks

9  against Anwar al-Awlaki -- bin Laden and these sorts of folks

10  or al-Awlaki.

11       So there's the argumentation that by participating in

12  a democracy, by paying your taxes, you're a willing participant

13  in the atrocities against the Muslim community, so that there

14  are no civilians, that no one is innocent.

15       He said in the March 2010 speech to the American

16  people that we heard at the beginning of the day yesterday that

17  America has become a country of evil, that it's through and

18  through.

19       And in this particular incident, we heard Mr. Bell

20  talk about -- how he has no -- he may use the word remorse --

21  or no sympathy for Americans who go along with this, who are so

22  easily -- you know, so easily succumb to this democracy, this

23  democratic idea.

24       I have no -- I think he said no respect -- or remorse

25  for people who are so easily sort of led along.

```
 1              THE COURT:  Ms. Kohn, I'm -- I know you've got other

 2  questions.  I think we may all be in need of a break.  So why

 3  don't -- how much longer do you think you have with the

 4  witness, especially if I don't interrupt?

 5              MS. KOHN:  Very few questions left, Your Honor.

 6              THE COURT:  All right.

 7              MS. KOHN:  A few minutes.

 8              THE COURT:  All right.  And then, Ms. Call, you're

 9  going to have some cross-examination?

10              MS. CALL:  Yes, Your Honor.

11              THE COURT:  Okay.  All right.  It's 10:25.  Let's --

12  let's take a 10-minute break, 12-minute break.  We'll be back

13  at 25 till.

14              COURT SECURITY OFFICER:  All rise.

15              THE COURT:  If you want to take a break, you can.

16     (Recess, 10:24 a.m. to 10:37 a.m.; defendant not present.)

17              COURT SECURITY OFFICER:  All rise.  This Honorable

18  Court is now in session.  Please be seated.

19     (Defendant enters the courtroom.)

20              THE COURT:  The record will reflect that all parties

21  are present, including Mr. Bell.

22              And, Ms. Kohn, you may proceed.

23              MS. KOHN:  Thank you, Your Honor.

24  BY MS. KOHN:

25  Q.  Mr. Braniff, if we could go back just one second to the
```

1    court's last inquiry about whether or not you had any examples

2    of how Mr. Bell would treat an ordinary American citizen.

3    Could you expound on that, please?

4    A.   Yes, ma'am.   Sometimes I overthink these things.   There's

5    the incident that we reviewed yesterday in preparation for the

6    mission at the cemetery, the destruction of the idols, where

7    Mr. Bell carried with him a loaded 9mm pistol and stated that

8    this is for any kuffar that may try to stop us.

9         Kuffar again means infidel.   And it's a sort of very

10   derogatory term.   Again, kuffar is someone that can be killed.

11   Their blood is licit.

12        That idea of takfir, to declare somebody an infidel,

13   is an important statement.   It's very important from what Islam

14   and the Quran would require, which is that people of the book,

15   Jews and Christians, are treated with respect, and these kind

16   of things.   And a kuffar is a dismissal of that and, instead,

17   the identification of them as an enemy.   So it's a fairly

18   obvious example of how other Americans may be considered.

19   Q.   You've had an opportunity to review the letter that

20   Mr. Bell has submitted to the court; is that correct?

21   A.   Yes, ma'am.

22   Q.   In that letter he talks about -- or he claims that there

23   were two opportunities, that they went to the border and -- two

24   times, that people suggested that instead of going and joining

25   that they go home, and yet he didn't.

1           Does that have any significance to you?

2   A.   Yes, ma'am.  Again, it's an indication of a commitment to

3   try to make this hijrah to a battlefield that, one -- it's not

4   always easy to do this, that there are examples of individuals

5   who have tried and not been able to get into terrorist

6   organizations.  So it's challenging.  You have to try to make

7   connections.  You're navigating a place you don't know.

8           But his persistence and willingness to continue to

9   make that effort, to try to find a plan B or plan C, I think

10  is an indication of the degree to which he wanted to join one

11  of these organizations.

12  Q.   And you also, I believe, reviewed the journal that he

13  wrote while he was detained in the Jordanian cell prior to

14  returning to the United States; is that correct?

15  A.   Yes, ma'am.

16  Q.   In that journal did you see any indication written by

17  Mr. Bell where he was remorseful or sorry for any of the

18  actions that he had taken thus far?

19  A.   No, ma'am.

20  Q.   Did you see any indications anywhere that he was rejecting

21  the teachings of Anwar al-Awlaki?

22  A.   No, ma'am.

23  Q.   Did you see any signs of homesickness?

24  A.   No, ma'am.

25  Q.   The second prong of al-Awlaki's teachings in the video

1   that we saw yesterday -- there was the call for hijrah.  And

2   then what was the second call?

3   A.   If you can't make the hijrah, jihad in the United States.

4   Q.   Have you seen anything in the discovery -- and I want to

5   be very specific here -- since Mr. Bell was detained in the

6   Jordanian prison, or detention cell, since coming back to the

7   United States -- have you seen anything in there that would

8   indicate to you one way or another whether Mr. Bell is

9   continuing that call to jihad?

10   A.   Yes, ma'am.  He was -- he continued to talk about ways to

11   engage in fraud to raise money.  He continued to talk about

12   isolating some of his compatriots, having them lie about his

13   return, so sort of maintaining some kind of sort of freedom of

14   maneuver, operational security, so that they can go outside of

15   those communities and communicate with one another.

16         And then there's the reference that I made earlier to

17   the use of the term Taghut, which is, again, disbeliever or

18   idolator, to refer to the sheriff who engaged with him briefly

19   after his return, where he -- Mr. Bell encouraged -- or told

20   him that he wasn't -- he was enforcing the wrong law, he should

21   be enforcing Sharia Islamic law, and, therefore, because he

22   wasn't, he was an idolator, he was not a true Muslim,

23   worshipping the wrong God, et cetera.

24   Q.   Does that also kind of go back to what the judge's inquiry

25   was about earlier, about how Bell's feelings are about

1   Americans?

2   A.   Yes.  In this case a Muslim-American, who was not the

3   right kind of Muslim.

4   Q.   Are there other indicators that you saw, such as the phone

5   calls that are in evidence, specifically B-1, where Bell makes

6   the references that there are wolves in the farmhouse, we have

7   to resort to any means necessary -- what is he referring to

8   there?

9   A.   Well, specifically in the context of the conversation,

10  he's referring to the need to lie about what they're doing.

11  "By any means necessary" means lie to your parents and lie to

12  whomever you need to lie to.

13          So there's a specific context.  The choice of phrase

14  is interesting.  "By any means necessary" is an excerpt from a

15  speech by Malcolm X that has been co-opted by the jihadist

16  community.  So there are English language jihadist propaganda

17  videos that use this repetitive clip -- audio clip from

18  Malcolm X, talking about overthrowing persecution by any means

19  necessary, by any means necessary.

20          And it's a really emotional sort of evocative clip.

21  And it's -- in that case it's a reference to violence, violent

22  jihad in the United States, to overthrow tyranny.

23          The same tyranny that was oppressing the

24  African-American community prior is oppressing the Muslim

25  community now, and we need to overthrow that tyranny by any

1  means necessary.  That's the nature of that jihadist video.

2  Q.   And he makes that reference while he's discussing building

3  the masjid in his backyard after he returns to the United

4  States, correct?

5  A.   Yes, ma'am.  And part of this is -- may also be a

6  reflection of part of al-Qa'ida's ideology, that talks about

7  separating yourself, distancing yourself from false Muslims.

8        The term is not important, but it's -- the translation

9  is unity and disavowal.  So you should only have unity with

10  those who are true Muslims and see the world the way you do and

11  should disavow all of your relationships or your engagement

12  with -- with false Muslims.

13        And so the -- you know, there are wolves in the

14  henhouse.  There are wolves at the mosque.  They betrayed us.

15  They talked to the FBI about us.  We need to separate ourselves

16  from them so we can be among the few that practice the right

17  kind of Islam.  And that's -- that's very much part of

18  al-Qa'ida's ideology.  And you see it sort of playing out in

19  behaviors.

20  Q.   You spoke earlier about the excitement that Mr. Bell

21  showed in the videos while they were still in Jordan, about

22  becoming a Sheikh and a leader and an imam.  Have you now seen

23  that come full circle on his return to the United States?

24  A.   The plan to build a masjid, which is, again, a mosque, on

25  his property is him acting out that -- creating a place in

1   which he could serve as someone who propagates jihad in the

2   United States outside of the eyes of the larger Muslim

3   community in the area.

4          So it's a -- establishing a place where he can serve

5   as a spiritual leader and prepare people both mentally and

6   physically for jihad.

7   Q.   And have you seen any indications -- the information that

8   he's gathered, the ideology, the training, the ability to

9   blow -- or to build bigger explosives, to carry a firearm and

10  utilize it, does any of that ever go away?

11  A.   The capability is there.  The -- the opportunity will be

12  present in the United States -- because we live in a free and

13  open society, there's opportunity to conduct violent attacks.

14         And he has internalized a lot of these ideas to a high

15  degree.  Whether -- I can't say, you know, what -- what his

16  trajectory will be in the future.  But he has certainly

17  internalized these ideas and has made them a part of his

18  identity, at least in the period of time that I've been able to

19  observe through discovery.

20         MS. KOHN:  I have nothing further, Your Honor.

21         THE COURT:  Ms. Call.

22                     **CROSS-EXAMINATION**

23  BY MS. CALL:

24  Q.   One of the early clerics or speakers that you spoke about

25  was an Azzam.  Is that the pronunciation?

1  A.    Yes, ma'am.

2  Q.    You mentioned that he issued a fatwa in about 1979?

3  A.    Yes, ma'am.  The -- the fatwa is in defense of Muslim

4  lands.  And I'm not -- I don't remember the exact year.  But it

5  was in reference to the Soviet Union's invasion of Afghanistan

6  which occurred in 1979.

7  Q.    And you're aware from the discovery in this case that

8  Mr. Bell was born in 1993, correct?

9  A.    Yes, ma'am.  Yes, ma'am.

10  Q.    So that would have been about 13 or 14 years before

11  Mr. Bell was even born?

12  A.    Yes, ma'am.

13  Q.    Okay.  And in the discovery you saw no information that he

14  had this fatwa or any information about Imam Azzam?

15  A.    I believe that's correct.

16  Q.    And you mentioned that one of the other events that led to

17  these -- global jihadist movement was Saudam Hussein's invasion

18  of Kuwait that happened in about 1991, correct?

19  A.    Yes, ma'am.

20  Q.    Again, before Mr. Bell was born?

21  A.    Yes, ma'am.

22  Q.    And then when we turn to al-Awlaki, you had mentioned

23  these lectures that he is famous for, correct?

24  A.    Yes, ma'am.

25  Q.    Okay.  And these lectures are published and available on

1  the Internet, correct?

2  A.   Yes, ma'am.

3  Q.   Basically, you put in a Google search, probably with

4  Anwar al-Awlaki, and they pop up, correct?

5  A.   Yes.  The same with the fatwa, in defense of Muslim lands.

6  It's one of the most widely circulated documents in the

7  jihadist world.  It's translated into about every language

8  there is.

9  Q.   And it's available on-line?

10  A.   Yes, ma'am.

11  Q.   Free?

12  A.   Yes, ma'am.

13  Q.   No registration is required, correct?

14  A.   For that content, correct.

15  Q.   And then it's downloadable, so that someone can obtain

16  that on to their own digital media, correct?

17  A.   Yes.

18  Q.   And you said that because he speaks English and because he

19  had an American background, he's masterful at crafting the

20  message, correct?

21  A.   That -- those are among the reasons that he was

22  successful.  He's also just very good at using emotion.  Where

23  a lot of other scholars are more cut-and-dry about quoting the

24  Quran or the Hadith, he's more emotional.  He tells more

25  personal stories.

1  Q.   And he had been killed in 2010, correct?

2  A.   I believe it was 2011.  But about that time period, yes,

3  ma'am.

4  Q.   Okay.  And what the downloads indicated was that Mr. Bell

5  had downloaded these videos in 2012.  So in either event, his

6  death is before Mr. Bell ever accesses the videos?

7  A.   Yes, ma'am.  This content is alive and well on-line, long

8  after the individuals are not with us.

9  Q.   Correct.  And you had mentioned that your institute of

10 studying terrorism -- and I think you defined it somewhat as

11 the use or threatened use of violence to influence the conduct

12 and policy of others.

13 A.   Yes.  It's -- I would say it's ideological violence or the

14 threat of violence in order to have a psychological impact

15 beyond the immediate target.

16 Q.   And you said that there had been something like 120,000

17 terrorist incidents since 1970 --

18 A.   Yes, ma'am.

19 Q.   -- that you were putting into the database.

20       And so when you talk about that, that could cover

21 everything from the Palestine -- Palestine terrorist attacks at

22 the Olympics in Munich, correct?

23 A.   Yes, ma'am.

24 Q.   Anywhere in the world.  So it could be the Tamil Tigers?

25 A.   Correct.  Any ideology, any location.

1   Q.    Boko Haram?

2   A.    Yes, ma'am.

3   Q.    Do you include domestic incidents, like the bombings of

4   abortion clinics or churches here in the United States?

5   A.    Yes, ma'am.

6   Q.    Okay.  And it can be intra-Islam attacks.  You mentioned

7   Shia versus Sunni, correct?

8   A.    Yes, ma'am.

9   Q.    So those 120,000 terrorist attacks are not limited to the

10  violent jihadist movement that you're talking about here?

11  A.    In no way.

12  Q.    And you said that one of the things that leads the

13  radicalization is some grievance that someone perceives,

14  correct?

15  A.    That is often a part of the radicalization story.  It

16  doesn't necessarily have to come first.  And so if I -- I don't

17  believe I said that.  But if I did, I shouldn't have.

18          There certainly are instances where someone will have

19  an older brother that they follow or admire, or a friend that

20  they love, even a significant other, a romantic relationship,

21  and they'll mobilize into that environment, and along the way

22  they'll identify what it is that they're fighting for.  So

23  there are lots of different trajectories.  But, yes, grievance

24  is typically a part of that story.

25  Q.    And one that you talked about was both from Anwar

1    al-Awlaki and Mr. Bell's videos, these concentration camps for

2    Muslims in the United States, correct?

3    A.    The threat of them being established, because eventually

4    the United States is going to turn on its Muslim communities.

5    Q.    Correct.  Because there aren't any concentration camps in

6    the United States for Muslims?

7    A.    Correct.

8    Q.    And when you indicated for Ms. Kohn what you had reviewed

9    in this case, it was the paper discovery and the video and

10   audiotapes that we've talked about here, and yesterday,

11   correct?

12   A.    Yes, ma'am.

13   Q.    Because you've never met Mr. Bell in person, correct?

14   A.    Correct.

15   Q.    Until yesterday you had never seen him live and in person,

16   correct?

17   A.    Correct.  Correct.

18   Q.    And what we're talking about are all of these things that

19   happened -- the discovery yesterday, the videos, are June to

20   October of 2012, correct?

21   A.    Yes.  I believe that's correct.

22   Q.    And the travel was from September 25th to November of

23   2012 --

24   A.    I think --

25   Q.    -- correct?  And that's two years ago, right?

```
 1  A.    Yes, ma'am.

 2  Q.    And at the time of Mr. Bell's travel, he was 18 years old?

 3  A.    Yes, ma'am.

 4  Q.    And you were aware that there was another person traveling

 5  with him?

 6  A.    Yes, ma'am.

 7  Q.    Were you able to also review those interview forms with

 8  the juvenile?

 9  A.    I was -- I did not review enough of that content, except

10  for what was in the videos, the phone calls, and the

11  transcripts provided.

12  Q.    And you indicated yesterday that this is your first time

13  testifying in a court proceeding, correct?

14  A.    Yes, ma'am.

15  Q.    It appears from some statistics in the sentencing

16  commission that there were five cases in fiscal year 2013 that

17  were filed under this same charge.

18        Were you involved in any of those cases?

19  A.    No, ma'am.

20  Q.    And if I can turn back to talking a little bit about the

21  juvenile, too, you were aware from reviewing the discovery that

22  Mr. Bell had never traveled overseas before this time in

23  September of 2012?

24  A.    Yes, ma'am.

25  Q.    Okay.  In fact, you knew he had to apply for a passport to
```

1  go on the trip?

2  A.   Yes, ma'am.

3  Q.   That he did not speak Arabic; is that correct?

4  A.   Yes, ma'am.

5  Q.   Okay.  And that while he was overseas he had money stolen

6  from him while he was in Jordan, correct?

7  A.   Yes, ma'am.

8  Q.   And there was a juvenile who traveled at the same time,

9  correct?

10  A.   Yes, ma'am.

11  Q.   And you were aware that that person was from the Middle

12  East, correct?

13  A.   Yes, ma'am.

14  Q.   That he spoke Arabic?

15  A.   Yes, ma'am.

16  Q.   And that the juvenile related that he had become more

17  involved in his faith before he ever met Mr. Bell, correct?

18  A.   Yes.

19  Q.   And that, in fact, when he first met Mr. Bell at the

20  mosque here in Jacksonville, he helped convert him to Islam?

21  A.   Yes.

22  Q.   That when he and Mr. Bell traveled overseas, the juvenile

23  arranged for them to stay with family members in Jordan,

24  correct?

25  A.   Yes.

1  Q.   So he was the first to arrange for -- for their housing

2  when they were overseas?

3  A.   Yes.

4  Q.   That after Mr. Bell had his money stolen, it was the

5  juvenile who offered to pay for travel tickets so they could

6  continue, correct?

7  A.   Yes.

8  Q.   And that when Mr. Bell suggested, as you were talking

9  about, staying behind for a few months, finding a wife, and

10  making some money, it was the juvenile who suggested travel to

11  Oman to enter Yemen, correct?

12  A.   Yes.

13  Q.   And then when they actually obtained tickets to Oman, they

14  turned those tickets back in, correct?

15  A.   I believe that is correct.  And I -- I believe it was --

16  Q.   And they obtained a second set of tickets to Oman and

17  turned those back in, correct?

18  A.   Yes.

19  Q.   And then you were aware that after the juvenile came back

20  he was interviewed some other times by the FBI, correct?

21  A.   Yes.

22  Q.   And that Mr. Bell had been detained on some state charges

23  in about January of 2013, correct?

24  A.   Yes, ma'am.

25  Q.   And that this interview with the juvenile is then about

1   seven months later, in August of 2013, correct?

2   A.   Yes, ma'am.

3   Q.   And that he's questioned at that point about what he feels

4   about jihad and violent jihad, correct?

5   A.   Yes, ma'am.  I'm less familiar with those interviews.

6   Q.   Okay.  But at that time, this now 17-year-old says that he

7   still believes in that and would go back overseas to fight.

8            Were you aware of that?

9   A.   Yes, ma'am.

10  Q.   So that would be a person who believes in true Islam,

11  correct?

12  A.   Yes, ma'am.

13  Q.   And when you talked about the cemetery incident as the

14  destruction of idols and one of the duties that Mr. Bell saw

15  himself undertaking -- do you recall testifying about that?

16  A.   Yes, ma'am.

17  Q.   And that incident happened in about July 4th of 2012,

18  correct?

19  A.   Yes, ma'am.

20  Q.   The travel, though, wasn't until September of 2012,

21  correct?

22  A.   Correct.

23  Q.   So no other steps were taken by Mr. Bell to destroy idols

24  in those three months?

25  A.   The planning -- I'm not sure when the planning for the

1  other attacks took place, but --

2  Q.   There was no other --

3        MS. KOHN:  Objection, Your Honor.  Could he be allowed

4  to finish what he was saying?

5        THE COURT:  Yes, ma'am.

6        Go ahead, sir.

7        THE WITNESS:  There was no other missions to go to

8  striatals after that.  That's correct.

9  BY MS. CALL:

10 Q.   And you mentioned Mr. Bell's attempts to isolate others.

11 No one ever lived with Mr. Bell, correct?  Were any of these

12 people that he talked to through the mosque or through the

13 community ever staying with him?

14 A.   Not to my knowledge, ma'am.

15 Q.   So they lived at their own homes, correct?

16 A.   Presumably, yes, ma'am.

17 Q.   They worked or went to school on their own, correct?

18 A.   Yes, ma'am.

19 Q.   So most of the day they were apart and separate from

20 Mr. Bell, correct?

21 A.   Yes, ma'am.

22 Q.   And there's a lot of discussion on the tapes about

23 statements that sound controversial.  And you were talking

24 about some of them -- someone saying, That's not my president.

25       Do you recall those statements on the tape?

1  A.    Yes, ma'am.

2  Q.    Unfortunately there's a lot of political debate today that

3  talks about that same idea, correct?

4  A.    Yes, that is correct.

5  Q.    Have you heard of people who say that President Obama is

6  not a natural-born citizen and is an illegitimate president?

7  A.    Yes, ma'am.

8  Q.    And that's mostly a right-wing position saying that he

9  should not be President, correct?

10  A.    Yes, ma'am.

11  Q.    And burning the flag -- although it's abhorrent to a lot

12  of people, it's constitutionally protected speech, correct?

13  A.    Yes, ma'am.

14  Q.    And when Mr. Bell talked about working under the table,

15  it's not unheard of to underreport one's cash income, correct?

16  A.    That's correct.

17  Q.    I wouldn't say that you've done this, but perhaps you've

18  heard of it?

19  A.    Right.  Yes, ma'am.

20  Q.    Okay.  And the debate about taking away individual

21  liberties since 9/11 and the Patriot Act, there's been debate

22  from both sides about where the limits of government are,

23  correct?

24  A.    Yes, ma'am.

25  Q.    Okay.  So these are all political statements that are in

1  the public realm?

2  A.   Yes, ma'am.  And taken in isolation, they would just be

3  political statements.  But married with a series of escalating

4  behaviors and a travel abroad to join a terrorist organization

5  that killed more people in 2012 than every other terrorist

6  organization in the world, but to -- dating back to 1970

7  changes the constellation of the picture.

8  Q.   Well, Mr. Bell killed none of those people, correct?

9  A.   Correct.

10  Q.   And the juvenile didn't kill anyone, correct?

11  A.   Correct.

12  Q.   And you said there was nothing in the journal to indicate

13  that Mr. Bell had reconsidered or was rethinking anything,

14  correct?

15  A.   Yes, ma'am.

16  Q.   Okay.  Were you aware on page 49 -- it starts out

17  saying -- handwritten in the top is Jordan prison.  Here again

18  awake in my bed, another long night, and no time to rest the

19  head.  It's the reflect moment to give remembrance and thanks

20  and praise for what I know -- for I know not what will happen

21  in these next few days.  Back to America or here to stay, the

22  question has run through my head day after day.  It's the will

23  of Allah.  So calm I remain.

24       So there's no certainty in what Mr. Bell believes will

25  happen next, is there?

 1          MS. KOHN:  Your Honor, may we ask that the last line

 2    be read, so that the witness can answer the question in full

 3    context of what --

 4          THE COURT:  I'll let you do that on redirect.

 5          Go ahead, Ms. Call, unless you want to do it

 6    voluntarily.

 7    BY MS. CALL:

 8    Q.   Here I remain -- wait.

 9          But calm I remain.  But here tonight, as I see faces

10    covered or turned from the light, I will invoke Allah -- Allah

11    to bring forth wrong from right.

12          Is that the complete rest of the line?

13          THE COURT:  He probably doesn't know.  But he'll take

14    your word for it if it was.

15          All right.  And what's your question?

16    BY MS. CALL:

17    Q.   You indicated that Mr. Bell had expressed no doubt or --

18    it came across to me that you were saying he had no doubts or

19    reflection about what was happening.

20    A.   He didn't evidence a change of heart or that he wanted to

21    come back to the United States, he wanted to return home, or

22    wanted to sort of change the path that he was on.

23          And that poem reflects a common saying, that, you

24    know, it's basically -- it's up to God to decide what happens

25    next.  It's -- God willing, these kinds of ideas that, you

1  know, many -- many religious people have, is that, you know, we

2  don't really control what happens, that only God knows.

3  Q.   Okay.  And you were talking about his discussion with the

4  JSO officer.  You were aware that that happened in January of

5  2013, correct?

6  A.   Yes, ma'am.

7  Q.   And that he -- Mr. Bell had turned 19 in December of 2012,

8  correct?

9  A.   Yes, ma'am.

10  Q.   And that's been about 18 months ago?

11  A.   Yes, ma'am.

12  Q.   When you were discussing other similar instances -- and I

13  guess part of it is the concern that there's some future

14  dangerousness involved.  When you discussed the Florida man who

15  went overseas, that happened within the last few months,

16  correct?

17  A.   Relatively recently.  I actually don't, off the top of my

18  head, remember the dates.  But it's a recent -- within the last

19  year, certainly.

20  Q.   Okay.  And Mr. Bell has been detained since January of

21  2013.  So it would be while he was in custody?

22  A.   Yes, ma'am.

23  Q.   And you said -- I guess part of the debate, and the

24  questioning that -- some of the things that the judge asked --

25  the institute that you work with is studying terrorists and

1  behavior and the actions that actually tend to be successful in

2  their terrorist behavior, correct?

3  A.    Not necessarily.  We also have studies on failed and

4  foiled plots, as well as counterterrorism responses and these

5  sorts of things.  So it's not just successful attacks.

6        The global terrorism database that I mentioned does

7  have a -- an inclusion threshold that says that the attacker

8  has to be at least what we would say is out the door, so on the

9  way to conduct an attack.

10       So if a plot was foiled a year before that operation

11 began, it would not be in the global terrorism database, but it

12 would be in other data sets that we maintain.

13 Q.    And so if someone doesn't get out the door, so to speak --

14 if they're thinking or if they've joined or -- or planned

15 something, but taken no action, they're not going to be part of

16 your data set and your study, correct?

17 A.    That one data set, that is correct.

18 Q.    Okay.  And so when someone -- you're not necessarily

19 studying the people who have renounced or reconsidered their

20 actions or their thoughts, correct?

21 A.    Not necessarily.  We have researched ongoing -- that look

22 at various disengagement or de-radicalization programs abroad.

23 So that includes populations that may or may not claim to have

24 disengaged from the actions or the beliefs.

25       We do interviews -- a lot of ethnographic interview

1  work with individuals in the United States, formers that I

2  mentioned, that is more in the -- the right-wing extremism

3  side.

4         So when we have access to that -- to people we can

5  talk to about that, we absolutely do.  It's just a challenging

6  thing to get access to.

7  Q.   Because one's faith or belief is not part of their fixed

8  personality, correct?  You are able to change your mind and

9  reconsider things, correct?

10 A.   Yes.  Correct.

11 Q.   And the person you are at 18 doesn't mean that that's the

12 person you are throughout your entire life?

13 A.   Correct.

14 Q.   And you said that the government here has no

15 de-radicalization programs, because there's no way to put

16 pressure on families.  Are you aware that part of the sentence

17 here could be fashioned to include supervised release?

18 A.   Yes, ma'am.

19 Q.   And supervised release would be a way that Mr. Bell

20 remains under the court's supervision or review for some

21 period, correct?

22 A.   Yes, ma'am.

23 Q.   And that could include the requirement that he maintain a

24 stable residence and stable employment, correct?

25 A.   Yes, ma'am.

```
 1   Q.    And that he report in periodically, correct?

 2   A.    Yes, ma'am.

 3   Q.    Okay.  And so that is a way not to put pressure on his

 4   family, but to put pressure on him, to monitor his behavior,

 5   correct?

 6   A.    Yes.

 7             MS. CALL:  Your Honor, may I have a moment?

 8             THE COURT:  Yes, ma'am.

 9        (Counsel confers with defendant.)

10             MS. CALL:  No other questions, Your Honor.

11             THE COURT:  Redirect?

12             MS. KOHN:  Nothing, Your Honor.

13             THE COURT:  Sir, I wanted to ask you a question.  You

14   said you read Mr. Bell's letter that he wrote to me that I -- I

15   just received it a few days ago.  I'm not sure when it was

16   written.  But you're familiar with what I'm talking about?

17             THE WITNESS:  Yes, sir.

18             THE COURT:  And I'm going to ask you a question.  I

19   recognize that -- I recognize that your answer is going to be

20   your answer.

21             I'm not necessarily asking you to be an expert on what

22   I'm going to ask you, nor am I -- and I'm saying this not for

23   your benefit but for the record's benefit, nor am I going to

24   put undue weight on your answer.

25             But I just am looking for any help I can get here.
```

1   And so, as you know, Mr. Bell, in this long letter to me -- I'm

2   going to read you a portion of what he said.

3        And I just wanted to find out what your -- given your

4   training and the things you're thinking about and studying,

5   what your reaction to it was.

6        He says, Upon returning home, I realized I hurt the

7   ones I hurt most by leaving.  Words cannot express the remorse

8   and regret I feel for my actions.

9        And I'm slightly paraphrasing.

10        I now look back at everything I did before my trip and

11   during my stay in Jordan and see how seriously I had gotten out

12   of hand.  All what we did in the videos, the videos themselves,

13   all the statements I made, seemed like fun and in some way very

14   righteous -- some way very righteous at the time.  I was

15   oblivious to the consequences and serious nature of the crimes

16   I was committing.  I believed all of what I was doing would

17   please God, but my thoughts and actions were really something

18   dark and twisted, far from the love that God has.  I was

19   ignorant to all the warnings friends and families gave and

20   arrogant in that I never considered myself or the ones I

21   followed to be wrong.  My intentions upon returning home are

22   still the same today.  I'm going to further my education and

23   shoot for an MBA, to be here for my family physically and

24   emotionally, to get back to my computer business, and put real

25   effort in establishing a legal and credible business, to

1   re-establish friendships I've neglected, and the best that I

2   can be for the woman I love.  I realize I'm responsible for my

3   actions and it shouldn't go unnoticed.  The damage is done to

4   the cemetery.  And all my actions and intentions leading up to

5   and during my stay overseas were wrong and foolish and is why I

6   have pled guilty.  I never intended to hurt my family and cause

7   all of this to happen.  I really never considered the

8   consequences at all.  I was ignorant to all harm I was causing.

9   And I have no excuse to present to you as to why I did it.

10  Maybe it was because I was looking for purpose in life,

11  somewhere that I could fit in.

12          And he goes on to say about how long he spent in

13  prison and it's caused him to rethink his situation.  But I

14  think that's the gist of what I wanted to ask you about.  He

15  says, for example, At the time I didn't realize how much of a

16  blessing having freedom to do is.  I clearly do now.

17          I'm still learning to -- how to be a man and grow past

18  thinking like a child, so -- and you did read this letter?

19          THE WITNESS:  Yes, Your Honor.

20          THE COURT:  So in the context of your training, your

21  experience, and the context of the review you had of this case,

22  what were your reactions -- and I know you've never met

23  Mr. Bell, and neither have I.

24          But what was your reaction -- what context did you

25  place this letter in as you were reviewing the matter?

1          THE WITNESS:  Your Honor, it's a challenging question.

2          THE COURT:  It's -- it is a challenging question.  And

3     it's one I'm going to have to answer.  And so I'm looking for

4     any help you can give me.

5          And I'm -- it's going to have to be my decision.  So

6     don't feel the burden of it.  You tell me what you think and

7     I'll figure out what to do with it.

8          THE WITNESS:  Yes, Your Honor.  So a few things.  The

9     idea of not understanding the consequences struck me as

10    inconsistent with much of what we saw.

11         And through the discovery process there was a lot of

12    talk about if people saw what we were doing now they would call

13    us terrorists, they'd refer to us as the Taliban, and these

14    kind of things, they'd throw us in prison, fingerprint us,

15    et cetera.  It didn't strike me as naive with respect to the

16    consequences of what he was doing.

17         With respect to entertainment, filming the videos for

18    entertainment, there are a few moments during the discovery --

19    or a few aspects of discovery where he talks about the goal to

20    disseminate this as content that could be found on-line to

21    inspire others to follow suit.

22         And I'm reminded specifically of the moment in his

23    longer sermon at the end of yesterday's discussion where he is

24    talking about a comedian who was making light of Islam and how

25    God made this comedian funny.  And he says, If God made you

1    funny, God made me stern.

2         And it -- that video doesn't strike me as

3    entertaining.  Some of the other videos with the other

4    individuals, there are moments where they are engaging in

5    laughter and joking and those kind of things.

6         That's part of the appeal of jihadist groups, is that

7    they're empowering to young people.  They're adventurists.  To

8    me that doesn't take away from the purpose of those groups or

9    what they're about.  It's -- that's -- part of that

10   socialization with other like-minded individuals and the

11   ability to -- to have a relationship with people is part of

12   recruitment radicalization, mobilization, and, frankly,

13   retention into organizations.

14        We talked a little before about people who get

15   disenfranchised and leave.  You also have the exact opposite,

16   which is people find a community that they participate in for

17   the rest of their lives, that there are individuals who sort of

18   go from conflict zone to conflict zone because that's what

19   they -- that's what their identity is and that's what they're

20   about.  And that happens through camaraderie.

21        And so I don't know that you -- and I know this sounds

22   strange, but that you have to sort of say, Well, if it was

23   entertaining, it couldn't have been serious.  I think that's a

24   false dichotomy, that you can entertain one another in a

25   serious pursuit.

1        I just think about my time as an officer and a soldier

2  and gallows humor is part of what you do, you laugh at the

3  worst circumstances when you haven't slept and it's raining and

4  you -- you know, you're hungry, and all these things.  You make

5  jokes about it.  And it doesn't mean you're not serious about

6  your intentions and what you signed up to do.

7        With intentions -- with respect to his intentions to

8  set up an honest, legal, and credible business, I think that

9  upon his return we heard him make statements to the contrary,

10  about engaging in fraudulent behavior, whether or not it's a

11  serious fraud, it's a criminal act, it's not honest or legal.

12        And then -- I jotted down prison to rethink, but I

13  don't remember what I was going to say.

14        THE COURT:  In order to -- in order to write what he

15  wrote me, would he not be having to -- if it was sincere --

16  let's assume it was sincere.

17        Would he not be having to renounce the principles that

18  he was espousing in the other materials we saw?  Is there any

19  way to be consistent with the ideologies and the way of life he

20  was espousing and to write -- to write these words and to mean

21  them?

22        THE WITNESS:  Sir, if he's sincere, I think that is

23  largely true.  I'd probably have to think about it.  But on the

24  surface of it, I think that if this is sincere, then that is

25  largely true.

1          Unfortunately we also have in the discovery him

2    encouraging people to lie by any means necessary in order to

3    continue propagating jihad.

4          THE COURT:  Right.  And that's the other possibility,

5    is it not, that this is an effort to say what needs to be said

6    in order to achieve a goal?

7          THE WITNESS:  Yes, sir.

8          THE COURT:  And that the -- and that he still believes

9    what he believed before, but he knows in order to -- in order

10   to further his work, he's got to say things that are going to

11   be appealing to a federal judge who's got to decide what his

12   sentencing is?

13         THE WITNESS:  Yes, sir.  That's true.  There's

14   actually a concept that jihadist groups use in certain

15   circumstances.  I don't make too much of it, because it has

16   been used by those who would just accuse all Muslims of being

17   liars and all Muslims as being violent.

18         And so it's been used as a tool by people who are

19   anti-Islamic.  But there's a term called taqiyya -- I

20   apologize -- t-a-q-q-i-y-y-a -- it might have one Q.  And it

21   translates as pious dissimulation.

22         So in order to protect your physical well-being, your

23   life, you're allowed to allowed to lie if it advances -- if the

24   ends justify the means.

25         THE COURT:  Even though -- even though the -- what I

1    was really wondering is if you really believed what you were

2    saying on the tapes, and if you really followed this other

3    fellow, and really believed it, would you even be able to utter

4    these words that are in this letter?

5         Would you be able to actually -- if somebody put a gun

6    to your head and said, I want you to read this statement and

7    say that you're -- you know, you're renouncing this and say you

8    want to get your MBA and say you want to do this, would you be

9    able to do it?

10        THE WITNESS:  So there are examples historically in

11   modern history of both, of people who use their trial as an

12   indictment of the regime, that they don't back down whatsoever

13   and they stick to their guns and they just say, I'm going to go

14   to jail, but I'm going to use it as an opportunity to make my

15   point, and then there are others who have had no issue

16   whatsoever lying to get back into the fight or to -- to gain

17   advantage.

18        Ali Muhammad is an example of an al-Qa'ida operative

19   who served in the United States Army, was an informant for the

20   intelligence community, all the while was stealing classified

21   documents and giving them to al-Qa'ida, U.S. doctrines.

22        He worked at the Kennedy Special Warfare School and

23   was stealing classified material and giving it to al-Qa'ida.

24   So you have both examples historically.  And it's a hard thing

25   to know.

         1              THE COURT:  Thank you, sir.

         2              Is there anything else on this point that you -- that

         3    I didn't give you a chance to say?

         4              THE WITNESS:  Sir, I mean, only that there is a --

         5    sort of a record of lying over time that has been established.

         6    There has not been a record of telling the truth over time

         7    that's been established yet.  That's it.

         8              THE COURT:  All right.  I will entertain questions

         9    from counsel based on my questions.

        10              Ms. Kohn?

        11              MS. KOHN:  I have nothing, Your Honor.

        12              THE COURT:  Ms. Call?

        13              MS. CALL:  No, Your Honor.

        14              THE COURT:  Okay.  Stay right there, because I assume

        15    you're going to jet off somewhere.  Let me make sure I don't

        16    have any other questions for you.

        17              This probably doesn't have directly to do with

        18    Mr. Bell, but it's just a matter -- I'm trying to put these

        19    things into context.

        20              Do you have any way to know or to judge how many

        21    people like Mr. Bell there are in the United States?  I mean,

        22    are there -- are there hundreds of people who are doing the --

        23    making the kind of videos and -- and making the kind of

        24    statements and traveling, whatever?

        25              Are there ten of them?  Are there a hundred of them?

1   Are there a thousand of them?  Or do we have any way to know?

2         THE WITNESS:  Sir, so there's what the intelligence

3   community has told us in open sources, which is that there are

4   around 100 individuals who have voiced that they would like to

5   go abroad to join the current fight in Iraq -- Iraq and Syria.

6   And about ten have tried, you know, have actually tried.

7         That's over a period -- a relatively recent period of

8   time.  The CIA open source numbers for foreign fighters from

9   the West who have gone to join the fight in Iraq and Syria is

10  in the many thousands, 15,000 or so, coming from Western

11  Europe, the United States, et cetera.

12        THE COURT:  Do you know how -- when they break that

13  out -- when you say open source, obviously, you're not going to

14  tell me anything that's classified and I'm not asking you to

15  tell me anything that's classified.

16        But do they break that down by country?

17        THE WITNESS:  Yes, sir.  And so the hundred would

18  be within -- so the ten or so would be within that huge number.

19        THE COURT:  Okay.

20        THE WITNESS:  So we have a database on individual

21  radicalization in the United States.  And there are several

22  hundred individuals in the United States that we've identified

23  in open media sources, who have radicalized to the point of

24  material support or violent action in furtherance of a

25  terrorist movement or organization, so several hundred.  And

1    that's going back considerable -- you know, as far back as we

2    can find open source material on.  So modern history I think is

3    fair.

4         THE COURT:  Okay.

5         THE WITNESS:  There's a fundamental difference

6    currently now in foreign fighter mobilization than even in

7    2012.  There have been new social media platforms that have

8    been created which allow for individuals to communicate

9    directly to individuals who are in the fight, without going

10   through any gateways, no hierarchical, you know, leader of a

11   terrorist organization.  No one has to let you in any longer.

12        So now, because of things like Instagram, I, as an

13   individual mujahid, fighting in Syria, can take pictures of the

14   things that I've just done on the battlefield, post it to my

15   own personal websites, social media platforms.

16        Somebody else in the United States is a follower, can

17   identify that person, follow them, sort of their own personal

18   hero, role model.

19        And then you can talk to them on other social media

20   platforms, like Kick, Surespot, or Ask.fm, that allow for some

21   degree of encrypted conversation.

22        So I can now talk to you specifically and ask you how

23   you got there, what route did you take, what do I bring with me

24   when I come?

25        And you're not the commander of this organization.

1    You're just another soldier fighting on the ground.  And I want

2    to be like you.

3           And so we've had individuals mobilize much more

4    readily now than even a few years ago, because of advances in

5    social media.

6           And groups like the Islamic State have been very savvy

7    about taking advantage of those changes in context.  So with

8    porous borders in Turkey, the ability to do this kind of

9    individual communication, foreign fighters -- we're seeing a

10   greater flow of foreign fighters into Iraq and Syria now than

11   we've seen in any past jihadist conflict.

12          THE COURT:  Okay.  Anything else for this witness?

13          MS. KOHN:  No, Your Honor.  And, actually, his flight

14   isn't until much later today, so...

15          THE COURT:  That's fine.  I just -- you know, I just

16   wanted to try to think of everything before I let him go.

17          Anything else, Ms. Call?

18          MS. CALL:  No, Your Honor.

19          THE COURT:  Okay.  Thank you for your time, sir.

20          THE WITNESS:  Thank you, Your Honor.

21      (Witness excused.)

22          THE COURT:  All right.  What says the government?

23          MS. KOHN:  We'd like to call our last witness.  It

24   should be very short or very brief, Detective Mana.

25          THE COURT:  Okay.  Come on up.

```
 1              MS. KOHN:  Detective Mana.  Sorry.

 2              DETECTIVE MANA:  Good morning, sir.

 3              COURTROOM DEPUTY:  Please remain standing and raise

 4    your right hand for me.  Do you solemnly swear that the

 5    testimony you are about to give before this court will be the

 6    truth, the whole truth, and nothing but the truth, so help you

 7    God?

 8              THE WITNESS:  I do.

 9              COURTROOM DEPUTY:  You may have a seat.

10              MS. KOHN:  May I proceed, Your Honor?

11              COURTROOM DEPUTY:  May I just have you state your name

12    for the record, please, and spell your name for the record.

13              THE WITNESS:  Nassim Mana, M-a-n-a.

14              THE COURT:  You may proceed.

15                NASSIM MANA, GOVERNMENT'S WITNESS, SWORN

16                           DIRECT EXAMINATION

17    BY MS. KOHN:

18    Q.   Detective Mana, how are you employed?

19    A.   With the Jacksonville Sheriff's Office.

20    Q.   How long have you been with the Jacksonville Sheriff's

21    Office?

22    A.   About five-and-a-half years.

23    Q.   Would you tell us about the training that you've received

24    to be a detective, please?

25    A.   Yes, ma'am.  I'm -- I'm certified in Florida as a law
```

1   enforcement officer.  I was hired at a paid class with JSO, so

2   I had to go through the academy and become a certified law

3   enforcement officer.

4   Q.   What are your duties as a detective with the Jacksonville

5   Sheriff's Office?

6   A.   I work with the intelligence unit.  And we are the liaison

7   for other local, state, and federal agencies.  We investigate

8   any threats and bomb incidents in this county.  We investigate

9   a variety of crimes, such as hate crime, or any other threats

10  to critical infrastructures.

11  Q.   As part of your duties, sir, did you investigate

12  allegations of some computer thefts that occurred at the Pecan

13  Park Flea Market back in 2012?

14  A.   Yes, ma'am.

15  Q.   Can you just briefly tell us what you found or what you

16  did as part of that investigation?

17  A.   Yes, ma'am.  Initially this call started as a bomb

18  call-out.  We had an off-duty officer who came into the

19  intelligence unit.  He advised us that the manager, slash,

20  owner of the Pecan Park -- he was trying to vacate a booth.

21         And evidently Mr. Bell owned a booth at the Pecan flea

22  market and he was behind in his rent and he hasn't shown up.

23  And he had -- the owner had a binding contract with the

24  vendors.  And when they abandon such property, the vendor --

25  the owner has the right to go in and vacate the property so he

1    can rent it out.

2           However, in the process of doing so, he was -- he was

3    approached by another vendor named Daniel Farmer, who advised

4    him that Shelton Bell has explosives inside his vehicle, also

5    inside his booth.  So at that point we had to call the -- the

6    bomb squad to make sure we safeguarded lives and property.

7    Q.   And to be fair, no explosives were found, correct?

8    A.   Correct.

9    Q.   As part of that cleaning out the -- his booth, or finding

10   that his booth was -- was cleaned out, did you become involved

11   in the actual theft investigation of -- the allegations of

12   theft investigations involving some computers?

13   A.   Yes, ma'am.

14   Q.   And what did you do?

15   A.   We contacted all the -- the initial complainants, slash,

16   victims.  And they all have advised that they dropped off their

17   either laptops or desktops to be fixed.  And either they were

18   given the runaround or they were never able to pick their

19   computers back up.  That's one part of the investigation.

20          The other part was we had a vendor who -- who gave

21   Mr. Bell $4500 to invest in a -- in some computer business, to

22   purchase of a pallet of refurbished computers, and -- and that

23   particular victim was defrauded of $4500 and never got them

24   back.

25   Q.   So let me back you up just one step.  The people that you

1  interviewed, in terms of dropping off their computers, at whose

2  booth were they dropping them off?

3  A.    Mr. Bell's booth.

4  Q.    And the runaround or the stories that they were being

5  given, who was giving them those stories?

6  A.    Mr. Bell.

7  Q.    Okay.  Eventually were charges filed against Mr. Bell?

8  A.    It was several counts of grand theft.  And then later on

9  it was enlarged to a scheme to defraud.

10  Q.    As a result of those charges, were you involved in the

11  actual arrest of Mr. Bell?

12  A.    Yes, ma'am.

13  Q.    And when did that arrest occur?

14  A.    That was January 29th, 2013.

15  Q.    Did you have any information regarding where Mr. Bell had

16  been prior to your arrest in 2013?

17  A.    Yes, ma'am.

18  Q.    Where was he?

19  A.    He was overseas.

20  Q.    Okay.  When you interviewed Mr. -- well, after you

21  arrested Mr. Bell, did you have an opportunity to interview

22  him?

23  A.    Yes, ma'am, I did.

24  Q.    And give him his *Miranda* rights?

25  A.    Correct.

1  Q.   Through the course of the interview -- and I don't want to

2  get into what that interview was all about.  But at some point

3  was there an exchange about you both sharing the same religion?

4  A.   Yes, ma'am.  I was trying to establish rapport to make him

5  feel at ease.  So I advised him that I was Muslim.

6  Q.   Let me back up one second.  Do you see Mr. Bell in the

7  courtroom today?

8  A.   Yes, ma'am, I do.

9  Q.   And would you point to him and tell us what he's wearing,

10 please?

11 A.   Yes.  He's wearing the red jumpsuit.

12      MS. KOHN:  Your Honor, may the record reflect the

13 witness' identification of the defendant?

14      THE COURT:  Yes, ma'am.

15      MS. KOHN:  Thank you, sir.

16 BY MS. KOHN:

17 Q.   So Mr. Bell knew that you were a Muslim, as well?

18 A.   Correct.

19 Q.   Tell us what happened after you left the interview room.

20 A.   Yes, ma'am.  After I concluded the interview room, I was

21 about to walk into the PTDF, the predetention facility center,

22 to -- for booking.  At that point that was -- a conversation

23 took place between myself and Mr. Bell.

24 Q.   Who initiated the conversation?

25 A.   He did.

1  Q.   And what was his mood at this point?

2  A.   He was -- he was serious.  He was serious.

3  Q.   What was the conversation?

4  A.   He stated to me -- he uttered -- he said, You should be

5  representing the law of Allah, which -- and then he further

6  added, There is -- there's more law.  And it's the Sharia law.

7        So I was puzzled and asked him, What do you mean by

8  that?  And he said, Well, you're Muslim, and you represent the

9  wrong law with that badge, referring to my JSO badge.  He said,

10 I said the same thing to the Jordanian authorities.

11 Q.   The Jordanian authorities?

12 A.   Yes, ma'am.

13 Q.   Okay.

14 A.   At that point I disagreed with him and he called me

15 Taghut, which is disbeliever.

16 Q.   Let me stop you there.  Is that -- was that insulting to

17 you?

18 A.   Absolutely.

19 Q.   Why is that?

20 A.   Because it's against my values and principles.

21 Q.   And when he said -- made the comment about you're serving

22 the wrong badge -- or representing the wrong law with that

23 badge, what did that mean to you?

24 A.   Well, again, I asked him what it is.  He referred to

25 Sharia law, which is the Islamic secular law.

Q.    And how does that differ from the law that you're

enforcing with the badge?

A.    Well, absolutely.  The -- it's totally against the

constitution, because it restricts freedom of religion, freedom

of assembly, freedom of speech.  The secular law only engages

in one religion, which is the Muslim religion.

Q.    Okay.

A.    So that led me -- I'm sorry.  That led me to believe that

he does not believe in the U.S. Constitution.

Q.    Okay.  After -- after he had called you a disbeliever,

what happened next?

A.    Well, at that point -- when he called me Taghut, we

further walked into the PTDF, and he stated -- and I asked him,

When did you convert to Islam?  And he said, Two years ago.

        At that point, after a long pause, he looked me in the

eye and said, Think about it.  Why do you think I went

overseas?  Just think about it.  Have you ever heard of being a

soldier?  It means a fighter.  At that point I stopped talking

to him and he was admitted into the PTDF.

Q.    During this exchange, did his mood ever change from

serious?

A.    No, ma'am.  He was very serious.

        MS. KOHN:  I have nothing further, Your Honor.

        THE COURT:  Cross-exam?

        MS. CALL:  I just had a couple of questions, Your

1  Honor.

2                           **CROSS-EXAMINATION**

3  BY MS. CALL:

4  Q.   As I understand, this happened, as you said, back --

5  January 29, 2013, correct?

6  A.   Yes, ma'am.

7  Q.   And it was about 9:40 or so in the morning that you and a

8  team went out to pick up Mr. Bell?

9  A.   That's correct.

10  Q.   And you went to his father's residence, correct?

11  A.   Yes, ma'am.

12  Q.   You took him, then, from that -- that's a home up on the

13  Northside, downtown to the Police Memorial Building?

14  A.   Correct.

15  Q.   Okay.  And you had indicated that when you took him into

16  custody from his father's home, he was wearing a

17  black-and-white shirt and some black shorts from the --

18  A.   I don't recall, but I can refresh my memory with the

19  report.

20  Q.   Yes.  That was what I was referring to.  I had the

21  supplemental report.  It says date printed January 30th of

22  2013.  And I was referring to page two of three.

23  A.   That's correct.

24  Q.   Okay.  And then you basically took him and your -- or one

25  of the officers took him in a patrol car downtown, correct?

1  A.   The criminal apprehension team, they came over -- which is

2  SWAT team.  We took him into custody.  We called in for a

3  patrol officer from that particular area to transport him,

4  because he had the cage on his patrol vehicle.

5  Q.   Okay.  And after you had the interview and this

6  questioning that you discussed with Ms. Kohn, that was your

7  last contact with Mr. Bell, correct?

8  A.   Correct, after the interview and being admitted into the

9  jail, yes, ma'am.

10  Q.   And basically once you get to the jail, you turn him over

11  to the officers who handle the booking process for fingerprints

12  and photographs and all of that?

13  A.   Correctional officers.

14  Q.   Yes.  And so after January 29 of 2013, you've never had

15  any other contact with Mr. Bell, correct?

16  A.   Yes, ma'am.

17        MS. CALL:  I have no other questions, Your Honor.

18        THE COURT:  Anything else, Ms. Kohn?

19        MS. KOHN:  No, Your Honor.

20        THE COURT:  Thank you for your time, sir.  Appreciate

21  it.

22        What says the government?

23        MR. HEAVENER:  That's all we have, Your Honor.

24        THE COURT:  Okay.  Ms. Call, are you going to call

25  Dr. Cohen?  Is that what you want to do?

1          MS. CALL:  Yes, Your Honor.

2          THE COURT:  Okay.  I'm hoping to -- to take a lunch

3   break about 12:15 or so.  I don't know if we'll get her done

4   before then or not, but let's at least get her started.

5          Is she here?

6          MS. CALL:  Yes, Your Honor.  I believe she's in the

7   interview room.

8          THE COURT:  Okay.  That's fine.

9          Are you going to have any other witnesses, Ms. Call?

10          MS. CALL:  No, Your Honor.  None to testify.

11          THE COURT:  Okay.  While we're waiting for the

12   witness, I think probably what I would like to do -- and,

13   Mr. Heavener, then that concludes the government's evidentiary

14   presentation, as well, right?

15          MR. HEAVENER:  Yes, sir.

16          THE COURT:  I think I probably -- you know, especially

17   since I cleared my calendar, I think I probably will entertain

18   argument this afternoon.

19          And we'll go through the guidelines and we'll talk

20   about -- I mean, we'll do what we normally do after we've --

21   and then see where we are.

22      (Dr. Cohen enters the courtroom.)

23          THE COURT:  So I think you should be prepared to do

24   that.

25          MR. HEAVENER:  Yes, sir.

1                    THE COURT:  Good morning.

2                    DR. COHEN:  Good morning.

3                    COURTROOM DEPUTY:  If you can please remain standing

4     and raise your right hand.  Do you solemnly swear that the

5     testimony you are about to give before this court will be the

6     truth, the whole truth, and nothing but the truth, so help you

7     God?

8                    THE WITNESS:  I do.

9                    COURTROOM DEPUTY:  You may have a seat.  If you could

10    please state your name for the record and spell your last name.

11                   THE WITNESS:  Dr. Robyn Cohen, C-o-h-e-n.

12                   THE COURT:  Thank you, Doctor, for your patience.  I

13    know you've been waiting to come to testify for about a day

14    now.  So I appreciate that.

15                   And, Ms. Call, you may proceed.

16                   MS. CALL:  Yes, Your Honor.

17                   **ROBYN COHEN, Ph.D., DEFENDANT'S WITNESS, SWORN**

18                               **DIRECT EXAMINATION**

19    BY MS. CALL:

20    Q.   Dr. Cohen, where is your practice at?

21    A.   Orlando, Florida.

22    Q.   And where exactly do you practice?

23    A.   Apopka, Florida.

24    Q.   And what is your position currently?

25    A.   Currently I have two positions.  I'm the director of

1    pediatric neuropsychology at Arnold Palmer Hospital for

2    Children.  And I also have a private practice on the side.

3    Q.   Okay.  Can you tell me about what your educational

4    background is?  Where did you attend college for your

5    undergraduate degree?

6    A.   I attended Rollins College in Winter Park, Florida.

7    Q.   And what did you major in?

8    A.   Psychology.

9    Q.   What was your next educational step?

10   A.   After that I obtained a master's degree and Ph.D. at

11   Rosalind Franklin University of Medicine and Science in North

12   Chicago.

13   Q.   When you obtained your master's degree, did you have a

14   focus on your training or your education?

15   A.   Neuropsychology.

16   Q.   And --

17        THE COURT:  Ms. Call, could I ask you to suspend one

18   second?

19     (Judge confers with court reporter.)

20        THE COURT:  I apparently was doing something that was

21   bothering Ms. Bishop.  And we can't have that.  So now I have

22   solved the problem.  You may proceed.

23   BY MS. CALL:

24   Q.   You went on then to get your Ph.D. there from Rosalind

25   Franklin University of Medicine and Science that's in North

1    Chicago.

2         What was your focus and training there on your Ph.D.?

3    A.    Neuropsychology, as well.

4    Q.    And in obtaining your master's degree and your Ph.D., what

5    was the -- can you tell me a little bit about the classes and

6    type of study you underwent?

7    A.    Sure.  Yes.  I took classes related to clinical

8    psychology, because we were -- we're trained as clinical

9    psychologists first, and then neuropsychologists as a

10   specialty.  And so there were many classes in assessment and

11   treatment of various psychological and medical disorders.

12   Q.    What is the focus on neuropsychology?

13   A.    So neuropsychological assessment looks a lot at brain

14   behavior relationships and the biological underpinnings of

15   various psychiatric diagnoses, as well as how medical

16   conditions can affect your behavior.

17   Q.    In studying, did you undergo any residencies or

18   internships that furthered your education or was part of your

19   educational tract?

20   A.    Yes.  So my internship was at the University of Miami,

21   where I focused on pediatric neuropsychology and

22   rehabilitation.  And then my postdoctoral experience was in

23   Winter Park, Florida, under the supervision of Dr. Patrick

24   Gorman.

25   Q.    When did you obtain your Ph.D.?

1  A.    2008.

2  Q.    And since then, have you been licensed in the State of

3  Florida?

4  A.    Yes, I have.

5  Q.    Since then, also, have you taught or published any

6  professional seminars or professional journals?

7  A.    Yes.  I published several articles on obsessive compulsive

8  disorder.  And when I was studying in Chicago, I was a lecturer

9  at the University of Wisconsin.

10 Q.    And you indicated that you have two positions.  One is at

11 the Arnold Palmer Hospital for Children.  During that -- or as

12 part of that employment, do you actually treat children and

13 adolescents through the hospital?

14 A.    I do -- I carry a small load for treatment, but mostly I

15 do evaluations and assessment.  But I do do treatment, as well.

16 Q.    And in private practice, do you also do treatment and

17 evaluations?

18 A.    I do mostly evaluations in private practice.

19 Q.    And in your experience in doing evaluations, have you ever

20 been called to testify in court?

21 A.    I have.  Once before.  Yes.

22 Q.    And when you testified before, were you qualified as an

23 expert witness?

24 A.    Yes, I was.

25         THE COURT:  Ms. Call, I have no concern about the

1   witness' qualifications, which I think have been established.

2   I take it the government does not either; is that correct?

3            MR. HEAVENER:  No objection, Your Honor.

4            THE COURT:  All right.  Then I'm happy to accept

5   Dr. Cohen's expertise and allow you to proceed.

6            MS. CALL:  Thank you, Your Honor.

7   BY MS. CALL:

8   Q.   Then turning in this case -- recently were you consulted

9   about doing an evaluation and a report of Shelton Bell?

10  A.   Yes.

11  Q.   Okay.  And in that, were you provided records from me in

12  my office to assist you in that?

13  A.   Yes, I was.

14  Q.   Do you recall the types of records that we provided to

15  you?

16  A.   So I went over a good deal of medical records from the

17  pediatrician, a great deal of school records from elementary

18  school through high school for Mr. Bell, an FBI report, the

19  presentencing investigation report, the indictment, and review

20  of discovery DVDs, and also the DVDs, as well.

21  Q.   And in -- after you reviewed that, did you also meet with

22  Mr. Bell?

23  A.   Yes, I did.

24  Q.   What kind of testing and interviewing did you do during

25  your evaluation of Mr. Bell?

```
 1   A.    So we started off with a pretty extensive interview,

 2   probably about two-and-a-half hours' worth, where I went over

 3   his childhood background and symptoms that he had had.

 4         I hadn't known that he had been diagnosed as a child

 5   with Attention Deficit Hyperactivity Disorder.  And so we spent

 6   a good deal of time going over his developmental history,

 7   school history, and then spent a lot of time going over the

 8   details related to his trip to the Middle East.

 9   Q.    And in reviewing his school records and then the testing

10   that you did, did you find it consistent that he was ADHD, the

11   Attention Deficit Hyperactivity Disorder?

12   A.    Yes.

13   Q.    Why did you conclude that from your testing?

14   A.    So in addition to the interview and reviewing the records,

15   which all showed elevated symptoms of this disorder, we did

16   psychological testing, as well.

17         The results that I got from the MMPI really all

18   pointed to a very consistent pattern of impulsivity and poor

19   forethought.

20         It was evident in behavior observations that there was

21   impulsivities and, in the testing, some fidgeting.  And

22   everything was really consistent developmentally and to the

23   present time.

24   Q.    And when you reach the conclusion or a diagnosis that

25   someone has ADHD -- and Mr. Bell is now 20 -- what would the
```

1  effects or consequences of having ADHD be?

2  A.   Well, a lot of times what you see is a very big difference

3  between a person's achievement, adaptive skills.  They're

4  basically at their functioning level and what their potential

5  is.

6       And so it's clear from the records and in talking with

7  Mr. Bell that he's highly intelligent.  So school records

8  indicated an IQ test when he was a child.  And he came up above

9  96 percent of children his age.

10      And so with that amount of intelligence, you would

11 expect a pretty straight A student with a lot of potential to

12 pretty much choose whatever it is he wanted to do.

13      But when you look at the records and you listen to his

14 history, there is a big discrepancy between what his academic

15 achievement was and his intellect.  There's a big difference

16 between what his functioning level is and his -- his

17 intellectual potential.

18 Q.   And you said that you saw that consistently through the

19 records.  So after he was tested in school and had a very high

20 IQ, the comments from his teachers indicated this impulsivity?

21 A.   Yes.  Impulsivity, poor planning, lack of motivation,

22 disorganization, all -- all pretty much hallmarks of the

23 disorder.

24 Q.   And was that reflected also, then, in the grades that he

25 actually achieved being significantly lower than one would

1    expect from his testing?

2    A.    Yes.  Absolutely.  And even in the interview, Mr. Bell

3    explained that it's not that the work was difficult for him;

4    it's just that he had a difficult time staying focused or

5    motivated or putting in the work to get the grades.

6    Q.    And is that also consistent with the fact that he dropped

7    out of school without completing his high school diploma

8    through a traditional tract?

9    A.    Yes.  Absolutely.

10   Q.    And apart from -- was Mr. Bell ever given a medical regime

11   to address the ADD or ADHD?

12   A.    Yes.  In the medical records there were two medications

13   that were tried at different times.  And Mr. Bell did say that

14   he remembered at some point faking that he took the medication

15   because he didn't like the way that it made him feel.

16         And medication for ADHD is one of those things that

17   really needs to be closely monitored and you really need to try

18   several different types and several different dosages to get

19   the one that doesn't have side effects that would make you feel

20   that way.

21         And it didn't look like -- in the medical records,

22   that that type of regimented, closely detailed following of the

23   medical condition was achieved.

24   Q.    And so that's not unusual for a child to have been

25   diagnosed with ADHD and not follow through on the medical -- or

1    the medical side to it?

2    A.    Right.  Well, a lot of that is -- is also to -- as a child

3    is up to the parents to really be diligent in that, as well.

4    Q.    And when you interviewed Mr. Bell, you also indicated that

5    you conducted several other tests.  Did you find that the tests

6    were consistent with each other in the record, so that Mr. Bell

7    was not malingering or presenting with any kind of indications

8    that the testing results would not be an accurate

9    representation of who he is right now?

10   A.    Right.  So, yes, we did do tests of his effort.  And he

11   put forth excellent effort on the testing.  He really tried his

12   best.  I did notice some impulsive responding at times.

13         But, again, because Mr. Bell is so intelligent, he

14   actually performed fairly well in these tests, which is not

15   uncommon, because when we give these tests we're in very

16   controlled settings.  And so the symptoms a lot of times don't

17   display themselves.  So there's no distractions.

18         We -- I try to create a very relaxing environment.

19   And a lot of times these symptoms really present themselves out

20   in the real world, where there's stress, there's emotions,

21   there's distractions.  And that's where you see the

22   implications for these symptoms coming out and interfering with

23   your functioning.

24   Q.    And what kinds of things, as you said, interfering with

25   the functions -- how would a diagnosis of ADHD impact someone's

1    daily life or their thought process when they're in the

2    community?

3    A.    Right.  So, really, the symptoms of this disorder impact

4    pretty much almost every aspect of -- of life.  It has a

5    tremendous impact on your social functioning and being able to

6    take part in social relationships in an appropriate way.  It

7    affects your ability to learn and remember things and attend to

8    things and prioritize.

9           I always give the metaphor that what is implicated in

10   ADHD is -- your executive functioning is very poor.  And your

11   executive functioning is really kind of like a CEO of a

12   company, where that person is responsible for planning things

13   out while having good forethought, being organized, staying on

14   task.

15          And those types of things are what's missing or

16   dysfunctional in individuals with this -- untreated individuals

17   with this disorder.

18   Q.    And would that impact -- if someone has this diagnosis

19   and -- I guess you're saying on the scale he is rather high on

20   the ADHD scale, to having severe kind of symptoms or severe

21   impact?

22   A.    Yes.  And there was reported a family history.  And this

23   is a genetic disorder.  It's neurodevelopmental.  There's a

24   biological basis to it.

25          But at the same time, the research also points to what

1   can worsen these symptoms is an instable environment growing

2   up.  And so there is a lot of instability in moving back and

3   forth.

4           And, you know, all kids need structure and routine and

5   supports.  But kids with ADHD need even more.  And he seems

6   like he had even less than -- than typical kids.

7   Q.   And so would someone with ADD or ADHD be likely to have

8   peers younger than themselves?

9   A.   Yes.  Absolutely.  That's very common.

10  Q.   And would someone with ADHD have difficult -- make

11  impulsive decisions without thinking through the consequences?

12  A.   Absolutely.

13  Q.   And in this case Mr. Bell had reported to the FBI, and I

14  believe to you, that after reading three verses of the Quran he

15  decided to convert to Islam.

16          Is that kind of impulsive decision consistent with

17  your view of him as having the ADHD?

18  A.   Yes, it is.

19  Q.   And why would you say that, making that lifestyle decision

20  based on a very brief kind of review of something, or --

21  A.   Well, right, exactly.  So a lot of times something will

22  catch their attention and then they'll latch on to it.  And,

23  you know, when people talk about ADHD, sometimes they get

24  confused, because they see these kids, or adolescents, hyper

25  focusing.

1           And so they say, Oh, well, they can focus, because

2    look how focused they are on this video game.  They can play it

3    12 hours a day.

4           But, really, that's actually -- it's not a hyper

5    focus.  It's more of a perseveration.  And so sometimes you can

6    make an impulsive decision like that and then kind of get stuck

7    on it, and really perseverate it, and not be able to see past

8    it, not be able to see consequences of it or pros and cons.

9    It's kind of all -- it becomes all-encompassing.

10   Q.   So it's almost like the motto all-in?

11   A.   Right.

12   Q.   If I'm focused on -- if this is what my attention is on,

13   it's only on A, I can't think through holding in my mind B, C,

14   and D at the same time?

15   A.   Exactly.  So part of that executive functioning system is

16   having that cognitive flexibility.  And a lot of times that is

17   lacking in kids with ADHD.

18   Q.   Now, I know part of the question that probably comes up in

19   someone listening to this is then if Mr. Bell has this ADD and

20   the impulsive control -- in this case he was able to obtain a

21   passport, make travel arrangements, begin travel.

22          How do you see the ADHD, though, impacting those

23   steps?

24   A.   Okay.  So, yes -- so Mr. Bell is -- you know, again, he's

25   very intelligent.  So he is able to take steps towards a goal.

1   But the question is:  Are these steps rational, well thought

2   out, planful, mindful, good decisions?  Or are they kind of

3   impulsive in nature without really seeing two or three steps

4   ahead?

5           And in general, when individuals with ADHD are

6   planning something, they're really only planning kind of one

7   step ahead.

8           And so there were multiple examples when we were going

9   through his travels to the Middle East of examples where he

10  really only thought one step ahead.  So there was questions

11  about, you know, flying into the wrong place, obtaining the

12  wrong type of visa, you know, carrying around money loose in

13  his pocket, misplacing a passport in his room that he couldn't

14  find but the authorities could find for him.

15          So lots of these kind of issues coming up, where there

16  is goal -- there is goal-directed behavior, it's just not

17  efficient or well planned or well thought out.

18  Q.   And you had indicated, also, that someone with -- that

19  children with ADHD develop their executive functioning skills

20  and maturity at a slower rate.

21          Can you expound on that?  What was the basis of that

22  study?  And what do you see in children with ADHD and their

23  developmental track?

24  A.    Sure.  Absolutely.  There's multiple studies tracking the

25  development of executive functioning in typically developing

1    kids versus kids with ADHD.

2         And developmentally you see about a 30 percent delay

3    in kids with ADHD in their ability -- just in their ability to

4    attend, focus, be planful.  So all the things that are involved

5    in executive functioning are about 30 percent behind kids their

6    age.

7         And so as they're going through school, it's important

8    when you're doing accommodations for their disability to kind

9    of keep that in mind.

10        And so when you're doing, let's say, an IEP plan, an

11   Individual Educational Plan, for, let's say, a nine-year-old

12   with ADHD, you have to really think that they have the

13   executive functioning more of, like, a six-year-old.

14        So a six-year-old isn't really able to keep track of

15   their homework and their assignments.  So you make

16   accommodations for the nine-year-old to give them services and

17   assistance with that.  And that continues on through adulthood.

18        So in typically developing kids and adults, executive

19   functioning continues to mature, get better, up until about

20   your mid-20s.  And then it kind of levels off throughout the

21   rest of your adulthood.

22        It's why your insurance rates go down when you're 25,

23   because you've kind of hit that peak.  In kids with --

24   developing with ADHD, especially when the ADHD is untreated,

25   this is still behind at 25.  And so it really continues on and

1   might reach the peak later.

2           An important aspect, too, is how much treatment has

3   been given, and then also what kind of compensatory strategies

4   has the person learned to kind of overcome some of these innate

5   difficulties that they have with executive functioning.

6   Q.   So someone who is biologically 18 with ADHD would not

7   necessarily be the same kind of 18-year-old, as you said, as a

8   normally developing or traditionally developing adult?

9   A.   Exactly.  So you would see their social maturity and the

10  their behavior and their attention, more of that of a younger

11  teenager than an 18-year-old, compared to typical 18-year-olds.

12  Yes.

13  Q.   And you said that in part of your testing you were looking

14  at whether Mr. Bell was putting forth a good faith effort

15  towards the test --

16  A.   Yes.

17  Q.   -- and whether the information he was -- was part of your

18  testing also to determine that the information he gave you was

19  consistent with the other sources that you had?

20  A.   Exactly.  And it was very consistent.  He was very

21  forthcoming.  There are scales on the MMPI that will measure

22  that as well.

23          There are actually tests that I gave to test

24  cognitively whether he was giving effort.  And everything was

25  very consistent and effortful.  And he was very cooperative

1   with me during the session.

2   Q.   Did you also find that he was sincere in addressing with

3   you the underlying conduct and the issues that led to him being

4   in court?

5   A.   Yes.  Absolutely.  There was a great deal of regret and

6   remorse, and a lot of when he was relaying things to me -- and

7   insight into, you know, what he had done and how misguided it

8   was at times.

9   Q.   Okay.  And would that delay from being 18 and doing the

10  activities to being 20 and looking at his conduct -- is that

11  consistent with his continuing development of an executive

12  functioning?

13  A.   Yes.  Sure.  Absolutely.  And, you know, I think that

14  there are lessons to be learned.  And a lot of times it -- you

15  have to go through the process to learn the lesson in kids and

16  adults with ADHD, or even maybe just get to the point where

17  it's no longer a future, it's a -- you kind of -- everything

18  that you do when you intervene for ADHD is to bring the future

19  into the present.

20         And so kids with ADHD have a very hard time thinking

21  about future consequences, good or bad, when they're very

22  focused on immediate gratification.

23         And so in Mr. Bell relaying his story to me, it only

24  got to a point where he kind of got to the border of his goal

25  destination, and the impact of, Okay, this is in the future,

1  now it's present, where I think that there was kind of a

2  turning point for him, because now the future was the present,

3  and it was able to come into focus for him more clearly at that

4  point.

5  Q.   And so out of your testing and your interview and

6  evaluation, do you find that Mr. Bell would be amenable to

7  counseling?  And would that be of assistance to him?

8  A.   Yes.  Absolutely.  He gave every indication with me that

9  he would be a good candidate for counseling and medication and

10 treatment of the ADHD and -- yeah.  Yes.

11 Q.   Okay.  And would a medical treatment and counseling --

12 you're talking about essentially a mental health counseling,

13 behavioral coaching, and therapy for emotional adjustment.

14 Those sound -- the counseling part sounds a lot like talk

15 therapy, to deal with anxiety, planning, thinking things

16 through.  Is that correct?

17 A.   Right.  That's correct.  Absolutely.

18 Q.   And then a part might be a consultation for whether he

19 needs a drug like Ritalin, or one of the other medical

20 treatments for ADHD?

21 A.   Yes.  Absolutely.

22 Q.   And the second part of your diagnostic impression was mood

23 disorder with symptoms of depression and anxiety.  Did you find

24 that to be more tied to his legal situation or more a part of

25 the -- his personality style?

1  A.   I think that was very tied to the situation he was in --

2  or that he is in.  I think that -- there does tend to be a

3  heightened level of anxiety in children and adolescents with

4  ADHD.

5       So I think that the propensity for anxiety is there to

6  begin with, but I think it's been greatly exacerbated by the

7  stress of his situation.  Absolutely.

8       MS. CALL:  Your Honor, I have no other questions.

9       THE COURT:  Cross-exam?

10                    **CROSS-EXAMINATION**

11 BY MR. HEAVENER:

12 Q.   Good afternoon, Dr. Cohen.  My name is Mac Heavener.  I'm

13 the Assistant United States Attorney.  I'd like to talk a

14 little bit about your background.  And I certainly accept that

15 you're an expert in neuropsychology.

16      Have you ever worked with violent jihadists?

17 A.   No, I have not.

18 Q.   Mr. Bell would be the first of those?

19 A.   Yes, he would.

20 Q.   And I've reviewed your record.  I didn't see any -- any

21 specialized study in that area or anything of that nature.

22 Would that be accurate?

23 A.   No.  There is not.

24 Q.   Okay.  Your report -- it begins with the phrase, The

25 purpose of the current evaluation is to determine the presence

1   and severity of ADHD.

2   A.   That's correct.

3   Q.   Was your assignment limited to that?

4   A.   The assignment was to do a comprehensive evaluation

5   psychologically and neuropsychologically, because of a previous

6   diagnosis of Attention Deficit Hyperactivity Disorder.

7        And so the focus would be on things that are related

8   to that.  So attention, executive functioning, anxiety, mood

9   disorders, and things of that nature.

10  Q.   So help me understand -- did you just focus on that

11  solely?  Or did you do a complete mental health examination of

12  Mr. Bell?

13  A.   I did an examination that was comprehensive in the purpose

14  of answering the referral question.  So it -- there could have

15  been multiple days of testing to look at every

16  neuropsychological construct and psychiatric disorder.

17       But it was focused more on what had already been

18  established and what was necessary for -- to establish for the

19  case.

20  Q.   So your work was in relation to the question you were

21  asked by Mr. Bell's counsel?

22  A.   Sure.  Yes.

23  Q.   Okay.  And that question related to Attention Deficit

24  Hyperactive Disorder?

25  A.   Yes.  And the consequences of that.

1   Q.   Okay.  With regard to the records you reviewed, you gave

2   us a list.  And my question is:  With regard to the discovery,

3   did you review any videotapes of Mr. Bell during the time

4   period in question?

5   A.   I did review some, yes.

6   Q.   How many of those did you review?

7   A.   About four or five.

8   Q.   And can you give us an estimate of how much time you

9   reviewed Mr. Bell on those videos?

10  A.   Probably about -- between an hour and two.

11  Q.   Between an hour and two hours?

12  A.   Yeah.

13  Q.   And what particular video scenes do you recall?  Which

14  videos did you --

15  A.   There was -- I read everything about the description of

16  all the videos.  But the ones that I was able to get through,

17  there were a lot -- there was a lot of praying.  Some were in

18  darkness.

19       There was -- the thing that I noted was that Mr. Bell

20  had told me in an interview that -- you know, he had thought he

21  had some OCD behavior about cleanliness and orderliness.  And

22  the videos that I saw, things were very disorderly and messy,

23  and very consistent with the presentation of ADHD.

24  Q.   Okay.  So you remember a particular video.  Was it in

25  Mr. Bell's room?

1   A.    I believe so.  I don't know.

2   Q.    All right.  And do you recall -- was that a video where

3   Mr. Bell says he'd rather go to jihad than fix his closet,

4   something of that nature?

5   A.    I don't know if I remember that exact statement, but...

6   Q.    Do you recall a video of Mr. Bell out in a wooded area

7   delivering a lecture or a sermon?

8   A.    I did read about that video.

9   Q.    You read about it?

10  A.    Yes.

11  Q.    Did you watch it?

12  A.    No.

13  Q.    Okay.  And would it surprise you that that video went on

14  for over 40 minutes?

15  A.    No.  That wouldn't surprise me.

16  Q.    And would it surprise you that Mr. Bell was regurgitating

17  teachings and comments of a violent jihadist all throughout

18  that video presentation?

19  A.    Right.  That wouldn't surprise me.  No.

20  Q.    All right.  You would agree that the video recordings of

21  Mr. Bell at the time period in question are probably the most

22  accurate judge of what Mr. Bell was acting like?

23  A.    During that time period?

24  Q.    Yes, ma'am.

25  A.    Yes.

```
 1   Q.   All right.  You said you spent about two-and-a-half hours

 2   with Mr. Bell?

 3   A.    I spent five-and-a-half hours with Mr. Bell.

 4   Q.    Five-and-a-half?

 5   A.    About the first two-and-a-half I would say -- I would say

 6   about half of that was an interview.  And then the other half

 7   was testing.

 8   Q.   Okay.  And I think you -- the words you just used to

 9   describe Mr. Bell is he's highly intelligent?

10   A.    Yes.

11   Q.   And if the testing is accurate, the 96 percent when he was

12   a child -- means he's in the top four percent of intelligence

13   functioning in -- among the population?

14   A.    Right.

15   Q.   With regard to that question of intelligence, is that

16   something that changes throughout someone's life?  Or if you

17   give someone an IQ test when they're a child, is it pretty much

18   standard that's what it's going to be when they're an adult?

19   A.    It's fairly stable.  I mean, every time you measure IQ,

20   you're going to get a little bit of a difference here and

21   there.

22          Sometimes if you're very -- have a very impoverished

23   environment, you might even be able to go down to a different

24   level of -- instead of superior functioning, you could just be

25   high average.  But in general it's pretty stable through time.
```

```
1   Q.   All right.  So the test that Mr. Bell took for IQ level

2   when he was a child -- in your interactions with him, you would

3   say he's probably still at a very high level functioning of

4   intelligence?

5   A.   Yes.

6   Q.   Okay.  When you spoke with Mr. Bell, did he mention the

7   name Anwar al-Awlaki to you?

8   A.   Yes, he did.

9   Q.   And what did he tell you about Anwar al-Awlaki?

10  A.   He told me that he used him as a mentor to guide his

11  learnings about Islam and that he watched extensive videos of

12  him.

13       And in retrospect that he sees him as an extremist.

14  But at the time he was not viewing him that way, as he was

15  listening to his videos.

16  Q.   Okay.  Did he tell you how many videos he watched?

17  A.   He made it seem like it was a lot of hours.

18  Q.   Now, I want to talk a little bit about -- when you're

19  obtaining the history from Mr. Bell, you're asking him

20  questions; he's giving you answers, correct?

21  A.   Correct.

22  Q.   And you said generally what he was telling you was

23  consistent with what you were reading in the discovery and the

24  other documents that you had; is that right?

25  A.   Right.
```

1  Q.   If you came across a situation where Mr. Bell told you one

2  thing and one of the documents said something else, would you

3  confront him about that?

4  A.   Sure.

5  Q.   Okay.  And particularly I want to draw your attention

6  to -- in his presentence report that you reviewed, Mr. Bell

7  made a statement to his presentence report preparer that he had

8  ceased using drugs and alcohol when he was a 15-year-old child,

9  because his mom and dad found drugs and alcohol in his room and

10 he realized that wasn't a good thing to do.

11 A.   Okay.

12 Q.   Okay.  In your report -- and he indicates that he quit

13 using drugs and alcohol as a result of his conversion to the

14 Islamic faith.

15 A.   Uh-huh (affirmative).

16 Q.   Did you ask him about that distinction?

17 A.   I really didn't.  A lot of the recollections -- when

18 you're going back and thinking about exact ages, I kind of take

19 that it's going to be blurry.

20      And so I didn't see that -- the take-home message was

21 that he did use drugs and alcohol fairly regularly, fairly

22 heavily.  And at some point he did stop.  So I didn't question

23 the exact age or manner of the -- of stopping.

24 Q.   All right.  The -- the report also references a number of

25 statements that Mr. Bell made about family members, like his

1    mother, his father, his mother's boyfriend, and his

2    grandmother.

3          During your analysis, did you contact any of those

4    individuals?

5    A.   No, I did not.

6    Q.   Okay.  So you -- you would agree with me your body of

7    knowledge about Mr. Bell would be a lot greater if you had

8    interacted with his mother to find out things about when he was

9    growing up, correct?

10   A.   That -- yes.  That would have been helpful.  All I had to

11   go on was an interview, I believe, with dad during the

12   investigative -- from the investigative report.

13   Q.   All right.  So you don't -- you didn't even -- you were

14   not able to speak with the father either?

15   A.   No, I was not.

16   Q.   And you understood that Mr. Bell was actually living with

17   his father at the time a lot of these events took place?

18   A.   Yes.

19   Q.   Okay.  In the -- in the presentence report that you

20   reviewed, there's a -- a paragraph that indicates that on

21   October 20th of 2011 Mr. Bell had a mental health screening.

22   Do you -- are you familiar with that term, what a mental health

23   screening is?

24   A.   Sure.  A screening would be a relatively brief evaluation.

25   Q.   Okay.  And that was done by a place called Gateway

1  Services here in Jacksonville?

2  A.   Okay.

3  Q.   Did you review that?

4  A.   I'm sure I did.  I might -- I'm not recalling exactly what

5  the results were.

6  Q.   Well, the presentence report that's listed as a document

7  you reviewed indicated that he was screened and there was no

8  referrals indicated as a result of that screening.

9       Do you remember that report?

10  A.   Yes.

11  Q.   Okay.  And is there a reason why you didn't address that

12  report in your report, or a reason why you discounted that

13  report?

14  A.   You know, screenings are really not sensitive enough to

15  detect these types of symptoms in somebody as intelligent as

16  Mr. Bell.

17       Even when I was interviewing him and he told me that

18  he had been diagnosed with ADHD, he didn't really seem to know

19  whether he really had it or not.

20       And so at the end of our evaluation he asked me, So do

21  you think I have this disorder?  And so I explained to him that

22  I did.  And I explained why.  But there's a lot more education

23  that could go into it.

24       So now that you say that, I do remember seeing it, but

25  a lot of times just screenings are just not sensitive to pick

1   up on a lot of these things.

2   Q.   When you just said it doesn't work well with someone as

3   intelligent as Mr. Bell, I think, or words to that effect, why

4   is that?  Why does the intelligence level have an effect on the

5   screening?

6   A.   So a lot of times when you have individuals with good

7   expressive language, the ability to show insight into some

8   parts of their behavior, it really takes kind of an in-depth

9   interview testing.

10          If somebody had just given Mr. Bell testing and not

11  done an interview, they wouldn't have found the presence of

12  ADHD, because he did do in the average range on testing.

13          But taking into account that he's actually superior in

14  his intellect and how what's translating in a testing situation

15  is not translating out into the real world, it's -- it's just

16  not sensitive.

17  Q.   All right.  Well, let me -- let me review some of the

18  testing that you did.  And I -- I don't do what you do, so I

19  may be using the wrong terms.

20          But when I reviewed your report, it looked like you

21  had administered something called a word memory test?

22  A.   Yes.

23  Q.   And if I'm reading the report correctly, Mr. Bell did okay

24  on that?

25  A.   He did very well.  Yes.

1   Q.    Very well?

2   A.    Yes.

3   Q.    Okay.  You also looked at his intellect.  You looked at

4   his -- his IQ test that was -- that you have records of?

5   A.    Yes.

6   Q.    You administered a CPT-II exam?

7   A.    Yes.

8   Q.    What is that?  What does that exam do?

9   A.    So that is a 14-minute test of sustained attention that

10  also measures impulsivity.  It's on a computer.  And the

11  instructions are basically to focus on the task for a sustained

12  amount of time.  It's a very boring task.

13        And the instructions say, Every time you see a letter

14  you press a space bar.  And that's -- except if you see an X,

15  you try not to press.

16        And so it's trying to measure your sustained

17  attention.  It's trying to measure your impulsivity.  Can you

18  stop yourself from pressing the X when you see it come up?

19        They also change the rate of the presentation of the

20  stimuli so that it's measuring can you keep up when it speeds

21  up, can you slow down when it slows down.  So it's trying to

22  measure your ability to adapt your behavior to the demands of

23  the situation or the environment.

24  Q.    And that's a test that you deem to be a valid test -- a

25  proper test to administer when you're diagnosing ADHD?  Would

1  that be accurate?

2  A.    Right.  It's one of the tests that we use.  Absolutely.

3  Q.    You wouldn't use the test if you didn't think it was going

4  to be helpful to your opinion?

5  A.    Exactly.

6  Q.    Okay.  And the same thing took place with the -- I think

7  you called it the WCST, the Winston Card Sorting Test?

8  A.    Yes.

9  Q.    Okay.  Go ahead.

10  A.    No.  I mean -- do you want me to describe that test?

11  Q.    Yes.

12  A.    So that test is a problem-solving test that looks at

13  cognitive flexibility.  And what that test attempts to do is it

14  doesn't give you any rules.  And it tells you you're going to

15  try to figure out what the rules of the test are by trial and

16  error.

17        And each time you make a move, you're told whether

18  you're right or wrong.  And then just based on whether you're

19  right or wrong, you have to figure out what your next move is.

20        And during the test you start learning how to do it.

21  And then after a certain amount of correct responding, the

22  rules change without the patient knowing.  And so we have to

23  see if they can problem solve to figure out what the new rule

24  is or do they get stuck on the old rule.

25  Q.    Okay.  And I think you indicated in your report Mr. Bell

```
 1  did adequate on that test?

 2  A.   He did.

 3  Q.   And you also indicated that he did adequate on the CPT-II?

 4  A.   He did.

 5  Q.   When you say "adequate," is that -- when you said "very

 6  well" when I asked you about the word memory test, you're

 7  saying adequate for these two tests.

 8          Is there a difference between those two or would

 9  the --

10  A.   It really is the nature of the test.  So the word memory

11  test -- really, when you give it to a population of, let's say,

12  1,000 adults his age, you'll really have a normal curve, where

13  most perform average, some will score at the high end, some at

14  the low end.

15          The other tests, when you give them to 1,000

16  20-year-olds, let's say, they don't have as much of a normal

17  distribution.

18          And so it's -- you really should only be talking about

19  whether they did adequately or not -- adequately, rather than

20  really interpreting the highs and lows of the test.

21  Q.   Okay.  Regardless, he didn't test out as indicating any

22  big problems with ADHD on any of those tests you gave him; is

23  that right?

24  A.   Right.  But that's -- again, that's fairly common, which

25  is why in all of the -- in all of the psychology training
```

1  you -- you can never diagnose ADHD just based on the tests.

2  Q.   All right.  But there is another test that you gave him --

3  I think it's called the Berkley ADHD test?

4  A.   Right.

5  Q.   And that test is based on what Mr. Bell is telling you

6  about his prior history; is that right?

7  A.   Yes.  It's based on current symptoms, his own perception

8  of them, and his own perception of his previous symptoms.

9  Q.   And the way you describe Mr. Bell's results on that report

10  is that he exhibited extreme ADHD when he was a child.  And I

11  think you used the phrase he was -- mildly to moderately

12  elevated symptoms -- no.  I'm sorry.

13       You used the phrase that he -- mildly to moderately

14  elevated symptoms of inattention hyperactivity and impulsivity

15  during his adult years, or older.

16       Is that -- am I reading that accurately?

17  A.   Yes.  So the current -- the part -- there's two parts to

18  it.  There's a current part that asks in the last six months

19  how much have you been experiencing these types of things.

20       And then the second part is when you were a child,

21  between the ages of -- I can't remember the exact ages, but

22  basically school-aged, how often did you experience these

23  symptoms?

24       And they don't ask were you inattentive.  They asked

25  about things like, Did you lose your homework a lot?  Did you

1   get into fights in school?  Things that are symptoms out in the

2   real world of this underlying developmental disorder.

3   Q.   All right.  But, regardless of what the questions are,

4   Mr. Bell -- he indicated -- much problem when he was a child,

5   not so much of a problem when he was an adult; is that right?

6   A.   Within the past six months, is what the questionnaire

7   says, yeah.

8   Q.   All right.  And despite the -- him testing adequately on

9   these tests and despite the self-report test you just

10  described, you still maintain the opinion that he suffers from

11  ADHD?

12  A.   Yes.  It's -- when you -- I mean, I've looked over

13  hundreds of records of kids with ADHD.  And when you look at

14  the medical records and the pediatricians' notes, when you look

15  at -- especially the school records, year after year after

16  year, where you see this just not being able to reach his

17  potential, and the symptoms that are interfering with it,

18  combined with some of the information I had about the family

19  history, it did seem fairly clearcut.

20  Q.   And I understand.  But your opinion is not dictated by the

21  tests that you think are valid tests, useful tests that you

22  administered.

23        Your opinion is more from your review of older records

24  and your interactions with Mr. Bell and his detailing of what

25  happened?

1          Would that be accurate?

2   A.   Yeah.  And my knowledge of how ADHD presents in

3   individuals with a good deal of intelligence.  A lot of them

4   are not diagnosed until adulthood, where there's really no

5   structure and no supports, and then they kind of fall apart,

6   because all along in childhood you're kind of given the

7   structure, you have to be at school at a certain time, you have

8   teachers watching you, you have your parents watching you, so a

9   lot of times they can get by.

10          And then either they get to college or they get in the

11  job and they have to structure their world and things kind of

12  fall apart.

13  Q.   All right.  And I think you indicate in your report that

14  these tests that you administer, these valid and useful tests

15  that you administer -- that sometimes they're not as good,

16  because those are done in a one-on-one setting and they don't

17  measure the way somebody really functions in the real world; is

18  that right?

19  A.   That's correct.

20  Q.   And when you prepared your report, you knew your report

21  was going to be used for testimony and people were going to be

22  relying on your report here in court, correct?

23  A.   Absolutely.

24  Q.   All right.  And you said that you were able to identify

25  some examples of Mr. Bell not functioning -- this ADH causing

1    dysfunction in the real world.  And you gave -- I would assume

2    you gave probably the better examples that you encountered.

3           Would that be accurate?

4    A.   I've given the best that we have developed so far.

5    Q.   Okay.  The best.  So not even better.  You've given us the

6    best examples of Mr. Bell's ADHD?

7    A.   Uh-huh (affirmative).

8    Q.   Okay.  And you've given us three examples in your report.

9    The first example is that he got the wrong visa stay, he got a

10   30-day visa, instead of a 90-day visa, right?

11   A.   Uh-huh (affirmative).

12   Q.   The second example you gave us is that he misplaced his

13   passport in his hotel room, correct?

14   A.   Uh-huh (affirmative).

15   Q.   And then the third example you gave us is that he lost a

16   large amount of money because he was carrying it around in his

17   pocket in a foreign country, correct?

18   A.   Uh-huh (affirmative).

19   Q.   And those are the best examples that you were able to come

20   up with after spending five-and-a-half hours with Mr. Bell

21   talking about his life, correct?

22   A.   That was a sample.  I mean, there were -- I mean, the

23   entire interview of five-and-a-half hours was basically example

24   after example of him not planning things appropriately,

25   going -- you know, trying to get into Israel and going --

1    flying into the wrong city, instead of through another --

2    Q.   We're going to talk about that in a moment.

3    A.   Okay.

4    Q.   But just stay with the -- you gave us the best examples

5    that you could think of to make your point that he still

6    suffers from ADHD, correct?

7    A.   Right, surrounding his travels to the Middle East.  Sure.

8    Q.   All right.  So let's start with the visa.  Do you know

9    what kind of plane ticket Mr. Bell had when he went to the

10   Middle East?

11   A.   A one-way ticket.

12   Q.   All right.  And do you know what he was telling people

13   about why he was going to the Middle East?

14   A.   That he was going on a Hajj.

15   Q.   Do you know what Hajj is?

16   A.   It's a -- I don't know a lot, but I know that it's a

17   sacred pilgrimage that Muslims take once a year, I believe.

18   Q.   Do you know how long it takes to make Hajj?

19   A.   A long time.

20   Q.   All right.  A long time?  Like -- you just don't know,

21   right?

22   A.   I really don't know.

23   Q.   My point is, if Mr. Bell's true intentions were to never

24   come back to the United States, it really wouldn't make any

25   difference what kind of visa he got, would it?

1  A.    No.

2  Q.    And if Hajj was not something that extended more than 30

3  days, it would probably make more sense for him to get a 30-day

4  visa if he was lying about making Hajj --

5  A.    Sure.

6  Q.    -- correct?

7        Okay.  So that may be an example of Mr. Bell's ADHD,

8  but it may be completely related to his ulterior purpose in

9  getting there, right?

10 A.    It did not seem in my interview with him -- again, you

11 know, there are times when people are being manipulative and

12 cunning.  And basically, in my interview with him, that did not

13 seem the case.

14       It really -- as he was talking about this -- and it

15 wasn't in a -- in a way like he was trying to seem careless.

16 He was basically telling it the way it is.  It didn't -- maybe

17 not even realizing how careless it was until I pointed it out.

18       So I find it unlikely that -- in retrospect, when I'm

19 interviewing him several years later, that -- that he is lying

20 to me about, you know, the forethought that he put into it.

21 It's just not consistent with what I saw in the presentation,

22 going through all of his history and records.

23 Q.    And that's your subjective feeling, right?

24 A.    Yes.

25 Q.    Okay.  But you would acknowledge that it's possible that

1    what I just described could have explained the reason for a

2    30-day visa versus any other kind of visa, right?

3    A.    If you're looking at it not in the context of him as a

4    whole person and the characteristic ways of his behaving, then

5    yes.

6    Q.    Did he tell you his original intent was to go straight to

7    Yemen and join a foreign terrorist organization?

8    A.    He did.

9    Q.    All right.  And so why would it not make sense that he

10   gets a 30-day visa versus a 90-day visa?

11          THE COURT:  All right.  I got that one.  What's next?

12   BY MR. HEAVENER:

13   Q.    All right.  Let's talk about the missing passport, the

14   hotel room passport.  All right.  Did Mr. Bell tell you that he

15   was arrested there at the hotel?

16   A.    He told me that they took -- they detained him, yes.

17   Q.    At the hotel?

18   A.    Yes.  They told -- the way that he described to me is that

19   they asked for his passport and he went to his room to look for

20   it and he looked for it for half an hour and couldn't find it.

21   And when he told them that he couldn't find it, that's when

22   they detained him.  I don't remember if he used the term

23   arrested.

24   Q.    So he did not tell you that he went to the Jordanian

25   police to report a theft and that's when he got detained?

1 A. So he had told me that days prior he had gone to the

2 authorities to report lost cash and had given them the hotel

3 and passport information at that point.  And then a few days

4 later is when they came to the hotel and asked for his

5 passport, and when he -- went through his things and couldn't

6 find it.

7 Q. All right.  Now, you've traveled abroad?

8 A. I have.

9 Q. Okay.  And if you were abroad and foreign police officers

10 came to your room and told you they needed to question you,

11 would you describe that as being an anxious, stress-provoking

12 incident?

13 A. Yes, I would.

14 Q. All right.  So -- and we don't know the answer.  But it's

15 possible that the stress he was under as a result of being

16 visited by foreign policemen could have resulted in some kind

17 of memory loss or some lapse of where his passport --

18 A. Oh, absolutely.  I believe that he's even more susceptible

19 to that type of anxiety in that situation.

20 Q. And particularly if you're there to join a foreign

21 terrorist organization, it would be even more stressful, right?

22 A. I would imagine it would be stressful in any situation,

23 yes.

24 Q. Okay.  And then -- so the final example you gave us is he

25 was carrying his money around in his pocket, correct?

1  A.   Right.  And he had indicated it was a rather -- in the

2  thousands, that he was carrying around loose in his pocket.

3  Q.   Did he tell you where that money came from?

4  A.   He said that he had saved it over the course of a summer,

5  working on computers.

6  Q.   All right.  Did he tell you anything about getting money

7  from a man that was there at the flea market -- somebody giving

8  him a large cash --

9  A.   No, he didn't.

10 Q.   The hotel where Mr. Bell and his friend were staying in

11 Oman, Jordan, is called the Sunrise Hotel.  I'm assuming you've

12 never been there?

13 A.   I have not.

14 Q.   Do you have any knowledge about whether the Sunrise Hotel

15 in Oman, Jordan, has room safes in the hotel room?

16 A.   I do not.

17 Q.   Did you ask Mr. Bell that?

18 A.   I didn't.

19 Q.   All right.  Would it be unusual if you're a traveler in a

20 foreign country and your hotel does not have a room safe, to

21 carry your cash around with you on your person?

22 A.   I would carry -- yes.

23 Q.   You would take it with you, too, right?

24 A.   I would carry my cash with me.

25 Q.   So there might be an explanation for that that doesn't

1   relate to ADHD, as well?

2   A.   Oh, I wouldn't carry it loose in my pocket, but, yes, I

3   would carry it on my person.

4   Q.   All right.  Okay.  Now, you indicate -- I mean, basically,

5   your opinion is that Mr. Bell suffers from impulsivity, from

6   poor planning and foresight, with regard to his executive

7   functioning; is that right?

8   A.    Yeah.  There are a lot of aspects of executive functioning

9   that kind of work in concert.  The things that come out -- that

10  stand out the most are basically not being able to see the

11  future consequences of your behavior.

12  Q.   All right.  Well, let me ask you some questions about

13  that.  If -- did you review any of the video materials where

14  Mr. Bell is making statements about, If people saw what we were

15  doing they're going to call us terrorists and we're going to go

16  to jail?

17       Do you remember seeing any of that?

18  A.    Uh-huh (affirmative).

19  Q.   That would be a little bit contrary to the opinion you

20  just gave us, right?

21  A.   These -- no.  Because it's not -- it's difficult to

22  describe.  But it's not that they're -- you can't see an if

23  then -- if yes, then this; if no, then that.

24       It's more -- as we're interacting in our day-to-day

25  lives, we're constantly considering three or four or five

1  different possible scenarios based on three or five or four

2  different choices that we might have.

3         And so keeping all of that organized and planful and

4  prioritizing and strategizing is where that executive

5  functioning falls apart.  But being able to see if X, then Y,

6  then, no, they would be able to see that.

7  Q.   All right.  Well, let me focus your attention on one

8  particular part of this case.  You're aware that Mr. Bell and

9  another individual went to a cemetery and destroyed some

10 religious statues?

11 A.   Yes.

12 Q.   Okay.  Did you do any analysis of that episode during this

13 case?

14 A.   Yes.  We talked about that.

15 Q.   And would you describe that as impulsive or as planned?

16 A.   That is -- that was a little bit of both.  But it was

17 planned, in terms of, These are, you know, statues of

18 sacrilegious, this is according to our rule, and we're going to

19 go do something about it.

20        Whether it was done in a planful manner or -- you can

21 do something impulsively and plan for it and kind of put

22 blinders on to all of the other things that kind of take place

23 in that.

24        So impulsivity isn't just doing something at the spur

25 of the moment.  It really is acting on an impulse.  And then it

1    might take you days or weeks or months to act out that impulse,

2    but you kind of can't weigh the consequences of it.  And you

3    can't see other perspectives of it.

4    Q.    Could it take you years to wait to act on that impulse?

5    A.    Normally there's -- the waiting is still part -- so you're

6    not waiting doing nothing.  You might be -- usually there's an

7    impulse to still actively try.

8          So, for example, all of the different times in the

9    Middle East, where it's like, Well, we can turn back, we can

10   turn back, or, you know, It's better to be patient and wait and

11   do this when the timing is right, well, No, no, no, no, who

12   cares when the timing is right, or this, that, and the other

13   thing -- you know, there's just that perseveration on that

14   impulse.

15         In this situation it's to an extreme.  But I -- but

16   it's fairly common and -- unfortunately in kids and

17   adolescents.  In kids and adolescents where there is structure

18   and support and they can't let go of a goal and it's a

19   pro-social goal, you can have successful people with ADHD,

20   because they have the tenacity to go after it.  But it's not

21   always usually in the best route, unless there's lots of

22   structure, support, treatment, medication, et cetera.

23   Q.    All right.  Well, let me get back to where we were, the

24   cemetery mission.

25   A.    Sorry.  Yes.

1           THE COURT:  Mr. Heavener, let me inquire from you how

2   much longer you're going to be.  I was hoping to get this done

3   before we broke, but I'm starting to wonder now.  How much

4   longer do you have with the witness?

5           MR. HEAVENER:  Your Honor, I'd say maybe five minutes.

6   Ten minutes at the most.

7           THE COURT:  All right.  Ms. Call, are you going to

8   have redirect?

9           MS. CALL:  So far I only have about three or four

10  questions, Your Honor.

11          THE COURT:  All right.  Well, if you think it's five,

12  I'll do it.  If you think it's ten and then she's 15, I may

13  break for lunch.  But I -- Dr. Cohen has been here a long time.

14  I'd like to get it done.  But I don't want to hurry you.  So

15  I'm just --

16          MR. HEAVENER:  We can break for lunch, if you want.

17          THE COURT:  So, Dr. Cohen, what's your schedule,

18  ma'am?  Are you trying to get back to work?

19          THE WITNESS:  I am if possible, but it's okay.  I

20  understand.

21          THE COURT:  Well, let's go ahead, Mr. Heavener, and

22  see what happens.

23          MR. HEAVENER:  Thank you, Your Honor.

24  BY MR. HEAVENER:

25  Q.   All right.  So if you'd answer my questions, ma'am.  With

1    regard to the cemetery mission, he had to pick a cemetery,

2    right?

3    A.    Yes.

4    Q.    He had to figure out where the statues were in that

5    cemetery, correct?

6    A.    Sure.

7    Q.    And with regard to the evening that they did this, do you

8    know how he was dressed?

9    A.    I don't.

10   Q.    Okay.  Would it surprise you that he wore all black?

11   A.    That would not surprise me.

12   Q.    Do you know if he used gloves?

13   A.    I don't know.

14   Q.    Okay.  Do you know if he wore a mask?

15   A.    I don't know.

16   Q.    Do you know if he used duct tape to tape over his shoes?

17   A.    I don't know.

18   Q.    Those would all be evidences of planning, though; wouldn't

19   you agree?

20   A.    Sure.  Sure.

21   Q.    He carried a loaded firearm with him and said that it was

22   in case any kuffar, or non-believers, get out of hand.  Do you

23   remember seeing that?

24   A.    I don't, but that --

25   Q.    All right.  That would be an example of planning, correct?

1  A.    Yes.

2  Q.    What would he be planning to do with a loaded firearm,

3  taking it with him on this mission?  What kind of plan would

4  that be?

5  A.    I believe that would be an impulsive plan of --

6  Q.    To do what to someone else?

7  A.    And that could be -- that could result in extreme harm.

8  Absolutely.

9  Q.    Okay.  All right.  So he was making preparations to

10  administer some kind of extreme harm if someone got in the way

11  of what he was trying to do, correct?

12  A.    Yeah.  I -- I wonder, though, if when that future came to

13  the present, like it did when he was on the border of Syria, if

14  there would be a, Oh, my gosh, this is the present, what am I

15  doing, or if there would be, you know, based on the adrenaline

16  and impulsivity of the situation -- it's a very dangerous

17  situation.

18  Q.    All right.  And then when they got to the cemetery -- they

19  didn't just park their car at the cemetery.  Were you aware of

20  that?

21  A.    No.

22  Q.    They dropped sledgehammers off.  Did you know that?

23  A.    No.

24  Q.    They go and park their car blocks away.  Did you know

25  that?

```
 1  A.   No.
 2  Q.   And then they go to the sledgehammers.  Were you aware of
 3  that?
 4  A.   No.
 5  Q.   With regard to the trip, did you know he had opened a
 6  business bank account within weeks before he took the trip?
 7  A.   I don't believe so.
 8  Q.   All right.  Do you have any knowledge about him applying
 9  for a passport?
10  A.   I'm just assuming that he did.
11  Q.   Do you know when he applied for it?
12  A.   I don't.
13  Q.   All right.  You would agree those are activities that most
14  normal 16-year-olds are not engaging in on a day-to-day basis?
15  A.   Correct.
16  Q.   He was able to purchase his airline tickets without any
17  help, right?
18  A.   Sure.
19  Q.   He leased a computer without any help, correct?
20  A.   Right.  And then took it with him.
21  Q.   Overseas, right?
22  A.   Overseas.
23  Q.   And if he had had his way, he would have never brought it
24  back, correct?
25  A.   I don't know.
```

1  Q.   All right.  He gets to the Israeli border and gets

2  detained, right?

3  A.   Yes.

4  Q.   And then he gets sent back to Poland, correct?

5  A.   Correct.

6  Q.   And instead of coming back to the United States, he comes

7  up with an alternative plan; is that right?

8  A.   Well, yes.  He had told me that he and his traveling

9  partner had come up with an alternate plan.

10 Q.   And did he tell you what input he had into coming up with

11 that alternate plan?

12 A.   He didn't really -- it seemed like it was a mutually

13 agreed-upon plan.

14 Q.   All right.  So it wasn't one person saying this is it and

15 the other person saying, Okay, that's the -- it was a mutual

16 thing?

17 A.   The way it was presented to me was -- I believe the person

18 he was traveling with was going to -- wanted to stay at his

19 aunt's house in Jordan.  And he agreed to that as an

20 alternate -- as an alternate.

21 Q.   All right.  And that was an alternative based on them

22 getting turned away at the Israeli border?

23 A.   Right.

24 Q.   It wasn't -- the original plan was not to go to the aunt's

25 house in Jordan; is that right?

1  A.   I thought he had mentioned going -- that he was going to

2  go there after.  But I could be mistaken.

3  Q.   All right.  Let me direct your attention to Mr. Bell's

4  return to the United States.  Did you ask him anything about

5  what he did when he returned to the United States?

6  A.   I did.

7  Q.   And what did he tell you?

8  A.   He had a hard time recollecting, was pretty vague.  He

9  basically made -- made it seem like he was trying to go back to

10  life as it was before this.

11  Q.   Did you have any discussions about him constructing a

12  mosque on the property where he lived, the wooded area behind

13  where he lived?

14  A.   I don't believe that came up -- that seems familiar, but I

15  don't believe it came up -- that he brought it up.

16  Q.   Did it happen in your discussion with Mr. Bell?

17  A.   I don't believe so.

18  Q.   Did you have any discussion with him about the group that

19  he had been consuming these Anwar al-Awlaki videos with when he

20  got back?

21  A.   No.

22  Q.   Did you have any discussions with him about if he had

23  given instructions to other juveniles to -- to -- don't tell

24  anybody I'm back in the country, anything like that?

25  A.   No.  He didn't mention that.

1  Q.   Okay.  Would it be fair to say that anything related to

2  what he had done when he was overseas -- that just didn't come

3  up in the context of your discussions about what happened when

4  he got back in the U.S.?

5          That's a bad question.  Let me rephrase that.

6  A.   It was -- okay.

7  Q.   All this radicalization that went on --

8  A.   Right.

9  Q.   -- the buildup and then going overseas --

10  A.   Right.

11  Q.   -- when he got back in the United States, did he have any

12  discussion with you about anything he may have done along those

13  same lines when he returned?

14  A.   No, he did not.

15  Q.   Did he say he didn't do anything along those same lines?

16  A.   No, he didn't.  It just -- there was a very foggy

17  recollection.  It was very difficult to get a sequence of

18  events, a lot of disorganization in the conversation.  So I

19  didn't get a lot of information.

20  Q.   Would disorganization be consistent with trying to make

21  false statements or cover something up?

22  A.   No.  I -- he answered everything that I -- what I

23  consistently had to do was make a direct question.  And then he

24  would be very forthcoming in answering it.

25          But then there would be a tangent and I'd have to

1    redirect him back to the question at hand.  So I would have had

2    to very directly ask the questions like you're asking to get

3    that information.

4         But I don't believe that he was trying to cover

5    anything up in my direct examination of him.  I don't believe I

6    asked the questions the way that you're asking them.

7    Q.   All right.  You just didn't inquire into that area?  Would

8    that be a fair statement?

9    A.   Right.  So my questions were more general.  What did you

10   do when you got back?  What did you do after this date?  What

11   happened then?

12        THE COURT:  Anything else, Mr. Heavener?

13   BY MR. HEAVENER:

14   Q.   Just with regard to the -- if you wait before you take

15   action, that would not -- would you still find that impulsive?

16   A.   Depending on what you're doing while you're waiting.  Are

17   you weighing the consequences of the actions?  Are you looking

18   for alternatives?  Are you, you know, seeking out new

19   information to make sure you're making the best decision?  Or

20   are you kind of focused on that impulse and just kind of

21   disregarding any other information that's coming at you?

22        MR. HEAVENER:  Just one second, Your Honor.

23        THE COURT:  Thank you.

24     (Counsel confer.)

25        MR. HEAVENER:  No further questions, Your Honor.

1        THE COURT:  Ms. Call?

2        MS. CALL:  Thank you, Your Honor.  I think I only have

3   about four or five, so I should be okay.

4                    **REDIRECT EXAMINATION**

5   BY MS. CALL:

6   Q.   Mr. Heavener had asked you if this was considered, say, a

7   comprehensive exam.  And you said it could take days of testing

8   to determine if there were any neuropsychology issues.

9        If you saw any indication of that in your testing or

10  your interview, would you have noted that in your report?

11  A.   Absolutely.

12  Q.   And you indicated that Mr. Bell has a high IQ and scored

13  very well on the word test.  Would that be consistent with him

14  being able to memorize phrasing, language, statements if he's

15  watching hours of these videos from al-Awlaki.

16  A.   Yes.  Absolutely.

17  Q.   And when you indicated that on some of the tests he had

18  what you called an adequate test result -- I believe what you

19  had indicated was that there's some tests that you score with

20  either a number or a high/low, and then some are more that you

21  say adequate/inadequate?

22  A.   Correct.

23  Q.   It's kind of an up-or-down test?

24  A.   Correct.

25  Q.   And so indicating that he's adequate doesn't provide any

1   scale to where he fell in those tests, because they're not

2   scaled tests?

3   A.    Correct.

4   Q.    Okay.  And when you indicated asking him within the last

5   six months have you suffered from these kind of indications or

6   side effects or consequences of ADHD, Mr. Bell had been in

7   detention for six months prior to your exam, correct?

8   A.    Correct.

9   Q.    And that's a more regimented environment --

10  A.    Correct.

11  Q.    -- kind of like what you were describing, you -- mom and

12  dad are there to tell you when to go to school, when to come

13  home, when to get to the gym, when to get back, correct?

14  A.    Correct.

15  Q.    So he might not report consequences because of the

16  environment he's in?

17  A.    Correct.

18          MS. CALL:  No other questions, Your Honor.

19          THE COURT:  I just had one question for you, ma'am.

20  If I were to ask you to assume that -- for example, in that

21  statement that you said you saw Mr. Bell make the long -- it's

22  been called a sermon, but it was a statement about his beliefs

23  and what he was going to do, and why he was doing it and so

24  forth -- if I were to ask you to assume that as a layman -- as

25  somebody watched that, they might say, This person not only

1   seems like he's 18, he looks like he could be even older than

2   18, he could be -- he looks like an adult --

3          THE WITNESS:  Yes.

4          THE COURT:  -- or he looks like somebody who is older

5   than his years -- what would you say to me in response to that

6   observation, vis-a-vis your statements that persons with ADHD

7   actually have executive functioning that's younger than they

8   are?

9          THE WITNESS:  Right.  So that -- that's actually very

10  common, where adolescents and adults will actually look and

11  have a demeanor of someone that's older, especially Mr. Bell is

12  very tall.  He had facial hair.  He's very intelligent, so he

13  can memorize these things, he can speak eloquently.

14         But when you get down into the can you take care of

15  yourself, can you get your needs met, can you -- if you had the

16  responsibility for someone else, can you follow through on

17  those types of hard, daily life things, you would see those

18  skills just be very, very immature.

19         THE COURT:  Thank you, ma'am.  Any questions based on

20  my questions?

21         MR. HEAVENER:  No, Your Honor.

22         MS. CALL:  No, Your Honor.

23         THE COURT:  Thank you for your time, ma'am.

24         THE WITNESS:  Thank you.

25     (Witness excused.)

1          THE COURT:  All right.  What we're going to do is

2     this -- it's 20 to one.  We're going to take a recess for

3     lunch.

4          What I'm anticipating this afternoon is that we will

5     start with the guidelines.  We'll talk about them.  Then we'll

6     get into the 3553(a).  And we'll go ahead and have our argument

7     and presentations.

8          Ms. Call, is Mr. Bell going to allocute?

9          MS. CALL:  Briefly, Your Honor.

10         THE COURT:  Okay.  I think I will probably hear that

11    at the end.  But we'll see about that.  But if he's going to do

12    that, he needs to prepare to do so.

13         And it's possible, Ms. Call -- and you may need to

14    think about this.  It's possible that I'll want to ask him some

15    questions.  And I want to be able to ask him what I want to ask

16    him.

17         But if you or he are going to have an objection to

18    that, you'll need to let me know, or you can object to a

19    specific question.  But I just wanted to give you a heads-up on

20    that.  Okay?

21         All right.  Anything else?  We will -- let's see.  I

22    guess we'll do an hour.  So 1:45.  Okay?

23         COURT SECURITY OFFICER:  All rise.

24    (Recess, 12:43 p.m. to 1:45 p.m.)

25         COURT SECURITY OFFICER:  All rise.  This Honorable

1    Court is now in session.  Please be seated.

2         THE COURT:  All right.  We are back on the record, all

3    parties and their counsel are present, including Mr. Bell.

4    Before we move to the next phase of the case, I wanted to go

5    back and address a couple of items of evidence.

6         I had reserved ruling on Government's Exhibit C-33.

7    And that was the FBI lab report about the explosive devices.

8    And we went back and looked at the law.  And my recollection of

9    it was correct, that the rules of evidence don't apply, so any

10   hearsay objection is not necessarily to be countenanced.

11        And otherwise, really, the test is whether the court

12   is able to consider the evidence reliable within its context.

13   And I -- for the reasons I stated yesterday, I have no reason

14   to doubt the authenticity of the report or its contents or the

15   regularity with which it was prepared.

16        And so I am going to admit Government's Exhibit C-33

17   over objection.

18      (Government's Exhibit No. C-33 was received into evidence.)

19        THE COURT:  The other government exhibits -- we went

20   back and looked to see which ones weren't in.

21        C-41 was not put into evidence.  That's actually --

22   somebody did a transcript of the journal.  And I'm -- I

23   wouldn't mind being able to read that, as opposed to the

24   journal, but I don't know under what circumstances it was

25   prepared.  I don't know why the government didn't offer it.  So

1   I just wanted to ask you-all about that.

2          MR. HEAVENER:  Your Honor, we simply prepared -- and I

3   included it for the very reasons the court is indicating.  We

4   think it's helpful.

5          THE COURT:  Okay.

6          MR. HEAVENER:  I would certainly offer it into

7   evidence at this time.

8          THE COURT:  Okay.  All right.

9          MR. HEAVENER:  But I don't --

10         THE COURT:  Was it prepared by -- who actually

11  prepared it?

12         MR. HEAVENER:  I believe an FBI analyst prepared that.

13         THE COURT:  Okay.

14         MR. HEAVENER:  And where they were uncertain of a word

15  they used, I think, unknown or unintelligible.

16         THE COURT:  Ms. Call, whether it's substantive

17  evidence or just a go-by for me, to the extent that I'm

18  interested in the writings in Mr. Bell's journal, which I think

19  you've mentioned a number of times, as well -- and, of course,

20  I haven't had the time to actually read the whole thing.

21         But do you have any objection to me using Government's

22  Exhibit 41, the transcript of the journal?

23         MS. CALL:  No, Your Honor.

24         THE COURT:  Okay.  All right.  Well, I'm going to go

25  ahead and admit it, then, in evidence as -- as a use, as a

1    go-by.

2         Obviously -- you know, I always tell the jury if I

3    ever have any doubt between the original and transcript, you go

4    with the original.  And I'll tell myself the same thing.

5         But I think it would be helpful to me to be able to

6    have access to that.  So I will admit that.

7       (Government's Exhibit No. C-41 was received into evidence.)

8         THE COURT:  And then the only other one -- and I'm not

9    soliciting it, but it's in -- there's a C-44, which is an audio

10   recording of a call with the mother, is what I'm told.  And I

11   don't think that was put into evidence.

12        I can't remember if it was referred to or not.  I

13   remember hearing one snippet of a phone call with a mother

14   about food stamps.

15        Is that the right -- is that the same one?  Or is that

16   a different exhibit?

17        MR. HEAVENER:  May we approach, Your Honor?

18        THE COURT:  Sure.

19      (Sidebar conference.)

20        MR. HEAVENER:  Judge, we had -- there was some

21   suggestion in Mr. Bell's sentencing memorandum that --

22   distinguishing him between the juvenile, that he had not been

23   provided the opportunity to cooperate.

24        THE COURT:  Right.  Okay.

25        MR. HEAVENER:  I outlined the opportunities he was

1   given in our response.  That call was reference to a phone call

2   where he and his mother actually discuss, you know, the FBI

3   wants me to talk and I've decided -- I've consulted with

4   counsel, but I'm not going to do that.  So that's...

5          THE COURT:  Okay.

6          MR. HEAVENER:  I didn't put it in because I -- we

7   considered it to be part of the sealed part of it.

8          THE COURT:  Thanks.

9     (The following proceedings occurred in open court:)

10         THE COURT:  Okay.  So I think that takes care of the

11  evidence, then.  And what I have in mind is that we will now

12  proceed more traditionally -- and I don't know how long this is

13  going to go.

14         I really don't have a sense for what people want to

15  say.  I mean, I've read an awful lot.  But that's not always

16  what people want to do.

17         But the way that I'm looking at this, Ms. Call had --

18  I don't believe the government had made any objections to the

19  guidelines.  Let me look and be sure about that.  And I would

20  simply start there.

21         Well, actually, the government did have an objection.

22  It was a fairly minor objection.  And I'm not sure you want to

23  be heard on it or not.

24         It had to do with whether the airline ticket was --

25  whether the Department of State was entitled to reimbursement

1    for the airline ticket.

2            And I doubt that's the most important thing on your

3    mind.  But does the government want to be heard on that

4    objection any further?

5            MR. HEAVENER:  Other than to simply say the government

6    requests that be included for restitution.

7            THE COURT:  Okay.  All right.  Any other objections,

8    Mr. Heavener, to the guidelines or to the PSR?

9            MR. HEAVENER:  No, Your Honor.

10           THE COURT:  All right.  So, Ms. Call, there were a

11   number of objections listed by Ms. Anderson.  And I'm not sure

12   which ones you want to be heard on.  Obviously you've argued

13   some of them in your memo.  But let me go through these one at

14   a time and just see if you want to be heard or not.

15           The first objection is paragraph 12, offense conduct.

16   The -- it was an objection to the PSR, referring to two other

17   individuals.  And I don't know if you want to be heard on that

18   further or not.

19           MS. CALL:  No, Your Honor.  I would rely on the

20   addendum.

21           THE COURT:  Okay.  Number -- next is -- No. 3 is

22   paragraphs 38 and 39, adjustment for obstruction of justice.

23           Now, as I understand it, the probation officer did not

24   accord an obstruction of justice enhancement, but you were

25   objecting more to the language that was used, which I guess

1    could lead one to say that Mr. Bell shouldn't have disposed of

2    the records -- the video files, I guess, were deleted upon his

3    return from the Middle East.

4            Do you want to be heard on that?

5            MS. CALL:  No, Your Honor.  I would rely on the

6    addendum.

7            THE COURT:  All right.  No. 4 is paragraph 45, which

8    is the offense computation.  You have made a legal argument

9    that rather than the cross-reference -- the guideline reference

10   that the probation officer used to make the calculations here,

11   that the more correct one would have been 2M, as in Mary, 5.3.

12           I read your briefing on that.  And I'm prepared to

13   hear from you on it if you care to be heard further.

14           There were some cases that were cited and some -- some

15   arguments made.  And I -- I think I have those in mind, but --

16   and let me just stop right here.  Here's what's going to happen

17   today, so everybody is clear.

18           I'm going to go through these.  I'm going to listen to

19   people.  Whether it be a guideline, whether it be a 3553(a),

20   whatever, I'm going to listen.  And we will end the day after

21   everybody has said everything they want to say, including

22   Mr. Bell.  But I am not intending to pronounce sentence today.

23           And so the only reason I'm bringing that up is I am

24   going to be considering all of these arguments as I go through

25   my analysis and make my final decisions.

1          And so all we're doing today is supplementing whatever

2     argument that you've previously made about them and then making

3     any new arguments you want to make today, so I'll have

4     everything in front of me when I do sit down and make a

5     decision.

6          So do you want to be heard further on paragraph 45,

7     Ms. Call?

8          MS. CALL:  No, Your Honor.  I would rely on the

9     sentencing memos and briefings that we filed and the summary of

10    the addendum.

11         THE COURT:  Okay.  No. 5, paragraph 49, role in the

12    offense, which has been a -- kind of a subject of some of the

13    questioning, surely.

14         And I -- obviously, I'll have the benefit of all the

15    evidence and all of the examination and cross-examination.  But

16    if you wish to be heard on that now, or if you have some

17    insight that you want to give me based on the testimony that

18    you've heard, I'll be happy to hear from you.

19         MS. CALL:  Yes, Your Honor.  I think that part of the

20    end of the addendum was that the government would introduce the

21    videos so that the court would have a fuller understanding of

22    the issue regarding leadership.

23         And I would just ask the court to note that during the

24    videos and the discussions, there was some, I guess, hint or

25    implication in some way that Mr. Bell had attained -- to

1    isolate the others that were involved.

2         And I think that you can see from the videos that they

3    were free to come and go, that there's no indication that

4    Mr. Bell had anyone else residing with him, that he kept anyone

5    physically isolated from the community, or from any family

6    members, or anything like that, and that particularly looking

7    at the juvenile, who's an issue here, this was a person who had

8    traveled overseas himself in the past.  He obtained -- he

9    already had his own passport.  He spoke Arabic.

10        His statements to the FBI were that he had become more

11   devout in his own faith the year before he met Mr. Bell, that

12   he and another person had helped convert Mr. Bell to Islam, and

13   that once he went overseas he assumed a more active role in

14   facilitating the plans.

15        And that's borne out by the fact that he helps obtain

16   housing with his own family members for some period of time,

17   that he had offered to pay for the plane tickets once Mr. Bell

18   lost his own money, and that he was the one to suggest the plan

19   to go through Oman, and that all of this indicates that

20   Mr. Bell's function does not rise to the level of being a

21   leader or a manager who directed the activities of the two of

22   them to warrant a two-level increase.

23        THE COURT:  Thank you.

24        Mr. Heavener, does the government wish to be heard on

25   role?

1          MR. HEAVENER:  Your Honor, only to say briefly that

2     I'll rely on the arguments we made in our briefing.  I would

3     also ask the court to consider all the evidence that was

4     presented.

5          I believe in one of the videos Mr. Bell specifically

6     references the commander.  And the court need only look at the

7     cemetery videos to see that Mr. Bell was the one providing

8     direction and all the supplies for that.

9          THE COURT:  Thank you.

10          MS. CALL:  And in the cemetery incident, it was not

11     the juvenile who was involved.

12          THE COURT:  Thank you.

13          All right.  Ms. Call, those are the only recorded

14     objections that were remaining that Ms. Anderson has -- has

15     given me.  And I think that -- when I read your brief, I think

16     those were the ones you were addressing, as well.  But let me

17     make sure about that.

18          Are there any other objections to the guidelines

19     scoring or the PSR that -- that we don't have account of,

20     Ms. Call?

21          MS. CALL:  No, Your Honor.  There are no others, other

22     than the ones noted in the addendum.

23          THE COURT:  Thank you.

24          Mr. Heavener, any other guideline issues or objections

25     to be noted by the government?

1          MR. HEAVENER:  No, Your Honor.

2          THE COURT:  Okay.  All right.  Again, I'm not going to

3    pronounce guidelines at this time, like I typically would do,

4    because I'm going to consider all of that.

5          And when I do pronounce, whether it be in a written

6    opinion, or whether it be orally from the bench, I'm going to

7    address each guideline issue and objection.

8          The government had -- even in ones that were not

9    objected to -- you know, I'll want to make sure that as I go

10   through I state what the basis for that is and why it's -- it

11   is what it is.  But -- but I think we've done everything we can

12   do with guidelines now.

13         We know the guidelines -- I think -- I think,

14   Ms. Call -- am I correct that -- we know that Mr. -- under the

15   guidelines that were proposed by the probation officer

16   Mr. Bell -- because of it being a terrorism-related crime, the

17   guidelines automatically accord him the highest level of

18   criminal history, regardless of what his real criminal history

19   is.

20         And then right now -- if I accepted the probation

21   officer's scoring, he would be at a 43/VI, which is --

22   recommends life imprisonment.

23         We all know, of course, that the statutes that he's

24   charged under -- it would not permit a life sentence.  And so

25   the maximum sentence that would be permitted by law would be 30

1   years, but the guidelines would be life.

2           I think, Ms. Call, if I'm -- if I'm looking at this

3   correctly, that even if I accept all of your objections -- and

4   I'm not saying I will.

5           But even if I did, I think he -- I think Mr. Bell

6   would be at a 37/VI, which is 360 to life, so 30 years to life,

7   which, again, at the bottom of that guideline would be the

8   maximum I could sentence him to anyway.

9           Is that -- do you have the same understanding,

10  Ms. Call?  Or do you have a different understanding?

11          MS. CALL:  No, Your Honor.  I concur.

12          THE COURT:  Okay.  So whether it's 43/VI, whether it's

13  37/VI, or whether it's somewhere in the middle, the fact of the

14  matter is that the guidelines are going to be advising me that

15  the -- that the sentence I should be giving Mr. Bell is 30

16  years, because that's the most I can give him under the law.

17          Now, as we all know, the guidelines are not mandatory.

18  And there is no minimum mandatory sentence that I'm aware of in

19  this case.

20          So the next phase we move to is a discussion of the

21  3553(a) factors, which are the other sentencing factors that

22  the court will need to take into account in arriving at a

23  sentence that, in the words of the law, is sufficient but not

24  greater than necessary.

25          And so what I think I'm going to do, Mr. Heavener, is

1    I'm going to call on the government to give me its analysis and

2    recommendations.

3            Obviously I know you've made a written recommendation,

4    but whatever oral presentation you care to make, based on

5    either the testimony or anything else.

6            To the extent you want to rely on briefing, that's

7    fine.  But this is the government's opportunity to make a final

8    recommendation and argument to me.  And then I'll hear from

9    Ms. Call.  And if Mr. Bell wishes to speak, that will be his

10   opportunity.

11           So, Mr. --

12           MR. HEAVENER:  Your Honor, may I have permission to

13   use the document camera during the government's presentation?

14           THE COURT:  Sure.  Absolutely.  Absolutely.

15           MR. HEAVENER:  Your Honor, when we begin -- I'm going

16   to begin with the guidelines, because I think the guidelines

17   capture one of the things the court needs to do, and that is to

18   have a judgment that reflects the seriousness of the offense.

19           And when we just talked about the guidelines, where

20   I'm going to begin is to begin with the point that Mr. Bell

21   already comes into the sentencing hearing not being as bad off

22   as he could be under the guidelines.

23           His statutory caps are 30 years.  By virtue of his

24   plea agreement -- he's not been charged with a 924(c), which

25   was viable.  So that could have triggered a guideline

1  recommendation of life.

2          He's not been charged with the actual conspiracy he

3  conspired and attempted to support.  So that could have

4  triggered a guideline recommendation of life.

5          And he's received the government's agreement that

6  whatever this court sentences him to can be run concurrent to

7  whatever sentence he faces in state court for the insurance

8  fraud case.

9          So I think that as we begin the analysis of the

10  seriousness of the offense, we need to understand that Mr. Bell

11  has already received a substantial benefit as a result of his

12  plea agreement.

13          But more than that, this is a --

14          THE COURT:  Let me ask you about charging -- just

15  while I was thinking of it, there were two questions I had.

16  First of all, my understanding has always been that I can

17  intimate to the state judge, if the state judge ever proceeds

18  on the insurance fraud case -- I can intimate to that judge

19  that I think the sentences ought to run concurrently, but I

20  can't bind that judge.

21          In other words, the second judge to sentence is always

22  the one that gets to decide whether it's concurrent or

23  consecutive.

24          You agree with that, right?

25          MR. HEAVENER:  I do agree with that, Your Honor.

1          THE COURT:  Okay.  But I understand that the

2  government's support of that is appropriate and that it may

3  well have a good influence on the state judge.  So I -- but I

4  just wanted to make that point.

5          The second point was just a -- and I appreciate what

6  you're saying, that I guess he could have been charged with

7  956, which I guess is a life crime.  He could have been

8  charged -- I think you said in your sentencing memorandum with

9  even a -- potentially a gun charge that would have been added

10  on to the back of the charges.  And that would have been

11  another way that his punishment could have been more severe.

12  So I -- I understand what you're saying.  I do.

13          When I actually looked at what he was charged with,

14  however, I was interested -- and I just wanted your analysis

15  here.  He's charged with conspiracy to provide material

16  support, and then also attempt to provide material support.

17          And I was interested in -- because his conduct

18  obviously was the same.  And I'm interested in what the

19  rationale -- for lack of a better term, for charging him with a

20  conspiracy to provide material support, and at the same time in

21  charging with attempt to provide material support, when those

22  two activities -- when those -- when the activities encompassed

23  by those two seem largely the same to me.

24          I know obviously a conspiracy -- you have to have

25  another person involved.  But when you look at the elements of

1    the offenses, other than that, they're pretty much the same.

2            So I just -- can you comment on that?

3            I mean, I know charging decisions are charging

4    decisions.  But in terms of the -- of the thinking as to why

5    two counts instead of one, or why -- why two counts instead of

6    three, can you tell me what the -- what the government's

7    viewpoint on that was?

8            MR. HEAVENER:  Yes, sir.  I think the -- the

9    conspiracy count certainly captures a broad swath of conduct.

10   Maybe the attempt count does not capture all that conduct.  And

11   I think the conspiracy can certainly be completed without

12   setting foot on the airplane to go to the Middle East and join

13   up.

14           I mean, he could certainly have conspired and agreed

15   to do all these things and then not do them and it still be a

16   crime.  But with regard to the attempt, I mean, he certainly

17   took a substantial step in completing the actual crime itself.

18   And that's why there's two counts in the indictment.

19           THE COURT:  And there's nothing -- and I know it was

20   pled to.  And I'm not trying to make a controversy where

21   there's not one.

22           But he could have been tried and convicted of both of

23   these counts without there being any contention that they were

24   somehow duplicative of each other?

25           MR. HEAVENER:  Yes, sir.

1          THE COURT:  Okay.

2          MR. HEAVENER:  And I think the law would bear me out

3  on that.

4          THE COURT:  All right.  Go ahead.

5          MR. HEAVENER:  So the need of the court to fashion a

6  judgment that reflects the seriousness of the crime -- I think

7  we have to begin with where Agent Berry began his testimony.

8  And that is this radical cleric Anwar al-Awlaki.

9          You've heard from Mr. Braniff -- I want to just

10  highlight -- one of our courts of appeal has said, in the law

11  about Anwar al-Awlaki -- it's *United States versus Hassan*, 742

12  F.3d 104, on page 117.

13          Mr. al-Awlaki was associated with two of the 9/11

14  highjackers.  He has been linked to other terrorist activities

15  in the United States.  And, of course, the court heard

16  something about the underwear bomber in Detroit.

17          He left the United States for the country of Yemen and

18  never returned.  He's described by the court as an active,

19  high-ranking member of al-Qa'ida.

20          He is exactly described by the court the same way

21  Mr. Braniff described him, as a violent -- he promotes violent

22  jihad against America, and he promotes the idea that violent

23  jihad against America was a binding obligation on all Muslims.

24          He regularly surfaces in cases of homegrown

25  terrorists.  And he is frequently attributed as a primary

1    source of radicalization.  And that's a completely different

2    case that went all the way up on appeal to one of our circuit

3    courts of appeal.  And that's the description of Mr. al-Awlaki.

4         That description is borne out -- at this sentencing

5    the court heard Mr. al-Awlaki's message to the United States.

6    And his message has not changed.

7         I believe Mr. Braniff's testimony was very insightful

8    about how serious this crime is.  He told you things about

9    al-Awlaki's messages.  You either have to take a trip from the

10   United States and live among Muslims or you have to participate

11   in violent jihad in the United States, if you can't get there.

12        He talked about the importance of youth in

13   Mr. al-Awlaki's message.  And you heard the appeal to youth.

14   You heard Mr. Bell making that same appeal.  And he described

15   to you how it's not just a violent ideology, it's a call to

16   action.

17        Based upon Mr. al-Awlaki, Mr. Bell chose Yemen as his

18   country of destination.  And he chose what Mr. Braniff

19   described to be the third most violent terrorist organization

20   in calendar year 2012.  I think he attributed 900-some-odd

21   deaths to Ansar al-Shari'a, which is just a -- an alias for

22   al-Qa'ida.

23        Mr. Braniff explained the significance of why Mr. Bell

24   and another individual, dressed in all black, put masks on,

25   taped their shoes, carried a 9mm loaded pistol and went and

1    destroyed religious statues in a cemetery.

2            It wasn't a child prank.  If it was a childish prank,

3    there would be no need for all that preparation, no need for

4    all that planning, and no need for all that forethought.  There

5    was very, very important symbolism with what they were doing on

6    July the 4th.  And Mr. Braniff explained that.

7            Mr. Braniff also explained what Mr. al-Awlaki's view

8    is of the United States citizenry.  He said that there is a

9    teaching of Mr. al-Awlaki that justifies violence against

10   civilians, when the court asked him that question.

11           And this teaching is that any civilian here who

12   participated in democracy is engaged in false worship.  And

13   paying taxes to the United States Government is essentially an

14   act of war.

15           So those things all show that Mr. al-Awlaki is serious

16   business.  He's been serious business in every other terrorist

17   case that his name has surfaced.  And he's serious business

18   here.

19           I think it's important to look at what Mr. Bell's

20   views of al-Awlaki was.  And I'm going to read directly from

21   the letter that Mr. Bell submitted to the court.

22           Mr. Bell says, My search led me to the Internet, where

23   I found a plethora of scholars and websites dedicated to

24   Islamic studies.  I would, for the most part, watch videos on

25   YouTube, and soon stumbled upon Anwar al-Awlaki through his

1   YouTube account.  He had hundreds of lectures on a variety of

2   subjects establishing his credibility, which, in turn, led me

3   to believe everything he preached.  I was unaware that he was

4   considered radical.  And his lectures on fighting and jihad

5   interested me because it was a subject no one talked about, but

6   yet was on everyone's mind, due to constant violence in the

7   Middle East over the past few decades.

8            And this is Mr. Bell's exact words, Needless to say,

9   under the guidance and the influence of Anwar al-Awlaki, my

10  understanding of Islam morphed into something similar to that

11  of a political activist.

12           And that's exactly what we're talking about.  We're

13  not talking about the difference between -- we're not talking

14  about these matters related to the Islamic faith.  We're

15  talking about political activism and seeking to overthrow

16  legitimate and established governments.

17           Mr. Bell continued and he says, I still to this day

18  can't name the reason why Anwar's message was so captivating

19  and influencing to me at the time.  With him as my -- and this

20  is Mr. Bell's exact quote, With him as my role model, it became

21  my duty to become a scholar myself and play an active role in

22  the world.

23           Now, if Mr. al-Awlaki is Mr. Bell's role model, the

24  only active role he can play in the world is either travel to

25  join the terrorist organization among Muslims or participate in

1    jihad here in America, where he finds himself.

2         Mr. Bell says, Months passed by.  And with Anwar as my

3    teacher, I truly believed I was learning more every day.  And I

4    think the court heard the testimony he had 372 of

5    Mr. al-Awlaki's lectures on his computers, over 170 hours of

6    this radical ideology and materials.  And he told the agents

7    when he got back to the United States that he had consumed 85

8    percent of it.

9         He says in his letter after a whole year had passed --

10   think of that, a whole year of listening to these lectures --

11   of me being a Muslim, and under the guidance of Anwar and other

12   radical scholars I listened to, we began to feel that simply

13   volunteering at the mosque wasn't enough.  We wanted to live in

14   an Islamic country under Islamic law, study under a scholar in

15   person, and support our fellow Muslims any way possible.

16        That language -- that last sentence I read is exactly

17   what Mr. Braniff was describing as al-Awlaki's call to the

18   youth, to come to Yemen.  And it's interesting even in

19   Mr. Bell's letter that he goes from referencing Anwar al-Awlaki

20   to -- from using his last name to using his name on a

21   first-name basis.

22        He continues.  He says, By the time I knew Anwar was

23   an extremist, but it didn't matter.  His last message calling

24   Muslim youth to Yemen as government upheaval in a religious

25   revival was taking place inspired me.

1          And, Your Honor, the use of that word "inspired" is

2    important.  Because we know from Mr. Braniff's testimony that

3    *Inspire* is the cover -- it's the title of the on-line magazine

4    that al-Qa'ida puts out.

5          He continues within that same message.  He said it was

6    every Muslim's obligation to migrate away from any Western

7    country and to live among fellow Muslims without question.

8          What's interesting is Mr. Bell doesn't give the second

9    half of Mr. al-Awlaki's message, which is you -- if you're not

10   living in a Muslim country, your job is to engage in violent

11   jihad against America and its interests.

12         Mr. Bell said, I viewed every word he, Mr. al-Awlaki,

13   said as truth.  I felt like this was my calling, this was my

14   time and chance to have a real impact in the world.

15         The time I did spend with friends I tried promoting

16   things I thought would show my dedication to Anwar's teachings.

17   And he says, Because he was so close a friend and we both

18   believed in what scholars like Anwar preached, I decided to

19   tell him, referencing the juvenile and a few other friends, the

20   truth.

21         I told them I was going to Yemen to start a new life

22   and live among Muslims.  Those are all words that describe

23   Anwar al-Awlaki, but they're Mr. Bell's direct quotes.  They're

24   words in Mr. Bell's language.

25         So we think that that makes this crime very serious,

1   who al-Awlaki was, what his ideology was, and the fact that he

2   was so influential with regard to Mr. Bell.

3          But even if you took all that away from this case,

4   Your Honor -- even if you took away the fact that this is

5   terrorism, the fact that he tried to join the third most

6   violent terrorist organization in 2012, what you have is

7   Mr. Bell attempted to kill and to murder people.  That's what

8   he was doing.

9          He got on a plane to go join a terrorist organization

10  whose job was to fight militantly -- militarily fight and to

11  kill people.  He didn't even know who he was killing, never met

12  them, never interacted with them.  He just knew that he was

13  supposed to get on that plane and go and kill people.

14         So if we took all the terrorism away and said Mr. Bell

15  had pled guilty to attempting to murder someone, I think it

16  sets the context of why the guidelines are where they are in

17  this case.

18         I will close with regard to the seriousness of the

19  crime by saying this, that whatever this court sentences

20  Mr. Bell to is going to be far more merciful than what Mr. Bell

21  had intended to do to the people in the country of Yemen, where

22  he wanted to go fulfill his mission.

23         Whatever this court does to him, you're not going to

24  murder him.  You're not going to kill him.  Whatever you do to

25  him is going to be far more merciful than the mercy he was

1    prepared to establish.

2          So that's with regard to the need of the judgment to

3    reflect the seriousness of the offense.

4          Another thing the court's judgment needs to do is to

5    take account of Shelton Bell's history and characteristics.  As

6    I indicated earlier, I'm relying upon our arguments that we

7    previously provided in briefing.

8          But I do want to focus on one particular

9    characteristic.  And that's the characteristic -- the

10   propensity for honesty.

11         You heard Mr. Bell, in his own words, after he gets

12   back from overseas -- you heard Mr. Bell tell a 16-year-old to

13   lie to his parents.  You heard Mr. Bell say to lie to your

14   parents because, quote, We have to resort to any means

15   necessary.  It's not, more or less, lying.

16         That's in Government's Exhibit B-1, that conversation.

17   It was played during the sentencing hearing.

18         You also have the juvenile telling you something

19   similar -- or telling the agents something similar.  And that

20   was Mr. Bell telling him about how he stole cash from

21   Mr. Papagiannakis and how that it's okay to steal because Anwar

22   would approve of it, because it's in connection with the

23   mission.

24         So that thread runs throughout this entire case, lying

25   is okay, because it's for the cause.  And it makes sense,

1   because Mr. Bell, as he told Agent Berry -- when he got off the

2   plane from the Middle East, he told Agent Berry he was prepared

3   to kill for the cause.

4           It's not a big stretch to think that lying for the

5   cause is any big achievement or any big problem.  And I think

6   I'm going to demonstrate to the court that Mr. Bell has lied

7   for the cause.

8           We know -- before he gets back from the United States,

9   we know that he came up with a cover story.  He says that in

10  his letter.  He says that -- and all of the witnesses say that,

11  that the cover story was, We were going to tell our parents, we

12  were going to tell our faith leaders at the mosque, that we

13  were going overseas to make Hajj.  That's a cover story to mask

14  and conceal our true intention, which was to go to Yemen.  And

15  I think in his words it was to go straight to Yemen.

16          We also know that he was comfortable with telling lies

17  on his passport application.  I don't see any way you can get

18  around the fact that he lied about his address.

19          There's no way you can get around the fact that he

20  lied about his employment status, when five days earlier he

21  opened a bank account saying he was employed in the flea

22  market, and the day after he submitted his passport application

23  he obtained a laptop computer, lying and saying he was employed

24  at the flea market, or saying he was employed at the flea

25  market.

1          Those statements are inconsistent.  There's no way you

2   get around that in that short period of time.  And he also

3   lied -- and this is probably most important.  He lied about the

4   purpose of his trip.  The question asked:  What's the purpose

5   of your trip?  And he said, I'm visiting Israel for about four

6   weeks.

7          Well, what we know is he had one-way tickets to the

8   Middle East.  He had no plans to return to the United States.

9   So those are lies that he committed.

10         We also know that he was comfortable with stealing.

11  If the testimony about Mr. Papagiannakis is to be credited,

12  which we think it is -- there's no real reason why, upon

13  learning that Mr. Bell had gone overseas he would -- he would

14  get a police officer and go out to Mr. Bell's grandmother's

15  house -- that's the -- that's consistent with him having given

16  Mr. Bell money.  It's not consistent with him not having given

17  Mr. Bell money.

18         And the phone records are consistent with

19  Mr. Papagiannakis having given Mr. Bell money, not not having

20  given him money.

21         But we know he stole that money.  And we also know

22  that he had no intention of returning the laptop he rented from

23  Aaron's Rentals, because he wasn't intending on coming back to

24  the United States.  So he was prepared to steal.  He was

25  prepared to lie for the cause when he went to Jordan.

1          The question is, then, was he prepared to steal, was

2   he prepared to lie when he comes back from Jordan.  Well, we

3   know that he lied to Agent Berry when he gets off the plane.

4   And this is after he's been detained in Jordan, after he's been

5   in the Jordanian holding cell.

6          He told Agent Berry he didn't know anything about a

7   firearm.  He told him that he minimized explosives and said

8   that someone made a false complaint about me.

9          And then we know that -- we've got a series of lies

10  that I'm going to go through in this letter that he's presented

11  to the court, which brings me to the letter.

12         And I think the court struggles with this letter.  And

13  I think he -- the court's questions to Mr. Braniff were

14  insightful.

15         And I'd like to spend a fair amount of time with the

16  letter, because I think the letter -- if we walk through it,

17  it will demonstrate to the court that it's not reliable.  And

18  it's not reliable for a number of reasons.

19         First of all, if you look at page one of the letter --

20  and with the court's permission, may I put it on the document

21  camera?

22         If you look at page one of the letter --

23         THE COURT:  Mr. Heavener, can I either ask you, or if

24  you don't know can I ask Ms. Call, when this letter was

25  authored?  Do you know when it was authored?

1           Ms. Call, when was it authored?

2           MS. CALL:  Your Honor, it's been a work in progress

3      for the last few weeks while we got ready for sentencing.  And

4      Mr. Bell finalized it last week.

5           THE COURT:  Thank you, ma'am.

6           Go ahead, sir.

7           MR. HEAVENER:  All right.  And I apologize for the

8      highlighting, but I --

9           THE COURT:  That's fine.

10          MR. HEAVENER:  -- it's the only copy I brought with

11     me, Your Honor.

12          THE COURT:  That's fine.

13          MR. HEAVENER:  Mr. Bell makes the statement early on

14     in his letter that upon his conversion to Islam he looked to

15     the head scholar, Imam Joe Bradford, for inspiration -- and I,

16     again, would suggest that's a very important term -- for

17     inspiration, because we had so much in common and we both came

18     from a Christian background.

19          The problem with that statement, looking to Imam

20     Bradford for inspiration, is the juvenile tells us a little bit

21     different story.  The juvenile, as you may recall Agent Berry's

22     testimony, said that Imam Bradford came to the group and said,

23     You all need to quit this, this is radical, we're going to

24     throw you out of the mosque if you don't stop engaging in this

25     kind of behavior.

1          I'd suggest that that account by the juvenile is

2    credible, because what we have is we have the mosque making a

3    report to the FBI, which is consistent with what the juvenile

4    said about that, and we also have the video the court reviewed,

5    where Mr. Bell is being rebuked by an older man.  And it

6    appears to be some setting in the mosque.

7          And that whole conversation that they're talking

8    about -- they're talking about Major Nidal Hasan.  And I think

9    if you listen to that recording carefully, one of the juveniles

10   actually uses the word Commander al-Awlaki.

11         So what I'm saying is, if Imam Bradford was so

12   inspirational to Mr. Bell, when Imam Bradford tells him you

13   better quit engaging in this conduct or this ideology, he

14   didn't.  He continued to follow al-Awlaki, not Imam Bradford.

15         The second item I'll point out to the court is on page

16   two.  Mr. Bell writes, This person insisted that I use the

17   Internet and listen to scholars like Anwar and others.

18         That is not consistent with what we understand from

19   speaking with the juvenile.  The juvenile does not give any

20   history of him soliciting Mr. Bell to Anwar al-Awlaki.  It's

21   the exact opposite.  And that's been testified to frequently.

22         Now, what we know is that the juvenile went through

23   four different interviews and proffers with agents.  And we

24   found his statements to be believable and credible.

25         We do not find the statement by Mr. Bell about the

```
 1   juvenile introduced him to al-Awlaki to be that.  Every other

 2   account is the exact opposite, that it was Mr. Bell.

 3          On page three of the letter -- I'm just going to focus

 4   up top.  This is not a falsehood, but Mr. -- Mr. Bell uses the

 5   words about al-Awlaki, that he inspired him.  And, again, he

 6   repeats this whole obligation of making hijrah, which

 7   Mr. Braniff talked about.

 8          But if you read where I've got highlighted here,

 9   Mr. Bell states -- and, in fact, I'm going to put a different

10   version up.  This is a statement Mr. Bell includes in his

11   written letter, October -- I'm using the date of October

12   31st -- 21st, because that's when I got the letter.

13          Mr. Bell says, I recorded all of what we did because I

14   wanted to imitate the videos that inspired me -- videos -- I

15   wanted to imitate the videos that inspired me, videos of

16   Muslims preaching and fighting.  The videos I recorded weren't

17   for reproduction or to be uploaded on the Internet.  I only

18   made them because I thought it was fun for the time to show

19   friends what I was doing and for my own enjoyment.

20          Okay.  That's what Mr. Bell says in his letter to you,

21   Your Honor.  Your Honor has seen the videos.  And it's clear

22   from watching the videos that that is not what the intent of

23   the videos was.

24          You take the videos themselves and it disproves that

25   statement.  But then you take what the juvenile said about the
```

1  videos, that there was another juvenile back home that was

2  supposed to be uploading these, and you take what the

3  individual who participated in the cemetery mission said about

4  the videos -- he said exactly the same thing, that the plan was

5  to -- to edit these things, provide some more footage when they

6  get overseas and start fighting, and then have another juvenile

7  back in the United States put them on the Internet.

8          Well, the question you have to ask is -- Mr. Bell says

9  this in his letter to the court.  But this is what Mr. Bell

10  said in his plea agreement that he swore under oath was true

11  and correct.

12          He says -- and he agreed with this under oath.  The

13  training sessions were recorded and Bell intended for another

14  individual to upload the recordings to the Internet to show

15  that a person like Bell had gone before to fight and

16  participate in violent jihad and to recruit others in joining

17  and emulating them -- him.

18          And then two lines below that you have Mr. Bell's

19  initials.  And I would suggest if the court reviewed the

20  transcript of his change of plea hearing, he agreed that those

21  statements and that factual basis were true.

22          He made that agreement under oath.  He didn't write

23  his letter to you under oath.  So that's a very glaring

24  falsehood that's contained in this letter.

25          And one would have to ask why would he lie about the

1   reason that he made these videos.  There's really -- the only

2   thing consistent would be that he still adheres to this

3   ideology and still intended to use them as some kind of

4   credibility.

5          On page three of the letter, he writes that the

6   juvenile didn't like the plan, that he wanted to come with me

7   but I objected because he wasn't 18.

8          So Mr. Bell is telling you in his letter that he

9   initially didn't want the juvenile to come because he was too

10  young.

11         And, of course, Mr. Bell's suggesting there's not much

12  age difference between he and the juvenile.  I would suggest

13  that statement is not believable.  It's certainly not what the

14  juvenile said.

15         And Mr. Bell continues on at that point and writes

16  about how the juvenile had family ties and language skills

17  and -- and he spoke Arabic.  And I would suggest that that's

18  why Mr. Bell used the juvenile, not the reason why he left him

19  at home.

20         The next pretty evident falsehood in Mr. Bell's letter

21  is on page four.  It's the statement that Mr. Bell makes in his

22  own handwriting, I went in search for a place for us to stay so

23  as not to burden ███████ family.

24         The presentence report directly contradicts that

25  statement, because the presentence report, in paragraphs 24 and

1    25, outlines these facts -- it says, The juvenile's aunt

2    eventually asked Bell to leave because he was not family,

3    making it improper for him to stay there.

4          And then in paragraph 25 it says, Several days later

5    Bell returned to the juvenile's aunt's home to speak with the

6    juvenile, and Bell's presence angered the aunt and she then

7    asked the juvenile to leave her home, as well.

8          So it wasn't that Mr. Bell was, out of the goodness of

9    his heart, trying to not be a burden to family members in

10   Jordan.  The exact opposite is the case.  He got kicked out of

11   a family member's home in Jordan.

12         The bottom of page five, Mr. Bell makes the statement

13   about not going to Oman to finish up the trip to Yemen.  And he

14   writes, The same day we got the tickets -- that's tickets to

15   Oman -- the scholar called and wanted to speak again.  And

16   Mr. Bell goes on to say that they canceled their tickets.

17         When Mr. Bell was interviewed on November 21st in the

18   airport upon his return to the United States, he did not say

19   they canceled their tickets because of a call from the -- the

20   person they were talking to in the Middle East.

21         He said he canceled their tickets because problems

22   developed with the juvenile.  And then when they tried to

23   inquire what those problems were, he would not talk, because he

24   refused to talk about -- about the juvenile at that point.

25         On page six of the letter, Mr. Bell interestingly

1  refers -- he talks about -- he's talking about Syria and he

2  refers to atrocities committed by the Syrian president.  Now, I

3  would suggest to the court that that is very intentional

4  language on Mr. Bell's part.

5         As the court knows, in Mr. Bell's sentencing

6  memorandum it's pointed out that Mr. Bell, at least with his

7  counsel, did not know who the president of Syria was.  It's

8  Bashar al-Assad.

9         This whole record is replete with regard to Mr. Bell

10  using the Syrian president's full name.  So why is he using

11  this -- this Syrian president language in this letter to the

12  court?

13         I think it's -- it's clear that it's to avoid the fact

14  that he's used the real name elsewhere and he's been called on

15  it.

16         Your Honor, there's a number of places in this

17  letter -- and I'll just read them -- where Mr. Bell says that

18  he was looking back -- looking forward to getting back home.

19         On page seven he says, Once we crossed over, there was

20  no turning back.  I believe we were both thinking about how

21  much we missed home, because we both agreed to turn back and

22  plan things a little more.

23         Now, that's interesting in two respects.  One is,

24  there's no record -- there's no evidence in this court of

25  Mr. Bell missing home other than this letter that the court

1   has.

2        The evidence you have before you, after Mr. Bell goes

3   into Jordanian custody, is his journal.  And you can scour it

4   day and night and you will not find any mention of Mr. Bell

5   missing home.  You will not find any mention about Mr. Bell

6   having a phone call with his father about his grandmother

7   passing away.  And you will not find any mention about a desire

8   to return to the United States.

9        In fact, what you will find is -- in the record before

10  the court, is that Mr. Bell was spoken to by agents of the

11  Department of State.  They explained to him that he could not

12  stay in Jordan because his visa had expired.

13       And his first question was not to return to the United

14  States, but it was to travel to the country of Turkey.  And

15  that's what Agent Berry summarized.

16       And Turkey is an entry point to the country of Syria

17  for those who are wanting to walk over that border and

18  participate in that conflict.

19       But, more importantly, if you look at Mr. Bell's own

20  language, he's not talking about coming home because they both

21  agreed to come home.  They both agreed to turn back and then

22  what, and then plan things a little more.

23       So it seems obvious that his purpose has not changed.

24  It's just the planning was not -- was not what he had

25  originally thought it was going to accomplish.

1          He mentions -- in that same page, he talks about he

2    and the juvenile going to the Jordanian police to report his

3    money stolen.

4          I would suggest that that account of the facts is

5    outlandish.  Mr. Bell -- you've got a -- replete evidence in

6    the record before the court of Mr. Bell talking about staying

7    undercover, not using phones, but yet he's going to go talk to

8    the police in Jordan.  That's just not believable.  I don't

9    have any direct proof that it's not, but it's so outlandish on

10   its face that the court should reject it.

11         Mr. Bell -- and I want to focus on this statement.  On

12   page seven of the letter, when Mr. Bell is talking about coming

13   home and having this change of heart, he writes to the court --

14   he says, The trip has changed my opinion about life and my

15   responsibilities and priorities drastically.

16         And you see, Judge, it would be one thing if Mr. Bell

17   was telling Your Honor that after sitting in detention for two

18   years he's suddenly had this change of heart and he's realized

19   the error of his ways.

20         But that's not what he says in this letter.  What he

21   tells you in the letter is that he had this change of heart in

22   the Jordanian holding cell.

23         And so what do we know about Mr. Bell that he did

24   after that Jordanian holding cell that would say his intentions

25   are not what he's expressing in this letter?

         Well, the first thing we know about Mr. Bell when he

returns to the United States is he's interviewed by Agent

Berry.

         During that interview he specifically tells Agent

Berry that he intends to continue influencing the youth and he

intends to continue promoting the jihad.

         We then know that the juvenile tells us that Mr. Bell

is planning to construct a mosque or a masjid in his backyard.

That statement is very corroborated, because you have two

phones call where Mr. Bell says that exact thing after his

return to Jordan.

         The juvenile says the purpose of this mosque in Bell's

backyard was to provide an outlet for like-minded individuals.

Now, we don't have Mr. Bell recorded saying that.  We don't

have Mr. Bell saying that to Agent Berry.

         But it's not a far stretch of the imagination to think

that the reason they're building this masjid is to associate

with like-minded individuals.

         And then, finally, the juvenile tells us that Mr. Bell

was supposed to be the imam of this masjid he was building in

his backyard.

         Again, we don't have Mr. Bell saying that directly.

But you certainly have the inference from all the videos you've

seen that there was no one else giving directions during these

activities and there was no one else calling the shots besides

1    Mr. Bell.

2          You also have discussions in these phone calls when

3    Mr. Bell returns -- now he's planning to open two computer

4    businesses.

5          We didn't publish it.  But in one of those phone calls

6    he even tells the juvenile that he's going to give them cards

7    with a fake name so that people can call and he can act like

8    somebody that he's not.

9          Again, the question is:  Is this all to re-establish

10   and live a good life?  Or is this to create the funds necessary

11   to go back to Yemen and do it right this time?

12         You have him, after he returns from Yemen, instructing

13   a 16-year-old to lie to his parents, to the 16-year-old's

14   parents.  You have Mr. Bell saying exactly, Use all means

15   necessary; it's not really lying.  That's after he returns from

16   Jordan.

17         You also have Mr. Bell, after he returns from Jordan,

18   engaging in this conversation about doing gold business under

19   the table.

20         You have Mr. Bell, after he returns from Jordan,

21   sitting right in front of a detective -- a JSO detective -- if

22   the court wants to question whether Mr. Bell has the ability to

23   lie, watch the JSO interview.  It's A-3.

24         You will see Mr. Bell shown a picture of the gun, the

25   same gun that you've seen him shooting at the training

1    missions, the same gun he carried with him at the cemetery.

2    You'll see that interview.  You'll see the detective ask him

3    about the gun and Mr. Bell expressly denies it.  He looks the

4    detective in the eye and says, No, it's not my gun.

5            That speaks volumes, Your Honor, as to whether there's

6    been a change of heart.

7            There has never been Mr. Bell approaching

8    authorities -- from the time of Agent Berry until the time of

9    this letter, there has been no effort by Mr. Bell to approach

10   authorities and say, Hey, I've had a change of heart, I want to

11   give you guys a bunch of information, anything like that.

12           He doesn't have to do that.  But if you're considering

13   whether someone is truly remorseful, I would suggest you can

14   consider that as part of the quantum.

15           Finally, apart from the lie to the JSO detective, you

16   also have Detective Mana's testimony.  This is in January.

17   This is now two months' return from the Middle East.

18           And you have Mr. Bell telling Detective Mana that he's

19   not a true Muslim, he's a non-believer, which according to

20   Mr. Braniff means that he can be killed at will.  And you have

21   that whole episode, that exchange.

22           So is there any evidence to support what Mr. Bell says

23   in this letter?  There is not one iota or one shred of evidence

24   for what Mr. Bell says in this letter.

25           Paragraph 21 -- sorry.  Not paragraph 21.  But if the

1    court looks at the end -- the last page of the letter, Mr. Bell

2    says, I never -- I really never considered the consequences of

3    it all.

4           Your Honor, that is outlandish, when you've got

5    Mr. Bell on video saying things like, If the people knew what

6    we were doing on the way to the cemetery, they would call us

7    terrorists, they would compare us to the Taliban, and the

8    brothers in Somalia.

9           You have him saying that if someone saw what we were

10   about to do, they would call 9-1-1 and we would be thrown in

11   jail immediately.

12          You have his lecture out in the woods dressed in full

13   battle guard where he's saying the exact same thing.  It's not

14   a question of Mr. Bell not appreciating the consequences of his

15   actions.  He fully appreciates it, knows that that's what's

16   going to happen to him, and tried to keep that undercover, but

17   it wasn't done so.

18          So for those reasons, his history and

19   characteristics -- we think he has a demonstrated record, both

20   before he went to the Middle East and after he came home from

21   the Middle East, of dishonesty and of stealing.

22          He tells you that -- and I did prepare -- I wanted to

23   put his statements now and his statements in the Jordanian

24   holding cell side by side.

25          He said, My friends and family came to mind and how

1    much I neglected them.  I made a vow in that holding cell that

2    I would make it up to everyone, especially my family, and vowed

3    to get my life back on the right track.  I realized then that

4    the whole idea of being some Islamic superhero was selfish and

5    outrageous.

6           Well, we don't have a recording of Mr. Bell's entire

7    time in the Jordanian holding cell, but what we do have is some

8    poems that Mr. Bell wrote.

9           And I thought it was very interesting -- Mr. Braniff's

10   testimony that one of al-Awlaki's pamphlets is *44 Ways to Serve*

11   *and Participate in Jihad*.

12          Way No. 40 is to write nasheeds -- I believe I'm

13   pronouncing that correct -- which are poems, because there's a

14   lot of them in Arabic, but there's none in English.

15          Well, what did Mr. Bell say?  This is what he said

16   from the interior of a Jordanian holding cell.

17          The public consensus, the rich blossom and bloom, the

18   media lies, the government's confused, Muslims are dying, our

19   children are crying, while the people of the world are being

20   used to further objectives of powerful men, to bring the world

21   near to its end.  They say -- they say I'm a terrorist, lock

22   him away, with no justification, they turn their heads away.  I

23   defend the poor and oppressed, surely wicked men will detest.

24          And then he continues, Don't trust your tongue and

25   don't you lie, I'm a Muslim, remember, I wouldn't hurt a fly.

1   Tell us the truth, we won't throw you in jail, tell us the

2   truth, we'll treat you well, we know your type, jihad for life,

3   if we gave you a ticket to Afghanistan, you would take it in

4   flight.  Look, you, you're ready to fight, your beard is long,

5   you look quite strong, and you have come all this way.  Send

6   him back, send him back to America you go.  Remember, we want

7   the best for you.  And it says jihad is of the -- and there's

8   some word we can't figure out what it is -- but I'd suggest

9   that's much more consistent with Mr. Bell having internalized

10  suggestion No. 40 of Mr. al-Awlaki's 44 ways to serve and

11  participate in Islam than its suggestion of him coming to some

12  realization in a Jordanian holding cell that this is all a big

13  error and big mistake.

14          The one other thing I will mention with regard to

15  Mr. Bell's character for truthfulness -- I think one of the

16  most important things that Dr. Cohen said during her

17  testimony -- a couple of important things.

18          One is Mr. Bell is very intelligent.  He's probably

19  smarter than the prosecutor.  I don't think my IQ exceeds 96

20  percent of the country.

21          But what she said with regard to Mr. Bell is that he,

22  quote, speaks eloquently.  And I think the court has to

23  consider his intelligence and the fact that he does speak

24  eloquently.  And he used words -- and I think he's used words

25  to try to deceive the court as to where he stands.

1              The sentence also must provide for deterrence.  That's

2     a big issue in terrorism cases.  The deterrence here is very

3     important.  And it's important for a number of reasons.

4              This week alone I have seen news accounts of three

5     teenagers flying from Denver, Colorado, to try to join ISIS in

6     Syria.

7              I have seen a news account of a member of the Canadian

8     Parliament having to pull a firearm on someone who was

9     attacking that institution.  And I've seen a news account about

10    another individual in Canada driving over a Canadian soldier.

11    This is an important issue.  And there has to be a deterrence

12    effect from the court's judgment.

13             More importantly, in this case the court has to speak

14    deterrence to those who Mr. Bell tried to influence.  As you

15    heard Agent Berry, there was initially a group of seven that

16    were toying with these ideas.  So that needs to be taken into

17    account.

18             But, more importantly, Mr. Bell needs to be deterred.

19    He says in his letter that he did not -- that he wanted to come

20    home.  That's not what the recordings say.  The recordings say

21    I had no desire to come home.

22             We brought him here.  If it weren't for the Jordanian

23    authorities arresting him, he'd probably be on the battlefield

24    today and he'd probably be a military problem instead of a

25    judicial problem.

1          The final factor I want to discuss is the need of the

2    sentence to protect the public.  And this is really the -- the

3    overwhelming and the overriding factor that's at play in this

4    case.

5          The Eleventh Circuit has a published opinion.  It's

6    the *Jayyousi* case, J-a-y-y-o-u-s-i.  Jayyousi tell us that

7    terrorists are unique among criminals.  That's not what I say.

8    That's what the Eleventh Circuit said.

9          It said they are unique among criminals because of the

10   likelihood of recidivism.  And you heard Mr. Braniff explain

11   why that is.  When your ideology says you have to keep

12   participating in this violent jihad until the end of days, it's

13   easy to understand why there's a likelihood of recidivism.

14         The Eleventh Circuit says that they are different and

15   unique among criminals because of the difficulty of

16   rehabilitation.  You've heard from the Department -- the Bureau

17   of Prisons explained that there is no government-recognized or

18   sanction program for rehabilitating terrorists.

19         And you heard from Mr. Braniff that that's -- that's,

20   in fact, the case, that there are some programs that there's no

21   empirical support for in other countries, but they're certainly

22   not going to be administered here.

23         And then, finally, the Eleventh Circuit said that

24   there's a need for incapacitation.  And I'm going to return to

25   that as my close.

1          But when we look at the need to protect the public, I

2     would suggest to the court that the sentencing guidelines do

3     that with the terrorism adjustment.

4          The sentencing guidelines say that whatever your

5     criminal history is, we're going to treat you as the most

6     severe criminal we treat in the system.  And they're going to

7     say whatever your offense level is, we're going to add 12

8     levels to it, because we view this as serious, and we believe

9     there's a need to protect the public.

10          You can find that thread in a different place in the

11    guidelines, though, with regard to the guideline that deals

12    with departing for having some kind of mental condition or

13    laboring under some kind of mental defect.

14          Mr. Bell has not asked the court to depart based upon

15    his ADHD.  But even if Mr. Bell qualified -- had something

16    wrong with the way his brain cognitively operated, the

17    guideline says when the need to protect the public is at play,

18    it does not provide a basis for any departure.  And that's

19    exactly what is at play here.

20          Mr. Braniff tells you that the only thing that's

21    necessary for a terrorist activity is motivation.  And the

22    record is amply supported by that with regard to Mr. Bell,

23    opportunity -- Mr. Braniff told you we live in an open and free

24    society, and Mr. Bell could find any opportunity he wanted to.

25          I mean, how hard did he have to look to find the

1    opportunity to inflict $20,000 of damage to large marble

2    statues?

3           So he had the motivation, he had the opportunity, and

4    then, finally, the capability.  He has no capability of

5    injuring the public, he has no capability of murdering citizens

6    because they send their tax money in, he has no capability of

7    murdering citizens because they participate in our democratic

8    process while he is behind bars.

9           He has every capability of doing those things outside.

10   The evidence is clear that he did those things.  He took a

11   loaded firearm with him while he destroyed these statues.  And

12   what did he tell you -- the reason why he was taking that

13   firearm?

14          It was in case any non-believers -- any people that

15   it's lawful for me to kill under my belief system, it's in case

16   they get involved, whether it's a civilian, whether it's a

17   police officer.

18          And notice he didn't just bring a loaded firearm.  He

19   brought a loaded firearm and loaded magazines, which suggests

20   to me that Mr. Bell was preparing in case not only was there

21   one shot fired, but there was a shootout with the police or

22   someone else.

23          He's already exhibited his capacity to do a violent

24   act here in Jacksonville, Florida, even if you didn't look at

25   the fact that he traveled to -- attempted to travel to Yemen

1    and join the third most violent terrorist organization in the

2    world.

3           And then he's already demonstrated this beginning

4    capacity to work with explosives.  As Agent Berry testified,

5    there was a progression.

6           I mean, certainly I don't think the public's in a big

7    danger of him blowing up a cardboard toilet roll filled with

8    gunpowder.  I mean, it may cause some injury, but he moves

9    to -- and you'll see it in the videos.  He moves to a pipe

10   bomb.  And then he moves to these fragmentation grenades.  And

11   there's really no purpose for those devices other than to

12   injure and kill people.

13          And so we believe that Mr. Bell is a serious threat.

14   He's a serious threat to the citizens.  And we believe the

15   court should impose a sentence that reflects the seriousness of

16   his offense, that reflects his history of not truth telling,

17   and that recognizes the need to deter others, and to protect

18   the public and the citizens of our country.

19          Thank you.

20          THE COURT:  Thank you, sir.

21          I did have two questions for you.  One is that -- and

22   I just don't know the record here on this issue.

23          The reference to the -- al-Awlaki's 44 rules, are

24   those rules in the record somewhere?  You mentioned No. 40.

25   But where are you getting that from?

1           MR. HEAVENER:  Your Honor, they're coming from

2   Mr. Braniff's testimony.

3           THE COURT:  Okay.

4           MR. HEAVENER:  He testified about one of the

5   publications -- he said it was originally *39 Ways to*

6   *Participate and Serve in Jihad*, in its Arabic version, and

7   Mr. al-Awlaki added six ways.  No. 40 was creating English

8   version nasheeds.

9           THE COURT:  Okay.  Thank you.

10          And then the second question I had is a more -- just a

11  commentary from you.

12          I have not -- I've had occasion to read several of the

13  cases.  I have read portions of the *Jayyousi* case that you

14  referenced.  I've read other cases as I was getting ready.  But

15  I haven't done a full-scale review.

16          The government, for example, in its briefing gave me a

17  listing of cases that had terrorism nexus and gives me the name

18  of the case and what the sentence was.  And I think -- if I

19  recall, maybe a little bit about the facts.  And then, of

20  course, we have other cases that -- that both sides have cited

21  to me.

22          And I'm going to make a statement to you.  And you'll

23  either agree with the statement or not.  And if you -- whether

24  you do or not, I want to get a commentary from you on it.

25          The government is seeking a sentence of 30 years in

1    this case, which would be essentially a guideline sentence,

2    based on the way that -- and it would also be the maximum

3    sentence that I'm permitted to give under the statutes that

4    Mr. Bell had pled guilty to.

5         When I looked at the sentences that you were giving to

6    me in the -- in the briefing, when I've looked at some of the

7    other sentences, when I look at the median sentences that the

8    sentencing commission gives to me, there are -- no question

9    there are some lengthy sentences of the type that perhaps

10   you're talking about, but there's also no question there are

11   other less lengthy sentences.  They vary quite widely.

12        All of them are serious.  They're treated all

13   seriously.  Nobody's getting probation for this, or anything

14   like probation.

15        But -- but there are sentences that are -- are less

16   than 30, or some of them are half as much.  Some of them are

17   ten years.  Some of them -- I think I saw one at 84 months.

18        So, first of all, do you agree with that?  Or do you

19   have an organizing principle as to what would account for

20   varieties in sentences, other than the obvious thing, which is

21   every case depends on its facts?

22        And if you do agree with the general premise, what --

23   what is it that is impelling the government in this case to

24   seek the 30-year sentence?  If you could just address those

25   issues.

1          MR. HEAVENER:  Your Honor, I haven't analyzed the

2    sentencing transcripts, of course, in each of those cases.  My

3    guess is that the government was likely requesting a guideline

4    sentence in each of those cases.  So to the extent that it

5    wasn't a guideline sentence, I believe that was probably on the

6    judge's part, not the -- not the government's part --

7          THE COURT:  Okay.

8          MR. HEAVENER:  -- number one.

9          THE COURT:  All right.

10          MR. HEAVENER:  Number two, we attempted to provide the

11    court with basically the universe of cases that we're aware of

12    where someone has done what Mr. Bell did, which is not only

13    exhibit this ideology and maybe do stuff here in the United

14    States, but actually travel.  And when I say we provided that

15    list, I'm referring to the list in my brief of --

16          THE COURT:  Right.

17          MR. HEAVENER:  -- simply the sentences, not any legal

18    analysis.

19          THE COURT:  Right.

20          MR. HEAVENER:  I don't think the court can really

21    glean a lot from that, because it's really -- I think as the

22    Eleventh Circuit instructs us, you have to compare apples to

23    apples.

24          Some of those lower sentences -- in fact, I would

25    suggest probably most of those lower sentences involve

1    cooperating defendants.

2          And the Eleventh Circuit certainly instructs us that

3    someone who cooperates is to be treated differently than

4    someone who doesn't cooperate.

5          And, again, going back to my comments earlier, I think

6    the court can consider Mr. Bell's lack of cooperation.  Not to

7    say he's punished for that, but to evaluate his credibility

8    with this letter he's submitted.

9          THE COURT:  And I know some of this -- I know some of

10   these issues involve the juvenile.  And I'm not sure how --

11   whether this is an area that is -- that I have to be careful

12   with or not.  But you'll know.

13         It's portrayed -- you portray -- and you've done it

14   today.  You portray Mr. Bell as not being willing to cooperate.

15   In fact, I think other than -- until he pled guilty and then

16   gave the factual basis, what I'm understanding is the only

17   interview with law enforcement was the one that happened in the

18   Houston airport; is that correct?

19         MR. HEAVENER:  That's absolutely correct, Your Honor.

20         THE COURT:  Okay.  And I think -- as I got it from

21   Ms. Call, the -- I think she's portrayed there really wasn't an

22   opportunity to cooperate.

23         And I guess I'm just trying to understand -- and I

24   know you gave me some information.  So maybe I'll leave it at

25   that.  But did the government -- in the government's view, was

1   there opportunity for Mr. Bell to be cooperative that was

2   afforded to him so that it is fair -- it is a fair thing for

3   you to say that he just -- he did not further cooperate?

4           Is that -- and I understand -- I don't hold it against

5   him.  And, of course, you're not filing a 5K, which you say

6   happens in a lot of these cases.

7           Is that, in the government's view, a correct

8   characterization of the state of affairs?

9           MR. HEAVENER:  It is, Your Honor.  I would

10  specifically advise the court -- I don't have the exact date,

11  but following, I believe, the first pretrial conference in this

12  case, we broached that subject with defense counsel.  We have a

13  jail phone call that I did not introduce, but that we provided

14  as a court exhibit --

15          THE COURT:  Okay.

16          MR. HEAVENER:  -- in which Mr. Bell specifically

17  discusses that overture from the government with his mother and

18  decides that he's not going to do that.

19          And then I specifically inquired with defense counsel

20  about the inclusion of cooperation language in the plea

21  agreement was provided, was advised not to include it.

22          That's all before Mr. Bell's letter.  And I'm not --

23  I'm certainly not suggesting that Mr. Bell is to be penalized

24  because he didn't talk to the government.  That's not what I'm

25  suggesting.  But I would suggest that that may be indicative of

1  where his mind was prior to writing that letter to the court.

2          THE COURT:  All right.

3          MR. HEAVENER:  I mean, if you view the United States

4  as the enemy that's controlling all these puppets in the Middle

5  East, and you view the United States taxpayers as enemy

6  combatants for paying taxes, then I don't know why you would

7  ever cooperate with the government.

8          THE COURT:  All right.  Thank you, sir.

9          Ms. Call, I'm going to just take five minutes.  So

10 we're in a five-minute recess.  And then I'll hear from you.

11         COURT SECURITY OFFICER:  All rise.

12     (Recess, 2:57 p.m. to 3:03 p.m.)

13         COURT SECURITY OFFICER:  All rise.  This Honorable

14 Court is now in session.  Please be seated.

15         THE COURT:  Ms. Call.

16         MS. CALL:  Your Honor, I'd first like to recognize

17 that Mr. Bell's family is here in court, his mother, father,

18 maternal grandmother, and younger brother are all on this side

19 of the courtroom, in the first long row on the bench.

20         THE COURT:  Yes, ma'am.

21         MS. CALL:  They were here yesterday all day and came

22 back today.

23         As the court knows from the presentence report,

24 Mr. Bell, Sr., was interviewed and indicates that he will have

25 Mr. Bell come home and live with him again, and that he has

1   good family support and ties here to the Jacksonville

2   community.

3          The second thing I'd like to address is the concurrent

4   issue, before I get into really the factual side of it.  I

5   would ask the court -- if it intends to suggest to the court --

6   to the state court that sentences can be run concurrently, that

7   it do make a notation of that in the judgment.

8          I was reviewing before court a document called

9   *Interaction of Federal and State Sentences When the Federal*

10  *Defendant is Under State Primary Jurisdiction.*  And this was a

11  position paper written by the regional council of the Bureau of

12  Prisons.

13         Mr. Bell is in state primary custody because he was

14  arrested by them first.  He's here on a writ.  So they maintain

15  the primary jurisdiction.

16         THE COURT:  Is that true?

17         MS. CALL:  Yes.

18         THE COURT:  He's still on a writ?

19         MS. CALL:  Yes.

20         MR. HEAVENER:  He is, Your Honor.

21         MS. CALL:  And so --

22         THE COURT:  So is he -- but he hasn't been adjudicated

23  in state court, right?

24         MS. CALL:  Correct.  It is a pending charge in state

25  court.

1          THE COURT:  So concurrency, even it were to be given,

2    can only occur from the date, I think, of the federal sentence,

3    right?

4          MS. CALL:  That's why I was going to suggest that the

5    court make some notation of its intent.  This position paper

6    says, If the federal judgment and commitment order is silent,

7    and if the state authorities have primary jurisdiction over the

8    defendant, the default by the Bureau of Prisons is to compute

9    the federal sentence as consecutive to the state sentence,

10   regardless of which sentence is imposed first.

11         And then it said, There was some split at the time of

12   this position paper regarding if it was a yet-to-be-imposed

13   sentence, and it referred to the fact that there was a case

14   called *Setser* that was pending before the Supreme Court.

15         THE COURT:  Well, if the -- the government, as I

16   understand it, as part of the plea agreement, has agreed, as

17   far as it's concerned, to concurrency, right?

18         MS. CALL:  Yes, Your Honor.

19         MR. HEAVENER:  Well, a little different.  I've agreed

20   not to oppose his request for concurrency.

21         THE COURT:  Okay.  Fair enough.

22         MR. HEAVENER:  I don't want to be accused of breaching

23   the plea agreement.

24         THE COURT:  Fair enough.  And if I say that -- when I

25   impose whatever sentence I impose, if I say it is this court's

1  intention that the -- whatever state sentence Mr. Bell gets

2  would be concurrent with this federal sentence -- or to put it

3  the other way, that whatever federal sentence this court gives

4  be concurrent with any state penalty, my -- my point was that's

5  only -- really can be deemed a suggestion to the state court

6  judge.

7          He would still -- he or she would still have the

8  authority, if he or she wanted to, to make it consecutive,

9  because they -- they go second.

10          But the one thing that I didn't really appreciate

11  was -- and so I'm happy to do that -- since the government has

12  said that they don't object to it, I'm sure I will do that.

13  But I -- in my own mind, I was thinking that Mr. Bell was

14  accumulating federal time.

15          But he's really not, is he?

16          MS. CALL:  Correct.

17          THE COURT:  Okay.  Okay.  That's --

18          MS. CALL:  And then I was just going to say on that,

19  Your Honor, that the *Setser* opinion then --

20          THE COURT:  Because he's in state custody, that means

21  he's really -- if the state court judge, right now, would -- if

22  we sent him back today and the state court judge sentenced him

23  to 18 months, he would have essentially completed his sentence,

24  right?

25          MS. CALL:  Yes, Your Honor.

```
1            THE COURT:  Okay.

2            MS. CALL:  Or alternatively, if the -- if he was -- if

3   the writ was dissolved and he went back to state court and was

4   given time served, the court is exactly correct, that his

5   federal sentence would only then begin because that time was

6   credited to another sentence.

7            THE COURT:  Okay.  I understand what you're saying.

8            My intention would be to honor the spirit of the plea

9   agreement and say that it -- either I -- it's my intention or I

10  have no objection to it being run concurrently.  I think that's

11  all I can do, though.  I don't think I can bind the state court

12  judge.

13           MS. CALL:  Correct.

14           THE COURT:  Okay.  All right.  What else?

15           MS. CALL:  Your Honor, as to addressing the 3553

16  factors, in some ways we've talked a lot about Islam, but I

17  don't think this case is about that.

18           I think any faith in the world can be twisted.  And

19  there are a lot of members of the First Baptist Church here who

20  would say that the Westboro Baptist Church is in no way

21  representative of their faith, in the same way that Anwar

22  al-Awlaki is not representative of the Islamic faith.

23           And Mr. Braniff had indicated that Anwar al-Awlaki is

24  masterful at shaping a message.  And he does that by stating a

25  version of Islam that appeals to young people, that targets
```

1    that very group.

2         He presents himself as a very authoritative presence.

3    As was noted in the video, he came out -- or was filmed kind of

4    wearing something that looked military-esque.  He had a sword

5    or a knife with him.

6         So he presents this image of a twisted version that

7    did appeal to Mr. Bell.  In these hours and hours of video that

8    Mr. Heavener discussed -- are all available on-line, for free,

9    for download, with no special capabilities.

10        There's no registration or anything that one has to do

11   to be able to access these videos.  And essentially it becomes

12   almost like a self-fulfilling prophecy.  Once someone's in that

13   community watching those videos, the comments, the posts on

14   those boards, are affirmative, and become self- -- you know, a

15   fulfillment of what one wants to see.

16        You saw from Mr. Bell's letter that he first said that

17   Joe Bradford, the imam at the local mosque, was an appealing

18   figure to him.  But as he went to learn more, he started

19   watching these videos and lectures and that became the person

20   to whom he looked up.  Obviously that's not good.

21        But when you look at how Mr. Bell became even that far

22   along in the process, he reports -- and there's no

23   contradiction to this -- that he had read the first three

24   chapters of the Quran and decided to convert, that he goes to

25   the mosque, he meets the juvenile that we've talked about, and

1    the juvenile says he and someone else helped convert him to

2    Islam.  And he went all in.

3            The court saw the videos where he's dressed in what he

4    believes represents Muslim garb.  That was how Mr. Braniff

5    described it.

6            And that going all in is consistent with Dr. Cohen's

7    testimony that someone with ADHD -- if they do fixate on

8    something, it becomes a hyper fixation, and that they would

9    focus on one topic to the exclusion of all others.  And that

10   was what Mr. Bell had done.

11           But we're looking at such a limited time period.  All

12   of the videos that have been introduced into this courtroom

13   have date stamps that go from June to October of 2012, two

14   years ago.

15           And when the government's expert talks about Mr. Bell

16   being able to regurgitate or restate these lectures, it is

17   consistent with the fact that he had a high IQ and a high word

18   score, that after listening to the hundreds of hours and the

19   repetitive message that's imposed in them, that he would be

20   able to recite them, or be able to speak like them.

21           But no one can measure from the outside -- and the

22   expert is saying he's never met Mr. Bell in person -- whether

23   he's internalized that or whether he can and has changed at

24   this point in his life.

25           So the fact that someone can recite papers doesn't

1    mean they understand them.  And if they could recite them two

2    years ago, it doesn't believe that -- it doesn't mean that they

3    believe them today.

4         There was a lot of the exhibits that were introduced

5    about what might have been or what could have been.  The court

6    saw the maps to other cemeteries and a day care center and

7    photos of other religious images.

8         Absolutely no other vandalism occurred.  So we go from

9    July 4th to their departure from the country in late September

10   and nothing else is vandalized.

11        There's the discussion of a need to burn down porn

12   stores.  Nothing is done from any of this time period.  The

13   talk about the plan to break liquor bottles with a sword,

14   nothing is done.

15        Mr. Bell didn't make any attempts to take or ship a

16   gun overseas or to take any explosives with him.  And as the

17   agent said, if he had done that, he would have been caught

18   right at the Jacksonville Airport.  And he was, in fact, under

19   surveillance at the Jacksonville Airport.  So he would have

20   been very easy to catch right there.

21        But he's going overseas.  And that's the charge that

22   he's faced and that he pled guilty to, was providing support,

23   including himself, to terrorist organizations.

24        But he doesn't take money with him that he's going to

25   use for -- you know, a huge amount of money to be able to fund

1    a terrorist operation.  He doesn't take any supplies other than

2    bandages and scissors and things like that.

3           When the FBI then obtains the computer that's returned

4    back to Aaron's Rental Service -- or Rental, the government

5    expert talked about sometimes people download encryption

6    software, this ability to talk individually to other people.

7           You didn't hear anything about any encryption software

8    being located on Mr. Bell's computer.  And, again, there's no

9    indication that he actually uploaded any of these videos or

10   that the juvenile actually uploaded any of the videos.

11          And so, obviously, when we go back to 2012 and the

12   late summer of that time period, there was a cover story that

13   was developed.

14          And it seems like it's now being held against Mr. Bell

15   that he admits that that was a cover story, but he's consistent

16   with his plea and the presentence report that the story was not

17   the true statement.  He told that to Dr. Cohen and he wrote it

18   in his letter to you.

19          And when the government had referenced the juvenile

20   being interviewed on four different occasions and that he was

21   believable and reliable, he, in fact, in his April interview,

22   reports that he and Mr. Bell went to -- he calls it the U.S.

23   Embassy to report their detention in Tel Aviv and the loss of

24   money.

25          So when Mr. Bell says that it's not true -- but I

1    guess if the juvenile had said it, it was true.  And both of

2    those can't be true at the same time.

3            So did they go to some authority?  The juvenile

4    reports it as being the U.S. Embassy.  I think Mr. Bell's

5    letter calls it the police.

6            The other interview that I thought was significant

7    with the juvenile is the August -- I think it's the 7th

8    interview.

9            And at that point the juvenile is being represented.

10   He has had counsel looking out for his own best interest.  He

11   reports to the U.S. Attorney's Office to be interviewed about

12   this case.

13           And he's -- well, the August interview -- or the April

14   interview, he also is still associating with the adult, who is

15   the other person discussed in this case.

16           But when he reports in for this August interview, one

17   of the last questions they asked him is, Do you still believe

18   in violent jihad?  And he answers, Yes.  If I had the chance

19   now, I would still go overseas and never come back again.

20           So he -- even after Mr. Bell is detained for something

21   like seven months, he's still reporting that to the

22   authorities.

23           In looking at the guideline issues here, this in some

24   way strikes me as being much like the offenses that we see in

25   the child porn cases.

1          If the court applies all of the guidelines and the

2    enhancements, it means that every case is lumped in as being

3    the worst of the worst, because there's almost no way to

4    calculate these guidelines that don't reach over a statutory

5    maximum, that there's a single count, or reach the statutory

6    maximum, in this case where there are two counts.

7          And the guidelines aren't designed to say that every

8    case is the worst.  And the effect of the terrorism increase

9    alone -- as the court knows, every six levels on the guidelines

10   essentially doubles someone's sentencing arrangement.  Plus 12

11   means it's quadrupling it.  And then the secondary effect of

12   moving from category II, where his criminal history score is,

13   to category VI.

14         And so that increase -- I would ask the court to

15   consider whether those accurately reflect what happened in this

16   case and who Mr. Bell is.

17         I think the court had noted considering past cases in

18   offenses like this from the sentencing commission.  And I tried

19   to look at how cases were assigned within the guidelines.

20         And in cases where the conviction was for 2339A alone,

21   like this -- so there were no other charges or no other money

22   laundering or something else being charged at the same time,

23   the sentencing commission reported that there had been about 12

24   cases over about the last five years or so, and that in the

25   last fiscal year, fiscal year 2013, there were five, four of

1  which are given the same cross-reference that the presentence

2  report gives here, 2A1.5.

3          One case had a cross-reference to 2A2.1.  But in those

4  five cases that were the most recent fiscal year, the average

5  length of the sentence was 91 months and the median was 60

6  months.

7          And in this case the guidelines look at a sentence of

8  360 months.  So that is a very wide disparity from where the

9  guidelines start at this point and what the most recent cases

10 are.

11         The trend developed in the same way that the overall

12 statement that the commission came to was that out of all 12

13 cases that have been filed under 2339A since 2009, the average

14 and median sentence were 116 and 114 months, respectively, less

15 than ten years.

16         In looking at the purposes of sentencing, the message

17 to the community -- part of it in looking at deterrence -- I

18 think it's a very hard measure in this case.

19         Because if someone has truly become radicalized and

20 they believe that there's a reward beyond all rewards waiting

21 for them -- and the cases that Mr. Heavener was referencing in

22 the news lately, that they were willing to die for the cause --

23 no sentence that the court can impose on Mr. Bell would make

24 them reconsider that view.

25         It's almost like the child porn cases again.  How do

1    you get a message to someone that may not believe that that's

2    the consequences or may not see themselves in that same kind of

3    role?

4           So I think that that's a very hard message and can't

5    be necessarily saying that doing any particular sentence to

6    Mr. Bell will stop or thwart or change some other person's

7    behavior.

8           The second part to it in protecting the public, saying

9    that terrorists are unique among criminals in that they're

10   irredeemable.  It goes against everything that the court has

11   said in its line of cases from *Kuhn* to *Baker* -- to *Booker*,

12   which is that every person coming before the court is an

13   individual, subject to measure by the good things and the bad

14   things they've done in their life, but they're not to be judged

15   by a class or a characteristic of their case.

16          The cooperation issue -- at the point that Mr. Bell

17   was indicted and then charged, the juvenile had been

18   interviewed at least four times.  The others -- there are some

19   other persons who are being interviewed.

20          And a review between myself and Mr. Bell -- it didn't

21   look like there was any significant information that he would

22   be able to provide, because what the government was asking

23   about was contacts overseas.  And they already knew everything

24   that Mr. Bell knew.  So it just was not an issue of cooperation

25   being something that we thought was advantageous to pursue.

1          In conclusion, Your Honor, I would just ask you to

2   consider that the person that we are at age 17 and 18 and the

3   decisions that we make when we're 17 and 18 do not define who

4   we are, and that Mr. Bell should be given a chance to pay his

5   debt to society that he's never denied.  He's the one that

6   wanted to sign a plea agreement and not challenge the case, but

7   he also needs to have a future and a chance to move forward.

8          THE COURT:  This may seem like a small thing to you,

9   Ms. Call, but I wanted to ask you about it anyway, because --

10  you know, one of the themes of Mr. Heavener's argument is that

11  Mr. Bell has demonstrated a continued capacity for deception.

12         And that -- that's important to me -- not only in the

13  context of this case, but also as I reflect upon this letter

14  that he wrote to me.

15         Because it certainly is possible that somebody with an

16  agenda would -- and somebody as intelligent as Mr. Bell, would

17  be able to know what to say in a letter like this that would

18  put him in a better light and maybe get him some favorable

19  consideration, if for no other reason than issues like

20  protecting the public and the future and deterrence, and the

21  future might -- the calculus of that might change if a court

22  became convinced that Mr. Bell was -- was truly remorseful.

23  You know, there's no way to know what's in somebody's heart or

24  in their mind.

25         But can you give me any insight into this letter, a,

1   when -- because the government has shown me that even after

2   Mr. Bell came back, he was -- it sounded like he was still in

3   the game, so to speak.

4          He was still saying and doing things that would

5   indicate that he hadn't changed his mind, he hadn't -- he

6   hadn't gotten away from the ideas that he -- that he went over

7   there with.  He just hadn't been successful.

8          And so that's -- that's one thing.  And so I'd like

9   you to give me any -- any insight you have into this letter, to

10  the extent you do.

11         And, number two -- and, again, this is a small thing,

12  but I want to understand it.  In your sentencing memorandum,

13  you took the position that Mr. Bell was so -- and I'll just use

14  the word clueless.  I can't quite think of a better word right

15  now, that he didn't even know the name of the president of

16  Syria.

17         Well, in the tapes he knows -- he knows the name of

18  the president of Syria.  He knows very well.  And so I just

19  wonder what the argument was there and why that isn't something

20  I ought to be taking into account.

21         So if you could talk about the letter for a minute and

22  talk about that one point for a minute, I would be grateful.

23         MS. CALL:  If I can do them in reverse.

24         THE COURT:  Sure.

25         MS. CALL:  I think that part of the -- I guess

1   interestingness of this case is its timeline and how it did

2   develop.

3          Because as the agent has indicated, both the juvenile

4   and Mr. Bell come back to the United States in November,

5   they're questioned at their respective airports, they're

6   travelling separately, they get here.

7          Mr. Bell is then released and he makes his connecting

8   flight back home.  He's then home, I guess, December and

9   January, when he's picked up on the state court charges.

10          This indictment was filed, I want to say, about early

11  August of 2013.  When I saw the press release and it was going

12  to be a federal case, I contacted Mr. Heavener and said, Is

13  this likely to be something that we're going to be appointed

14  on?  And I went to meet Mr. Bell when he was still at the Duval

15  County Jail to kind of walk him through the process.

16          So by the time Mr. Bell and I met, he had essentially

17  been in custody five or six months or so.  And at that point,

18  that was my discussion with him, was, you know, I need to get a

19  little bit of background.

20          And that was one of his comments was, like, Yeah, we

21  had talked about fighting, you know -- you know, the dictator

22  guy.  And I don't know if it's the lapse of time, the stress,

23  the change in his views.  But he didn't say I wanted to fight

24  President Assad, or, you know, here's my -- the use of the

25  formal title.

1          And, also, I think, kind of like in the letter,

2    when -- it's often easier for me to think of the guy in the

3    video as Anwar, because I have a hard time pronouncing his last

4    name.  I don't say that because he and I are close friends or

5    anything like that, but it's just an easier reference.

6          The letter is that -- I've come more and more to the

7    conclusion that judges do want to hear from clients.  And I

8    suggested to Mr. Bell that he write out what he thought he

9    wanted to say.  And he wrote out information.

10         I kind of looked at it and I said, I think some of the

11   focus here is little maybe too rambling.  There's a lot of,

12   kind of, misspellings and things like that.  But he put the

13   letter together on his own.  And this was what he wanted to

14   convey to the court.

15         And then I did ask him to write it in his neatest

16   handwriting so that we could submit a copy to the court.

17         THE COURT:  Thank you, ma'am.

18         Mr. Bell, the law gives you the right to speak on your

19   own behalf.  And I wanted to give you that opportunity right

20   now.

21         Do you care to speak?

22         THE DEFENDANT:  Yes, Your Honor, I do.

23         THE COURT:  Why don't you come on up to the podium,

24   please, sir.

25         All right, sir.  There's no -- unless Ms. Call wants

1    to ask you questions, there is no format for this.  This is

2    just your opportunity to speak.  And if I have questions at the

3    end of your statement, I will ask them.

4         THE DEFENDANT:  All right.  Well, I guess all I want

5    to express is all the remorse and regret in my heart for

6    everything I did leading up to me going overseas, while I was

7    overseas.

8         Even my intentions upon returning -- I wouldn't say so

9    much my intention, but my ideology and the way I oriented my

10   belief around how I cared about my everyday life -- it hadn't

11   changed.

12        So when I did come back, I was still heavily

13   influenced by Anwar al-Awlaki.  The FBI agent can testify to

14   that, because I didn't lie to him when I said he -- I still

15   believe his message is truth.

16        But at the same time, when I did come home and when I

17   did spend time in the Jordanian holding cell, I realized that I

18   neglected the ones that I love most and that I left them just

19   high and dry.  I didn't even explain to them why I was leaving

20   or my intention that I was going to be gone forever.

21        So when I did come back and I started trying to adhere

22   to a daily lifestyle, like -- my opinion about fighting, it

23   didn't necessarily change until I got arrested and I started

24   having time to develop a stronger opinion about what influenced

25   me, why I was influenced, and why I was led down this negative

1   path, instead of a path that I could be proud of to show my

2   brothers and sisters, and, you know, something my mother and

3   father could be proud of, you know.  It's -- it's something

4   that I can't take back now.

5        It's only something I can improve on and grow older

6   and accept the responsibility and the repercussions for my

7   actions and just move forward in the future, and hope that I

8   can earn everyone's forgiveness one day.

9        THE COURT:  Are you an American?

10       THE DEFENDANT:  Yes, sir, I am.

11       THE COURT:  You know, you said you weren't.

12       THE DEFENDANT:  I am an American, sir.

13       THE COURT:  There's no answer -- there's no right

14  answer to this question, but the government, with some

15  justification, based on your past acts, says that I

16  shouldn't -- I shouldn't believe what's in this letter, because

17  you're smart enough and you're committed enough to know that if

18  you tell me what's truly in your mind, that is, you're still

19  committed to the principles that sent you over to the Middle

20  East, that I'm going to give you a long sentence, but that if

21  you tell me that you're not committed to that anymore, and you

22  tell me instead you want to get your MBA and be a good citizen,

23  that -- if I believe that, maybe I'll give you a lighter

24  sentence, and that would give you the opportunity to be

25  released sooner and to begin to practice those principles

1  again.

2          And I guess that's something I'm going to have to

3  resolve.  But I want to ask you, essentially, why should I

4  believe this Shelton Bell instead of the Shelton Bell that I

5  saw on those videos?

6          THE DEFENDANT:  I want to say that every word I used

7  in that letter I strongly considered.  And when I went over it

8  and I read it, it was the absolute truth from my heart.

9          Now, two years ago I couldn't say I would have wrote

10  that letter.  In fact, I don't even know if I would have

11  presented you any excuse or any justification for what I did.

12          All I can say is that I do want to move forward and

13  that my intentions upon release -- and, you know, I do want to

14  have a family and be there for my family.

15          And it was just every word I considered -- I didn't

16  want to try to make it sound like I didn't want to hide the

17  thing or -- like the videos, you know, was an issue of did I

18  intend to upload those videos -- not those particular videos,

19  but I did intend to put videos up one day.  Like I said two

20  years ago, I don't know if I would have been able to wrote you

21  that letter because of how embedded in that radical ideology I

22  was.

23          And when I had time to think about it and just view my

24  family's constant plea before I -- I mean, while I was

25  accepting Islam to, you know, don't be brainwashed, don't be

1  brainwashed by this radical ideology, I was just arrogant to

2  that.  I was arrogant to all the warnings I was given.  And I

3  think it was just finally time to come clean, Your Honor.

4          THE COURT:  Do you keep up with the news of the day?

5          THE DEFENDANT:  Every now and again we are able to

6  catch the news in the dorm that I'm staying.

7          THE COURT:  Are you familiar with what's going on with

8  ISIS and Syria and Iraq and so forth?

9          THE DEFENDANT:  Yes, sir.

10          THE COURT:  When you see all that, what do you think?

11          THE DEFENDANT:  I feel thankful that I'm still here

12  and not there, where the -- where my actions could have really

13  spiraled out of control or I could be dead or held hostage.

14          You know, the organization I was trying to join even

15  claims that ISIS currently is more extreme than them, where you

16  have the killing of other Muslims, the persecutions and

17  genocide of minorities.

18          I hear about these things and it just makes me ashamed

19  of what I was becoming, and makes me want to further my

20  education -- not only in an MBA, but similar to the study that

21  Mr. Braniff has presented, and to counterterrorism and to

22  realize, like, what was going on through my mind.

23          All the things he presented, I have no argument

24  towards.  And I just -- I look at that situation in disgust.

25  And I'm thankful that I'm here now safe, where I know I can see

 1  my family and, you know, hopefully grow old one day.

 2          THE COURT:  Is there anything else you wanted to say,

 3  sir?

 4          THE DEFENDANT:  I just wanted to apologize to the

 5  victims, the cemetery, and the insurance fraud, and the people

 6  at the flea market, and even, you know, my mother and father,

 7  my brothers and sisters, my grandmother, and just the Muslim

 8  community in general, Your Honor.

 9          THE COURT:  Thank you, sir.  Y'all can sit down.

10          Ms. Call, does that complete your presentation?

11          MS. CALL:  Yes, Your Honor.

12          THE COURT:  Mr. Heavener, I know you had completed

13  your presentation, but obviously there's been some comments and

14  statements made.  And I wanted to make sure the government felt

15  like it wasn't being disadvantaged.

16          Do you have any additional argument or commentary

17  you'd like to make?

18          MR. HEAVENER:  Your Honor, the only thing I would

19  point out is -- I think Mr. Bell is now saying that the letter

20  is inaccurate, because he's saying the change in heart is from

21  being incarcerated here in the United States versus in the

22  letter it says in the Jordanian cell.

23          I would note that the only real correction he makes is

24  the one that we pointed out on the example.  So we still

25  question very seriously the -- the veracity of the letter.

1           THE COURT:  Thank you, sir.

2      (Judge confers with law clerk.)

3           THE COURT:  For the benefit of the -- those in

4  attendance, the way that a sentencing hearing ends before the

5  court pronounces sentence is that I ask whether there is any

6  legal bar to the imposition of sentence.

7           And that's the way that the court knows that everybody

8  has been fully heard and everybody is ready to have sentence

9  pronounced.  And so I think we're at that point now, but let me

10 find out.

11          Mr. Heavener, is there any legal bar to the imposition

12 of sentence at this time?

13          MR. HEAVENER:  No, Your Honor.

14          THE COURT:  Ms. Call, is there any legal bar to the

15 imposition of sentence at this time?

16          MS. CALL:  No, Your Honor.

17          THE COURT:  All right.  As I indicated, because of the

18 unique and -- sometimes I think the word unique is overlooked.

19 But this case is unique in my experience, in 12 years on the

20 district bench.

21          And because of the numerous legal issues -- guidelines

22 issues, legal issues, because of the precedence that I need to

23 consult to see what's occurred in other cases, and whether

24 they're similar to this case or different from this case --

25 because of the volume of material I've heard in a two-day

1    sentencing hearing, which is a pretty unprecedented, long

2    period of time for a sentencing hearing -- oftentimes we have

3    trials that last less than two days.  And so we have really

4    heard quite a bit of information in the last two days.

5         And because of the obvious importance of the case, not

6    only to Mr. Bell, but to the government as well, I want to

7    consider the matter and think about it.  I -- I don't do that

8    lightly, because I know when -- when a matter is ready for

9    sentencing everybody is ready to have it occur.  But I think

10   it's more important that I deliberate upon it.

11        It is also possible that I would write a written

12   opinion on it, which is not something we usually do.  I usually

13   just pronounce orally from the bench.

14        But because of the legal issues involved and because

15   of the potential precedential value of the -- of the case, I

16   may actually write an opinion on it.  All of that is a way of

17   saying that I'm certainly not going to sentence today.  And it

18   may be a little while before I pronounce sentence.

19        Obviously Mr. Bell is in custody.  And so that's not

20   an issue.  He'll remain in custody until the date of

21   sentencing.

22        And I think what I'm going to do is this, I think I'm

23   going to go ahead and set the date now for pronouncement.  And

24   that way everybody will know when it's going to be.

25        And I -- I think it's going to be -- because of the

1   need to -- to get it right and to have time to do it,

2   consistent with my other obligations, including my other trial

3   obligations, I'm going to set it out for a little while.  And

4   that way I'll make sure I've got sufficient time and I'm not

5   having to reschedule it.

6          So what I'm going to do is to set a pronouncement of

7   sentence for Friday, January 9th, 2015, which is a couple of

8   months from now.

9          And I know that's a long time out, as sentencings go,

10  but that's the time that I think I'll need in order to be able

11  to -- to do it and to give it the serious consideration it

12  deserves, and reflection it deserves.

13         And so Friday, January 9th, 2015, at 10 a.m., in this

14  courtroom, I will pronounce sentence in Mr. Bell's case.  He

15  will remain in the custody of the United States marshals until

16  that time.

17         Before I adjourn today I want to do two other things.

18  One is I want to compliment the attorneys in this case for the

19  professional presentations that were made in this courtroom the

20  last two days.

21         The decision in this case is excruciatingly difficult.

22  And I need all the help I can get.  And I think both the

23  government and Ms. Call did a very professional job of bringing

24  to the court the information that I need, giving me a complete

25  record, giving me good briefing that I can use, and -- and

1  unbeknownst to those who are not familiar with it, the

2  professionalism that the government, Mr. Heavener, and his

3  folks, and Ms. Call, exhibit toward each other in order to

4  prepare and put something together like this -- while still

5  being able to advocate for their clients in a -- in a

6  meaningful and forceful way, they're able to work with each

7  other, which is -- which is very, very important to the

8  functioning of our system of justice.  And so I do want to

9  compliment counsel for their efforts.

10        And the last thing I want to do -- and this is without

11  any prediction as to what an ultimate sentence in this case

12  might be.

13        But I could not help but be struck by the fact that

14  Mr. Bell was accused of a terrorism crime, a crime essentially

15  against the United States, a conspiracy and so forth.

16        And the irony that -- that appears to me is that under

17  the system of laws and the rule of law that Mr. Bell was

18  protected by the requirement that a federal grand jury indict

19  him, or he give up that right, if he wants to, before he can be

20  charged with that crime -- that the government, in order to

21  prove him guilty of those crimes, could not simply just declare

22  him guilty, but would have to come into a court of law and

23  prove him guilty beyond a reasonable doubt to a jury of his

24  peers, if Mr. Bell had decided that he wanted that trial, that

25  Mr. -- and Mr. Bell would have had full rights of

1    cross-examination.

2            He would have the benefit of a very good counsel.  I

3    think it's been demonstrated on this record that Ms. Call is a

4    very good lawyer.

5            He would have the benefit of a very good lawyer, paid

6    for by the American taxpayers, to defend Mr. Bell and his Sixth

7    Amendment rights.

8            He then decided to plead guilty to the crime, give up

9    his right to jury trial, which he otherwise would have had, and

10   then he stands guilty in this court of conspiracy and attempt

11   to commit, essentially, acts that are designed to support

12   terrorism.

13           And even after pleading guilty to that crime, the law

14   has now provided him the same very good lawyer, the same

15   resources to hire an expert to come testify on his behalf, has

16   afforded him and the government two days' worth of time in

17   front of a judge who is sworn to the law, and to be impartial,

18   and now he's going to get consideration from that same court

19   before I pronounce a sentence in this case, a sentence that is

20   circumscribed by law; that is, there's certain sentences I can

21   give Mr. Bell and there's certain sentences the law would not

22   allow me to give Mr. Bell, because of our system of law and our

23   system of justice.

24           And so regardless of what outcome there is in this

25   case, given the nature of these charges, I could not help but

1    reflect upon that.

2            We are in recess.

3            COURT SECURITY OFFICER:  All rise.

4       (The proceedings concluded at 3:45 p.m.)

5                                - - -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE

UNITED STATES DISTRICT COURT      )
                                  )
MIDDLE DISTRICT OF FLORIDA        )


      I hereby certify that the foregoing transcript is a true and correct computer-aided transcription of my stenotype notes taken at the time and place indicated herein.


      DATED this 3rd day of November, 2014.



      s/Shannon M. Bishop
      Shannon M. Bishop, RMR, CRR