**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA

vs.                                                                    CASE NO. 3:13-cr-141-J-32JRK

SHELTON THOMAS BELL

---

## <u>SENTENCING ORDER</u>

The global threat of terrorism, so fresh in everyone's mind, has come to this Court

in the case of Shelton Thomas Bell. At age nineteen (he is now twenty-one), Bell came

under the influence of Anwar al-Awlaki, an infamous American-born terrorist who, from his

base in Yemen, not only sponsored terror, but also recruited young persons from all over

the world to become terrorists, until he was killed in an American drone strike in 2011.

Seduced by al-Awlaki's video teachings, Bell chose to answer his call and proceeded down

the road to becoming a terrorist, offering to fight and die for the cause.

Bell trained to become a terrorist, lying, defrauding, and causing property damage

in the process, made videos which emulated al-Awlaki's diatribes, and then traveled to the

Middle East intending to join al-Awlaki's organization in Yemen. Fortunately, he was

intercepted and returned to the United States before he could kill or injure anybody or be

killed himself. Once back, though, he continued to espouse his extremist beliefs both

before and after he was arrested. Now, in custody for nearly two years and having pleaded

guilty to terrorism related charges, Bell says he made a grievous, immature mistake, and

that he no longer subscribes to al-Awlaki's hate-filled agenda. He expresses remorse to

his family, his friends, his fellow Muslims, and the Court, stating that his goal now is to be

a productive citizen, raise a family, get an MBA, and even study terrorism and how to

combat it.

The Government does not believe Bell's repentance and thinks him still a danger to the American people; thus, the Government asks the Court to impose the statutory maximum of thirty years in prison. Bell says his change of heart is real and a lesser sentence will suffice. The essential question before the Court is: "Who is the real Shelton Thomas Bell?" No court could answer that question with absolute certainty. Still, this Court must determine, using the factors announced in 18 U.S.C. § 3553, what sentence is "sufficient, but not greater than necessary to comply with the purposes" of sentencing.

The Court has considered hundreds of pages of briefing, the Probation Office's presentence investigation report, hours of video and audio exhibits, and many pages of documentary exhibits. The Court held a two-day sentencing hearing on October 23 and 24, 2014, hearing testimony from experts on terrorism and psychology and from other witnesses, including Bell himself. The Court has since reviewed all the materials again, as well as the transcript of the sentencing hearing. Finally, the Court has also researched court decisions in other terrorism cases, seeking the wisdom of judges who have grappled with similar issues. The Court is now ready to state its reasoning and conclusions and to pronounce sentence. In addition to this Order, the Court incorporates by reference the transcripts of the October 23 and 24, 2014 and January 14, 2015 sentencing hearings.

## I.   PROCEDURAL BACKGROUND

On July 18, 2013, a federal grand jury returned an indictment charging Bell with one count of conspiracy to provide material support to terrorists and one count of attempt to provide material support to terrorists, both in violation of 18 U.S.C. § 2339A(a). (Doc. 1.) Bell eventually entered into a plea agreement with the government and, on March 19, 2014, changed his plea to guilty to both counts of the indictment. (Docs. 37, 38.) On March

31, 2014, the Court accepted Bell's guilty plea and adjudged him guilty of those counts. (Doc. 40.)

The Court set a schedule for the parties to file sentencing memoranda and responses (including sealed briefing to the extent necessary to protect Bell's juvenile co-conspirator) and to disclose exhibit and witness lists, including expert witnesses (Doc. 46). The Government and Bell filed their disclosures and initial public and sealed sentencing memoranda, and the Government filed both a public and a sealed response to Bell's memoranda. (Docs. 47, 50, 54, 55, 57, 63, 64, 65, 66.)

## II.   THE SENTENCING HEARING

On October 23 and 24, 2014, the Court heard evidence and argument bearing on the appropriate sentence in this case. (Docs. 75, 76.) The Government opened the evidence with the testimony of U.S. Customs and Border Protection Agent William James Berry, Jr., a member of the Northeast Florida Joint Terrorism Task Force, regarding the investigation leading to Bell's arrest and conviction. (Doc. 86 at 9-86, 111-82.) The Government next presented the testimony of David Schiavone, senior intelligence analyst with the counterterrorism unit of the Federal Bureau of Prisons, to discuss how inmates with a nexus to terrorism are handled in the federal prison system. (Id. at 91-110.) The Government also offered the expert testimony of William Braniff, Executive Director of the National Consortium for the Study of Terrorism and Responses to Terrorism at the University of Maryland. (Id. at 184-202; Doc. 87 at 5-91.) The final witness for the Government was a detective with the Jacksonville Sheriff's Office involved in the investigation and January 29, 2013 arrest of Bell on several state charges and who testified regarding an exchange he had with Bell after an interview. (Doc. 87 at 92-100.)

After the close of the Government's presentation, Bell presented expert testimony

3

from neuropsychologist Robyn Cohen, Ph.D., about her diagnosis that Bell suffers from Attention Deficit Hyperactivity Disorder. (Id. at 102-54.) The Court then heard argument from the parties on the appropriate calculation of Bell's guidelines-recommended sentence range and the factors set forth in 18 U.S.C. § 3553(a). (Id. at 159-223.) Bell then spoke on his own behalf and answered a few questions posed by the Court. (Id. at 223-228.) The Court permitted the Government a brief rebuttal. (Id. at 228.) The Court took the case under advisement.

## III.    FACTUAL BACKGROUND

As part of his plea agreement, Bell admitted to a lengthy factual basis, which begins this way:

> Beginning in approximately May 2012 and continuing through at least July 18, 2013, BELL agreed and conspired with a juvenile and at least one other individual to train in the Jacksonville area to prepare themselves as combatants for overseas violent jihad (for purposes of this agreement, the phrase "violent jihad" means armed conflict), to then travel from Jacksonville, Florida to the Middle East for the ultimate purpose of providing personnel, namely BELL and the juvenile, to terrorists, including members of Ansar al-Sharia in Yemen, to receive further training and deadly weapons from Ansar al-Sharia, and to then engage in violent jihad against, and to kill, others in the country of Yemen and elsewhere. At all relevant times, BELL and the juvenile knew that Ansar al-Sharia had engaged in, and continued to engage in, terrorist activity and the killing of other persons in foreign countries, including both Yemen and Syria.

(Doc. 38 at 15.)[1]

The investigation into these offenses began in June 2012 with a tip from the leaders at the Islamic Center of Northeast Florida in Jacksonville, Florida. (Doc. 86 at 19.) The leaders notified the FBI that an individual attending the Center had been speaking about

---

[1] The full factual basis (Doc. 38) is attached to this Sentencing Order as Exhibit A.

"jihad,"[2] that the individual had gathered some young people to him with his message, and that the leaders were concerned about his influence. (Id.) The leaders identified the individual as Shelton Thomas Bell. (Id.) Leaders at the Center had tried to intervene and discuss the issue with Bell, but he was defiant.[3] (Id. at 41.)

Bell had first begun giving voice to his desire to travel overseas to engage in violent jihad in May 2012. (Doc. 38 at 15.) A recent convert to Islam in 2011 when he was seventeen years old, Bell had thrown himself headfirst into studying the religion. (Doc. 72 at 1.) He first found a role model in the faith in a local, American-born imam. (Id.; Doc. 86 at 165-66.) But Bell also looked for other sources of information, including online. (Doc. 72 at 1.) His online search eventually led him to the radical preaching of Anwar al-Awlaki,[4] once the most important spokesman for the terrorist group first known as al-Qai'da in the Arabian Peninsula and later rebranded as Ansar al-Shari'a.[5] (Doc. 72 at 1; Doc. 86 at 21-

---

[2] The term jihad can stand for at least a few different concepts in Islamic doctrine. The more common and accepted understanding of jihad among Muslims is as the "internal struggle" to be a better, more pious Muslim. (Doc. 86 at 25; Doc. 87 at 5-6.) But jihad can also include a military aspect of defending Muslim lands from an attack by outsiders. (Doc. 87 at 6.) In more recent history, individuals like Osama bin Laden developed a more extreme understanding of jihad that involves an offensive component of preemptively defending Islam through violent attacks against the supposed enemies of Islam wherever they might be found in the world. (Doc. 87 at 6-9.) It is this last form of jihad that Bell was preaching and which motivated him and another individual to travel to the Middle East in the hope of joining a terrorist organization and killing for Islam. (See Doc. 86 at 25.)

[3] The leaders' attempts to intervene is well-documented, including in a video taken at the Islamic Center in August 2012 by one of Bell's associates, where a fifty-year-old member of the center repeatedly counsels Bell that his discussion of jihad is "not beneficial" because he is "concentrating on building hatred." (Gov't Ex. A-4.)

[4] Bell's local imam later moved out of Northeast Florida. Bell had already begun discussing jihad by that time, though, because that imam was among those who told Bell and his group to stop their discussions of jihad or face being kicked out of the Islamic Center. (Doc. 86 at 43.)

[5] Al-Qai'da is the terrorist organization responsible for planning and carrying out the horrendous attacks on September 11, 2001. Al-Qai'da in the Arabian Peninsula is a direct

22, 28.)

Al-Awlaki, a dual citizen of Yemen and the United States, was killed in 2011 in Yemen by an American drone strike. (Doc. 86 at 20; Doc. 87 at 10, 66.) Before then, he was the most significant recruiter for Ansar al-Shari'a and had published many hours of propaganda online that are still effective recruitment tools for extremists, particularly among English-speakers. (Doc. 87 at 10-11.) Al-Awlaki preached a violent strain of jihad that espoused that Islam is under attack and that it is the duty of every Muslim to defend Islam by either conducting their own attacks wherever they live or traveling to wherever the jihadists are fighting, like Yemen, and joining the fight.[6] (Id. at 9; Gov't Ex. A-2.)

By his own admission, Bell found al-Awlaki "captivating" and believed everything he preached. (Doc. 72 at 1-2.) All told, Bell accumulated and consumed hundreds of hours of al-Awlaki's speeches and propaganda.[7] (Doc. 86 at 21-22.) By listening to al-Awlaki, Bell came to accept al-Awlaki's mission as his own, specifically to forcibly establish a severe reading of Islamic law, or "Sharia," throughout the world. (Id. at 28.) Following al-Awlaki's posthumous call, Bell decided that his small group of young people should go to Yemen and join al-Awlaki's group, Ansar al-Shari'a. (Id. at 24, 45; Doc. 38 at 15-16.)

To prepare themselves mentally and physically, Bell and his group began to train with firearms that Bell supplied, to continue consuming extremist media, and to record their

---

branch from the core al-Qai'da organization and is the affiliate with the closest, most direct ties to core al-Qai'da and its one-time leader Osama bin Laden. (Doc. 87 at 10-11.)

[6] As recent events have shown, sometimes these recruits train overseas and return to their home countries to conduct terrorist operations there.

[7] FBI analysis of Bell's computer revealed that it contained approximately 372 audio and video files containing al-Awlaki's lectures and that Bell had consumed approximately 176 hours of them. (Doc. 86 at 22.) Bell himself estimated that he had consumed approximately 85% of the al-Awlaki lectures available online. (Id. at 21.)

own videos that Bell, as the group's "commander," directed another member of the group to post online (though the videos never were uploaded). (Doc. 86 at 64-66, 177-78; Doc. 38 at 16-18.) In the early morning hours of July 4, 2012, Bell and another group member recorded themselves carrying out a "mission" Bell had conceived of to destroy two statues of Jesus at the Chapel Hill Cemetery in the Arlington neighborhood of Jacksonville. (Doc. 86 at 71-75; Gov't Exs. A-16, A-17, A-18, A-19.) One of the videos depicts Bell supplying the equipment for the mission, including black masks and gloves and black tape for their shoes, and a handgun Bell describes as having "full mags, fully loaded, ready to go, in case any kuffar [unbeliever, infidel] wants to cause some trouble." (Gov't Ex. A-16.) The other individual later explained that Bell intended to use the gun to shoot anyone who tried to stop the mission, including the police. (Doc. 86 at 74.) Other videos of the mission include Bell explaining the plan to the other individual and lecturing him about how destroying these "idols" fits with his plan for jihad. (See Gov't Exs. A-17, A-19.) In one video made during the drive to the cemetery, Bell says that Muslim scholars in America would see their actions and say, "'You're a terrorist,'" that he and the individual would be demonized as terrorists, "just as they do the Taliban, just as they do the brothers in Somalia, just as they do the brothers everywhere across the globe." (Gov't Ex. A-17; Doc. 38 at 20.) The two were ultimately unable to completely destroy the statues, but did succeed in knocking off their heads with sledgehammers, causing $17,000 in damage. (Gov't Exs. C-9, C-11, C-12; see Doc. 86 at 72.)

Around the same time, Bell began fashioning homemade explosives that he tested and refined to achieve greater explosions. (Gov't Exs. A-22, A-23, A-24, A-29, A-30, A-35.) On a parcel of state land next to his father's house, Bell and his group video recorded

themselves setting off the explosions and conducting firearms training. (Gov't Exs. A-21, A-25, A-26, A-27, A-28.) At one point during this training, the juvenile commented about the smell of beer, and Bell responded, "It may stink, but how you think [sic] the battlefield is gonna smell?" (Gov't Ex. A-21; see Doc. 38 at 18.)

On July 26, 2012, Bell recorded himself wearing a white robe, black tactical gear, and a black turban and giving a nearly forty-minute speech that echoes many of the extremist sentiments he had heard in the hundreds of hours of al-Awlaki's speeches that he had consumed. (Gov't Ex. A-33.) In the video, Bell describes himself as "partaking in the training of jihad," diagnoses the "devilish indulgences" of society, and calls on all Muslims to "come together under one banner," "fight as a Muslim nation, as one," and "fight for one cause . . . ." (Id.) He makes a specific call to his generation of Muslim youth:

> Inshallah [Allah willing], within this generation, by the will of Allah, we will be the ones to liberate al-Quds [Jerusalem]. We will be the ones to liberate this entire planet of this kuffar establishment. Dar ul-Kufr [the house, or land, of unbelievers] will be no more, inshallah. The flags of Tawheed [monotheism] will rise high on every monument in the kuffar society. Buckingham palace, the kingdoms in India, the great skyscrapers in China, the tower of Dubai, the White House in Washington D.C., the prime minister's castle in Canada. All throughout the globe."

(Id.) Closing this message to the youth, he asks, "What are you doing for the sake of Allah? What lengths are you willing to go?" (Id.) Then, just over an hour after concluding this rant, Bell recorded himself setting off various explosive devices he made, including one he termed a "frag grenade." (Gov't Ex. A-34; Doc. 38 at 19.)

In September 2012, Bell and a juvenile member of his group began to prepare for their trip to Yemen. (Doc. 38 at 19-20.) Their cover story for their families was that they were going to the Middle East to "make Hajj," a yearly pilgrimage to Mecca in Saudi Arabia. (Doc. 86 at 123-26.) So the day before they left, Bell obtained a certificate of his conversion

to Islam from the Islamic Center to make the story seem believable. (Id. at 124-25; Gov't Ex. C-43.) Because the juvenile could not obtain a student visa to travel directly to Yemen, the trip now included a stop in Israel before the two would travel to Yemen to join Ansar al-Sharia. (Doc. 86 at 159.) Bell ordered an expedited passport and purchased one-way tickets to Tel-Aviv for himself and the juvenile. (Doc. 86 at 126-27; Doc. 38 at 19-20.)

On September 25, 2012, Bell and the juvenile departed Jacksonville on their way to Tel-Aviv via New York and Poland. (Doc. 38 at 20.) Bell and the juvenile were detained and interrogated by authorities in Tel-Aviv, however, and sent back to Poland on September 27, 2012. (Id.) At the juvenile's suggestion, they then bought one-way tickets to Amman, Jordan, where the juvenile had relatives. (Doc. 86 at 170-71.) Bell and the juvenile stayed for a time with the juvenile's aunt until she asked Bell to leave. (Gov't Ex. A-9.) They then went to a local mosque, but Bell was eventually kicked out for being vocal about wanting to wage jihad. (Doc. 86 at 41.)

After speaking with a few individuals about traveling to Yemen to fight and potentially crossing the Jordanian border to enter Syria to fight, the juvenile had the idea to fly to Oman and then cross into Yemen. (Id. at 51-52, 177; Gov't Exs. A-10, A-11; Doc. 38 at 21.) But Bell and the juvenile were eventually taken into custody before executing that plan and were detained by the Jordanian authorities on November 12, 2012 for overstaying their visas. (Doc. 86 at 179-80.) On November 21, 2012, Bell returned to the United States on a ticket he purchased with a loan from the State Department. (Id. at 11, 134-35; Doc. 38 at 21.) His first stop was Houston International Airport, where he voluntarily sat for an interview with Agent Berry of the Joint Terrorism Task Force. (Doc. 86 at 11.) Bell acknowledged during the interview that he and the juvenile had purchased

plane tickets to Oman with the intention of entering Yemen. (Doc. 38 at 21.) He stated, "If you ask me if I was going for jihad in Yemen, I say yes," and that he and the juvenile would have fought for whatever group was fighting against those who were persecuting Muslims. (Id.) Bell confirmed they had sought to join Ansar al-Shari'a, but explained that several groups were affiliated with Ansar al-Shari'a, including al Qai'da and the Taliban. (Id.) Bell was released and subsequently returned to Jacksonville.

Upon his return, Bell made a number of intercepted telephone calls to his associates in which he said he had some "substantial stuff" planned for Jacksonville and that he intended to build a "masjid," or mosque, of his own in the woods by his father's house so that he could continue to speak with other young people about jihad. (See Gov't Exs. B-2, B-3; Doc. 86 at 48-49.) Bell also discussed possible ways to finance his activities, including unauthorized gold buying and fraudulently obtaining food stamps at a false address. (Gov't Exs. B-1, B-4, B-5.) However, Bell's plans were interrupted on January 29, 2013 when he was arrested by the Jacksonville Sheriff's Office on state criminal charges.[8] (Doc. 87 at 94-95.) Based on a brief exchange with a Muslim sheriff's detective after a custodial interview, even after his arrest, Bell evidently still persisted in his radicalization, calling the detective "Taghut," or disbeliever, telling the detective that he represented the "wrong law," and pointedly telling the detective that he had gone overseas to be a soldier. (Doc. 87 at 97-98.)

---

[8] Bell was initially arrested on charges of grand theft for allegedly failing to return customers' computers that he had accepted for repair. (Doc. 87 at 94-95.) Those charges have been dropped, but he has since been charged for his alleged involvement in a fraudulent scheme to fund his jihadist activities by staging a motor vehicle accident to defraud the auto insurance company. (Doc. 86 at 146.)

## IV.    STATUTORY PENALTIES AND ADVISORY SENTENCING GUIDELINES

Bell stands convicted of one count of conspiracy to provide material support to terrorists and one count of attempt to provide material support to terrorists, both in violation of 18 U.S.C. § 2339A(a). (Doc. 40.) Each count carries a statutory maximum imprisonment of "not more than 15 years," for a maximum imprisonment in Bell's case of thirty years. 18 U.S.C. § 2339A(a). There is no mandatory minimum sentence. Under either the Government's or Bell's calculation of the Sentencing Guidelines, the recommended guideline term of imprisonment is the same. Still, the Court must endeavor to find the applicable Guidelines. Gall v. United States, 552 U.S. 38, 49-50 (2007) ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.").

### A.    Base Offense Level

Calculating the appropriate guideline sentence begins with identifying the proper guideline section and determining from there the base offense level.[9] USSG §1B1.1 (2014). The Statutory Index cross-reference for 18 U.S.C. § 2339A directs the Court to either §2X2.1 or §2X3.1. USSG app. A. The commentary to these two guideline sections confirm that reference. USSG §2X2.1 cmt. statutory provisions; USSG §2X3.1 cmt. statutory provisions. The Government and Bell agree that, of the two, §2X2.1 on "Aiding and Abetting" more closely fits the facts of this case than §2X3.1 on "Accessory after the Fact." The Court also agrees. See §2X3.1 cmt. n.1.

Section 2X2.1 provides that "[t]he offense level is the same level as that for the

---

[9] The two counts of the indictment are to be grouped together in a single Group and scored together as "closely related counts" that are "connected by a common criminal objective or constituting part of a common scheme or plan." USSG §§3D1.2, 3D1.3, 3D1.4.

underlying offense," which "in the case of a violation of 18 U.S.C. § 2339A . . . means the offense the defendant is convicted of having materially supported or provided or collected funds for, prior to or during its commission." USSG §2X2.1, §2X2.1 cmt. n.1. This is where the parties' disagreement begins.[10]

The Government contends, and Probation agreed, that because Bell was charged with, admitted, and has been found guilty of conspiring and attempting to support a conspiracy to kill, kidnap, maim, or injure persons or property in a foreign country in violation of 18 U.S.C. § 956, (Doc. 1 at 3, 12; Doc. 38 at 1-3; Doc. 40), the appropriate "underlying offense" is conspiracy to commit murder, the base offense level for which is found at §2A1.5. USSG app. A. Section 2A1.5 has a base offense level of 33. USSG §2A1.5(a).

Bell recognizes this argument, but contends that the appropriate "underlying offense" is found in §2M5.3, "Providing Material Support or Resources to Designated Foreign Terrorist Organizations or Specially Designated Global Terrorists, or for a Terrorist Purpose." Section 2M5.3 has a base offense level of 26. USSG §2M5.3(a).

Neither Bell nor the Court has been able to find any published case agreeing with him that §2M5.3 is the appropriate underlying offense for a conviction of § 2339A. However, information provided directly to the Court by the Sentencing Commission regarding sentences of defendants convicted under only § 2339A indicates that, in the past five years, three courts have used §2M5.3. The Court has done its best to track down

---

[10] Neither the Government nor Bell suggests that the Court start with §2X1.1, the provision of the Guidelines for attempts, solicitations, and conspiracies not otherwise covered by a specific guideline. USSG §2X1.1; see §1B1.2(a). Section 2X1.1 also directs courts to use the base offense level for the underlying substantive offense, so the Court's subsequent analysis would largely remain the same. USSG §2X1.1(a).

any available materials from these cases, but has been unable to find any explanation for these courts' choices to use §2M5.3. Moreover, the Sentencing Commission's information shows that, in the past five years, eight of the courts that handled convictions under only § 2339A have applied §2A1.5 as the appropriate base offense guideline. The Eleventh Circuit does not appear to have addressed this issue. The Government cites to one unpublished opinion from the Eastern District of North Carolina that goes against using §2M5.3. United States v. Hassan, No. 5:09-CR-216-FL-7, 2012 WL 147952, at *2 (E.D.N.C. Jan. 18, 2012). Upon due consideration, the Court agrees with the Government and Probation that application of §2A1.5 tracks most closely with the language of the Guidelines, as the "underlying offense" for both the conspiracy and the attempt under § 2339A is 18 U.S.C. § 956. Bell's appropriate base offense level is therefore 33.[11]

### B.    Adjustments

Starting with this base offense level, Probation recommends that the Court apply enhancements of fourteen additional levels and then decrease it by three levels for Bell's acceptance of responsibility. Bell objects to certain of these enhancements and not others. Even so, the Court must still satisfy itself that the Guidelines have been calculated correctly and therefore considers each proposed adjustment in turn.

### 1.    Terrorism Enhancement

Section 3A1.4(a) provides that "[i]f the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by **12** levels" the base offense level. USSG §3A1.4(a). The term "'federal crime of terrorism' has the meaning given that

---

[11] Neither the specific offense characteristic in §2A1.5(b) nor the cross references in §2A1.5(c) apply here.

term in 18 U.S.C. § 2332b(g)(5)." USSG §3A1.4 cmt. 1. That statute defines a federal crime of terrorism as "an offense that is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and is a violation of" one of a list of specified federal statutes. 18 U.S.C. § 2332b(g)(5). The first part of the definition of federal crime of terrorism "focuses on the intended outcome of the defendants' unlawful acts—i.e., what the activity was calculated to accomplish, not what the defendants' claimed motivation behind it was." United States v. Jayyousi, 657 F.3d 1085, 1115 (11th Cir. 2011) (citing United States v. Mandhai, 375 F.3d 1243, 1248 (11th Cir. 2004) and United States v. Awan, 607 F.3d 306, 316-17 (2d Cir. 2010)).

Bell has not objected to the application of the terrorism enhancement under §3A1.4. The list of qualifying federal terrorism offenses includes 18 U.S.C. § 2339A, satisfying the requirement that the offense be one of the specified offenses to qualify as a federal crime of terrorism. 18 U.S.C. § 2332b(g)(5)(B)(i); Jayyousi, 657 F.3d at 1115; United States v. Garey, 546 F.3d 1359, 1361-62 (11th Cir. 2008).

As for whether Bell's offenses were "calculated to influence, or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," the evidence shows that they were. "'It is the defendant's purpose that is relevant, and if that purpose is to promote a terrorism crime, the enhancement is triggered.'" Jayyousi, 657 F.3d at 1115 (quoting Mandhai, 375 F.3d at 1248).

The many images found on Bell's computer indicate that his goal was to play a role in the overthrow of secular governments and their replacement with governments rooted in Sharia, as symbolized by the removal of the flag of the secular government—the flag of Taghut—and the raising of the black flag of Tawheed—adopted by the jihadist

movement—over every continent. (Gov't Exs. C-20, C-26, C-28, C-30, C-31.) Bell expressed that precise sentiment himself before, during, and after his trip to Jordan on his mission to join Ansar al-Shari'a in Yemen. (See, e.g., Gov't Ex. A-8 ("It's quite saddening to see the flag of Taghut instead of the flag of Tawheed. . . . Wouldn't you be much happier? Wouldn't it put a smile on your face to see a black flag declaring Shahadah [there is no god but Allah, and Muhammed is his prophet] above the city? Inshallah, one day."); see Gov't Ex. A-1; Doc. 86 at 28.) In his nearly forty-minute diatribe, Bell articulated his plan to become active in violent jihad and to recruit others to the cause of setting up the jihadist flag over places like the Buckingham Palace, the White House, and "the prime minister's castle" in Canada. (Gov't Ex. A-33; Doc. 38 at 19.) The evidence at the sentencing hearing was that the purpose of Bell's trip to the Middle East was to join Ansar al-Shari'a, an alias for al-Qai'da in the Arabian Peninsula, a terrorist organization designated as such by the U.S. State Department and dedicated to waging violent jihad on the secular governments of the world, starting in Yemen. (Doc. 86 at 19-20, 24, 44-45.) The Court is satisfied that the terrorism enhancement of §3A1.4 applies, raising Bell's offense level twelve levels from 33 to 45.

### 2. Leadership Role

The Government and Probation both urge the application of a two-level enhancement to Bell's offense level for his leadership role in the plot to provide material support to terrorists. Bell disputes that the leadership role enhancement applies because only he and the juvenile participated in the criminal activity and the juvenile had the more significant role, particularly on the trip to Jordan. The Court finds that the two-level leadership enhancement in §3B1.1(c) is appropriate.

Section 3B1.1 of the Guidelines provides for either a four or three-level increase in

a defendant's offense level, respectively, if he was "an organizer or leader" or a "manager or supervisor (but not an organizer or leader)" of a "criminal activity that involved five or more participants or was otherwise extensive . . . ." USSG §3B1.1(a), (b). If the criminal activity was not as extensive, but the defendant was still an organizer, leader, manager, or supervisor, the Guidelines provide for a two-level increase. USSG §3B1.1(c). It is the two-level enhancement, which does not require five or more participants, that is in dispute here.

"The government must prove the existence of a leadership role by a preponderance of the evidence." United States v. Pringle, 571 F. App'x 755, 758 (11th Cir. July 2, 2014) (citing United States v. Yates, 990 F.2d 1179, 1182 (11th Cir. 1993)).

> In evaluating whether this enhancement applies, the district court should consider: (1) the exercise of decision-making authority; (2) the nature of participation in the commission of the offense; (3) the recruitment of accomplices; (4) the claimed right to a larger share of the fruits of the crime; (5) the degree of participation in planning or organizing the offense; (6) the nature and scope of the illegal activity; and (7) the degree of control and authority exercised over others.

Id. (citing United States v. Ramirez, 426 F.3d 1344, 1355 (11th Cir. 2005) and USSG §3B1.1 cmt. 4). The Court may consider hearsay in making this determination as long as the hearsay is reliable and consistent with the other evidence of the defendant's role. Id.

A preponderance of the evidence shows that Bell played a leadership role in the plan to provide material support to terrorists. The many video files taken from Bell's computer provide perhaps the best evidence on this issue. In video after video, Bell is shown and heard taking the dominant role in the group of young people as they mentally and physically prepare for violent jihad. For instance, in a video showing Bell and others in the woods shooting a firearm (supplied by Bell) at a target with a roughly human outline, Bell is referred to as "the commander." (Gov't Ex. A-21.) Bell's role in the group is

confirmed by statements from an interview with the juvenile who traveled with Bell that the group had elected Bell their leader. (Doc. 86 at 42-43.)

Then in a series of videos, Bell leads another individual in an assault on the statues of Jesus at Chapel Hill Cemetery.[12] (Gov't Exs. A-16, A-17, A-18, A-19, A-20.) Bell directs the other individual in shooting the videos and provides the black duct tape to disguise their shoes, the black masks to hide their faces, black gloves, and the handgun with "full mags, fully loaded, ready to go, in case any kuffar wants to cause some trouble." (Gov't Ex. A-16.) Bell explains to the other individual the plan he developed for the assault—a plan drawn out on maps found on Bell's computer (Gov't Exs. C-13, C-14)—and continues to command the other individual, lecturing the individual and even, to an extent, controlling the individual's emotional responses (Gov't Ex. A-17; Doc. 86 at 74-75). And it is Bell who provides the extended commentary in the videos setting forth the supposed religious justification for the assault. (See id.)

As for Bell's role in the trip to the Middle East, a preponderance of the evidence supports application of the leadership role enhancement. True, the juvenile had more

---

[12] It is worth noting that Bell has not been separately charged with trespass or destruction of property for this mission, though it is included as "overt acts" in Count I of the indictment in this case. (Doc. 1 at 4, ¶¶ 5-6.) The Government believes the trespass and damage to statues of Jesus was criminal conduct, that it was in line with the teachings of Anwar al-Awlaki that Bell absorbed and himself espoused, and that it was at least preparation for his eventual trip to the Middle East and hoped-for participation in violent jihad in Yemen.

The Government also alleges that the cemetery mission was just the first of many assaults Bell had planned, including the destruction of religious statues at a Christian day care center, as well as unidentified liquor stores and stores that sell pornography. (Gov't Exs. C-15, C-16; Doc. 86 at 85-86.) This destruction would have been in keeping with al-Awlaki's call for young Muslims living in the West to practice jihad. (Doc. 87 at 34-38.) Bell correctly noted at the hearing, though, that no other such assaults were carried out.

experience traveling overseas, spoke Arabic, and had relatives in Israel and Jordan. (Doc. 86 at 170.) The juvenile also came up with the plan to go first to Israel and then Yemen, and the later plan to fly to Jordan and stay with his aunt after he and Bell were removed from Israel. (Doc. 86 at 159, 170-71.) But it was Bell's idea to go overseas in the first place; the juvenile joined in with Bell's plan. (Id. at 42-43, 159.) Bell selected the final destination, Yemen, so they could join Ansar al-Shari'a. (Doc. 86 at 45, 159.) The stops in Israel and Jordan were accommodations for the juvenile, who could not obtain a student visa to travel directly to Yemen. (Doc. 86 at 159.) When the juvenile got cold feet on the trip, Bell convinced him to stay by showing him more videos of al-Awlaki's sermons.[13] (Id. at 24-25.)

But even accepting Bell's contention that the juvenile's involvement in planning the trip raised the juvenile to the position of a leader of sorts, Bell may still qualify for a leadership role enhancement himself. Even in a two-person conspiracy, "each participant can be a[n] 'organizer, leader, manager, or supervisor' in the criminal conduct when each participant takes primary responsibility for a distinct component of the plan and exercises control or influence over the other participant with respect to that distinct component of the plan." United States v. Yeager, 331 F.3d 1216, 1227 (11th Cir. 2003). At the very least, Bell could be described as the "big picture" leader of the trip, while the juvenile handled logistics (though Bell also handled some of the logistics, too, like obtaining a passport and

---

[13] Some videos taken during the trip suggest Bell at times cooled somewhat on the plan to go to Yemen, with him stating that he might stay in Jordan, get a job, and get married. (Gov't Ex. A-11.) But even this idea was part of his larger plan to join in jihad. (Id.) And when he returned to the United States, Bell still planned to continue recruiting for jihad and to one day return to the Middle East, this time flying directly to Yemen to join with Ansar al-Shari'a. (Doc. 86 at 158-59.)

paying the juvenile's way to the Middle East). The Court concludes that a leadership enhancement is appropriate.[14]

However, the Court agrees with Probation that the two-level increase in §3B1.1(c), rather than the four or three-level increases in (a) or (b), is applicable.[15] Thus, the Court will increase Bell's total offense level by two levels from 45 to 47.

### 3.    Using a Minor to Commit a Crime

Bell does not expressly object to Probation's recommendation that the Court apply a two-level increase under §3B1.4 for his use of a minor to commit the crime, except to the extent that Bell's objection to the role enhancement might be considered applicable to this enhancement as well. Section 3B1.4 provides that "[i]f the defendant used or attempted to use a person less than eighteen years of age to commit the offense or assist in avoiding detection of, or apprehension for, the offense, increase by **2** levels." USSG §3B1.4. In the commentary to §3B1.4, "used or attempted to use" is defined to include "directing, commanding, encouraging, intimidating, counseling, training, procuring, recruiting, or soliciting." Id. at cmt. n.1. An upward departure may also be warranted where the defendant used or attempted to use more than one minor.[16] Id. at cmt. n.3. The enhancement may be applied even where the minor is a co-conspirator with the defendant, as long as the defendant took "some affirmative act to involve the minor in the commission

---

[14] The Court declines Bell's invitation to evaluate whether he or the juvenile was more mature in his faith at the time of the offense. Aside from being both improper and impossible for a court to decide, neither age nor maturity is necessarily indicative of whether one acted as a leader in a criminal conspiracy. Mandhai, 375 F.3d at 1248, 1250 (affirming application of leadership role enhancement for "only teenager involved" in terrorist conspiracy with other "seasoned adults").

[15] The Government does not argue for more than the two-level adjustment.

[16] Though it might have, the Government did not seek to invoke this departure.

of the criminal activity." <u>United States v. Taber</u>, 497 F.3d 1177, 1181 (11th Cir. 2007). For many of the same reasons that make a leadership role enhancement appropriate, the Court agrees with Probation and the Government that Bell took affirmative acts to involve the juvenile such that the use of a minor enhancement should be applied, raising Bell's total offense level from 47 to 49.

### 4.      Obstruction of Justice

Bell's final objection is directed toward language in the presentence report that he attempted to obstruct justice by deleting video files from the computer he leased from Aaron's Rental. Bell contends that he was unaware he was under investigation when he deleted the files so he could return the computer to Aaron's. Probation concluded that this activity would be "obstructive" under §3C1.1, but did not apply the obstruction of justice enhancement because Probation did not find the video files material to proving the Government's case. Given the evidence presented at the sentencing hearing, the Court agrees that the obstruction of justice enhancement is inappropriate here, but will not direct Probation to remove the language from the presentence report. The Court does not accept that Bell was unaware that he was under investigation since he was interviewed by the federal law enforcement in Houston on November 21, 2012 while he was on his way back to Jacksonville and was recorded on wiretaps making statements about being watched by the FBI. (Doc. 86 at 11; Gov't Ex. B-1.) Still, the Court was not presented with enough evidence about the deletion of the files to conclude that it amounts to obstruction of justice such that §3C1.1 applies.

### 5.      Acceptance of Responsibility

Bell is entitled to the full three-level decrease to his offense level permitted in USSG §3E.1. As part of the plea agreement, Bell admitted to the substantive allegations in the

indictment and to the more detailed allegations set forth in the "Factual Basis." (Doc. 38.) Bell also cooperated with Probation as it prepared the presentence report. For its part, the Government has agreed to not oppose the application of the two-level downward adjustment provided in §3E1.1(a) and to support a one-level downward adjustment under §3E1.1(b). (Id.) The Court is satisfied that Bell qualifies for both downward adjustments, bringing his offense level down from 49 to 46. Then, because his calculated offense level is still above 43, under USSG ch. 5, pt. A, cmt. n.2, his offense level is treated as a total offense level of 43.

### C.   Criminal History

The next step in identifying Bell's advisory guideline range is to determine his criminal history category. The presentence report reveals one adult criminal conviction for trespass committed after the offense in this case, for which adjudication was withheld. This offense does not score towards Bell's criminal history. USSG §4A1.2(c). Bell committed the instant offenses while he was on probation until age nineteen for violating a temporary injunction while he was a minor. His violation of the temporary injunction scores as one criminal history point under §4A1.1(c). See USSG §4A1.2(d)(2)(B). Then, two additional points are added because Bell "committed the instant offenses while under any criminal justice sentence, including probation . . . ," USSG §4A1.1(d).[17] A total criminal history score of three would place Bell in criminal history category II. USSG ch. 5, pt. A. However, the terrorism enhancement in §3A1.4, in addition to adding twelve levels to a defendant's

---

[17] The presentence report also includes other criminal conduct that does not score, including juvenile charges, as well as pending charges that have not yet been resolved. The Court will address this conduct, to the extent relevant, in its discussion of the 18 U.S.C. § 3553(a) factors.

offense level, provides that, "the defendant's criminal history category . . . shall [automatically] be Category VI," the highest criminal history category. USSG §3A1.4(b).

### D. Advisory Guideline Range

With a total offense level of 43 and a criminal history category VI, the Guidelines would recommend Bell be sentenced to a term of life imprisonment. USSG ch. 5, pt. A. However, the offenses of conviction, 18 U.S.C. § 2339A(a), bear a statutory maximum imprisonment of "not more than 15 years." If the Court sentenced Bell to the statutory maximum on both counts and the Court ran the sentences consecutively, the maximum term of imprisonment is thirty years. Therefore, the guideline range is actually 360 months. See USSG §§5G1.1(a), 5G1.2(b), 5G1.2 cmt. n.3. Moreover, the Guidelines would still be 360 months even if the Court were to accept each of Bell's objections.[18]  Accordingly, the Court calculates Bell's guidelines-recommended sentence to be 360 months.

### V. 18 U.S.C. § 3553(a)

Of course, after the Supreme Court's opinion in United States v Booker, 543 U.S. 220 (2005), the Sentencing Guidelines are no longer mandatory, but advisory. The sentencing court must still consult the Guidelines and correctly calculate the range provided by the Guidelines, but also consider the other statutory factors of 18 U.S.C. § 3553(a) and not presume that the guideline range is reasonable. Nelson v. United States,

---

[18] Bell proposes starting with the base offense level of 26 found in §2M5.3. Bell does not object to application of the terrorism enhancement, which would add twelve levels, or the enhancement for use of a minor, which would add another two levels. After the three-level downward adjustments for acceptance of responsibility, Bell's total offense level would be 37. With a criminal history Category VI due to the terrorism enhancement, the sentencing chart would call for a range of 360 months to life imprisonment. Then, with the application of the statutory maximum, the guidelines-recommended sentence would still be 360 months.

555 U.S. 350, 351-52 (2009); Gall v. United States, 552 U.S. 38, 49-50 (2007). 18 U.S.C. § 3553(a) provides that "[t]he court shall impose a sentence sufficient, but not greater than necessary to comply with the purposes" of the sentencing statute. Section 3553(a) also directs the court to consider certain factors "in determining the particular sentence to be imposed."

### A.   The Nature and Circumstances of the Offenses

The Government and Bell have very different conceptions of the offenses to which Bell has admitted and pleaded guilty. In the Government's view, nothing separated Bell from becoming another Anwar al-Awlaki other than his means. Bell stresses just how far away he was from making any contact with an actual terrorist organization and conducting the kind of terrorist attack seen all too frequently in recent years.

To the extent that Bell seems to suggest that the Court should depart or vary from the guideline sentence just because he failed to bring his plan fully to fruition, Eleventh Circuit case law counsels against doing so. Bell was charged with conspiracy and attempt to provide material support to terrorists, inchoate crimes that do not require that their ultimate objectives be completed. Bell's guideline sentence has been calculated based on these inchoate offenses. United States v. Jayyousi, 657 F.3d 1085, 1118 (11th Cir. 2011) (quoting United States v. Abu Ali, 528 F.3d 210, 264 (4th Cir. 2008)); United States v. Mandhai, 375 F.3d 1243, 1249 (11th Cir. 2004).

On the other hand, there is merit in Bell's suggestion that the Court not adopt "the darkest possible interpretation of a defendant's conduct and potential and then sentence the defendant as if that interpretation is truth." United States v. Warsame, 651 F. Supp. 2d 978, 981 (D. Minn. 2009). With both these ideas in mind, the Court looks again at what Bell did accomplish, that is, "the nature and circumstances" of his crime.

Bell aligned himself with Anwar al-Awlaki, one of the most radical and dangerous extremists in recent history, consumed hundreds of hours of al-Awlaki's propaganda espousing violence, and then proceeded to help radicalize a group of young men at his local Islamic center. (Doc. 72 at 1-2; Doc. 86 at 21-22, 24, 45; <u>see</u> Doc. 38 at 15-16.) Adopting al-Awlaki's mission of jihad as his own, Bell planned and executed a mission to destroy the "idolatrous" statues of Jesus at the Chapel Hill Cemetery, bringing along with him a handgun to shoot anyone who interfered, including the police.[19] (Doc. 86 at 71-75; Gov't Exs. A-16, A-17, A-18, A-19.) He practiced making homemade explosives and, along with others in the group, trained in the use of firearms "to propagate the Jihad here in America . . . ." (Gov't Exs. A-21, A-25, A-26, A-27, A-28.) Then, Bell and the juvenile, joining in Bell's plan, traveled to the Middle East to join with Ansar al-Shari'a. (Doc. 38 at 20.) When he and the juvenile returned to the United States after being detained by the Jordanian authorities, Bell continued to support jihad and planned to build his own masjid in the woods near his father's home so he could continue to indoctrinate youths in his radical ideology. (Gov't Exs. B-2, B-3; Doc. 86 at 48-49.) Bell used lies and fraud to help accomplish his goals. He also encouraged his associates to lie about his whereabouts. (<u>See</u> Gov't Exs. B-2, B-5.)

Bell at times now characterizes his activities, like shooting guns and making explosives out of fireworks, as not unusual for teenaged boys. Standing alone, that might be so. But Bell's cemetery mission and trip overseas to join Ansar al-Shari'a take this

---

[19] Bell's decision to target statues of Jesus on the Fourth of July is meaningful, knowing the effect it would have on the citizenry. As terrorism expert Braniff explained, terrorism is designed not only to inflict physical harm, but to instill fear and strike at the heart of the country's foundational institutions. (Doc. 86 at 188; Doc. 87 at 66.)

beyond simple teenage rambunctiousness to something much more sinister. Though he never got to Yemen or made contact with Ansar al-Sharia or any other terrorist group, it was not for lack of trying or desire, a desire which continued even after his first attempt was unsuccessful and he was forced to return home. Left unchecked, it is likely that Bell would have become a full-blooded terrorist, capable of killing or injuring any "kuffar" who stood in his way. Of course, we will never know for sure because he was interdicted with the help of the leaders at the Islamic Center. But even after being returned to the United States and then being interviewed both by federal law enforcement and the Jacksonville Sheriff's Office, Bell seemed prepared to carry out jihad at home or abroad, as circumstances would dictate.

**B.**    **The History and Characteristics of the Defendant**

The Court had the opportunity to observe Bell over the course of the two-day sentencing hearing and to speak with him briefly at the end of the hearing. Bell presents as a bright and articulate young man. As a child, he tested toward the highest percentiles in aptitude. There is no doubt from viewing his many videos that he is intelligent and charismatic.

Bell's history suggests that he had a somewhat troubled adolescence, marked by an inability to adjust to his parents' divorce and the attendant changes to his own life. This is reflected in a bit of a juvenile criminal history, largely centered around the conflict between Bell and his mother's boyfriend at the time. Bell was under an injunction against contact with the boyfriend when he committed these offenses. Bell also acknowledges periodic marijuana and alcohol use during his early teenage years, which he stopped either as part of his conversion to Islam or because he came to see it as wrong.

Around the time he turned seventeen, Bell began working at a local flea market

repairing computers. (Doc. 86 at 129.) According to charges brought against him in state court but later dropped, Bell accepted but never returned several of his customer's computers. (Doc. 87 at 94-95.) It is also alleged that he and another vendor at the flea market had agreed to buy a number of computers for Bell to refurbish, but that Bell took the other vendor's money and used it to fund his trip to the Middle East. (Doc. 86 at 54-55, 142-44; Doc. 87 at 94.) Bell is also awaiting disposition on state charges that he staged a motor vehicle accident to defraud the insurance company as a further funding source for his plan for jihad.[20]  (See Doc. 86 at 145-46.)

Bell's neuropsychological expert Dr. Robyn Cohen has diagnosed him with Attention Deficit Hyperactivity Disorder, or ADHD. (Doc. 87 at 107.) She testified at the sentencing hearing that ADHD is characterized by poor impulse control and executive planning. (Id. at 107-08.) An individual with ADHD like Bell would still be capable of developing plans like those he has been convicted of executing here, but becomes fixated on the plan or idea to the exclusion of the details and without recognizing the consequences of the plan. (Id. at 112-14, 117-18, 141-43.) She recommends that any disposition in this case include a counseling component to address Bell's deficits. (Id. at 118.) While it is hard to dispute that Bell needs counseling, the Court does not find Bell's ADHD to be a mitigating factor for the reasons discussed further below.

Terrorism expert William Braniff explained that radicalization of an individual is a multi-step process of the individual identifying supposed grievances, becoming cognitively open to radicalization, and the application of an ideology to explain and address the

---

[20] The Court does not judge Bell's guilt on these offenses, but considers the underlying allegations as part of the overall picture of Bell.

perceived grievances, ultimately resulting in a mobilization towards radical ends. (Doc. 86 at 194-96.) This is apparently what happened to Bell. One of the concerns evident in Braniff's testimony is that there is currently no good evidence beyond the anecdotal that a radicalized individual can be "de-radicalized." (Doc. 87 at 49-53.) David Schiavone with the Federal Bureau of Prisons confirmed in his testimony that the BOP currently has no programs for de-radicalizing prisoners convicted of crimes of terrorism. (Doc. 86 at 96.)

In his very articulate letter to the Court, Bell says that his actions were a mistake. (Doc. 72.) When asked directly at the sentencing hearing whether he now considers himself an American, a label he had expressly rejected before, Bell responded that he is an American. (Doc. 87 at 225.) Thus, the Court returns to the question it posed initially: "Who is the real Shelton Thomas Bell?"

For the Government, the answer is the avowed follower of Anwar al-Awlaki evident in the many videos found on Bell's computer. During a fairly compelling segment of its closing argument, the Government went line-by-line through Bell's letter to the Court to identify what the Government saw as inconsistencies and lies. (Id. at 182-196.) The Government also points to the incidents where Bell has been willing to lie in the past and encouraged others to lie for him. Although he was reluctant to stress the concept too strongly, Braniff explained in his testimony "taqqiyya," or "pious dissimulation," that some extremists have adopted. (Id.) The concept translates to being permitted to lie to authority and to others if necessary to advance the radical cause. (Id.) The Government urges the Court to view Bell's present contrition as another lie to receive a lesser sentence.

Bell asks the Court to view his letter as a sincere expression of his remorse and to view his actions in committing the offenses here as immature mistakes. (Id. at 224-28.) He

apologized to all involved and says he wants to pursue an M.B.A. and study how to prevent terrorism. (Id.)

### C. The Seriousness of the Offenses, Respect for the Law, and Just Punishment

In judging the seriousness of the offenses, Bell asks the Court to distinguish between the foolish and the successful. The Government has taken Bell up on its offer and, through Braniff's testimony, sought to compare Bell with his "virtual mentor" al-Awlaki by dissecting Bell's forty-minute manifesto piece by piece. (Gov't Ex. C-42.) The comparison starts before Bell begins speaking. He is dressed in a white robe and tactical assault gear, much like how al-Awlaki was usually dressed. (Gov't Ex. A-33.) From there, Bell echoes many of the same themes al-Awlaki stressed in his videos, sometimes nearly word-for-word. (See Gov't Ex. C-42.)

Bell's actions were of a piece with his words, particularly when he began to put his plan for jihad into action in the cemetery mission and then the trip to the Middle East. Bell's offenses are serious, and his sentence must reflect that.

### D. Deterrence and Protection of the Public

According to the Government, "Bell poses a likelihood of recidivism, no meaningful chance of rehabilitation, and due to his virtual tutelage by al-Awlaki, a heightened risk of dangerousness." The Government encourages the Court to heed the words of the Eleventh Circuit, echoing the Second Circuit, that "'[T]errorists[,] [even those] with no prior criminal behavior[,] are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation.'" United States v. Jayyousi, 657 F.3d 1085, 1117 (11th Cir. 2011) (alterations in original) (quoting United States v. Meskini, 319 F.3d 88, 92 (2d Cir. 2003)). The Government contends the Court should therefore impose

a long sentence out of concern for the danger Bell and those like him pose to the public and to deter youths in the local community who have not yet started down the path towards radicalization. Bell counters that, if the Government is right that terrorists cannot be deterred or rehabilitated, then a long sentence only serves to encourage terrorists to succeed in their plans and evade capture.

As it has from the start, the Court struggles to discern the true level of future threat Bell would pose to the public were he given anything other than the thirty-year statutory maximum imprisonment. He certainly was a serious and growing threat as he sought to carry out his plan and before his apprehension by law enforcement. The testimony of Braniff suggests that there is little reason to believe such a threat could ever be extinguished short of permanent incapacitation. (See Doc. 87 at 49-53.) On the other hand, Bell's seemingly sincere expressions of remorse and Dr. Cohen's testimony provide some hope that a counseling component to Bell's incarceration could have a positive effect. (See Doc. 72; Doc. 87 at 118.)

This case is concerning and sad because it demonstrates that, in the age of the internet, a disaffected young American can be so easily indoctrinated into terrorism. That Bell so readily bought into al-Awlaki's call to hate and violence means others will as well, as confirmed by terrorism expert Braniff. Thus, the Court agrees that general deterrence of others from taking the first step along the path to radicalization is an important component of Bell's sentence. A substantial sentence is likely necessary to have any deterrent effect. But the Court is not convinced that only the statutory maximum will work, while anything less would embolden would-be terrorists.

### E.     Unwarranted Sentence Disparities

Finally, § 3553(a)(6) directs the Court to be mindful of "the need to avoid

unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Bell suggests that his juvenile co-conspirator is the best comparator for this purpose, and the Court starts there.

### 1.     The Juvenile

At first glance, the most logical comparator to Bell might appear to be his co-conspirator. Certainly, the charges and the criminal conduct involved are the most similar of any other possible comparator defendant. The co-conspirator, a juvenile at the time of the crime and the entry of judgment in his case, received a juvenile disposition, which by law only extends to his twenty-first birthday. Bell suggests that he should receive a sentence that reflects that disposition. But the Government identifies what it sees as key distinctions between Bell and the juvenile.

The Government cites authority that co-conspirators are not <u>per se</u> valid comparators for purposes of § 3553(a)(6), and suggests that Bell's case is a good example of why. Most important, the co-conspirator was a juvenile at the time of the offenses and the entry of judgment, making him subject to the Federal Juvenile Delinquency Act, 18 U.S.C. §§ 5031-5042. Bell, on the other hand, though young, was an adult when he hatched the conspiracy. The Government cites to analogous authority that a defendant not eligible for a diversionary program is not entitled to receive a sentence in line with those of his codefendants who are. <u>See</u> <u>United States v. Matthews</u>, 517 F. App'x 871, 872-73 (11th Cir. 2013) (holding defendant not eligible for the fast track program was differently situated than codefendants who were eligible and was therefore not entitled to similar sentence); <u>United States v. Spoerke</u>, 568 F.3d 1236, 1252 (11th Cir. 2009) (finding no unwarranted disparity between co-defendant eligible for pretrial diversion program and defendant who was not because they were not similarly situated); <u>also</u> <u>United States v. Docampo</u>, 573

F.3d 1091, 1101-02 (11th Cir. 2009) (holding that comparing adult defendant to juvenile co-conspirators sentenced to probation in state court was improper).

The Government also correctly recognizes that, under Eleventh Circuit precedent, a defendant eligible for a departure for cooperating with the government (as the juvenile did here) cannot be similarly situated to a codefendant who does not cooperate. See, e.g., United States v. Mozie, 752 F.3d 1271, 1289 (11th Cir. 2014) (quoting Docampo, 573 F.3d at 1101). Bell suggested at one point that the Government never offered him an opportunity to cooperate, but later conceded that he had made a strategic decision not to cooperate since he did not feel he had any helpful information. (Doc. 87 at 219-20.) In any event, the Court may not attempt a backdoor departure for cooperation for which a defendant is not eligible under the guise of accounting for a potential disparity with the sentence received by a co-conspirator who did receive a cooperation departure. See Docampo, 573 F.3d at 1101.

There are other reasons to find the juvenile an improper comparator, including that Bell led him into the conspiracy, the juvenile had no criminal record at the time of the offenses, and the juvenile did not participate in the cemetery mission. The Court declines to use the juvenile as a comparator in fashioning an appropriate sentence for Bell.

### 2. Other § 2339A and Terrorism Cases

The Government has directed the Court to published and unpublished cases involving charges of supporting terrorism. In reviewing these cases, the Court has learned that it should not just treat any case with a terrorism component as a valid comparator; instead, the Court must try to compare "apples to apples" and "not draw comparisons to cases involving defendants who were convicted of less serious offenses," went through trial, "lacked extensive criminal histories," or where the government sought, for instance,

the death penalty. Jayyousi, 657 F.3d at 1118; see United States v. Matthews, 517 F. App'x 871, 872-73 (11th Cir. 2013). Still, some of these cases provide useful guidance and are worth review.

The Court begins, though, with the general information provided directly by the Sentencing Commission on cases where the only count of conviction was § 2339A, like this case. From Fiscal Year 2009 through 2013, twelve cases nationwide fit that description. Of those twelve cases, the average sentence was 116 months, and the median sentence was 114 months. This information, though interesting, is only useful to a point. Thus, the Court has endeavored to gather as much information as it could about these cases and the others cited by the parties.[21] The Court briefly discusses several of these cases below.

### a. *Jayyousi*

The Eleventh Circuit in Jayyousi considered the appeals of three defendants convicted of conspiring to support terrorist violence overseas in violation of 18 U.S.C. § 956(a)(1), 18 U.S.C. § 371, and 18 U.S.C. § 2339A. Jayyousi, 657 F.3d at 1091. The defendants had formed a terrorist support cell in the 1990s that provided money, recruits, and equipment to radical jihadist groups worldwide. Id. at 1092-93. The district court sentenced the defendants to the maximum imprisonment permitted on the second and third counts, but had in particular reduced one defendant's sentence on the first count, varying from the Guidelines recommendation of 360 months-to-life to 208 months. Id. at 1092, 1115-16. Among other things, the two other defendants appealed the application of

---

[21] The Court has been only marginally successful, mainly because the sentencing transcripts or other source materials for these cases were not readily available.

the terrorism enhancement in USSG §3A1.4, while the government cross-appealed the district court's decision to sentence the third defendant, Padilla, below the guidelines-recommended range. Id. at 1114-16.

The Eleventh Circuit held that the district court did not err in applying the terrorism enhancement. Id. at 1114-15. But the district court did substantively err in sentencing the Padilla significantly below the Guidelines recommendation. Id. at 1117. Padilla had seventeen arrests and a murder conviction, qualifying him as a career offender under USSG § 4B1.1, but yet received a sentence only twenty months more than a codefendant with no criminal record. Id. The Eleventh Circuit also concluded that Padilla's sophistication and al-Qai'da training made him uniquely dangerous and highly likely to recidivate, which the district court had not adequately considered. Id. Then, the district court erred by favorably comparing his case to terrorism cases involving either less serious offenses or by contrast to cases where the government had sought the death penalty. Id. at 1117-18. The district court also improperly took into account that Padilla had not personally killed anyone or targeted the United States because he was only charged with conspiracy. Id. at 1118. Finally, the district court had varied too dramatically in its attempt to adjust for Padilla's harsh pretrial detention. Id. at 1118-19. The Eleventh Circuit remanded Padilla's case for re-sentencing.[22] Id. at 1119.

Padilla had a much more extensive criminal history than Bell and had actually trained with al-Qai'da, while Bell's attempt to do so was thwarted. Moreover, Padilla's

---

[22] A substantial dissent takes issue with, among other things, the majority's conclusion that the defendant's sentence was substantively unreasonable, arguing that the majority wrongly discounted the level of discretion given to the district court to fashion a sentence. Id. at 1129-1134.

activities were more prolonged and wide-ranging than Bell's. He was also convicted of different charges than Bell. Still, there is much to learn from <u>Jayyousi</u>.

b. <u>***Hassan***</u>

In <u>United States v. Hassan</u>, No. 5:09-CR-216-FL-7, 2012 WL 147952, at *1 (E.D.N.C. Jan. 18, 2012), Hassan was convicted at trial of one count of conspiracy to provide material support to terrorists in violation of 18 U.S.C. § 2339A and not guilty of one count of conspiracy to murder, kidnap, maim, and injure persons in a foreign country pursuant to 18 U.S.C. § 956(a). <u>Id.</u> at *1 Hassan had a history over multiple years of training and promoting violent jihad, including traveling overseas to do so. Unlike Bell, Hassan had actually made contact with Anwar al-Awlaki. <u>Id.</u> When approached by the FBI, he resisted requests to provide information. <u>Id.</u> at *2.

Like Bell, Hassan argued that USSG §2M5.3 was the applicable base offense level, particularly since he had been acquitted of the conspiracy to murder. <u>Id.</u> The district court disagreed. <u>Id.</u> The district court also found that the terrorism enhancement in §3A1.4 was appropriate and applied the obstruction of justice enhancement. <u>Id.</u> at *4 n.5. The court denied the defendant's request to apply a reduction for his alleged minimal participation. <u>Id.</u> at *5.

In considering 18 U.S.C. § 3553, the court determined that a guideline sentence was appropriate under the circumstances. <u>Id.</u> at *5-6. The twenty-four-year-old Hassan had a much longer criminal record than Bell does, however, including two assault convictions, kidnapping, and drug possession. <u>Id.</u> at *6-7. Hassan demonstrated a readiness to resort to force, and his destructive ideology supported sentencing the defendant to the fifteen years called for by the Guidelines. <u>Id.</u> The Fourth Circuit affirmed

his sentence on appeal. 742 F.3d 104 (4th Cir. 2014).[23]

### c. *Mandhai*

Because of the many differences in the facts and the charges, United States v. Mandhai, 375 F.3d 1243 (11th Cir. 2004) is not a useful comparator. But Mandhai is still notable for, among other things, the majority's holding that the district court was correct to find that the effect of the terrorism enhancement "prevent[ed] the penalty from fitting the crime, based on the facts of this record," such that the totality of the circumstances removed the case from the "heartland" of the Guidelines.[24] Id. at 1249. The majority held that the district court erred in departing downward because of its mistaken belief that inchoate crimes did not fall within the terrorism enhancement, but also held that the facts could nevertheless warrant departure from the full effect of the terrorism enhancement. Id. The Eleventh Circuit remanded the case to the district court for reconsideration of the grounds for its downward departure. Id. at 1251.

### d. *Thavaraja*

The two main cases that Bell cites are United States v. Thavaraja, 740 F.3d 253 (2d Cir. 2014) and United States v. Warsame, 651 F. Supp. 2d 978 (D. Minn. 2009). Neither is a perfect comparator as the defendants in both cases were charged with violating 18 U.S.C. § 2339B, not § 2339A, along with additional charges. Thavaraja was sentenced to

---

[23] The conspiracy in which Hassan was engaged included a number of other individuals, two of whom were also convicted only under § 2339A. One of these defendants was sentenced to 93 months and the other was sentenced to 84 months. However, the Court has not been able to obtain the sentencing materials for these individuals to determine the basis for the court's sentences.

[24] The initial sentencing in Mandhai was pre-Booker, so the district court treated the Guidelines as mandatory. See United States v. Mandhai, 140 F. App'x 54, 55 (11th Cir. 2005).

108 months imprisonment, substantially below the guideline range, which was the statutory maximum of 240 months. <u>Thavaraja</u>, 740 F.3d at 257. He had been much more deeply involved in a terrorist organization than Bell, acting as the principal procurement officer for the Tamil Tigers, a separatist group in Sri Lanka designated a foreign terrorist organization. <u>Id.</u> at 255-56. But Thavaraja had no prior convictions, was a Sri Lankan citizen with no real connection to the United States, and was likely to be deported upon release from prison. <u>Id.</u> at 256. Moreover, he taught and worked with other inmates while in pretrial detention to the extent that the district court was convinced he was "'a person of substance and decency.'" <u>Id.</u> at 260.

### e. *Warsame*

The facts of <u>Warsame</u> are a bit closer to the circumstances in this case. Warsame was sentenced to 92 months imprisonment, though he had actually traveled to Afghanistan before September 11, 2011, trained with al-Qai'da, and met and attended lectures by Osama bin Laden. 651 F. Supp. 2d at 979-80. He continued to keep in contact with al-Qai'da after he returned to Canada and then moved to the United States. <u>Id.</u> at 980. However, he had no other criminal history and was not eligible for an enhancement for playing a leadership role or using a minor in the offense. <u>Id.</u> at 980-81. Importantly, the government requested a variance in <u>Warsame</u>. <u>Id.</u> at 981. Also, Warsame had pleaded guilty to just one count of conspiracy to provide material support to a designated foreign terrorist organization under § 2339B, not two counts under § 2339A like Bell.[25] <u>Id.</u> at 979.

---

[25] Other cases the Court reviewed yielded sentences from 540 months to thirty-six months, depending on the facts and whether the defendant received a departure under USSG §5K.1.

## VI.  BELL'S SENTENCE

Utilizing its analysis of the § 3553 factors, the Court must now decide the correct sentence for Bell. If the Court was convinced that Bell's repentance was sincere and permanent, he would still need to be punished, but a lesser term of imprisonment would suffice. If the Court was convinced that Bell's radicalization was permanent and his remorse feigned, the full thirty-year maximum term might well be appropriate because he would present an ongoing terrorist threat. What, though, if the Court cannot be sure?

Bell has admitted that he was a terrorist, that he had accepted and fully subscribed to the extremist views of Anwar al-Awlaki, and that he had become radicalized to the point of turning these views into action both in the United States and abroad. There may be lingering doubt whether he would have indeed fought and killed had he joined Ansar al-Shari'a or another terrorist group. But there is reason to think that he would have. The cemetery mission is evidence that Bell would commit criminal acts to further jihad. His own words, spoken as he prepared a loaded firearm for the mission, were that he was ready to shoot anyone who stood in his way. In targeting statues of Jesus, Bell's actions were designed to instill fear and to strike at basic societal institutions.

Moreover, Bell understood that he would be considered a terrorist for his actions. Yet, he persisted in his radical agenda even after returning to the United States and knowing he was under surveillance by federal law enforcement.

Bell's ADHD diagnosis does not excuse or mitigate his conduct. Accepting Dr. Cohen's testimony that Bell has some level of ADHD, the link between ADHD and Bell's activities is tenuous. Even if ADHD contributed to making Bell receptive to a message like al-Awlaki's, it does not relieve him of his criminal responsibility. There may be reasons why individuals are more susceptible to being successfully recruited by persons like al-Awlaki,

whether it be family background, social alienation, school difficulties, or even the lack of any worthy ambition. But at best those reasons explain, and do not excuse, the decision to join a terrorist organization. Certainly, every person who joins such a group has some reason for doing so.

Similarly, the Court does not agree with the idea that Bell was functioning at a maturity level more like a sixteen-year-old than an adult when he committed the crimes of which he stands convicted. All of his actions—the training, the speeches, the alleged fraudulent schemes, the Middle East travel—bespeak someone able to navigate the adult world. In particular, Bell's nearly forty-minute video shows a savvy young man mature beyond his years who, while mimicking his idol al-Awlaki, was also positioning himself as a leader in the same mold. And as we have seen all too frequently and too recently, youth itself is no disqualifier for being a terrorist. Bell was mature enough, and intelligent enough, to understand the consequences of his actions and to lie, and encourage others to lie, to conceal his activities both before and after his trip to the Middle East.

Bell's past lies and full embrace of the terrorist ideology color his current expressions of remorse and make it difficult for the Court to know whether to believe his seemingly sincere renunciation of terrorism and re-acceptance of the label of "American." Bell is undoubtedly bright and capable of feigning remorse to obtain a more favorable sentence. But on the other hand, though it contains discrepancies, his letter's expressions of regret and hope of rejoining society and becoming a law-abiding citizen cannot be ignored.

At the sentencing hearing, the Court was interested to hear from Bell himself. As committed to the cause as he was in the many videos, the Court thought it might be difficult,

if not impossible, for him to personally and publicly reject his past statements and actions.[26] But he did. Had he done otherwise, the Court's decision here would have been easier. As it is, though, the Court cannot gainsay the possibility that, having now been in custody for nearly two years, Bell has permanently turned away from terrorism.

If he has, Bell would still have to pay for his crimes, but the Court's sentence could reflect that a troubled young life had begun the journey of rejoining civilized society. However, unlike other crimes, where, in a close case, the Court might give the benefit of the doubt to a seemingly remorseful defendant, terrorism-related crimes are different. Terrorism endangers the lives and property of the public at large, seeks to weaken or destroy societal institutions, and tries to spread as much fear and panic as possible. While the Court hopes that Bell's disavowal of this path is real, the need to protect the public from further crimes of this defendant remains an important consideration.

In looking at the sentences for defendants in other terrorism cases, some of whom had undertaken more serious or sustained terrorist activity, a guideline sentence of thirty years, which is also the statutory maximum of both counts of conviction run consecutively, is not necessary. Because Bell's efforts at becoming a terrorist were interrupted relatively early, his acts, though serious, were not as damaging as they could have been. Bell is very young and appears chastened by his nearly two years in pretrial detention. While it is possible he is feigning, he is at least saying the right things, renouncing his terrorist ways, and expressing a desire to become a productive, law-abiding American citizen. He can be

---

[26] Indeed, terrorism expert Braniff confirmed that committed terrorists often cannot bring themselves to even *act* remorseful, but use court appearance as venues to reaffirm their views regardless of the ill effect on their sentence. (Doc. 87 at 87.) Braniff also testified, however, that some terrorist can feign remorse for "the greater good" or to get back into the fight. (Id.)

counseled while in prison, and in the years to come, one would expect more comprehensive methods for rehabilitating would-be terrorists will be developed. The Court also has the tool of an extended period of supervised release to closely monitor Bell's activity even after he is released from prison. Though Bell's sentence will be substantial, it need not be the maximum. The Court finds that a sentence of twenty years (240 months), followed by a lifetime period of supervised release[27] will be, in the words of the law, "sufficient but not greater than necessary . . . ." 18 U.S.C. § 3553(a).

## VII.    POSTSCRIPT

Before proceeding with the formal imposition of sentence, there are some additional aspects of this case worth noting. First, lest there be any concern that Bell is being punished for his views, there is a ready answer. The difference between strident political or religious speech, protected by the First Amendment, and terrorism is that terrorists act out in violent and criminal ways. Thus, Bell stands convicted of his actions, not his beliefs.

Second, it was a group of concerned citizens that stopped Bell's plan from coming fully into fruition. The leaders of the Islamic Center in northeast Florida were dismayed by Bell's radical views and were concerned about what he might do. These leaders contacted law enforcement and set the investigation in motion.

Third, the Court was impressed with the testimony of Detective Nassim Mana with the Jacksonville Sheriff's Office, himself a Muslim. During his testimony about an encounter during which Bell insulted him and told him he served the "wrong law," the detective spoke about the importance of the U.S. Constitution and its protection of all

---

[27] Probation will be instructed to evaluate the continued need for supervised release after ten years and thereafter every five years.

religions and how Bell's views stood in stark contrast.

Fourth, even though Bell had proclaimed that he was not an American (he has since recanted) and tried to align himself with a terrorist organization that seeks to kill Americans, Bell remains an American citizen, fully protected by the same U.S. Constitution of which the detective spoke. Bell has been afforded the full panoply of rights under the Constitution afforded to those accused of a crime: due process, the right to counsel, and the right to trial by jury, among others. Bell has further been given every consideration leading up to this sentencing before a court created under Article III of the Constitution, whose judgment is circumscribed by law. Continuing to adhere to our Constitution and the rule of law is one way the United States of America contrasts itself with those who embrace terror.

The Court now proceeds with the formal imposition of sentence.

**DONE** and **ORDERED** at Jacksonville, Florida this 14th day of January, 2015.

_____
TIMOTHY J. CORRIGAN
United States District Judge

bjb
Copies:

Mac D. Heavener, III, AUSA
Lisa Call, Esquire
U.S. Probation
U.S. Pretrial Services
U.S. Marshals Service
Defendant


Attachment: Exhibit A - Factual Basis