IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA,          Jacksonville, Florida

            Plaintiff,          Case No. 3:13-cr-141-J-32JRK

 vs.                             January 14, 2015

SHELTON THOMAS BELL,             2:16 p.m.

            Defendant.          Courtroom No. 10D
_____

SENTENCING HEARING
BEFORE THE HONORABLE TIMOTHY J. CORRIGAN
UNITED STATES DISTRICT JUDGE

 GOVERNMENT COUNSEL:

            **MAC D. HEAVENER, III, ESQ.**
            United States Attorney's Office
            300 North Hogan Street, Suite 700
            Jacksonville, Florida  32202

            **MARA M. KOHN, ESQ.**
            Department of Justice
            Counterterrorism Division
            950 Pennsylvania Avenue
            Washington, D.C.  20530

 DEFENSE COUNSEL:

            **LISA CALL, ESQ.**
            Federal Public Defender's Office
            200 West Forsyth Street, Room 1240
            Jacksonville, Florida 32202

 COURT REPORTER:

            Shannon M. Bishop, RDR, CRR
            221 North Hogan, #150
            Jacksonville, Florida  32202
            (904)549-1307
            dsmabishop@yahoo.com

 (Proceedings recorded by mechanical stenography; transcript
produced by computer.)

P R O C E E D I N G S

January 14, 2015                                    2:16 p.m.

- - -

COURT SECURITY OFFICER: All rise. The United States District Court in and for the Middle District of Florida is now in session. The Honorable Timothy J. Corrigan presiding. Please be seated.

THE COURT: Good afternoon. I apologize for running late. I know Ms. Call had another court appearance. And I was spending the remaining moments while we were waiting finishing my reading of the sentencing transcript from the two-day hearing, which goes along with the other work that I have been doing over the last days.

This is the case of *United States of America versus Shelton Thomas Bell*. And the case is numbered 3:13-cr-141.

Mr. Heavener and Ms. Kohn represent the government in this case. Agent Berry is also in attendance.

Mr. Bell, who is present in the courtroom, is represented by Lisa Call, assisted by Mr. Pinkham.

The posture of the case is that we had a two-day sentencing hearing on October 23rd and 24th. And the court, following the completion of that sentencing hearing, asked if there was any legal bar to the imposition of sentence. And there was none.

The transcripts of those hearings will reflect a full

consideration of the relevant matters in evidence, including a

presentation by Mr. Bell himself.

And I am not inviting anything at all, but I -- just

for purposes of form, I do wish to reiterate with the

government -- Mr. Heavener, is there any legal bar to the

imposition of sentence in this case?

MR. HEAVENER:  No, Your Honor.

THE COURT:  Ms. Call?

MS. CALL:  No, Your Honor.

THE COURT:  All right.  One housekeeping matter

before we proceed.  The -- there had been some requests, I

guess, from the members of the media to the government to

release some of the materials which were played during the

sentencing hearing.

The problem we had with that was that there were some

juveniles involved.  Some of them were on the tapes.  Some of

them were in the other materials.  And so I directed the

government to come up with a way to redact the faces of the

juvenile individuals who are protected by law, and also to do

the other necessary to be able to release those items without

identifying the juveniles.

And so the government has done that with respect to

those matters which were actually played at the sentencing

hearing.

And so I signed an order this morning which will

1    allow those redacted -- and when I say "redacted," the only --
2    the only thing we've done is to try to hide the identity of the
3    juveniles, which is -- other than that, they're the way they
4    were presented in court.

5         And we will be doing the same thing -- I've directed
6    the same thing be done with respect to the rest of the
7    sentencing record in this case.  And so it will all be publicly
8    filed and available, except the identity of the juveniles will
9    be protected, whether it be in writing or video or audio.  So
10   that has been done and we will proceed in that way.

11        What I'm going to do this afternoon is this.
12   Typically, because of the number of sentencings that we have
13   every month in this court and the press of other business, I
14   don't have the time to prepare a written sentencing order that
15   you see in some courts around the country.

16        But every once in a while there's a case that's
17   either complicated enough or perhaps involves some precedent
18   setting or for some other reason I do take the time to write a
19   sentencing order.

20        This case seemed to me to be one that justified it.
21   And it also gives me a chance to fully consider all of the
22   intricacies of this case and to try to come to some conclusion.

23        And so what I have done is prepared a sentencing
24   order which is 40 pages long.  And I am going to be releasing
25   that as soon as I finish here today.

1    It will be publicly docketed.  And also we'll have

2  copies -- Mr. Bulthuis, my law clerk, will have copies for

3  those in the courtroom who wish to get a copy after I pronounce

4  sentence.

5    So my intention this afternoon in pronouncing

6  sentence is to essentially read from the sentencing order.  I

7  will not read every word of it.  I will skip those parts that I

8  think are not as germane but are kind of legal requirements.

9  And I will summarize in some places.

10    But for the most part I intend to adhere to the

11  order.  I certainly don't intend to go beyond the order in what

12  I'm going to be saying.  And, as I said, the actual printed

13  order will be available to you immediately after the

14  sentencing.

15    What that means is this is going to take a while, but

16  I think it's -- it's what I need to do in order to discharge my

17  responsibilities under 18, U.S.C., Section 3553(a).

18    At the end of my recitation of the order, I will

19  actually, of course, pronounce in Mr. Bell's case and proceed

20  as we traditionally do at the end of a sentencing, in terms of

21  the terms of imprisonment, the conditions of those -- of that

22  imprisonment, and then any -- any supervised release and

23  conditions.  So I'll do that at the end.

24    So this is my sentencing order in this case:

25    The global threat of terrorism, so fresh in

everyone's mind, has come to this court in the case of Shelton

Thomas Bell. At age 19 -- he's now 21 -- Bell came under the

influence of Anwar al-Awlaki, an infamous American-born

terrorist who, from his base in Yemen, not only sponsored

terror, but also recruited young persons from all over the

world to become terrorists, until he was killed in an American

drone strike in 2011. Seduced by al-Awlaki's video teachings,

Bell chose to answer his call and proceeded down the road to

becoming a terrorist, offering to fight and die for the cause.

      Bell trained to become a terrorist, lying,

defrauding, and causing property damage in the process, made

videos which emulated al-Awlaki's diatribes, and then traveled

to the Middle East intending to join al-Awlaki's organization

in Yemen. Fortunately, he was intercepted and returned to the

United States before he could kill or injure anybody or be

killed himself.

      Once back, though, he continued to espouse his

extremist beliefs both before and after he was arrested. Now

in custody for nearly two years and having pleaded guilty to

terrorism-related charges, Bell says he made a grievous,

immature mistake, and that he no longer subscribes to

al-Awlaki's hate-filled agenda.

      He expresses remorse to his family, his friends, his

fellow Muslims, and the court, stating that his goal now is to

be a productive citizen, raise a family, get an MBA, and even

study terrorism and how to combat it.

The government does not believe Bell's repentance and thinks him still a danger to the American people; thus, the government asks the court to impose the statutory maximum of 30 years in prison.  Bell says his change of heart is real and a lesser sentence will suffice.  The essential question before the court is:  "Who is the real Shelton Thomas Bell?"

No court could answer that question with absolute certainty.  Still, this court must determine, using the factors announced in 18, U.S.C., Section 3553, what sentence is, quote, sufficient but not greater than necessary to comply with the purposes of sentencing, close quote.

The court has considered hundreds of pages of briefing, the probation office's presentence investigation report, hours of video and audio exhibits, and many pages of documentary exhibits.

The court held a two-day sentencing hearing on October 23rd and 24th, 2014, hearing testimony from experts on terrorism and psychology and from other witnesses, including Bell himself.

The court has since reviewed all the materials again, as well as the transcript of the sentencing hearing.  Finally, the court has also researched court decisions in other terrorism cases, seeking the wisdom of judges who have grappled with similar issues.  The court is now ready to state its

reasoning and conclusions and to pronounce sentence.

As part of this plea agreement, Bell admitted to a lengthy factual basis, which begins this way: Beginning in approximately May 2012 and continuing through at least July 18th, 2013, Bell agreed and conspired with a juvenile and at least one other individual to train in the Jacksonville area to prepare themselves as combatants for overseas violent jihad -- for purposes of this agreement, the phrase "violent jihad" means armed conflict -- to then travel from Jacksonville, Florida to the Middle East for the ultimate purpose of providing personnel, namely Bell and the juvenile, to terrorists, including members of Ansar al-Sharia in Yemen, to receive further training in deadly weapons from Ansar al-Sharia, and then to engage in violent jihad against, and to kill, others in the country of Yemen and elsewhere. At all relevant times, Bell and the juvenile knew that Ansar al-Sharia had engaged in, and continued to engage in, terrorist activity and the killing of other persons in foreign countries, including both Yemen and Syria.

The investigation into these offenses began in June 2012 with a tip from the leaders at the Islamic Center of Northeast Florida in Jacksonville. The leaders notified the FBI that an individual attending the center had been speaking about "jihad," that the individual had gathered some young people to him with his message, and that the leaders were

concerned about his influence.  The leaders identified the individual as Shelton Thomas Bell.  Leaders at the Center had tried to intervene and discuss the issue with Bell, but he was defiant.

Bell had first begun giving voice to a desire to travel overseas to engage in violent jihad in May of 2012.  A recent convert to Islam in 2011 when he was 17 years old, Bell had thrown himself headfirst into studying the religion.

He first found a role model in the faith in a local, American-born imam.  But Bell also looked for other sources of information, including online.

His online search eventually led him to the radical preaching of Anwar al-Awlaki, one of the most important spokesmen for the terrorist group first known as al-Qaeda in the Arabian Peninsular and later rebranded as Ansar al-Sharia.

Al-Awlaki, a dual citizen of Yemen and the United States, was killed in 2011 in Yemen by an American drone strike.  Before then, he was the most significant recruiter for Ansar al-Sharia and had published many hours of propaganda online that are still effective recruitment tools for extremists, particularly among English-speakers.

Al-Awlaki preached a violent strain of jihad that espoused that Islam is under attack and that it is the duty of every Muslim to defend Islam by either conducting their own attacks wherever they live or traveling to wherever the

jihadists are fighting, like Yemen, and joining the fight.

By his own admission, Bell found al-Awlaki "captivating" and believed everything he preached. All told, Bell accumulated and consumed hundreds of hours of al-Awlaki's speeches and propaganda.

By listening to al-Awlaki, Bell came to accept al-Awlaki's mission as his own, specifically to forcibly establish a severe reading of Islamic law, or "Sharia," throughout the world.

Following al-Awlaki's posthumous call, Bell decided that his small group of young people should go to Yemen and join al-Awlaki's group, Ansar al-Sharia.

To prepare themselves mentally and physically, Bell and his group began to train with firearms that Bell supplied, to continue consuming extremist media, and to record their own videos that Bell, as the group's, quote, commander, close quote, directed another member of -- I'm sorry. I read that wrong -- that Bell, as the group's commander, directed another member of the group to post online, though the videos were never uploaded.

In the early morning hours of July 4th, 2012, Bell and another group member recorded themselves carrying out a "mission" Bell had conceived of to destroy two statues of Jesus at the Chapel Hills Cemetery in the Arlington neighborhood of Jacksonville.

One of the videos depicts Bell supplying the equipment for the mission, including black masks and gloves and black tape for their shoes, and a handgun Bell describes as having full mags, fully loaded, ready to go, in case any kuffar -- that's an unbeliever or an infidel -- wants to cause some trouble.

The other individual later explained that Bell intended to use the gun to shoot anyone who tried to stop the mission, including the police.

Other videos of the mission include Bell explaining the plan to the other individual and lecturing him about how destroying these, quote, idols, unquote, fits with his plan for jihad.

In one video made during the drive to the cemetery, Bell says that Muslim scholars in America would see their actions and say, You're a terrorist, that he and the individual would be demonized as terrorists, quote, just as they do the Taliban, just as they do the brothers in Somalia, just as they do the brothers everywhere across the globe, close quote.

The two were ultimately unable to completely destroy the statues, but did succeed in knocking their heads off with sledgehammers, causing $17,000 in damage.

Around the same time, Bell began fashioning homemade explosives that he tested and refined to achieve greater explosions.

1    On a parcel of state land next to his father's house,

2  Bell and his group video recorded themselves setting off the

3  explosions and conducting firearms training.

4    At one point during this training, the juvenile

5  commented about the smell of beer and Bell responded, It may

6  stink, but how do you think the battlefield is going to smell?

7    On July 26, 2012, Bell recorded himself wearing a

8  white robe, black tactical gear, and a black turban, and giving

9  a nearly 40-minute speech that echos many of the extremist

10  sentiments he had heard in the hundreds of hours of al-Awlaki's

11  speeches that he had consumed.

12    In his video, Bell describes himself as partaking in

13  the training of jihad, diagnoses the, quote, devilish

14  indulgences, close quote, of society, and calls on all Muslims

15  to come together under one banner, fight as a Muslim nation, as

16  one, and fight for one cause.  He makes the specific call to

17  his generation of Muslim youth:  Allah willing, within this

18  generation, by the will of Allah, we will be the ones to

19  liberate Jerusalem.  We will be the ones to liberate this

20  entire planet of this kuffar establishment.

21    And I'm leaving out some words, but trying to

22  interpret them.

23    The house, or land, of unbelievers will be no more.

24  The flags of Tawheed will rise high on every monument in the

25  kuffar society.  Buckingham Palace, the kingdoms in India, the

great skyscrapers in China, the tower of Dubai, the White House

in Washington, D.C., the prime minister's castle in Canada.

All throughout the globe.

Closing this message to the youth, he asked, What are

you doing for the sake of Allah?  What lengths are you willing

to go?  Then just over an hour after concluding this rant, Bell

recorded himself setting off various explosive devices he made,

including one he termed a, quote, frag grenade, close quote.

In September of 2012, Bell and a juvenile member of

his group began to prepare for their trip to Yemen.  Their

cover story for their families was that they were going to the

Middle East to "make Hajj," a yearly pilgrimage to Mecca in

Saudi Arabia.

So the day before they left, Bell obtained a

certificate of his conversion to Islam from the Islamic Center

to make the story seem believable.

Because the juvenile could not obtain a student visa

to travel directly to Yemen, the trip now included a stop in

Israel before the two would travel to Yemen to join Ansar

al-Sharia.  Bell ordered an expedited passport and purchased

one-way tickets to Tel Aviv for himself and the juvenile.

On September 25th, 2012, Bell and the juvenile

departed Jacksonville on their way to Tel Aviv via New York and

Poland.  Bell and the juvenile were detained and interrogated

by authorities in Tel Aviv, however, and sent back to Poland on

1  September 27th, 2012.

2          At the juvenile's suggestion, they then bought

3  one-way tickets to Amman, Jordan, where the juvenile had

4  relatives.  Bell and the juvenile stayed for a time with the

5  juvenile's aunt until she asked Bell to leave.

6          They then went to a local mosque, but Bell was

7  eventually kicked out for being vocal about wanting to wage

8  jihad.

9          After speaking with a few individuals about traveling

10  to Yemen to fight and potentially crossing the Jordanian border

11  to enter Syria to fight, the juvenile had the idea to fly to

12  Oman and then cross into Yemen.

13          But Bell and the juvenile were eventually taken into

14  custody before executing that plan and were detained by the

15  Jordanian authorities on November 12, 2012, for overstaying

16  their visas.

17          On November 21st, 2012, Bell returned to the United

18  States on a ticket he purchased with a loan from the state

19  department.  His first stop was Houston International Airport,

20  where he voluntarily sat for an interview with Agent Berry of

21  the Joint Terrorism Task Force.

22          Bell acknowledged during the interview that he and

23  the juvenile had purchased plane tickets to Oman with the

24  intention of entering Yemen.  He stated, quote, If you ask me

25  if I was going for jihad in Yemen, I say yes, close quote, and

that he and the juvenile would have fought for whatever group
was fighting against those who were persecuting Muslims.

Bell confirmed that they had sought to join Ansar
al-Sharia, but explained that several groups were affiliated
with Ansar al-Sharia, including al-Qaeda and the Taliban.  Bell
was released and subsequently returned to Jacksonville.

Upon his return, Bell made a number of intercepted
telephone calls to his associates, in which he said some --
that he had some, quote, substantial stuff, close quote,
planned for Jacksonville, and that he intended to build a
mosque of his own in the woods by his father's house so he
could continue to speak with other young people about jihad.

Bell also discussed possible ways to finance his
activities, including unauthorized gold buying and fraudulently
obtaining food stamps at a false address.

However, Bell's plans were interrupted on January
29th, 2013, when he was arrested by the Jacksonville Sheriff's
Office on state criminal charges.

Based on a brief exchange with a Muslim sheriff's
detective after a custodial interview, even after his arrest,
Bell evidently still persisted in his radicalization calling
the detective -- and I don't know how to pronounce this --
T-a-g-h-u-t -- Taghut, or disbeliever, telling the detective
that he represented the, quote, wrong law, close quote, and
pointedly telling the detective that he had gone overseas to be

a soldier.

Bell stands convicted of one count of conspiracy to provide material support to terrorists and one count of attempt to provide material support to terrorists, both in violation of 18, U.S.C., Section 2339A.

Each count carries a statutory maximum imprisonment of not more than 15 years, for a maximum imprisonment, in Bell's case, of 30 years.

There is no mandatory minimum sentence. Under either the government's or Bell's calculation of the sentencing guidelines, the recommended guideline term of imprisonment is the same. Still, the court must endeavor to find the applicable guidelines.

And then what I'm going to do here is summarize the guidelines, because it gets kind of technical. It's all in the opinion. And I'm going to try to summarize it as best I can.

First of all, there is a disagreement as to what the base guideline should be. And the court has considered the arguments. And the opinion goes through what the arguments are.

And the court ultimately concludes that upon due consideration the court agrees with the government and probation that application of section 2A1.5 tracks most closely with the language of the guidelines as the underlying offense for both the conspiracy and the attempt under 2339A -- is

18, U.S.C., Section 956.  Therefore, Bell's appropriate base

offense level is 33.

Then we get to the guideline adjustments.  The first

one is the terrorism enhancement.  And the court ultimately

concludes that the terrorism enhancement applies.  Again,

there -- it gets fairly technical in terms of the

cross-references and so forth.  And I'm not going to go into

all that.

I will -- I will pick up with why the terrorism

enhancement applies.

The many images found on Bell's computer indicate

that his goal was to play a role in the overthrow of secular

governments and their replacements with governments rooted in

Sharia, as symbolized by the removal of the flag of the secular

government, the flag of Taghut, and the raising of the black

flag of Tawheed, adopted by the jihadist movement, over every

continent.

Bell expressed that precise sentiment himself before,

during, and after his trip to Jordan on his mission to join

Ansar al-Sharia in Yemen.

And then there's a number of quotes to Mr. Bell to

that effect.

The evidence at the sentencing hearing was that the

purpose of Bell's trip to the Middle East was to join Ansar

al-Sharia, an alias for al-Qaeda in the Arabian Peninsula, a

terrorist organization designated as such by the U.S. State Department and dedicated to waging violent jihad on the secular governments of the world, starting in Yemen.

The court is satisfied that the terrorism enhancement of section 3A1.4 applies, raising Bell's offense level 12 levels, from 33 to 45.

The next enhancement is for a leadership role. The government and probation argue for a leadership role. The -- Bell opposes the leadership role.

The court does find that a two-level -- the leadership role can be four levels, three levels, or two levels. The court finds that the two-level leadership enhancement of Section 3B1.1(c) is appropriate.

A preponderance of the evidence shows that Bell played a leadership role in the plan to provide material support to terrorists.

The many video files taken from Bell's computer provide perhaps the best evidence on this issue. In video after video, Bell is shown and heard taking the dominant role in the group of young people as they mentally and physically prepare for violent jihad.

For instance, in a video showing Bell and others in the woods shooting a firearm, supplied by Bell, at a target with a roughly human outline, Bell is referred to as the commander.

Bell's role in the group is confirmed by statements from an interview with the juvenile who traveled with Bell, that the group had elected Bell as their leader.

Then in a series of videos, Bell leads another individual in an assault on the statues of Jesus at the Chapel Hills Cemetery.  Bell directs the other individual in shooting the videos and provides the black duct tape to disguise their shoes, the black mask to hide their faces, black gloves, and the handgun that has previously been referenced.

Bell explains to the other individual the plan he developed for the assault, a plan drawn out on maps found on Bell's computer, and continues to command the other individual, lecturing the individual, and even, to an extent, controlling the individual's emotional responses.

And it is Bell who provides the extended commentary in the video, setting forth the supposed religious justification for the assault.

As for Bell's role in the trip to the Middle East, a preponderance of the evidence supports application of the leadership role enhancement.  True, the juvenile had more experience traveling overseas, spoke Arabic, and had relatives in Israel and Jordan.  The juvenile also came up with the plan to go first to Israel and then Yemen, and the later plan to fly to Jordan and stay with his aunt, after he and Bell were removed from Israel.

1    But it was Bell's idea to go overseas in the first

2 place.  The juvenile joined in with Bell's plan.  Bell selected

3 the final destination, Yemen, so they could join Ansar

4 al-Sharia.  The stops in Israel and Jordan were accommodations

5 for the juvenile who could not obtain a student visa to travel

6 directly to Yemen.

7    When the juvenile got cold feet on the trip, Bell

8 convinced him to stay by showing him more videos of al-Awlaki's

9 sermons.

10    It is true that some videos taken during the trip

11 suggest Bell at times cooled somewhat on the plan to go to

12 Yemen, with him stating that he might stay in Jordan, get a

13 job, and get married.

14    But even this idea was part of his larger plan to

15 join a jihad.  And when he returned to the United States, Bell

16 still planned to continue recruiting for jihad, and to one day

17 return to the Middle East, this time flying directly to Yemen

18 to join with Ansar al-Sharia.

19    Even accepting Bell's contention that the juvenile's

20 involvement in planning the trip raised the juvenile to the

21 position of a leader of sorts, Bell may still qualify for a

22 leadership role enhancement himself.

23    Even in a two-person conspiracy, each person can be

24 an organizer or a leader with respect to certain components of

25 the plan.

1    At the very least, Bell could be described as the

2 "big picture" leader of the trip, while the juvenile handled

3 logistics, though Bell also handled some of the logistics, like

4 obtaining a passport and paying the juvenile's way to the

5 Middle East.  The court concludes that a leadership enhancement

6 of two levels is appropriate.

7    The next enhancement is using a minor to commit a

8 crime.  And the court does find that enhancement to apply, and

9 for many of the same reasons that the court has found the

10 leadership role.  And there's more detail in the opinion.

11    With respect to obstruction of justice, which has to

12 do with Mr. Bell deleting some computer files, the court finds

13 insufficient evidence of obstruction of justice to imply that

14 enhancement and, therefore, that enhancement will not be

15 applied.

16    Mr. Bell is entitled to acceptance of responsibility

17 under the sentencing guidelines.  He did plead guilty.  And he

18 agreed to a more -- he agreed to a detailed factual basis.  He

19 also cooperated with probation as it prepared the presentence

20 report.

21    The government does not oppose this two-level

22 downward adjustment, and also supports an additional one-level

23 downward adjustment under section 3E1.1(b).

24    Taking all this into account, the -- Mr. Bell's

25 offense level is 49.  And then subtract the three levels for

1 the acceptance of responsibility, it becomes 46. Because the

2 highest level of the guidelines is 43 -- the guidelines revert

3 to 43. So even though it's a 46, it becomes a 43.

4 The next step is evaluating Mr. Bell's criminal

5 history. His criminal history under the guidelines have to do

6 with violating a temporary injunction and then being on

7 probation when he committed this offense, the terrorism

8 offense.

9 Typically, that would give him a Criminal History

10 Category II. However, under the terrorism enhancement 3A1.4,

11 in addition to adding 12 levels to Mr. Bell's offense level,

12 the guidelines provide that the defendant's criminal history

13 category shall automatically be category VI, which is the

14 highest criminal history category.

15 So with a total offense level of 43 and a criminal

16 history category of VI, the guidelines would recommend that

17 Mr. Bell be sentenced to a term of life imprisonment.

18 However, the offenses of conviction, 18, U.S.C.,

19 Section 2339A, bear a statutory maximum imprisonment of not

20 more than 15 years.

21 So if the court sentenced Mr. Bell to the statutory

22 maximum on both counts and the court ran the sentences

23 consecutively, the maximum term of imprisonment is 30 years;

24 therefore, the guideline range reverts to that 30-year period,

25 or 360 months.

1    The opinion notes at footnote 18 that even if the

2 court had accepted all of Ms. Call's objections to the

3 guidelines, that the guidelines would still be 360 months.  And

4 so because that's the statutory maximum, the court calculates

5 Mr. Bell's guidelines to be 360 months, or 30 years.

6    The court did not adopt all of Ms. Call's objections.

7 And the opinion makes clear which -- which ones the court

8 adopted and which ones it didn't.  But the bottom line is that

9 the guidelines are 360 months no matter what.

10    Now, under the Supreme Court's opinion in *United*

11 *States versus Booker*, the sentencing guidelines are no longer

12 mandatory, but advisory.

13    The sentencing court must consult the guidelines and

14 correctly calculate the range provided by the guidelines, but

15 also considers the other statutory factors in 18, U.S.C.,

16 Section 3553(a), and does not presume that the guideline range

17 is reasonable.

18    3553(a) provides, quote, that the court shall impose

19 a sentence sufficient but not greater than necessary to comply

20 with the purposes of the sentencing statute.

21    The statute also directs the court to consider

22 certain factors in determining the particular sentence to be

23 imposed.

24    The court will now briefly review the other

25 sentencing factors that it needs to take into account.  First

1    is the nature and circumstance of the offenses.

2         The government and Bell have very different

3    conceptions of the offenses to which Bell has admitted and

4    pleaded guilty.

5         In the government's view, nothing separated Bell from

6    becoming another Anwar al-Awlaki other than his means.  Bell

7    stresses just how far he was making -- he was from making any

8    contact with an actual terrorist organization in conducting the

9    kind of terrorist attacks seen all too frequently in recent

10   years.

11        To the extent that Bell seems to suggest that the

12   court should depart or vary from the guideline sentence just

13   because he failed to bring his plan fully to fruition, Eleventh

14   Circuit case law counsels against doing so.

15        Bell was charged with conspiracy and attempt to

16   provide material support to terrorists in crimes that do not

17   require that their ultimate objectives be completed.  Bell's

18   guideline sentence has been calculated based on these inchoate

19   offenses.

20        On the other hand, there is merit in Bell's

21   suggestion that the court not adopt, quote, the darkest

22   possible interpretation of a defendant's conduct and potential

23   and then sentence the defendant as if that interpretation is

24   truth.

25        And that's quoting a case.

1    With both these ideas in mind, the court looks again

2    at what Bell did accomplish; that is, the nature and

3    circumstance -- circumstances of his crime.

4    Bell aligned himself with Anwar al-Awlaki, one of the

5    most radical and dangerous extremists in recent history,

6    consumed hundreds of hours of Awlaki's propaganda espousing

7    violence and then proceeded to help radicalize a group of young

8    men at his local Islamic center.

9    Adopting al-Awlaki's mission of jihad as his own,

10   Bell planned and executed a mission to destroy idolatrous, in

11   quotes, statues of Jesus at the Chapel Hills Cemetery, bringing

12   along with him a handgun to shoot anyone who interfered,

13   including the police.

14   Bell's decision to target statues of Jesus on the

15   Fourth of July is meaningful, knowing the effect it would have

16   on the citizenry.  As terrorism expert Braniff explained,

17   terrorism is designed not only to inflict physical harm, but to

18   instill fear and strike at the heart of the country's

19   foundational institutions.

20   He practiced making homemade explosives and, along

21   with others in the group, trained in the use of firearms to

22   propagate the jihad here in America.

23   Then Bell and the juvenile, joining in Bell's plan,

24   traveled to the Middle East to join with Ansar al-Sharia.  When

25   he and the juvenile returned to the United States after being

detained by Jordanian authorities, Bell continued to support

jihad and planned to build his own mosque in the woods near his

father's home so he could continue to indoctrinate youths in

his radical ideology.  Bell used lies and fraud to help

accomplish his goals.  He also encouraged his associates to lie

about his whereabouts.

Bell at times now characterizes his activities, like

shooting guns and making explosives out of fireworks, as not

unusual for teenage boys.  Standing alone, that might be so.

But Bell's cemetery mission and trip overseas to join Ansar

al-Sharia takes this beyond simple teenage rambunctiousness to

something much more sinister.

Though he never got to Yemen or made contact with

Ansar al-Sharia, or any other terrorist group, it was not for

lack of trying or desire, a desire which continued even after

his first attempt was unsuccessful and he was forced to return

home.

Left unchecked, it is likely that Bell would have

become a full-blooded terrorist, capable of killing or injuring

any, quote, kuffar who -- unquote, who stood in his way.

Of course, we will never know for sure, because he

was interdicted with the help of the leaders at the Islamic

Center.

But even after being returned to the United States

and then being interviewed by -- both by federal law

enforcement and the Jacksonville Sheriff's Office, Bell seemed
prepared to carry out jihad at home or abroad as circumstances
would dictate.

The next factor is the history and characteristics of
the defendant.

The court had the opportunity to observe Mr. Bell
over the course of the two-day sentencing hearing and to speak
with him briefly at the end of the hearing.

Bell presents as a bright and articulate young man.
As a child, he tested toward the highest percentiles in
aptitude.  There's no doubt from viewing his many videos that
he is intelligent and charismatic.

Bell's history suggests that he had a somewhat
troubled adolescence, marked by an inability to adjust to his
parents' divorce and the attendant changes to his own life.

This is reflected in a bit of juvenile criminal
history, largely centered around the conflict between Bell and
his mother's boyfriend at the time.

Bell was under an injunction against contact with the
boyfriend when he returned to commit these offenses -- I'm
sorry, was under an injunction against contact with the
boyfriend when he committed these terrorist offenses.

Bell also acknowledges periodic marijuana and alcohol
use during his early teenage years, which he stopped either as
part of his conversion to Islam or because he came to see it as

wrong.

Around the time he turned 17, Bell began working at a local flea market repairing computers. According to charges brought against him in state court, but later dropped, Bell accepted, but never returned, several of his customers computers.

It is also alleged that he and another vendor at the flea market had agreed to buy a number of computers for Bell to refurbish, but that Bell took the other vendor's money and used it to fund his trip to the Middle East.

Bell is also awaiting disposition on state charges that he staged a motor vehicle accident to defraud the insurance company as a further funding source for his plan for jihad.

And the court, in footnote 20, notes that the court does not judge Bell's guilt on these offenses, but considers the underlying allegations as part of the overall picture of him.

Bell's neuropsychological expert, Dr. Robyn Cohen, has diagnosed him with Attention Deficit Hyperactivity Disorder, or ADHD. She testified at the sentencing hearing that ADHD is characterized by poor impulse control and executive planning.

An individual with ADHD like Bell would still be capable of developing plans like those he has been convicted of

executing here, but becomes fixated on the plan or idea to the
exclusion of the details and without recognizing the
consequences of a plan.  She recommends that any disposition in
this case include a counseling component to address Bell's
deficits.

While it is hard to dispute that Bell needs
counseling, the court does not find Bell's ADHD to be a
mitigating factor for the reasons discussed further below.

Terrorism expert William Braniff explained that
radicalization of an individual is a multi-step process of the
individual identifying supposed grievances, becoming
cognitively open to radicalization, and the application of an
ideology to explain and address the perceived grievances,
ultimately resulting in a mobilization toward radical ends.
This is apparently what happened to Bell.

One of the concerns evident in Braniff's testimony is
that there is currently no good evidence beyond the anecdotal
that a radicalized individual can be, quote, de-radicalized,
close quote.

David Schiavone with the Federal Bureau of Prisons
confirmed in his testimony that the BOP currently has no
programs for de-radicalizing prisoners convicted of crimes of
terrorism.

In his very articulate letter to the court, Bell says
that his actions were a mistake.  When asked directly at the

sentencing hearing whether he now considers himself an American, a label he had expressly rejected before, Bell responded that he is an American. Thus, the court returns to the question it posed initially: "Who is the real Shelton Thomas Bell?"

For the government the answer is the avowed follower of Anwar al-Awlaki evident in the many videos found on Bell's computer.

During a fairly compelling segment of its closing argument, the government -- government went line by line through Bell's letter to the court to identify what the government saw as inconsistencies and lies.

The government also points to the incidents where Bell has been willing to lie in the past and encourage others to lie for him.

Although he's reluctant to stress the concept too strongly, Bell explained in his testimony that some extremists have adopted concepts that permit them to lie to authority and to others if necessary to advance the radical cause.

The government urges the court to view Bell's present contrition as another lie to receive a lesser sentence.

Bell asked the court to view his letter as a sincere expression of his remorse and to view his action in committing the offenses here as immature mistakes. He apologized to all involved and says he wants to pursue an MBA and study how to

prevent terrorism.

        The court next considers the seriousness of the
offense, respect for law, and just punishment.  In judging the
seriousness of the offenses, Bell asked the court to
distinguish between the foolish and the successful.

        The government has taken Bell up on its offer, and
through Braniff's testimony sought to compare Bell with his,
quote, virtual mentor, close quote, al-Awlaki by dissecting
Bell's 40-minute manifesto piece by piece.  The comparison
starts before Bell begins speaking.

        He is addressed -- he is dressed in a white robe and
tactical assault gear, much like how al-Awlaki was usually
dressed.  From there, Bell echos many of the same themes
al-Awlaki stressed in his videos, sometimes nearly word for
word.

        Bell's actions were of a piece with his words,
particularly when he began to put his plan for jihad into
action in the cemetery mission and then the trip to the Middle
East.

        Bell's offenses were serious and his sentence must
reflect that.

        According to the government -- and this is under the
category of deterrence and protection of the public --
according to the government, Bell poses a likelihood of
recidivism, no meaningful chance of rehabilitation, and due to

his virtual tutelage by al-Awlaki, a heightened risk of dangerousness.

The government encourages the court to heed the words of the Eleventh Circuit, echoing the Second Circuit, that, quote, terrorists, even those with no prior criminal behavior, are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation.

The government contends that the court should, therefore, impose a long sentence out of concern for the danger Bell and those like him pose to the public and to deter youths in the local community who have not yet started down the paths toward radicalization.

Bell counters that if the government is right that terrorists cannot be deterred or rehabilitated, then a long sentence only serves to encourage terrorists to succeed in their plans and evade capture.

As it has from the start, the court troubles to discern the true level of future threat Bell would pose to the public were he given anything other than the 30-year statutory maximum imprisonment.

He certainly was a serious and growing threat as he sought to carry out his plan and before his apprehension by law enforcement.

The testimony of Braniff suggests that there's little reason to believe that such a threat could ever be extinguished

short of permanent incapacitation.

On the other hand, Bell's seemingly sincere expression of remorse and Dr. Cohen's testimony provides some hope that a counseling component to Bell's incarceration could have a positive effect.

This case is concerning and sad because it demonstrates that, in the age of the internet, a disaffected young American can be so easily indoctrinated into terrorism. That Bell so readily bought into Awlaki's call to hate and violence means others will as well, as confirmed by terrorism expert Braniff.

Thus, a court -- the court agrees that general deterrence of others from taking the first step along the path to radicalization is an important component of Bell's sentence. A substantial sentence is likely necessary to have any deterrent effect.

But the court is not convinced that only the statutory maximum will work while anything less would embolden would-be terrorists.

The court next considers unwarranted sentencing disparities.

Finally, Section 3553(a)(6) directs the court to be mindful of the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct.

1    Bell suggests that his juvenile co-conspirator is the

2  best comparator for this purpose, and the court starts there.

3    At first glance, the most logical comparator to Bell

4  might appear to be his co-conspirator.  Certainly the charges

5  and the criminal conduct involved are the most similar of any

6  other possible comparator defendant.

7    The co-conspirator, a juvenile at the time of the

8  crime in the entry of judgment in this case, received a

9  juvenile disposition which, by law, only extends to his 21st

10  birthday.

11    Bell suggests that he should receive a sentence that

12  reflects that disposition.  But the government identifies what

13  it sees as key distinctions between Bell and the juvenile.

14    The government cites authority that co-conspirators

15  are not, per se, valid comparators for purposes of 3553(a)(6)

16  and suggests that Bell's case is a good example of why.

17    Most important, the co-conspirator was a juvenile at

18  the time of the offenses and the entry of judgment -- at the

19  time of the offenses and the entry of judgment, making him --

20  making him subject to the Federal Juvenile Delinquency Act,

21  18, U.S.C., 5031.

22    Bell, on the other hand, though young, was an adult

23  when he hatched the conspiracy.  The government cites to

24  analogous authority that a defendant not eligible for a

25  diversionary program is not entitled to receive a sentence in

line with those of his codefendants who are.

The government also correctly recognizes that under Eleventh Circuit precedent a defendant eligible for a departure for cooperating with the government, as the juvenile did here, cannot be similarly situated to a codefendant who does not cooperate.

Bell suggested at one point that the government never offered him an opportunity to cooperate, but later conceded that he had made a strategic decision not to cooperate since he did not feel he had any helpful information.

In any event, the court may not attempt a backdoor departure for cooperation for which a defendant is not eligible under the guise of accounting for a potential disparity with the sentence received by a co-conspirator who did receive a cooperation departure.

There are other reasons to find the juvenile an improper comparator, including that Bell led him into the conspiracy, the juvenile had no criminal record at the time of the offenses, and the juvenile did not participate in the cemetery mission.

The court declines to use the juvenile as a comparator in fashioning an appropriate sentence for Bell. The government has directed the court to published and unpublished cases involving charges of supporting terrorism.

In reviewing those cases, the court has learned that

it should not just treat any case with a terrorism component as a valid comparator.

Instead, the court must try to compare apples to apples and, quote, not draw comparisons to cases involving defendants who were convicted of lesser offenses, close quote, went through trial, lacked extensive criminal histories, or where the government sought, for instance, the death penalty. Still, some of these cases provide useful guidance and are worth review.

The court begins, though, with the general information provided directly by the sentencing commission on cases where the only count of conviction was section 2339A, like this case.

From fiscal year 2009 through 2013, 12 cases nationwide fit that description. Of those 12 cases the average sentence was 116 months. The median sentence was 114 months.

This information, though interesting, is only useful to a point. Thus, the court has endeavored to gather as much information as it could about these cases and the others cited by the parties.

The court then -- and I'm not going to take the time to do it. The court then does go through and discusses the *Jayyousi* case from the Eleventh Circuit, the *Hassan* case -- these are all cases that were cited either by the government or by Ms. Call -- *Mandhai*, *Thavaraja*, and *Warsame*, W-a-r-s-a-m-e.

1       And each case is discussed in how they either might

2  be different or similar to the case -- to Mr. Bell's case.  But

3  I'm not going to take the time to do all that.

4       I do conclude this section at footnote 25 by saying

5  that the other cases -- the totality of the cases reviewed by

6  the court were -- yielded sentences from 540 months to 36

7  months, depending on their facts and whether the defendant

8  received a departure under 5K1 for cooperation.

9       Utilizing its analysis of the 3553 factors, the court

10  must now decide the correct sentence for Bell.  If the court

11  was convinced that Bell's repentance was sincere and permanent,

12  he would still need to be punished, but a lesser form of

13  punishment -- lesser term of imprisonment would suffice.

14       If the court was convinced that Bell's radicalization

15  was permanent and his remorse feigned, the full 30-year maximum

16  term might well be appropriate, because he would present an

17  ongoing terrorist threat.  What, though, if the court cannot be

18  sure?

19       Bell had admitted that he was a terrorist, that he

20  accepted and fully subscribed to the extremist views of Anwar

21  al-Awlaki and that he had become radicalized to the point of

22  turning these views into action both in the United States and

23  abroad.

24       There may be lingering doubt whether he would have

25  indeed fought and killed had he joined Ansar al-Sharia or

another terrorist group, but there is reason to think he would have.

The cemetery mission is evidence that Bell would commit criminal acts to further jihad. His own words, spoken as he prepared a loaded firearm for the mission, were that he was ready to shoot anyone who stood in his way.

In targeting statues of Jesus, Bell's actions were designed to instill fear and to strike at basic societal institutions.

Moreover, Bell understood that he would be considered a terrorist for his actions, yet he persisted in his radical agenda even after returning to the United States and knowing he was under surveillance by federal law enforcement.

Bell's ADHD diagnosis does not excuse or mitigate his conduct. Accepting Dr. Cohen's testimony that Bell has some level of ADHD, the link between ADHD and Bell's activities is tenuous.

Even if ADHD contributed to making Bell receptive to a message like al-Awlaki's it does not relieve him of his criminal responsibility.

There may be reasons why individuals are more susceptible to being successfully recruited by persons like al-Awlaki, whether it be family background, social alienation, school difficulties, or even the lack of any worthy ambition.

But at best those reasons explain and do not excuse

1  the decision to join a terrorist organization.  Certainly every

2  person who joins such a group has some reason for doing so.

3          Similarly, the court does not agree with the idea

4  that Bell was functioning at a maturity level more like a

5  16-year-old than an adult when he committed the crimes of which

6  he stands convicted.

7          All of his actions, the training, the speeches, the

8  alleged fraudulent schemes, the Middle East travel, this

9  speaks -- bespeaks someone able to navigate the adult world.

10          In particular, Bell's nearly 40-minute video shows a

11  savvy young man, mature beyond his years, who, while mimicking

12  his idol al-Awlaki, was also positioning himself as a leader in

13  the same mold.

14          And as we have seen all too frequently and too

15  recently, youth itself is no disqualifier for being a

16  terrorist.

17          Bell was mature enough and intelligent enough to

18  understand the consequences of his actions and to lie and

19  encourage others to lie to conceal his activities both before

20  and after his trip to the Middle East.

21          Bell's past lies and full embrace of the terrorist

22  ideology color his current expressions of remorse and make it

23  difficult for the court to know whether to believe his

24  seemingly sincere renunciation of terrorism and re-acceptance

25  of the label of American.

1    Bell is undoubtedly bright and capable of feigning

2 remorse to obtain a more favorable sentence.  But, on the other

3 hand, though it contains discrepancies, his letter's expression

4 of regret and hope of rejoining society and becoming a

5 law-abiding citizen cannot be ignored.

6    At the sentencing hearing, the court was interested

7 to hear from Bell himself.  As committed to the cause as he was

8 in the many videos, the court thought it might be difficult, if

9 not impossible, for him to personally and publicly reject his

10 past statements and actions.

11    Indeed, terrorism expert Braniff confirmed that

12 committed terrorists often cannot bring themselves to even act

13 remorseful, but use court appearances as venues to reaffirm

14 their views, regardless of the ill effect on their sentence.

15    Braniff also testified, however, that some terrorists

16 can feign remorse for the greater good or to get back into the

17 fight.

18    In any way -- in any event, Bell did renounce his

19 terrorism activities.  Had he done otherwise, the court's

20 decision here would have been easier.

21    As it is, though, the court cannot gainsay the

22 possibility that, having now been in custody for nearly two

23 years, Bell has permanently turned away from terrorism.

24    If he has, Bell would still have to pay for his

25 crimes.  But the court's sentence could reflect that a troubled

young life had begun the journey of rejoining civilized
society.

However, unlike other crimes, where in a close case
the court might give the benefit of the doubt to a seemingly
remorseful defendant, terrorism-related crimes are different.
Terrorism endangers the lives and property of the public at
large, seeks to weaken or destroy societal institution, and
tries to spread as much fear and panic as possible.

While the court hopes that Bell's disavowal of this
path is real, the need to protect the public from further
crimes of this defendant remains an important consideration.

In looking at the sentences for defendants in other
terrorism cases, some of whom had undertaken more serious or
sustained terrorist activity, a guideline sentence of 30 years,
which is also the statutory maximum of both counts of
conviction, run consecutively, is not necessary.

Because Bell's efforts at becoming a terrorist were
interrupted relatively early, his acts, though serious, were
not as damaging as they could have been.

Bell is very young and appears chastened by his
nearly two years in pretrial detention.  While it is possible
he is feigning, he is at least saying the right things,
renouncing his terrorist ways, and expressing a desire to
become a productive, law-abiding citizen.

He can be counseled while in prison and, in the years

1   to come, one would expect more comprehensive methods for

2   rehabilitating would-be terrorists will be developed.

3         The court also has the tool of an extended period of

4   supervised release to closely monitor Bell's activity even

5   after he is released from prison.

6         Though Bell's sentence will be substantial, it need

7   not be the maximum.

8         And before I pronounce sentence, I do want to add a

9   couple of postscripts.

10         First, lest there be any concern that Bell is being

11   punished for his views, there is a ready answer.  The

12   difference between strident political or religious speech,

13   protected by the First Amendment, and terrorism is that

14   terrorists act out in violent and criminal ways; thus, Bell

15   stands convicted of his actions, not his beliefs.

16         Second, it was a group of concerned citizens that

17   stopped Bell's plan from coming fully into fruition.  The

18   leaders of the Islamic Center in Northeast Florida were

19   dismayed by Bell's radical views and were concerned about what

20   he might do.  These leaders contacted the law enforcement and

21   set the investigation in motion.

22         Third, the court was impressed with the testimony of

23   Detective Nassim Mana with the Jacksonville Sheriff's Office,

24   himself a Muslim.  During his testimony about an encounter in

25   which Bell insulted him and told him he served the, quote,

wrong law, the detective spoke about the importance of the U.S.
Constitution and its protection of all religions and how Bell's
views stood in stark contrast.

Fourth, even though Bell had proclaimed that he was
not an American, he has since recanted and tried to align
himself with a terrorist organization that seeks to kill
Americans, Bell remains an American citizen fully protected by
the same U.S. Constitution of which the detective spoke.

Bell has been afforded the full panoply of rights
under the Constitution afforded to those accused of a crime:
due process, the right to counsel, and the right to trial by
jury, among others.

Bell has further been given every consideration
leading up to this sentencing before a court created under
Article III of the Constitution, whose judgment is
circumscribed by law.  Continuing to adhere to our Constitution
and the rule of law is one way the United States of America
contrasts itself with those who embrace terror.

The court will now proceed with the formal imposition
of sentence.  And, Mr. Bell and Ms. Call, if you'll come
forward.

Mr. Bell, on March 19th of 2014, you entered a plea
of guilty to Count One of the indictment, charging you with
conspiracy to provide material support to terrorists, in
violation of 18, United States Code, Section 2339A; and Count

Two of the indictment, charging you with attempting to provide

material support to terrorism, in violation of Title 18, United

States Code, Section 2339A.

The court has previously accepted your guilty pleas

and adjudged you guilty of those crimes.  The court has now

heard from all affected parties and is fully advised, and the

court, incorporating all proceedings, including the October

23rd and 24th hearing, and today's hearing, and all matters

pertaining to it, and the court being otherwise fully advised,

and pursuant to 18, U.S.C., Section 3553(a), it is the judgment

of this court that you be committed to the custody of the

Bureau of Prisons for a term of 240 months.

This term consists of 180 months as to Count One and

60 months as to Count Two, to run consecutively, for a total

term of 240 months, or 20 years.

The court recommends to the state court that this

term of imprisonment imposed in this case run concurrently with

any term of imprisonment if you are convicted in the pending

state case, Case No. 13-CF-1125, Circuit Court of Fourth

Judicial Circuit, Duval County, Florida.

The court, as part of your term of imprisonment,

recommends that you receive vocational and educational

programming.  The court also recommends that you receive mental

health treatment or other appropriate counseling.

Ms. Call, is there -- I don't know what the

1  designation situation would be.  We heard from the Bureau of

2  Prisons person the other day.  But if you want to request a

3  location, I'll be happy to at least make that recommendation.

4       MS. CALL:  Yes, Your Honor.  Mr. Bell would like to

5  be placed as close to home as possible.  So if the court can

6  recommend Coleman or Jesup.

7       THE COURT:  I will.

8       Now, upon release from imprisonment, Mr. Bell, I'm

9  going to place you on a lifetime term of supervised release.

10 That consists of a life term as to Count One and Count Two,

11 such terms to run concurrently.

12      However, I am going to provide in the judgment that

13 after ten years of supervised release and every five years

14 thereafter probation should evaluate whether continued

15 supervision is warranted.

16      While on supervised release, you shall comply with

17 the standard conditions adopted by the court in the Middle

18 District of Florida.  In addition, you are to comply with the

19 following special conditions.

20      You shall participate in a mental health or other

21 appropriate counseling program as directed by probation and

22 follow probation's instructions regarding that matter.

23      You shall submit to searches of your person,

24 residence, place of business, any other places under your

25 control, your computer, your vehicle, all to be conducted by

1  the United States Probation Officer in a reasonable time and

2  manner.

3         Because of the restitution, you will be prohibited

4  from incurring new credit charges, opening additional lines of

5  credits and so forth, major purchases, without permission of

6  probation.

7         You are to have no contact with any of the juveniles

8  who were involved in your activities or in this case.  Of

9  course, they won't be juveniles, but those same persons.

10         You shall provide the probation officer access to any

11  requested financial information.  DNA collection is required by

12  law.  Drug testing -- I don't think there's current substance

13  abuse, but there is random drug testing, which is standard.

14         Restitution is in the amount of $17,000 to Chapel

15  Hills Memorial Garden Cemetery.  Because I have no idea what

16  your financial situation will be when you get out of prison, I

17  will start it off at $50 a month, starting 60 days from release

18  from custody.  It can be adjusted as appropriate.

19         Based upon your financial situation, I'm going to

20  waive costs and fines.  I am required by law to give you a $200

21  special assessment.

22      (Judge confers with probation officer.)

23         THE COURT:  Sir, to the extent permitted by your plea

24  agreement you have the right of appeal from the judgment and

25  sentence of this court within 14 days of the entry of judgment.

1    Failure to appeal within that 14-day period would be

2    a waiver of your right to appeal.  The government can also

3    appeal from this sentence if it decides to do so.

4    You are also advised that you're entitled to the

5    assistance of counsel in taking an appeal.  If you're unable to

6    afford a lawyer, one will be provided for you at no cost or

7    charge to you.

8    My contemplation would be the federal public

9    defender, either Ms. Call or one of her partners, would

10    continue to represent you on appeal, or they would make

11    arrangements for you to be represented by other counsel.

12    The court having pronounced sentence, the court will

13    now entertain objections from the parties to the court's

14    sentence or to the manner in which the court has pronounced

15    sentence at this time.

16    Let me hear from Mr. Heavener, first, please.

17    MR. HEAVENER:  Your Honor, solely to preserve the

18    government's appellate rights, the United States would lodge an

19    objection to the reasonableness of the sentence based upon all

20    the government's previous submissions and the testimony and the

21    presentations at the sentence hearing.

22    THE COURT:  All right, sir.

23    Ms. Call?

24    MS. CALL:  Your Honor, we would maintain the

25    previously stated legal objections, but no other objections to

1   the sentence.

2        THE COURT:  Okay.  Mr. Bell, I don't really know what

3   to say to you, other than if you really meant what you said to

4   me the other day, and if you really meant what you said in your

5   letter, there's no reason you shouldn't still mean that, and

6   there's no reason that you can't try to act that way from now

7   on.

8        Because the truth of it is -- is that you will --

9   this is a long sentence.  There's no getting around that.  It's

10   not as long as it could have been, but it's a long sentence.

11        And -- but the truth of the matter is, both while

12   you're in prison and when you get out, you've got -- still got

13   your whole life ahead of you.

14        And how you choose to live it, how you choose to

15   conduct it -- it can still be productive.  It can still be

16   law-abiding.  There are goals you can still achieve.  It will

17   be a lot harder, but you can do it.

18        And everything you said in your letter and everything

19   you said to me the other day are the right things to say.

20   You've just got to mean them.

21        And if you don't, there's nothing I can do for you.

22   But if you do, I do want to encourage you and wish you the best

23   and wish your family the best.

24        Is there anything else, Mr. Heavener?

25        MR. HEAVENER:  No, Your Honor.

1          THE COURT:  Ms. Call?

2          MS. CALL:  No, Your Honor.

3          THE COURT:  Mr. Bell, I will be required to remand

4    you into the custody of the United States Marshals, awaiting

5    designation of your institution.  And I wish you well, sir.

6          We're in recess.

7          COURT SECURITY OFFICER:  All rise.  This Honorable

8    Court is now in recess.

9      (The proceedings concluded at 3:27 p.m.)

10                         - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

### CERTIFICATE

UNITED STATES DISTRICT COURT     )
                                 )
MIDDLE DISTRICT OF FLORIDA       )


        I hereby certify that the foregoing transcript is a

true and correct computer-aided transcription of my stenotype

notes taken at the time and place indicated herein.


        DATED this 28th day of March, 2016.




                    s/Shannon M. Bishop
                    Shannon M. Bishop, RDR, CRR